# EXHIBIT A

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## DMRJ Group LLC

This Operating Agreement ("Agreement") effective as of January 1, 2011, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## Article I

### Definitions

Section 1.1  As used herein, the following terms and phrases shall have the meanings indicated:

    A.  "Act" shall mean the Delaware Limited Liability Company Act, as amended.

    B.  "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules of paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

    C.  "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

    D.  "Cash Flow" shall have the meaning provided in Section 7.1.

    E.  "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

    F.  "Company" shall mean this Limited Liability Company.

    G.  "IMA" means the Amended and Restated Investment Management Agreements by and among Platinum Management (NY) LLC, Platinum Liquid Opportunity Management (NY) LLC, and each of Daniel Small and David Levy.

    H.  "Operating Managers" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manager or Operating Managers of the Company.

I. "Members" shall mean the persons designated as such in this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

J. "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

K. The words "membership interest" shall mean a Member's interest in the Company, the rights of which shall be as set forth in this Agreement. A "majority in interest of the Members" and "two-thirds in interest of the Members" shall mean Members whose aggregate share of the current profits of the Company constitute more than one-half or two-thirds, respectively, of the aggregate shares of all the Members in the profits of the Company. A Membership Interest may be evidenced by a certificate issued by the Company. A Membership Interest may be expressed on a certificate as "Units" where a Member's Unit bears to the aggregate Membership Interests of all Members. A Member's Interest may be a certificated security or an uncertificated security within the meaning of section 8-102 of the uniform commercial code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the uniform commercial code, be deemed to be a general intangible asset.

L. "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

M. The profits interests issued under this Agreement are referred to as "profits interests" and the capitalized term "Profits Interest" is used as defined in the IMAs and includes reference to profits interests issued by affiliated limited liability companies.

## Article II

### Organization of the Company

Section 2.1   The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

Section 2.2   The Company name shall be DMRJ Group LLC. The Members shall be Members in the Company and shall continue to do business under the name until the Operating Managers shall change the name or the Company shall terminate.

Section 2.3   The principal address of the Company shall be 152 W. 57th Street, 4th Floor, New York, NY 10019-3310, or such other place or places as the Operating Managers may

determine. The Operating Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

Section 2.4   The Company shall have perpetual existence, except that the Company may terminate prior to such date as provided in this Agreement.

## Article III

## Status of Members

Section 3.1   No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

Section 3.2   No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

Section 3.3   No Member will have the right to require partition of the Property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provisions of law to the contrary.

## Article IV

## Meeting of Members

Section 4.1   An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the State of its organization) as shall be fixed by the members. At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

Section 4.2   A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of a majority in interest of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

Section 4.3   Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose discretion the meeting is being called), shall be given by the Operating Managers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting. Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time

of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

Section 4.4   The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute or the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

Section 4.5   Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy.  Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Agreement.

Section 4.6   Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy.  Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute.  Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

Section 4.7   All meetings of Members shall be presided over by the Operating Managers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

Section 4.8   For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to

receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

Section 4.9   The Company shall be entitled to treat the holder of record of any membership interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such membership interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## Article V

### Management

Section 5.1   Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members. All Operating Managers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of the business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

Section 5.2   The Operating Managers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

Section 5.3   Any Operating Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

Section 5.4   The Company shall by managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement. In addition to and not in limitation of any right and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits. Such powers shall include, without limitation, the following:

      A.    To open accounts and deposit and maintain funds in the name of the Company in banks or savings and loan associations;

      B.    To determine the appropriate accounting method or methods to be used by the Company;

      C.    To commence lawsuits and other proceedings;

      D.    To retain accountants, attorneys or other agents to act on behalf of the Company;

      E.    To execute, acknowledge and deliver any and all instruments to effectuate the foregoing, and to take all such action in connection therewith as the Operating Managers deem necessary or appropriate.

    Section 5.5    Notwithstanding the foregoing, the Operating Managers may not make any of the following management decisions without obtaining the consent of two-thirds in interest of the Members:

      A.    To acquire, sell, assign, or otherwise transfer any interest in any property;

      B.    To create any indebtedness for borrowed money whether or not secured;

      C.    To make, execute or deliver on behalf of the Company any assignment for the benefit of creditors or any guarantee, indemnity bond, or surety bond;

      D.    To obligate the Company or any Member as a surety, guarantor or accommodation party to any obligation;

      E.    To confess any judgment on behalf of the Company;

      F.    To do any act which makes it impossible to carry on the ordinary business of the Company;

      G.    To make any decision regarding any employee;

      H.    To obligate the Company in any manner for a liability in excess of $ 10,000,

    Section 5.6    Platinum Partners Value Arbitrage Fund L.P. shall serve as the Tax Matters Member as such term is defined in Code Section 6231(a)(7).

