# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DMRJ GROUP LLC,

                    Plaintiff,

v.

B ASSET MANAGER, LP, and BAM
ADMINISTRATIVE SERVICES, LLC,

                    Defendants.

Index No. 655181/2017

Justice Charles E. Ramos
IA Part 53

### DECLARATION OF CHRISTOPHER BARNETT KENNEDY IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

I, CHRISTOPHER BARNETT KENNEDY, a citizen of Ireland and resident of the Cayman Islands, hereby affirm pursuant to CPLR 2106(b) the truth of the following statements:

1. My colleague Martin Trott and I are the duly appointed joint official liquidators ("**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**"). PPVA is the sole operating member of plaintiff DMRJ Group LLC ("**DMRJ**") and, in connection with my appointment as Liquidator, I also have been appointed as an operating manager of DMRJ.

2. I am a qualified insolvency practitioner and a director of RHSW (Cayman) Limited ("**RHSW**"). My colleague and fellow Liquidator, Mr. Trott, also is a qualified insolvency practitioner at RHSW. We both meet the statutorily proscribed requirements under the Cayman Islands Insolvency Practitioners' Regulations (2008 Revision) to act as Liquidators.

3. I respectfully submit this declaration (the "**Declaration**") in opposition to the Motion to Dismiss filed in this action by defendants B Asset Manager, LP and BAM Administrative Services, LLC (together "**Defendants**" or "**BAM**").

4. I am duly authorized to make this Declaration. I am fully familiar with the facts of this matter as a consequence of my day to day conduct in connection with the Cayman Proceeding (defined below) and position as a Liquidator of PPVA and an operating manager of DMRJ over the past eighteen months. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of the operations and financial condition of PPVA and DMRJ, my review of relevant documents and from my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

5. This case involves the validity and enforceability against DMRJ of a three paragraph January 13, 2016 putative side letter allegedly executed by Mark Nordlicht in his individual capacity and purporting to apply and remit certain future sale proceeds due to DMRJ from the sale of Implant Sciences, LLC to Defendants ("**Alleged Nordlicht Side Letter**"). A copy of the Alleged Nordlicht Side Letter is annexed hereto as **Exhibit 1**.

**PPVA, the Cayman Proceeding and the Chapter 15**

6. PPVA is an exempted limited partnership registered under the Exempted Limited Partnership Law, 2014 of the Cayman Islands.

7. On August 25, 2016, the Grand Court of the Cayman Islands (the "**Grand Court**") (cause no. FSD 131 of 2016 (AJJ)) entered an order directing the provisional liquidation of the Master Fund and appointing Matthew Wright and me as its Joint Provisional Liquidators. On October 27 and December 16, 2016, the Grand Court entered orders directing that PPVA's provisional liquidation be converted to an official liquidation (the "**Cayman Proceeding**"), and appointing Matthew Wright and me as its Joint Official Liquidators on first an interim and then a final basis. Thereafter, on September 29, 2017, the Grand Court issued an Order directing that

Matthew Wright be relieved of all responsibilities as a Liquidator of PPVA and substituting Martin Trott as Liquidator in his place.

8. On October 18, 2016, the Liquidators filed a petition and my accompanying Declaration (respectively, the **"Chapter 15 Petition"** and **"Kennedy Chapter 15 Declaration"**) seeking recognition of the Cayman Proceeding as a foreign main proceeding and the Liquidators as foreign representatives and certain other relief under chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 16-12925 (the **"Chapter 15 Court"**). On November 23, 2016, the Chapter 15 Court entered an Order directing, *inter alia*, that the Master Fund's Cayman Proceeding be recognized as a foreign main proceeding and the Liquidators be recognized as the Master Fund's duly appointed foreign representatives (the **"Chapter 15 Recognition Order"**).[1]

**DMRJ**

9. DMRJ is a limited liability company organized under the laws of Delaware and an accredited institutional investor. PPVA holds all or substantially all of the membership interests in DMRJ and is its sole operating manager.

10. DMRJ has no employees. After our appointment, the Liquidators were appointed as the operating managers of DMRJ on behalf of PPVA, replacing all prior managers. DMRJ is not the subject of any pending insolvency proceeding.

11. Between December 2008 and 2016, DMRJ was both a secured lender to and at various times an equity holder of Implant Sciences Corporation and its affiliates (collectively **"Implant Sciences"**). During the relevant period, Implant Sciences was a public company engaged in the business of developing products for the explosives trace detection market. Its

---

[1] A copy of the Chapter 15 Recognition Order is annexed as Exhibit 3 to the Complaint in this action.

primary business was designing, manufacturing, and selling systems and sensors to detect trace amounts of explosives and narcotics for use in various security, safety, and defense industries.