    Section 5.7    Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or intestate, then, is, or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection

130355.01006/12101449v.1

with an appeal therein, to the fullest extent permissible by the Act. Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## Article VI

## Capital and Profits Interest

Section 6.1 The Members, other than the Profits Interest Members, have contributed to the Company in exchange for their membership interests the cash and other property as set forth on the books and records of the Company. Daniel Small (the "First Profits Interest Member") and David Levy (the "Second Profits Interest Member" and collectively with Daniel Small referred to as the "Profits Interest Members") are hereby admitted as Members of the Company, and are issued membership interests in exchange for their services, which are intended to be "profits interests" within the meaning of IRS Revenue Procedure 93-27. In connection therewith, the capital account of Platinum Partners Value Arbitrage Fund L.P., shall be booked at a value reflecting the value of the Company's assets in accordance with the valuation principles set forth in Section 3(g) of each of the IMAs. Notwithstanding anything else to the contrary contained in this Agreement, (i) the Profits Interest Members shall be entitled to the distributions and allocations set forth herein with respect to their membership interests, (ii) but they shall not be entitled to attend or vote at a meeting of the Members, to vote on who shall be the Operating Managers, or to vote on any matter which is subject to a vote of the Members pursuant to the terms of this Agreement, (iii) they shall not be entitled to assign, transfer, or pledge their membership interests or any of the rights connected thereto without the consent of the Operating Managers, which may be granted or not in their sole discretion, and (iv) notwithstanding the preceding clauses (i)-(iii) no amendment to this Agreement shall be permitted without the written consent of a Profits Interest Member if such amendment would have an adverse effect on his rights to distributions and allocations hereunder. If a Profits Interest Member, in his capacity as a Portfolio Manager under his respective IMA terminates the IMA or the IMA is terminated, in either case in circumstances requiring the application of Section 3(e) of his IMA, then (v) the profits interest of the Profits Interest Member hereunder shall be forfeited with respect to the calendar year in which such Termination Date (as defined in the IMA) occurs, including with respect to a realization of profits in such year corresponding to a previous book-up of the capital account of the Profits Interest Member pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f)-(g), (vi) any amount held back pursuant to the last sentence of Section 7.2 hereof shall be forfeited, (vii) the profits interest hereunder shall be reduced as necessary to reflect the application of Section 3(e)(iv) of the IMA (as if all the Profits Interests, as defined in the IMA, were part of the Bonus payable under the IMA), with any such reduction being made so as not to duplicate any needed reduction needed hereunder with a reduction made to another Profits Interest, (viii) if an allocation has been made to the Profits Interest Member as a result of a book-up pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f)-(g) in a calendar year previous to the year of such Termination Date, such capital account and all rights to any distribution with respect thereto shall be forfeited, and (ix) if the Termination Valuation Date, as defined in the IMA, is on or after January 1st but prior to February 15th for purposes of Section 3(e)(v) of the IMA, then the profits interest of the Profits Interest Member hereunder shall be forfeited with respect to the just completed calendar year. If a Profits Interest Member, in his capacity as Portfolio Manager under his IMA terminates his IMA or his IMA is terminated, in either case in

circumstances requiring the application of Section 3(f) of his IMA, then such Profits Interest Member shall continue to be entitled to his profits interest hereunder.

Section 6.2   The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on the books and records of the Company.

Section 6.3   Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.  Any additional capital contributions may be made only with the permission of the Operating Managers and shall be set forth on the books and records of the Company.

Section 6.4   No interest shall be paid on the Capital Account of any Member.

Section 6.5   A Capital Account shall be established for each Member on the books and records of the Company in accordance with section 1.1.B.  If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## Article VII

### Distributions of Cash

Section 7.1   The Company shall make distributions to the Members at such times and in such amounts as the Operating Managers shall determine in their sole discretion, provided, however, that all cash (regardless of the source thereof, except capital contributions) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow") shall be distributed as set forth in Section 7.2.

Section 7.2.   Distributions shall be made 100% to Platinum Partners Value Arbitrage Fund L.P., provided, however, that (i) there shall be distributed to the Profits Interest Members the amounts allocated to them pursuant to Section 8.2 hereof, with the Operating Managers having the authority to make any such distribution prior to the end of a calendar year based on the expected allocations to the Profits Interest Members, and (ii) such distribution shall be made as soon as reasonably practical after the amount distributable has been determined. Notwithstanding the previous sentence, the Company shall make a distribution of Cash Flow to the Profits Interest Members as a priority distribution to those set forth in the previous sentence in an amount estimated to permit such Members to pay their federal, state, and local income taxes attributable to the taxable income allocated, or estimated to be allocated, to them by the Company for a calendar year, subject to their obligation to return such tax distributions if they turn out to be based on excessive estimates of such allocable income; and the Company shall use commercially reasonable efforts to make such distributions, to the extent of available Cash Flow, prior to the dates for estimated tax payments by such Members and April 15 of the following year.  All such tax distributions shall be applied as an offset to reduce any subsequent distributions payable to such Members pursuant to the first sentence of this Section 7.2 (but not