12. Before the Cayman Proceeding was commenced and the Liquidators were appointed, PPVA, DMRJ and PPVA's other subsidiaries were managed by Platinum Management (NY), LLC ("**Platinum Manager**"), and persons employed by Platinum Manager. Those persons included Mark Nordlicht ("**Nordlicht**"), who held the title of chief investment officer of PPVA and was one of the founders of the various Platinum related funds. Platinum Manager managed the various investments of PPVA, as well as the investments of other Platinum funds and the funds' subsidiaries, including DMRJ.

### DMRJ Operating Agreement Requirements and Limitations on Managers

13. In my capacity as Liquidator of PPVA and manager of DMRJ, I have reviewed the DMRJ Amended and Restated Operating Agreement, dated January 1, 2011 (the "**DMRJ Operating Agreement**"), which governs the management of DMRJ and which was in effect at the time the Alleged Nordlicht Side Letter purportedly was executed in January 2016. A copy of the DMRJ Operating Agreement is annexed hereto as **Exhibit 2**.

14. Among other things, the DMRJ Operating Agreement provides that "Management of [DMRJ] shall be vested in all of the Members who shall also serve as Operating Managers . . . [DMRJ] shall be managed by the Operating Managers and the conduct of [DMRJ's] business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement." See DMRJ Operating Agreement at § 5.4. To that end, the DMRJ Operating Agreement authorizes the Operating Managers:

(A) To open accounts and deposit and maintain funds in the name of [DMRJ] in banks or savings and loan associations,

(B) To determine the appropriate accounting method or methods to be used by [DMRJ];

(C) To commence lawsuits and other proceedings;

(D) To retain accountants, attorneys or other agents to act on behalf of DMRJ;

(E) To execute, acknowledge and deliver any and all instruments to effectuate the foregoing and to take all actions in connection therewith as the Operating Managers deem necessary and appropriate.

DMRJ Operating Agreement at § 5.4.

15. The Operating Managers' authority is not unlimited. The DMRJ Operating Agreement specifically limits the Operating Managers' authority to make the following management decisions without obtaining the consent of two-thirds in interest of the Members:

(A) To acquire, sell, assign or otherwise transfer any interest in any property;

(B) *To create any indebtedness for borrowed money whether or not secured;*

(C) *To make, execute or deliver on behalf of [DMRJ] any assignment for the benefit of creditors or any guarantee, indemnity bond or surety bond;*

(D) *To obligate [DMRJ] or any Member as a surety, guarantor or accommodation party to any obligation;*

(E) To confess any judgment on behalf of [DMRJ];

(F) To do any act which makes it impossible to carry on the ordinary business of [DMRJ];

(G) To make any decision regarding any employee; and

(H) *To obligate [DMRJ] in any manner for a liability in excess of $10,000.*

DMRJ Operating Agreement at § 5.5 (emphasis supplied).[2]

16. As such, it is clear that a resolution by two thirds of the members would have been required to authorize DMRJ to take any of the actions listed in paragraph 15 above, and that any such action taken without such a resolution, which never occurred, was unauthorized.

---

[2] Moreover, no amendment to the DMRJ Operating Agreement was permitted without the written consent of certain "Profits Interest Members if such amendment would have an adverse interest on the Profits Interests' Member's rights to distributions and allocations thereunder. *Id.* at § 6.1. Clearly, amendments that would grant to an individual officer or manager the authority to bind DMRJ as a guarantor or accommodation party or to issue debt in excess of $10,000 without the written consent of the members would have had an adverse interest on all members' rights to distributions and allocations, and thus are prohibited under the DMRJ Operating Agreement.

5

17. The Affidavit of Christian B. Thomas ("**Thomas Affidavit**") submitted in support of Defendants' Motion to Dismiss attaches as Exhibit 8 an e-mail from Joshua Kramer-Eisenbud forwarding a copy of a Written Consent of the Manager of DMRJ Group LLC, dated December 31, 2014. I understand that Mr. Kramer-Eisenbud was then an employee of Platinum Manager. The cover e-mail is dated May 22, 2015, and was sent to several persons associated with Defendants, including Naftali Manela, Samuel Adler and Christian Thomas. The body of this May 22, 2015 e-mail states "attached are corporate resolutions for signature authority, DMRJ operating agreement, certificate of formation. Also PPVA LPA and cert of registration" and shows that copies of numerous documents, including the DMRJ Operating Agreement discussed above, were attached to this May 22, 2015 e-mail. *See* Exhibit 8 to Thomas Affidavit. A copy of this May 22, 2015 e-mail is annexed hereto as **Exhibit 3**.