to offset future tax distributions unless the Operating Managers consent not to require a repayment of excess tax distributions and instead agree to allow them to be applied to tax distributions for a subsequent taxable year). If an allocation is made to a Profits Interest Member as a result of a book-up pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f)-(g), the distributions to him under this Agreement shall be made when there is a realization event corresponding to the book-up. To the extent that under the IMAs, the Holdback Amount (as defined in the IMAs) for a calendar year cannot be funded from amounts payable as the Bonus under the IMAs, distributions to a Profits Interest Member hereunder shall be deferred in an amount necessary and to the time necessary to make such deferral an equivalent arrangement to the Holdback Amount arrangements under the IMAs; provided that any such holdback hereunder shall take into account, on a pro rata basis, any similar holdbacks applied with respect to such calendar year to other Profits Interests (as defined in the IMAs), so as to avoid duplicative holdbacks in excess of the intended economic arrangement under the IMAs.

## Article VIII

### Profits and Losses

Section 8.1   The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes, with the adjustments required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv).

Section 8.2   Subject to Section 8.4 hereof, the Net Profits of the Company shall be allocated to the Members as follows:

> A.   90% to Platinum Partners Value Arbitrage Fund L.P; 6.5% to the First Profits Interest Member, or if a lesser amount his Adjusted Profits Amount; and 3.5% to the Second Profits Interest Member, or if a lesser amount, his Adjusted Profits Amount.

The "Initial Adjusted Profits Amount" shall be calculated separately for each Profits Interest Member as equal to the Bonus (as defined in the applicable IMA) for the applicable calendar year, but for this purpose such Bonus shall be hypothetically determined as if no Profits Interests (as defined in the applicable IMA) had been issued (and instead the Bonus for such year under the IMA was calculated without the inclusion of clause (III) in the definition of Bonus in Section 3(b) of the IMA).

If there is more than one realization of profits allocable to the Profits Interests (as defined in the applicable IMA) in a calendar year, their sum shall not exceed the Initial Adjusted Profits Amount. Each Profits Interest (as defined in the applicable IMA) shall be reduced by its pro rata share of the excess of the sum of the Profits Interests (prior to reduction pursuant to this sentence) over the Initial Adjusted Profits Amount. Such proration shall be done in proportion to the realizations of profits, if any, for each of the Profits Interests (as defined in the applicable IMA) for such year (calculated prior to any reduction pursuant to the previous two sentences and this sentence).

The "Adjusted Profits Amount," for purposes of Section 8.2.A hereof, shall be calculated separately for each Profits Interest Member and shall equal the lower of (i) the Initial Adjusted Profits Amount and (ii) the amount calculated as a result of reducing the Profits Interest allocable hereunder pursuant to the previous paragraph. The Operating Managers and the Profits Interest Members shall agree to make any commercially reasonable adjustments in the applicable Adjusted Profits Amount as necessary or appropriate in order to realize the intended economic arrangement embodied in the IMAs and Profits Interests. Notwithstanding anything else contained herein to the contrary, if an allocation is made to a Profits Interest Member as a result of a book-up pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f)-(g), the Company shall determine in good faith how much to allocate to the Profits Interest Member under Section 8.2.A hereof, which allocation may or may not, for example, take into account the Adjusted Profits Amount, in order to realize the intended economic arrangement embodied in the IMA and Profits Interests.

The intended calculation of the Adjusted Profits Amount is illustrated in Schedule A attached hereto.

Section 8.3   Subject to Section 8.4 hereof, the Net Losses of the Company shall be allocated to Platinum Partners Value Arbitrage Fund L.P.

Section 8.4   References herein to "Reg. Sec," are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset" and "nonrecourse deduction" are to be interpreted consistent with the definitions of such terms in Reg. Sec. 1.704-2. "Nonrecourse liability" means any liability with respect to which no Member bears the risk of loss under Code Section 752. The following special allocations shall be made in the following order:

    A.    Except as otherwise set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

    B.    Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the

net decrease in Members' nonrecourse debt minimum gain attributable to such Member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C. A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.4 were made as if this paragraph were not in the agreement.

D. Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E. Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

Section 8.5  Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## Article IX

### Admission and Withdrawal of a Member

Section 9.1  A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

Section 9.2  The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

Section 9.3 All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

Section 9.4 Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## Article X

## Termination or Dissolution of Company

Section 10.1 The Company shall be terminated prior to the date of expiration of the term as provided in Section 2.4 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

Section 10.2 The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for of all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

Section 10.3 If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a Successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

Section 10.4 Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

    A.    If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled, The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public

        accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

    B.    All distributions upon liquidation of the Company shall be distributed as follows: to each of the members, in proportion to the amounts of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and any deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No member shall be liable to repay the negative amount of his Capital Account.