18. Based on this May 22, 2015 e-mail, Defendants were clearly aware that the DMRJ Operating Manager had <u>no authority</u> to "create any indebtedness for borrowed money whether or not secured," "make, execute or deliver on behalf of [DMRJ] any . . .guarantee, indemnity bond or surety bond," "obligate [DMRJ] or any Member as a surety, guarantor or accommodation party to any obligation" or "to obligate [DMRJ] in any manner for a liability in excess of $10,000" absent a resolution by two thirds of the members of DMRJ. *See* DMRJ Operating Agreement at §5.5. Thus, any action taken by an Operating Manager in the absence of such a resolution is null and void – which Defendants knew since they had received a copy of DMRJ's Operating Agreement by the May 22, 2015 e-mail.

19. The members of DMRJ did not pass a resolution authorizing Nordlicht or any other party to execute the Alleged Nordlicht Side Letter that is the subject of this action. The members of DMRJ also did not authorize Nordlicht or any other party to execute any documents

or other agreements by which DMRJ would guarantee any obligation owed by Golden Gate Oil to Defendants or any other party.

20. Defendants included with their Exhibit 8 a copy of a December 31, 2014 Written Consent of the Manager of DMRJ Group LLC (the "**December 31, 2014 Consent**"). Defendants rely on this document to assert that Nordlicht was authorized to execute the Alleged Nordlicht Side Letter on behalf of DMRJ. The December 31, 2014 Consent grants Nordlicht no such authority. A copy of the December 31, 2014 Consent is annexed hereto as **Exhibit 4**.

21. The December 31, 2014 Consent identifies the names and titles of various DMRJ officers who are "Authorized Signatories" for DMRJ and provides a specimen of each of their respective signatures and identifies Uri Landesman as the Manager of DMRJ. The persons identified as "Authorized Signatories" in the December 31, 2014 Consent are not granted unlimited authority to execute documents on behalf of DMRJ. To the contrary, the persons identified in the December 31, 2014 Consent merely are empowered to execute documents in connection with transactions that are within the authority of the Operating Manager as provided in § 5.4 of the DMRJ Operating Agreement, such as: "(i) opening, maintaining and closing of bank, brokerage, margin or other types of operating accounts, (ii) entering into, maintaining or terminating derivative contracts, such as ISDA master agreements, in each case on behalf of DMRJ, whether acting for its own account or as investment manager for the investment vehicles and/or accounts it manages (collectively the "Accounts"); and (iii) executing on behalf of DMRJ all agreements, certificates and other documentation; *provided that such Authorized Signatory is carrying out the policy decisions of the manager.*" (Emphasis supplied). The December 31, 2014 Consent does not grant (nor purport to grant) to Nordlicht or any other Authorized Signatory the power to bind DMRJ to agreements that are outside the scope of the Operating Manager's decisions or authority, as set forth in Section 5.5 of the DMRJ Operating Agreement

7

(**Exhibit 2** hereto). In short, the December 31, 2014 Consent cannot override, abrogate or otherwise affect the specific limitations on the Operating Manager's authority contained in Section 5.5 of the DMRJ Operating Agreement.[3]

**Defendants' Illusory "Consideration" Contention**

22. My staff, my attorneys and I have reviewed Defendants' memorandum of law in support of their motion to dismiss, as well as all documents in the possession, custody or control of the Liquidators concerning Implant Sciences. I understand that Defendants' memorandum of law argues that the Alleged Nordlicht Side Letter was signed by Mark Nordlicht as purported consideration for Defendants' agreement not to declare a default with respect to the note that Implant Sciences had issued to Defendants the prior year. This assertion is incredible on its face. Notably, this assertion does not appear in the Thomas Affidavit, the only affidavit submitted in support of Defendants' motion.

23. First, the bargain that Defendants assert is belied by the Alleged Nordlicht Side Letter itself, as Defendants' purported agreement to forbear defaulting Implant is nowhere stated in that document.

24. In fact, the Alleged Nordlicht Side Letter does not obligate Defendants to do, or not do, to give, or not give, anything, as consideration for allegedly obligating DMRJ to guaranty payment of the Golden Gate Oil debt. By contrast, under the terms of the parties' Intercreditor Agreement, in the event of a default by Implant Sciences, Defendants could foreclose on the common collateral securing Implant Sciences' obligations to Defendants and to DMRJ and DMRJ could not do anything to stop Defendants' actions other than paying the debt in full.

25. Second, there was no basis for Defendants to declare a default in January 2016 with respect to the note issued to them by Implant Sciences. The Implant Sciences' public

---

[3] Moreover, Defendants have made no showing that the execution of the Alleged Nordlicht Side Letter was "carrying out the policy decisions of the manager" as set forth in the DMRJ Operating Agreement.