    Section 10.5    Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Manager shall execute and cause to be filed Articles of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## Article XI

## Books and Reports

    Section 11.1    The Operating Managers shall cause the Company to maintain the following records:

    A.    Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principals applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all the Members unless the determination is inconsistent with any express provision of this Agreement.

    B.    A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and

        share in profits and losses of each Member; a copy of the Articles of Organization of the Limited Liability Company and any amendments thereto; a copy of the Limited Liability Company Operating Agreement and any amendments thereto; a copy of the Limited Liability Company's Federal, state and local income tax returns for the three most recent fiscal years.

C.     Any Member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

Section 11.2  No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

Section 11.3  The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following; (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## Article XII

### Tax Elections

Section 12.1  In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## Article XIII

### Miscellaneous

Section 13.1  Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

  A. If to the Company, to it in care of the Operating Managers at the address of the Company.

  B. If to the Operating Managers, to them at the address of the Company.

  C. If to any Member, to him at his address set forth on the books and records of the Company.

 Section 13.2 This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement,

 Section 13.3 This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

 Section 13.4 This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

 Section 13.5 Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

 Section 13.6 Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed in the State of Delaware.

 Section 13.7 The captions, headings and table of contents in this Agreement are solely for convenience of references and shall not affect its interpretation.

 Section 13.8 This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document,

 Section 13.9 Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

**IN WITNESS WHEREOF**, the Members have executed this Agreement as the day first above set forth.

<u>Platinum Partners Value Arbitrage Fund L.P.</u>

By: Platinum Management (NY) LLC,

By: _____
Name: _____Mark Nodlicht_____
Title: _____Chairman_____       June 14, 2011

_____       June 14, 2011
Daniel Small, individually

_____       June 14, 2011
David Levy, individually

## SCHEDULE A

Example 1. As an illustration of the intended calculation of the Adjusted Profits Amount of the First Profits Interest Member, assume the following for a given calendar year. All defined terms not defined herein have the meanings assigned to them in the IMA of the First Profits Interest Member. Net Profits (for purposes of determining the Bonus under the IMA) are $20,000,000, net of any applicable Loss Carryforward. The Base Salary is $180,000. The Net Profits consist of (i) $10,000,000 in realized and unrealized Net Profits attributable to the Assets in the Account other than the Assets designated as Realized Only, (ii) $2,000,000 in realized profits by the Company, and (iii) $8,000,000 in realized profits by another entity in which the First Profits Interest Member owns a Profits Interest.

The Profits Interest allocable to the First Profits Interest Member hereunder is the lesser of (i) $130,000 ($2mm x 6.5%) and (ii) the Adjusted Profits Amount.

The "Initial Adjusted Profits Amount" shall be calculated as equal to the Bonus for the applicable calendar year, but for this purpose such Bonus shall be hypothetically determined as if no Profits Interests had been issued (and instead the Bonus for such year under the IMA was calculated without the inclusion of clause (III) in the definition of Bonus in Section 3(b) of the IMA). The Initial Adjusted Profits Amount is $1,032, 250. [($15.5mm x 6.5%) + ($4.5mm x 4.55%) - $180,000]. The Adjusted Profits Amount is the same as the Initial Adjusted Profits Amounts (see next paragraph).

So the Profits Interest under this Agreement is $130,000. The other entity's Profits Interest is $520,000. The Bonus payable under the IMA, after reduction for the Profits Interests allocations is $382,250. The sum of the Profits Interests does not exceed the Initial Adjusted Profits Amount, so no reduction of the Profits Interests applies.

Example 2. Same as Example 1, except the Net Profits of $20,000,000 consist of (i) $10,000,000 in realized and unrealized net losses attributable to the Assets in the Account other than the Assets designated as Realized Only, (ii) $2,000,000 in realized profits by the Company, and (iii) $28,000,000 in realized profits by the other entity.

The profits interest allocable to the First Profits Interest Member is the lesser of (i) $130,000 ($2mm x 6.5%) and (ii) the Adjusted Profits Amount.

The Initial Adjusted Profits Amount is initially calculated as $1,032, 250, as above. However, in this case, the sum of the initially calculated Profits Interests would exceed the Initial Adjusted Profits Amount, since $130,000 ($2mm x 6.5%) plus $1,820,000 ($28mm x 6.5%) exceeds $1,032,250. Therefore, each Profits Interest is reduced pro rata. As reduced, the Profits Interest hereunder is $68,851 and the other entity's Interests is $963,399 = total $1,032,250.