8

filings that are attached as exhibits to the Thomas Affidavit make it clear that the note at issue was not due to mature until March 31, 2016. Moreover, contrary to Defendants' false statements, Implant Sciences had in excess of $3 million of availability under its revolving credit line <u>as well as other sources of credit and funding</u>. *See* Exhibit 21 to Thomas Affidavit at p. 5 (describing availability under DMRJ credit line, $2 million RCA receivables factoring agreement). As such, Implant Sciences had available liquidity with which to pay any interest that might have been due at that time.

26. Certainly, Implant Sciences' public filings make it clear that it was necessary for the company to extend the maturity of its obligations to Defendants as well as to DMRJ and its affiliate beyond March 31, 2016. Implant Sciences routinely included similar warnings in its public statements throughout the years of its business relationship with DMRJ and defendants. *See, e.g.*, Annual Report (Form 10-K), at 30 (Oct. 14, 2016) ("Despite our current sales, expense and cash flow projections and $507,000 in cash available from our line of credit with DMRJ ... to fund our operations and continue the development, commercialization and marketing of our products will require that we extend our credit facilities with DMRJ, BAM and Montsant."); Annual Report (Form 10-K), at 10 (Sept. 28, 2012) ("[A]s of September 25, 2012, our obligation to DMRJ for accrued interest under [the Notes and line of credit] approximated $3,146,000. If we are unable to repay these amounts, refinance our obligations, or negotiate extensions of these obligations, DMRJ may seize our assets and we may be forced to curtail or discontinue operations entirely."). I am aware that such extensions were regularly granted by the lenders during this period. *See, e.g.*, Annual Report (Form 10-K), at F-30-31 (Sept. 28, 2015) (confirming extension of maturity date on DMRJ and BAM debt from March 31, 2015 to March 31, 2016); Annual Report (Form 10-K), at F-22-23 (Sept. 30, 2013) (referencing four different extensions between 2011 and 2013); Current Report (Form 8-K), at 2 (Jan. 10, 2010) (extending

9

the maturity date from December 10, 2009 to June 10, 2010). Indeed, the March 31, 2016 maturity date for the defendants' note and the DMRJ notes was in fact extended, first to June 30, 2016 and later to October 31, 2016. *See, e.g.,* Current Report (Form 8-K), at 2-3 (Apr. 8, 2016) (extending maturity date from March 31, 2016 to June 30, 2016); Current Report (Form 8-K), at 4-5 (July 18, 2016) (extending from June 30, 2016 to October 31, 2016). A copy of Implant Sciences' public filings cited in this paragraph are collectively annexed hereto as **Exhibit 5**.

27. Moreover, it would not have served Defendants' interest to call a default in January 2016 or at any point during the ensuing months on the Implant Sciences debt. I am aware that, beginning in or about late summer or early fall 2015, Implant Sciences had engaged an investment banker for the purpose of marketing the company for a potential sale of its business to a third party buyer. The lenders, including Defendants, PPVA and DMRJ, were aware of this sale process and the expected timeline for a sale of the company. In January 2016, when the Alleged Nordlicht Side Letter was purportedly signed, Implant Sciences was in the process of accepting bids from third party buyers. Given that a default likely would have significantly depressed Implant Sciences' market value or possibly even caused potential bidders not to make an offer, I submit that there is no basis for Defendants now to allege that they would have declared a default, even were there a basis for one.

28. Third, Defendants' assertion that they agreed to forbear from defaulting Implant Sciences (which contention is made only in Defendants' memorandum of law) has no documentary support and Defendants have submitted no affidavit to support this assertion.

**The Master Guaranty Superseded the Alleged Nordlicht Side Letter**

29. From about September through November 2016, my staff and I engaged in serious substantive discussions with various potential buyers in connection with the possible sale of one or more of the Implant Sciences notes. It was as a result of and during these sale efforts that I first became aware of Defendants' purported claims under the Alleged Nordlicht Side Letter. In particular, Defendants asserted that as a result of the Alleged Nordlicht Side Letter, they had the right to approve (or block) any sale of the Implant Sciences notes. While not giving any credence to these claims or to any assertion that the Alleged Nordlicht Side Letter was valid, the Platinum Management employees, including Nordlicht, who had been directly involved in negotiating the Master Guaranty Agreement, dated March 21, 2016 (the "**Master Guaranty**"), and in the relationship with Defendants, consistently told me that the Master Guaranty superseded the Alleged Nordlicht Side Letter. A copy of the Master Guaranty is annexed hereto as **Exhibit 6**.

I affirm this 19th day of December, 2017, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: December 19, 2017

_____
CHRISTOPHER BARNETT KENNEDY

#54736255_v1