# **Exhibit 2**

Andrew M. Calamari
Sanjay Wadhwa
Adam Grace
Kevin P. McGrath
Neal Jacobson
Danielle Sallah
Jess Velona
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0180 (Velona)

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Civil Case No.** |
| **Plaintiff,** | |
| **v.** | **Complaint** |
| **PLATINUM MANAGEMENT (NY) LLC; PLATINUM CREDIT MANAGEMENT, L.P.; MARK NORDLICHT; DAVID LEVY; DANIEL SMALL; URI LANDESMAN; JOSEPH MANN; JOSEPH SANFILIPPO; and JEFFREY SHULSE;** | **Jury Trial Demanded** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Platinum Management (NY) LLC ("Platinum Management"), Platinum Credit Management, L.P. ("Platinum Credit"), Mark Nordlicht ("Nordlicht"), David Levy ("Levy"), Daniel Small ("Small"), Uri Landesman ("Landesman"), Joseph Mann ("Mann"),

Joseph SanFilippo ("SanFilippo") (collectively the "Platinum Defendants"), and Jeffrey Shulse ("Shulse") (all collectively "Defendants"), alleges as follows:

## SUMMARY

1.      This case involves a multi-pronged fraudulent scheme by Platinum Management and Platinum Credit, the managers of hedge funds Platinum Partners Value Arbitrage Fund L.P.(together with its feeder funds, "PPVA") and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, led by Nordlicht, the co-Chief Investment Officer ("CIO") of PPVA and PPCO.

2.      To existing and prospective investors, Platinum Management projected stability and confidence, reporting steady, positive returns every year that averaged 17% annually from 2003-15.  It also guaranteed its investors liquidity, as they were permitted to redeem on 60 or 90 days' notice (depending on when they invested) and receive payment of 90% of their redemption request within 30 days thereafter.  Marketing materials likewise stressed the fund's ready capacity to liquidate positions.

3.      Behind the scenes, however, PPVA faced a growing liquidity crisis, which Platinum Management, Nordlicht, Landesman, Mann and SanFilippo in various ways concealed from existing and prospective investors for years.  In fact, PPVA's growing concentration in illiquid positions made it ever-more difficult for Platinum Management to pay investor redemptions on time each quarter.  Internal documents discussing redemptions are replete with references such as "Hail Mary time," and of hoping that new subscriptions would prove sufficient to pay current redemptions.  As early as November 2012, Nordlicht and Landesman complained that redemptions were "daunting " and "relentless," and in June 2014 Nordlicht wrote Landesman that "It can't go on like this or practically we will need to wind down. . . . this

is code red . . . We can't pay out 25 million in reds [redemptions] per quarter and have 5 come in." Nonetheless, existing and prospective investors were kept in the dark for years about PPVA's liquidity crisis; to the contrary, Platinum Management continued to market the fund's flexible redemption terms even as it struggled to pay redemptions.

4. Platinum Management also deceived investors by vastly overvaluing its interest in a small oil production company, Golden Gate Oil LLC ("Golden Gate"). This position, valued at times by Platinum Management at around $170 million, purported to represent more than 19% of PPVA's total assets at the end of 2013. In fact, it was worth a fraction of that. Golden Gate consumed more than $20 million in PPVA loans and yet barely produced any oil, suffered large operating losses and never made a single interest payment on PPVA's loans. Tellingly, when Platinum Management engaged in transactions involving Golden Gate, including buying or selling options to buy interests in the company, they were at values much lower than what it carried on its books. Indeed, it eventually purchased the remaining 52% of Golden Gate for a mere $3.2 million, and yet it was still touting an enterprise valuation of at least $170 million. Platinum Management's inflation of Golden Gate's valuation by itself led to an overstatement of PPVA's AUM by as much as 13% at the end of 2014.

5. Platinum Management also orchestrated a fraudulent scheme in connection with its other major oil investment, Black Elk Energy Offshore Operations LLC ("Black Elk"). In part to cope with the fund's deepening liquidity crisis, Nordlicht, two of his colleagues, Levy and Small, and Black Elk CFO Shulse, schemed to divert almost $100 million – proceeds of a forthcoming asset sale – out of Black Elk to benefit preferred shares held mostly by PPVA and its affiliates. The problem was that Black Elk noteholders, some of whom were independent of Platinum Management, had priority over preferred shares, and Platinum Management and its

3

affiliates, which dominated Black Elk's management, could not participate in any vote among noteholders to change this priority. Thus, Nordlicht and others created a deceptive consent solicitation process and rigged the vote. They secretly transferred a large block of notes from PPVA and its affiliates to various entities advised by two other entities, B Asset Manager and B Asset Manager II (together, "BAM"), for whom Levy served as CIO. They drafted a solicitation document that falsely stated that PPVA and its affiliates only held $18 million in notes, when in fact they controlled almost $100 million. BAM affiliates then joined PPVA and its affiliated funds in casting its controlling block of notes for the consent solicitation. Once the votes were counted, and Platinum Management's fraudulent scheme prevailed, Nordlicht, Levy and Small directed Shulse to wire almost $100 million out of Black Elk for the benefit of PPVA and its affiliates.

6.      Meanwhile, in 2014-15, PPVA's liquidity crisis worsened, and Platinum Management resorted to other schemes to keep the fund afloat. For example, faced with relying on heavy short-term borrowing at annual interest rates as high as 19%, Platinum Management and PPVA CFO SanFilippo told PPVA's auditor that the loans were done to complete "investment transactions" — a false explanation provided to investors in the fund's audited financials, when they were finally released to investors months later than they were supposed to be. Platinum Management's internal documents confirmed that the real purpose for the high-interest borrowing was to ease the fund's liquidity constraints.

7.      In mid-March 2015, Nordlicht, Landesman and other senior Platinum Partners officials schemed to meet a sudden wave of over $70 million in redemptions by pressing redeeming investors to cancel those redemptions or at least defer them one quarter, and to launch an aggressive push for new investment money, all while concealing PPVA's liquidity

4

crisis. Their pitch focused on anticipated investment gains in the following month, while omitting mention of the firm's significant liquidity crisis, which would obviously scare new investors and people looking to redeem.

8.      Nordlicht also treated investor monies held in separate funds under the Platinum Partners umbrella as fungible, transferring money between funds as needed to meet liquidity demands, contrary to promises made to investors in each fund and representing an obvious conflict of interest. In particular, Platinum Management schemed with Platinum Credit to have PPCO make over $30 million in loans to PPVA in least in part to help PPVA make payments that were coming due. On one occasion, $7 million in new subscriptions to PPCO was diverted to PPVA within 24 hours to pay off an overdue short-term loan owed by PPVA. Also, certain preferred redeeming PPVA investors were allowed to transfer interests worth millions of dollars to PPCO, but no cash moved from one fund to the other. The amount was merely added to the principal owed by PPVA on its outstanding loan from PPCO, and PPCO got nothing more than a promise to pay by a fund that couldn't pay its redemptions.

9.      Along the way, Platinum Management and Nordlicht also repeatedly paid redemptions in a preferential manner, even as they continued to market redemption rules that promised investors equal treatment.

10.      Eventually, in late November 2015, Platinum Management placed a majority of PPVA's assets, all highly illiquid, in a "side pocket", from which no redemptions were possible for three years. Even then, however, few redemptions were paid from the supposedly more liquid original PPVA fund.

11.      In June 2016, after the FBI executed a search warrant on Platinum Management's premises, as well as the filing of criminal charges against a co-owner of Platinum Partners (the

umbrella entity for the Platinum companies), Nordlicht announced to investors that PPVA and PPCO would stop taking in new money and would look to monetize current investments in an orderly fashion.

12.     The PPVA fund is currently in liquidation in the Cayman Islands, while the PPCO fund and another Platinum Partners affiliated fund (the Platinum Partners Liquid Opportunity Fund ("PPLO")) have contractually retained an independent monitor.  By way of this action, the Commission seeks to have a court-appointed receiver installed over the domestic PPCO and PPLO funds and their respective advisers (together, the "Receivership Entities"), in order to protect investor assets and secure a fair and orderly process by which assets are liquidated and distributions are made to investors.

## VIOLATIONS

13.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit and Nordlicht, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

14.     By virtue of the conduct alleged herein, Nordlicht, in the alternative, aided and abetted Platinum Management's and Platinum Credit's violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; and Landesman, Levy, Mann, SanFilippo and Small aided and abetted Platinum Management's violations of Section 206(4) of the Advisers Act, 15 U.S.C. §80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8 .

15.     By virtue of the conduct alleged herein, Platinum Management violated Section 206(4) of the Advisers Act, 15 U.S.C. §80b-6(4), and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2.

16.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit Nordlicht, Landesman, Levy and SanFilippo, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Mann, directly or indirectly, singly or in concert, has engaged and is engaging in transactions, acts, practices and course of business that constitute violations of Securities Act Section 17(a)(1) and (3), 15 U.S.C. § 77q(a)(1) and (3).

17.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit Nordlicht, Landesman, Levy, SanFilippo and Small, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, and Mann and Shulse, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. §240.10b-5(a) and (c).

18.     By virtue of the conduct alleged herein, Nordlicht and Levy, in the alternative, aided and abetted Platinum Management's and Platinum Credit's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; Landesman, Mann and SanFilippo, in the alternative, aided and abetted Platinum Management's violations of Section 17(a) of the

Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; Small, in the alternative, aided and abetted

Platinum Management's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; and Shulse, in the alternative, aided and

abetted Platinum Management, Nordlicht, Levy and Small's violations of Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

19.     The Commission brings this action pursuant to the authority conferred upon it by

Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, Section 20 of the Securities Act, 15 U.S.C. §

77t, and Section 21 of the Exchange Act, 15 U.S.C. § 78u, seeking to permanently enjoin

Defendants from engaging in the acts, practices and courses of business alleged herein and for

such other relief as set forth below.

20.     In addition, the Commission brings an emergency action seeking: (1) a temporary

restraining order and preliminary injunction against Defendant Platinum Credit enjoining it from

future violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-

6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; Section 17(a) of the

Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; (2) appointing a receiver over the

Receivership Entities; (3) prohibiting the Receivership Entities from destroying or altering any

documents; and (4) permitting the Commission to conduct expedited discovery.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14; Sections 20(b), 20(d) and 22(a)

of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a) and Section 21(d) of the Exchange

Act, 15 U.S.C. § 78u(d).

22.     Defendants, directly or indirectly, made use of the means or instruments of

transportation or communication in interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the transactions, acts, practices, or courses of

business alleged herein, certain of which occurred in this District.

23.     For example, various investors and portfolio managers were located in Brooklyn,

New York, and communications in furtherance of the fraudulent schemes and other violations

alleged herein were sent to them through the means or instruments of communication in

interstate commerce.

## DEFENDANTS

24.     **Platinum Management** is an investment adviser registered with the Commission

since September 2, 2011.  It is a Delaware limited liability company headquartered in New York,

New York, and is the adviser to various funds, including PPVA.  Platinum Management's March

30, 2016 Form ADV ("ADV") reported that it had approximately $1 billion in assets under

management ("AUM").

25.     **Platinum Credit,** a Delaware limited partnership headquartered in New York,

New York, is a relying adviser of Platinum Management, *i.e.*, it is included within Platinum

Management's umbrella adviser registration with the Commission.  Platinum Credit is the

adviser to the PPCO.  Platinum Management's March 30, 2016 ADV reported that Platinum

Credit had approximately $590 million in AUM in PPCO.  .

26.     **Nordlicht**, 48, resides in New Rochelle, New York.  He is chairman of Platinum

Partners, the umbrella organization for the various funds, co-chief investment officer or CIO of

Platinum Management and Platinum Credit, and CIO of Platinum Liquid Opportunity

Management (NY) LLC ("Platinum Liquid"), a relying adviser of Platinum Management.  He

also owns, directly and indirectly, between a 20% and 33% beneficial interest in Platinum

Management, Platinum Credit and Platinum Liquid, and he, his relatives and/or related trusts are

also investors in certain of the funds managed by the above-named advisers.  Nordlicht also was

a member of the managing member of Platinum Partners Black Elk Opportunities Fund LLC

("PPBE").  From 1998-99, he held Series 7 and Series 63 licenses and was registered with

FINRA.

27.     **Levy**, 41, resides in New York, New York.  He is an owner and co-CIO of

Platinum Management and Platinum Credit.  He previously served as a PPVA portfolio manager

from 2006 to approximately the end of 2013, including with respect to PPVA's investment in

Black Elk.  He also was chairman and CIO and general partner of the managing member of

PPBE.  At the end of 2013, Levy purported to leave Platinum Partners, and he became the CIO

and 10% owner of B Asset Manager LP and B Asset Manager II LP (together, "BAM"), the CIO,

CFO, and 49.99% owner of Beechwood Re Ltd., and the CIO and 49.99% of Beechwood

Bermuda Ltd. (the latter two, together, "Beechwood").

28.     **Small**, 45, resides in New York, New York.  From 2007 to at least 2014, he was a

managing director and portfolio manager at PPVA, and a portfolio manager of, among other

things, Black Elk.  He also was a managing director and portfolio manager of PPBE.  From July

2009 to at least 2014, he served as a Platinum Management-appointed member of Black Elk's

board of managers.

29.     **Landesman**, 55, lives in New Rochelle, New York.  He was managing general

partner of PPVA and PPLO until approximately April 2015, and formerly held a percentage of

Platinum Management's ownership.  Thereafter, he continued to have substantial responsibility for investor communications for PPVA.  He also supervised PPVA's Chief Marketing Officer.

30. **Mann**, 24, resides in Brooklyn, New York.  At times pertinent to this Complaint, he worked in the investor relations department of Platinum Management.

31. **SanFilippo**, 38, resides in Freehold, New Jersey.  At times pertinent to this Complaint, he was the CFO of PPVA.  He is licensed as a CPA in New York.

32. **Shulse**, 46, resides in Houston, Texas.  He was the CFO of Black Elk from approximately January to September 2014, and the CEO thereafter until early 2015.  His Texas CPA license expired in 2014 and was suspended thereafter due to Shulse's failure to complete his mandatory continuing professional education, or CPE.

### RELATED ENTITIES

33. **PPVA** is a Cayman Islands exempted limited partnership managed directly by Platinum Management.  PPVA has the following feeder funds:  Platinum Partners Value Arbitrage (International) LTD; Platinum Partners Value Arbitrage Fund (USA) L.P.; and, Platinum Partners Value Arbitrage Intermediate Fund LTD.  The PPVA feeder funds were offered only to qualified purchasers, as that term is defined in the Investment Company Act of 1940 (the "Company Act").  PPVA was marketed as a multi-strategy fund that includes long/short fundamental equity trading; asset-based financing in energy, mining, and other industries; energy-related and Asia-based arbitrage opportunities; and event-driven investing in corporations.

34. **PPCO** is a Delaware limited partnership managed by Platinum Credit.  It has the following feeder funds:  Platinum Partners Credit Opportunities Fund (TE) LLC; Platinum Partners Credit Opportunities Fund International (A) LTD.; Platinum Partners Credit

Opportunities Fund International LTD.; Platinum Partners Credit Opportunities Fund LLC; and, Platinum Partners Credit Opportunity Fund (BL) LLC. The PPCO feeder funds were offered only to qualified purchasers, as that term is defined in the Company Act. PPCO was marketed as a single-strategy fund that invests in asset-based loans in areas such as natural resources, energy litigation, life insurance settlements, and receivables.

35. **Platinum Liquid** is a Delaware limited liability company that serves as the investment manager to Platinum Partners Liquid Opportunity Fund (USA) L.P. ("PPLO USA"); Platinum Partners Liquid Opportunity Fund (International) LTD,; Platinum Partners Liquid Opportunity Intermediate Fund L.P. and Platinum Partners Liquid Opportunity Master Fund L.P. (the "PPLO Master Fund") (such funds, together, "PPLO"). It is a relying adviser of Platinum Management. Platinum Management's March 30, 2016 ADV reported that Platinum Liquid had approximately $27 million in AUM in PPLO. At times pertinent to this Complaint, Nordlicht was the CIO for Platinum Liquid and was "responsible for oversight of all trading, asset allocation and risk management on behalf of the Platinum-managed funds." At times pertinent to this Complaint, Nordlicht was the majority owner of Platinum Liquid. Landesman became President of Platinum Liquid in April 2010 and became the managing member of Platinum Liquid effective January 1, 2011.

36. **B Asset Manager LP and B Asset Manager II LP** (together, "BAM"), headquartered in New York, are operationally integrated unregistered investment advisers that manage assets primarily obtained by their controlled affiliates through reinsurance contracts with domestic insurance companies and under investment management agreements made directly with domestic insurance companies. Nordlicht, Levy, and two other close associates collectively

owned 68.9% of BAM through at least August 2016.  BAM claims to have approximately $2 billion in AUM and is an affiliate of the Beechwood reinsurance entities.

37.    **PPBE** is a special purpose vehicle through which other Platinum funds and individual investors obtained interests in Black Elk Class E preferred shares.

## FACTS

### Background

38.    Platinum Partners had two principal funds – PPVA, created in 2003, and PPCO, formed in 2005.  PPVA, the flagship, was billed as a multi-strategy hedge fund, ranging from long/short equity fundamental strategies and arbitrage to asset-based finance.  Meanwhile, a primary investment strategy of PPCO was "to originate a variety of high yield, fixed income instruments."

39.    PPVA was billed as a liquid fund.  Its domestic and foreign feeder fund PPMs, consistent with their respective limited partnership agreement ("LPA") and governing articles, set out a fixed, orderly redemption process for all investors:  quarterly redemptions, upon 60 or 90 days advance notice (depending on the version of the PPM), with the fund "intend[ing] to pay" to the investor at least 90% of the amount requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit.  Nothing elsewhere in the PPMs or their respective formative documents granted broad discretion to pay some redemption requests but not others, particularly those submitted in the same cycle.

40.    Platinum Management's Due Diligence Questionnaires for PPVA ("DDQs") confirmed the fund's liquidity.  From September 2013 through September 2015, they stated, in part,

> How long does it take to exit the most liquid positions in the portfolio?
> The Fund's most liquid positions could, under normal market conditions, typically be
> liquidated in less than a week, including assets in the Energy and Power Arbitrage,

Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage strategies.

The listed liquid strategies represented more than half of the portfolio during that same period, according to monthly "tear sheets" sent to investors, as well as marketing presentations provided principally to prospective investors. For example, a May 2016 presentation stated the fund was targeting "42% risk allocation to short term trading and relative value strategies, 26% to event driven strategies and 32% to asset based finance strategies."

41.     Fund documents also carefully delineated the separation between the finances of the PPVA and PPCO funds. For example, the March 2015 PPCO and April 2015 PPVA PPMs stated, as a risk factor, that they permitted loans to or from affiliated funds, but only in narrow circumstances: "in the event that an affiliate fund, such as one of the Platinum-managed funds, requires additional funds on a short-term basis in order to make an investment, the Master Fund may loan such affiliate fund any amounts to facilitate such investment"; likewise, "in the event the Master Fund requires additional funds on a short-term basis in order to make an investment, the Managing Member, the Loan Portfolio Manager or their Affiliates and/or an affiliate fund, such as one of the Platinum-managed funds, may loan the Master Fund any amounts to facilitate such investment" (quoting PPCO Onshore March 2015 PPM; emphasis added.).

42.     On the surface, PPVA and PPCO were highly successful funds. As of March 2016, Platinum Management reported that PPVA had almost $1.1 billion in AUM, and PPCO had almost $600 million in AUM. Also, PPVA reported a virtually unbroken string of strong and steady reported performance, with its NAV going up each year from 2003 to 2015, for an average annual return of 17%, with typically small gains reported for 85% of the months throughout this period.

43.     Beneath the surface, however, lurked serious problems, which defendants kept
from investors for years.  In fact, from at least 2012, PPVA faced recurring liquidity crises.
There was a growing liquidity mismatch, as the fund became increasingly concentrated in
illiquid investments, including equity and debt positions in start-up companies, many of which
were not publicly traded.  And yet, many investors could and did demand their money back
every quarter.  Although the liquidity crisis extended for years, Platinum Management did not –
for whatever reason – sell enough of its illiquid portfolio to overcome this crisis.  Instead, it took
cash out of more liquid strategies, thus skewing the balance of the portfolio toward greater
illiquidity even while the liquidity pressures remained.

44.     For example, in a November 6, 2012 email entitled "Current Redemptions Nov 5,
2012," a Platinum Partners employee advised Nordlicht that there were "$27 million total,"
apparently referring to outstanding redemption requests.  Nordlicht forwarded this email to
Landesman and stated:  "If we don't exceed this in subs [new subscriptions] from dec 1 and jan 1
we are probably going to have to put black elk [one of the fund's illiquid investments] in side
pocket. I also need to pay back [a loan from an individual] and an additional 4 million oct 31 and
nov 30 so we are talking 40" – apparently indicating they needed to get $40 million in new
subscriptions to cover pending redemption requests and other obligations.  Landesman responded
by saying he would try his best, and that he thought "…we could sweep the table here, so far,
think Jan. 1st is a possibility for some, if not all."  Nordlicht replied that "it's just very daunting.
It seems like we make some progress and then reds [redemptions] are relentless almost. It's
tough to get ahead in subs [subscriptions] if u have to replace 150-200 a year…." Landesman
replied: "Didn't take it as complaining, it is my job. Redemptions very daunting."

45.     That said, illiquid positions, most of them categorized for accounting purposes as "Level 3" assets, which represented almost 80% of fund assets at the end of 2014, had one virtue for Platinum Management:  since they were not publicly traded and there were no other readily available market prices, they were valued by Platinum Management itself, "determined in such manner as may be selected from time to time by the Investment Manager in its discretion."

46.     To be sure, the PPVA PPMs limited this discretion by requiring that the result represent "fair value."  Platinum Management reassured investors by noting in its DDQs that its valuations were verified by an internal valuation committee.  And the DDQs, tear sheets, and marketing presentations touted that Platinum Management used the services of an independent valuation agent.  In reality, however, Nordlicht often instructed his staff to adjust the values of various positions up or down, with the staff left to flesh out the rationales for those adjustments.

47.     Platinum Management's external auditor in early 2015 reported to it that "a material weakness exists in the Master Fund's investment valuation process related to its Level 3 investments."  Platinum Management did not disclose to its investors this important information.  The auditor also identified a "very material" misstatement that required a large markdown of the valuation of one large, illiquid position, triggering a restatement of the fund's year-end 2013 AUM.

48.     Platinum Management terminated that auditor.  Still, the replacement auditor included in its 2014 opinion, which it did not issue until September 2015, an "emphasis-of-matter" stating that management's estimated values for investments representing over $800 million rested on unobservable inputs, and that the amounts that might be realized in the near-term could differ materially from management's valuations.

16

49.     Platinum's substantial control over the valuations of its illiquid positions helped ensure that fund performance, which was largely composed of unrealized gains, remained steady. This was essential, because shortfalls in performance could be expected to trigger more redemptions, and so deepen the liquidity crisis.

**Overvaluation of Golden Gate Oil LLC Investment**

50.     A principal example of PPVA's growth in AUM through unrealized gains is Platinum Management's manipulation of the valuation of its disastrous investment in Golden Gate, a start-up oil production company it helped create in 2012. In 2013 through 2014, PPVA's reported AUM of approximately $900 million to $1 billion rested heavily on the valuation of this single investment. Whereas Platinum Management valued Golden Gate at approximately $78 million at the end of 2012 (when PPVA's equity interest in Golden Gate was 48% of the company, or $37 million), the value rose sharply to $173 million at the end of 2013 (when PPVA owned or had the option to buy a 100% interest).

51.     At the end of 2013, the Golden Gate equity and loan constituted approximately 19% of PPVA's AUM, the fund's largest position. At the end of 2014, even after the price of oil had plummeted 60%, from $100 to $40 per barrel, PPVA valued its equity in Golden Gate at $140 million, less than 20% below its 2013 year-end valuation. It also continuously valued at par its loans to Golden Gate, which reached $18 million in principal by the end of 2013, even though Golden Gate never made a single interest payment to PPVA.

52.     Throughout this period, Nordlicht was principally responsible for setting the valuation of Golden Gate for PPVA. Golden Gate was vastly overvalued, for multiple reasons.

53.     First, PPVA sharply increased its valuation of Golden Gate while in fact the company's performance was falling far below initial projections, with minuscule oil production

and heavy operating losses.  Golden Gate's first stage involved the drilling of seven wells, but it encountered large drilling cost overruns, consuming $18 million borrowed from PPVA by the end of 2013, as well as delays in obtaining needed permits.  Moreover, the wells produced mostly water and many were shut in (*i.e.*, not producing).  The only consistently-producing well provided revenue representing less than 10% of initial projections.  As a result, far from generating the expected millions in cash flow to pay for future drilling, Golden Gate generated $6 million in net losses in 2013.

54.    Second, several transactions with third parties concerning the sale of some or all of Golden Gate's assets were for a mere fraction of the valuation that PPVA carried on its books for the same assets.

55.    For example, in October 2013, PPVA granted its partner an option to buy one of the two main Golden Gate oil fields for a mere $6.2 million, barely one-tenth of the value touted by PPVA for the same fields.

56.    At the same time, the partners granted each other an option to buy the other party's share for $60 million, effectively meaning that the whole company was worth roughly $120 million (rather than $173 million).

57.    One month later, though, Black Elk (another PPVA investment) reported in a public filing that it had obtained an option to buy the whole company for $60 million.  This posed a problem for Platinum Management; Months later, a PPVA portfolio manager for Golden Gate told Nordlicht and Levy that a potential third party lender had brought up Black Elk's filing, saying "the issue is that it publicly discloses the value of the option and therefore pegs GGO [Golden Gate]'s value to $60M.  This is ultimately a marketing issue that could be dealt with but something we should all be aware of."

58.     Then, in August and September of 2014, PPVA in fact bought out its partner's 52% interest in Golden Gate not for $60 million, or $30 million, but a mere $3.2 million, with an additional $5.9 million contingent on achievement of production levels that Golden Gate had not come close to achieving.  These actual option and sales prices belie Platinum Management's far higher valuations, including an enterprise valuation of at least $170 million it touted as of September 30, 2014.  Third, even internally Platinum Management personnel frequently acknowledged Golden Gate was worth much less than claimed.  In early 2012, Nordlicht initially scoffed at his portfolio manager's optimistic projections: "I cringe at the 1 billion PV-10 number [a measure of the present value of the oil reserves] as it doesn't mean anything . . . . when u have billion pv10 on fields that are worth 15 [$15 million] in sale now, it doesn't really mean much . . . ."  Likewise, in late 2012, one of Platinum's project managers for Golden Gate wrote to Nordlicht that once Golden Gate, as a first step, had about seven wells producing at its two fields, the value would rise to $45 million.  Nonetheless, at the end of 2013, when the drilling program had fallen far short even of that goal and Golden Gate was deeply in the red, Platinum Management increased PPVA's valuation of its interest to $173 million.

59.     Tellingly, in early 2014, Nordlicht did not grant discretionary compensation to the portfolio managers responsible for Golden Gate based on the valuation that was on PPVA's books.

60.     Fourth, Platinum Management took steps to mislead third parties who evaluated Golden Gate's reserves and the value of PPVA's interest in the company.  Those third parties were largely at Platinum Management's mercy, for they relied upon Platinum Management and Golden Gate for virtually all of the inputs used in their calculations.  For example, Platinum Management retained an independent valuation expert to buttress its own ultimate valuations, but

19

the valuation expert's quarterly reports repeatedly contained multiple false statements, obtained from Platinum Management, overstating the number of producing wells and the volume of oil production.

61.    When Platinum Management considered having Black Elk buy PPVA's interest in Golden Gate, an independent engineering firm chosen by Black Elk made preliminary estimates that valued Golden Gate's reserves at about 10% of the estimates made by the engineering firm retained by Golden Gate.  In particular, Black Elk's engineering firm found that most of the reserves should be characterized as merely "probable" rather than as "proven" – a critical difference since classifying reserves as proven rather than probable would have a positive effect on PPVA's interest in Golden Gate.  Nordlicht ordered that those lower estimates be ignored.

62.    Although Golden Gate's chosen engineering firm was willing to characterize more reserves as proven, that firm ultimately determined that it could no longer produce reserve reports for Golden Gate based on the company's pattern of making unrealistic projections of future well completions and production.

63.    Overall, Platinum Management and Nordlicht's words and conduct, including the exceedingly small consideration paid to obtain a larger equity stake in Golden Gate, and the decision to hold on to the Golden Gate asset in the throes of deep liquidity crises, reflect that Nordlicht understood that the valuations he was continuing to use for PPVA's balance sheet did not accurately reflect the lesser realizable value reflected by Platinum Management's negative experiences in attempting to develop profitable wells.

64.    Platinum Management's and Nordlicht's recklessly or knowingly inflated valuation of PPVA's interest in Golden Gate was material to the fund's overall valuation.  For example, the $3.2 million PPVA paid for the remaining 52% interest in Golden Gate in

September 2014 implied an enterprise value of about $6.2 million for the whole company.

Meanwhile, as of December 31, 2014, PPVA valued Golden Gate at $140 million.  Deducting

the difference of $134 million from the fund's overall $872 million in "investments in securities"

as of the end of 2014 would reduce that line item on its balance sheet by 16%.  Likewise, the

$134 million represented approximately 13% of PPVA's overall AUM of $1.04 billion as of the

end of 2014.

65.    By failing to adjust Golden Gate's valuation to match reality, Nordlicht and

Platinum Management inflated the management and incentive fees they received based on that

inflated valuation.

66.    Meanwhile, Platinum Management responded to investor skepticism about

Golden Gate by misleading at least one investor who raised repeated concerns about PPVA's

energy positions and their valuation.  On March 28, 2014, investor relations official Mann

provided this investor with a report about Golden Gate and Black Elk "that we have just created

for investors who would like to know more about the two positions."  In fact, however, the report

was replete with misstatements exaggerating Golden Gate's performance.  It included charts, not

labeled as either actual or projected, showing Golden Gate's first quarter revenues as $4.6

million.  In fact, information readily available to Platinum showed that Golden Gate's revenue

for the first quarter (then almost entirely concluded) was less than 5% of the reported figure:

$229,000.

67.    Moreover, focusing just on revenues was misleading, because due to high

operating costs Golden Gate had a net operating loss of $100,000 for Q1 2014.  The same report

reported Q1 2014 production as 508 barrels per day, when in fact net production for the quarter

was less than 30 barrels per day.  The report also vastly overstated probable reserves, pegging

them at 16 million barrels, when the most recent engineering reserve report then available showed only 6 million barrels of probable reserves. The report also said that "Overall PPVA has lent less than $18 million to GGO." In fact, as of December 31, 2013, the amount lent was $18.4 million, and after further lending in January and February of 2014 the total outstanding stood at $21.8 million.

68.     These misstatements built upon Mann's statement to the same investor two days earlier, after speaking with Nordlicht, that Nordlicht had changed his mind about combining Golden Gate with Black Elk "since Golden Gate has been doing very well since then" – at a time when the project was in fact losing money and producing almost no oil.

**2014:  Growing Liquidity Crises and the Ensuing Black Elk Fraud**

69.     By 2014, PPVA's liquidity crisis had worsened. SanFilippo sent Nordlicht and Landesman an email on February 5, 2014, attaching a chart entitled "December 31 Redemption Summary" that highlighted approximately $14 million in redemptions and other monies still owing to investors based on their December 31 redemption requests. Indeed, under the PPMs, payment was required within 30 days and so this amount was overdue. The same chart indicated that other, apparently preferred, investors, had been paid over $22,325,000 in connection with the same quarterly redemption period.

70.     Likewise, in a board meeting of the Directors of PPVA International held on March 12, 2014, in which Nordlicht and Landesman participated, Platinum Management acknowledged that the fund had experienced a greater number of redemptions than net capital contributions during 2013. Platinum Management also represented to the Board that 40% of the fund could be liquidated in 30 days, but it also represented that it was focusing on making the portfolio more liquid.

71.     Despite these promises, when an investor emailed Landesman on April 29, 2014 asking when the wires would go out for the April 1 redemptions, payments for which were due no later than the next day, Landesman could not answer and instead forwarded the email to SanFilippo, asking: "What can I tell Jacques?"

72.     Later on April 29, 2014, Nordlicht sent an email to San Filippo stating: "Start paying down reds [redemptions] as u can. Between Blake and ppbe (additional 10 million), shd have decent short term infusion. Hopefully some may 1 subs [subscriptions] show up as well. Have a few more outflows to discuss but this is obviously the priority."  As indicated in Nordlicht's stated hope about subscriptions showing up, PPVA was heavily dependent on the infusion of new money from both subscriptions and other sources to meet its ongoing redemption obligations and lacked sufficient liquid assets in its portfolios to meet its redemption obligations.

73.     A June 3, 2014 email from a Platinum employee to Nordlicht and others entitled "Cash Sheet" listed cash on hand of $96,000; "Pending Inflows" totaling $20,000,000; "Pending Outflows" totaling $16,750,000 and Redemptions of $500,000 for May and $9,500,000 for June, which resulted in a "Projected Cash" of negative $6,154,000.  Nordlicht forwarded this email to another employee instructing him to: "Take June reds off the list," suggesting that they were unable to meet the pending June redemptions of $9,500,000 due to cash flow problems.

74.     On June 16, 2014, Nordlicht emailed Landesman that the firm was in "code red" due to its inability to match redemptions with quarterly inflows of investor funds.  Nordlicht stated:

> It can't go on like this or practically we will need to wind down. This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude. I think we can overcome this but this is code red, we can't go on with the status quo. … We can't pay out 25 million in reds per quarter and have 5 come in…."

Landesman responded: "We are pushing hard, illiquidity a bigger hurdle than energy concentration…Need monetization/liquidity events in the fund…" Nordlicht replied: "….We just need to short term go crazy, get everyone focused, and long term try to come up with marketing pitches where we can raise even when we are illiquid."

75.     In early 2014, these same liquidity problems caused Nordlicht to focus on Black Elk, PPVA's other large, illiquid energy investment.

76.     Black Elk operated oil wells in the Gulf of Mexico, and PPVA was its principal lender.  Platinum Management officials once considered the Black Elk position one of the strongest in PPVA's portfolio.  At the end of 2012, Platinum Management's valuation of Black Elk represented 24% of PPVA's total assets.  However, Black Elk's ambitious expansion plans ran into problems after a deadly 2012 explosion on an offshore rig prompted numerous official investigations.  By 2014 its economic performance was mixed and it was struggling to pay its bills.

77.     Meanwhile, as of early 2014, PPVA owned the vast majority of Black Elk's preferred shares, and a large portion of Black Elk's $150 million face value of outstanding senior secured notes.  PPVA also had the power to control Black Elk's management, as admitted by Black Elk in its Form 10-K, as PPVA owned about 85% of the outstanding voting membership interests and had the authority to appoint and remove all Black Elk key personnel and determine management policies.[1]

---

[1] "As of December 31, 2013, Platinum beneficially owned approximately 85% of our outstanding voting membership interests and approximately 66% of our total outstanding membership interests.  As a result, and for as long as Platinum holds a membership interest in us, Platinum has the ability to remove and appoint key personnel, including all of our managers, and to determine and control our company and management policies, our financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to our members for approval, including potential mergers or acquisitions,

78.     Moreover, PPVA aggressively exercised this power, through Nordlicht, as well as through Levy and Small who were also PPVA portfolio managers for Black Elk.  They did so by appointing a majority of Black Elk's Board of Managers, appointing Shulse as CFO, repeatedly forcing the CEO to rescind his firing of that CFO and otherwise usurping the CEO's authority, making prolonged, almost weekly visits to Black Elk's Houston office, and controlling which of Black Elk's vendors were paid (if at all) and when.  As the CEO later testified in Black Elk's bankruptcy proceeding, "Platinum was calling all of the financial shots.  I would say as of February [2014], they were in complete control of, you know, essentially almost every daily activity and most certainly stayed on top on every penny in and every penny out."

79.     Nordlicht decided to use this control over Black Elk not to try to turn around the company's business, but to plunder its assets for the benefit of PPVA and its affiliates, by getting repayment of most or all of approximately $110 million in Black Elk preferred shares held by those entities.  A key reason was to stave off PPVA's liquidity crisis.  Nordlicht acknowledged the liquidity crisis in vivid terms in an email to Small on March 17, 2014:

> This is also a week I need to figure out how to restructure and raise money to pay back 110 million of preferred which if unsuccessful, wd be the end of the fund. This 'liquidity' crunch was caused by our mismanagement –yours David and I – of the black elk position so I will multitask and also address your concerns but forgive me if I am a little distracted. I have been up until 3 am for the last two weeks working through this issue.

80.     In 2014, Black Elk agreed to sell much of its prime assets to Renaissance Offshore, LLC.  Platinum Management, Nordlicht, Levy and Small schemed to divert the proceeds from that sale to redeem preferred shares, most of which were held by PPVA and affiliated funds.  However, the Black Elk note indenture required that such proceeds be paid first

---

asset sales and other significant corporate transactions.  As a controlling member, Platinum could make decisions that may conflict with noteholders' interests."

to the noteholders, and many of the notes were held by non-Platinum parties. So the Platinum
parties thus devised a scheme to amend the note indenture to authorize that proceeds of the
Renaissance sale be paid to holders of Black Elk Class E preferred shareholders, mostly PPVA,
PPCO and two other affiliated funds.

81.     The problem for Platinum was that a majority vote of noteholders was required to
amend the indenture. Platinum controlled a majority of the notes, but it could not vote. As the
consent solicitation later recited, "Notes owned by the Company or by any person directly or
indirectly controlling or controlled by or under direct or indirect common control with the
Company shall be disregarded for purposes of determining the majority." Moreover,
independent noteholders would have no reason to vote for such an amendment, as it would divert
the proceeds of the sale of key Black Elk assets to parties junior to themselves.

82.     Therefore, Platinum personnel devised a scheme to obtain the necessary consents
in a manner that deceived independent noteholders. Specifically, Nordlicht, Small and Levy
worked to transfer the Black Elk notes held by PPVA to parties he and Small called "friendlies."

83.     In a March 11, 2014 email, Nordlicht wrote to Shulse, Levy, Small and another
individual, that "We are likely to have friendlies buy the bonds as of tomorrow."

84.     Two days later, Shulse sought to benefit from his support for this effort, asking
for "a substantial bonus, 1% of the amount of preferred's actually paid back to Platinum." He
added, "Platinum getting its money out of Black Elk is a good thing for Platinum and it should
be a good thing for me as well."

85.     At one point, the plan was to quietly get pro-Platinum parties representing a
majority of the notes to sign consents, without consulting independent noteholders. However,
the note indenture trustee resisted, insisting on a formal consent solicitation process. As Shulse

explained in an email to Nordlicht, Small and Levy: "they don't trust our consents are valid because we have received a default notice in the past 60 days and we have the behind the scenes process with various dates on our consents."

86.     Nordlicht's response to the idea of an open consent solicitation was a vehement no.

87.     Shulse, showing a complete understanding of and support for Platinum's scheme to control a majority of the notes, supported the solicitation: "the quickest way is to do the formal solicitation . . . get our 51% in order . . . vote it through the DTC/BNY agents and end it." He added, "why are we afraid of an open solicitation?  Probably going to avoid a lawsuit and if we have the bonds we say we do, the process ends as soon as we get over the number?"

88.     On May 12, 2014, Shulse sent an email to Levy, Small, and Nordlicht suggesting they slip an announcement regarding the amendment to the indenture "in with the 10Q filing so it has a chance to get lost and not seem like such a big deal."

89.     Nordlicht, Levy and Small eventually decided to pursue a formal consent solicitation, albeit a rigged one.  Crucial to this effort was the transfer of a large number of notes from PPVA and its affiliates to BAM and its Beechwood affiliates.  BAM was closely affiliated with Platinum Management through majority ownership by Nordlicht and other owners of Platinum Management, and through Nordlicht's influence over the entity thanks to the installation of Levy as CIO and many other Platinum officials in key positions at BAM.  Indeed, in early 2014 Nordlicht told a third party that he planned to leave Platinum for BAM as of January 1, 2015.

90.     All told, prior to the consent solicitation, PPVA transferred over $37 million in Black Elk notes to BAM and two related entities, BBIL SHIP and BBIL ULICO 2014 Trust, at

prices Nordlicht designated.

91.     Numerous emails reflect Nordlicht's involvement:  In a May 13, 2014 email, Nordlicht instructed that "Beechwood is buying 8 million black elk from PPVA. What is the best way to cross? Can we do it today please."   Similarly, on June 23, 2014, he emailed: "I want to move/sell 10 million of black elk bonds to bbil the nomura account. Please take care of it." After confirming that BBIL was buying the bonds from PPVA, Nordlicht emailed instructions on July 1, 2014, to sell $7 million in Black Elk bonds from PPVA to BBIL SHIP at a price of 99.

92.     Levy's position as BAM's CIO (along with the fact that many other Platinum Partners officials were also BAM officials) assured Nordlicht that the BAM-related entities would support the scheme.  By July 3, the Platinum Partners-related funds and BAM-related entities held almost $100 million out of the $150 million in Black Elk notes, as reflected on a list shared by Nordlicht, Levy and Small.

93.     Meanwhile, Nordlicht, Small, Shulse and Levy participated in the drafting of a document to be circulated to all noteholders, which contained two closely related parts.  The first was a tender offer, which offered to buy back notes at par.  The second part was a solicitation to consent to note indenture amendments, most notably including that the proceeds of the Renaissance sale would, after payment of any tendered notes, be payable to holders of preferred shares, who were disclosed to be mostly Platinum Partners-related entities.

94.     During the drafting process, on July 3, Small circulated to Black Elk counsel a disingenuous deceptive hypothetical question about whether $5 million in notes owned by an affiliate had to be excluded from voting – in fact, PPVA and its affiliates held more than $98 million in notes.  Still, counsel confirmed that even Small's hypothetical $5 million in affiliate-held notes would have to be disregarded in the vote, and Small forwarded this finding to

Nordlicht and Levy.

95.    Despite their knowing this key principle, the final consent solicitation contained this false representation:

> As of the date hereof, there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture.  <u>Platinum Partners Value Arbitrage Fund, L.P. and its affiliates</u>, which own approximately 85% of our outstanding voting membership interests, <u>own approximately $18,321,000 principal amount of the outstanding Notes. Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, hold any Notes.</u>  (Emphasis added.)

The $18 million figure was a vast understatement, as it failed to disclose the $72 million in other notes held by PPVA affiliates and BAM-related related entities.  Knowing the consent solicitation contained this falsehood, and that the vote was rigged, Small signed the Black Elk Board of Managers' authorization for Black Elk to conduct the consent solicitation, and to implement it should it be approved.

96.    Also, while formally the solicitation preserved the priority of tendering noteholders, in reality the offer discouraged tenders by its unattractive terms.  Because the notes were callable months later at par, tendering meant foregoing months of interest for no gain.

97.    However, not tendering would be a mistake if the consent solicitation were approved.  In the end, $11 million in notes were tendered by independent noteholders.

98.    Platinum caused all of the notes held by its PPVA and its undisclosed affiliates, including PPCO and PPLO, and the  Beechwood entities to vote in favor of the consent solicitation <u>but</u> without tendering.  Levy was copied on the document by which Beechwood entities cast their votes in that manner, against their own interests as noteholders but in favor of the interests of preferred shares held by PPVA and affiliated funds.

99.     Small signed the consent of Black Elk's board of managers which falsely recited that "the Company has received sufficient consents" to amend the indenture. On August 14, 2014, Black Elk falsely claimed in a press release that "holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly consented to the Consent Solicitation." (Emphasis added.) On August 21, Black Elk issued a Form 8-K announcing that it had received "the requisite consents" of noteholders' to, among other things, apply the proceeds from the recently-concluded Renaissance sale to retire the tendered notes and use the remaining proceeds to repurchase preferred equity issued by Black Elk.

100.    On August 18, Small, from his Platinum email address, but purporting to speak for the Black Elk board of managers, directed Shulse to wire $70 million in partial payment of Class E preferred shareholders. Levy meanwhile sent Shulse specific wire instructions for sending to PPVA and other designated parties most of the proceeds from Black Elk's sale of assets to Renaissance. This included three other Platinum Partners funds, and one third party to which Platinum had sold preferred shares and was subject to a put repurchase obligation. The $20 million of Black Elk sale proceeds sent to that party extinguished that obligation. After Nordlicht pressed Shulse to "send these wires out already," Shulse complied with the directions.

101.    All told, from August 18 to 21, 2014, Black Elk wired approximately $98 million in Renaissance sale proceeds for the benefit of PPVA and its affiliated funds, including PPCO and PPLO. One other such fund, PPBE, set up specifically to invest in Black Elk notes, distributed its share of those proceeds to its investors. Among those investors were Levy and Small, who received $256,678 and $102,671, respectively, thus benefiting directly from the Black Elk fraud.

102.    PPVA investors received various communications from Platinum Management under Nordlicht's direction, such as financial statements, marketing materials and monthly reports that reported fund performance based, in part, on the Black Elk fraudulent note scheme. However, they omitted the material fact that the proceeds paid to PPVA on account of its Black Elk Class E preferred shares were derived based on the above-referenced fraudulent conduct.

**Late 2014: Misleading Investors about PPVA's
Borrowing to Cope with Liquidity Constraints**

103.    Obtaining the Black Elk proceeds by itself was not enough to stanch PPVA's liquidity problems. Accordingly, starting at least in July 2014, the fund began incurring short-term loans, a principal purpose of which to ease liquidity constraints, including paying redemptions.

104.    On July 1, PPVA borrowed $10 million from a group of insiders for six months, at a 19% annual interest rate. ("July 2014 Loan"). This wasn't enough, and in September, PPVA borrowed another $50 million, at 16% interest. The vehicles were two notes by PPVA in favor of over 40 lender-participants investors, again including many insiders. The notes had a three-year term, but in fact each participating lender could elect to get back its principal after six months. These notes were marketed and referred to internally as the "PPNE Loan," *i.e.*, Platinum Partners Northstar Energy, creating the impression that the funds were to be used to invest in Northstar, a recent addition to PPVA's energy portfolio which was in the process of acquiring the remaining assets of Black Elk.

105.    All told, PPVA borrowed $95 million from various parties during 2014 at 16-19% annual interest, including the July 2014 Loan and the PPNE Loan, and as of the end of 2014 more than $40 million in overall loan principal remained outstanding. PPVA also paid over $3

million in interest on these loans, draining value from the fund and further squeezing its capacity to pay redemptions.

106.    In late 2014, Platinum Management continued to market PPVA to prospective investors and to make reports to existing investors.  However, it misled prospective and existing investors by not revealing that PPVA was engaged in heavy short-term borrowing.

107.    Still, the issue of disclosure was forced upon Platinum Management toward the end of the year.  PPVA's auditor was still working on its audit of the fund's 2013 financial statements – the same audit that would conclude with a markdown of one of PPVA's large illiquid positions and a finding that Platinum Management's valuation process represented a material weakness.  In preparing the section on subsequent events, the auditor asked about loans incurred by the funds.  When the July 2014 Loan and PPNE Loan were produced, the auditor inquired as to their purpose.  PPVA CFO SanFilippo misled the auditor, as well as investors who received the resulting audited financial statements, about the purpose of those loans, in order to conceal PPVA's pressing liquidity needs.

108.    All internal Platinum Management documents addressing auditor questions and draft disclosures said that these loans were incurred for liquidity needs.  When Levy explained the PPNE Loan internally to SanFilippo, he first wrote its purpose was "liquidity to complete a transaction," but he changed this a minute later to "Ppne is a general obligation of PPVA taken for liquidity."  SanFilippo ignored this change and used the more benign first version, telling the auditor it was for "liquidity to complete a specific transaction."

109.    Even worse, PPVA's later submission to the auditor of a financial statement disclosure about the loans – sent by an assistant and copying SanFilippo – eliminated any reference to liquidity.  The initial draft, not sent to the auditor, listed the two loans separately and

32

in each case said the loan "dealt with liquidity restraints." The version sent to the auditor, however, which appeared in the final financial statement notes, combined the loans into a single disclosure, saying that PPVA "entered into multiple financial transactions . . . in order to complete multiple investment transactions."

110.    In this manner, SanFilippo helped to misstate the purpose of these sizable short-term, high-interest loans and conceal the fund's significant liquidity constraints – which would have been a major red flag for PPVA investors.

111.    In addition, PPVA's 2013 audited financials were not released until February 11, 2015, 287 days following the April 30, 2014 due date. This prolonged delay caused Platinum Management to violate the custody rule promulgated under the Advisers Act (the "Custody Rule"). Under the Custody Rule, Platinum Management was required to either engage an independent public accountant to conduct a surprise examination once per year, or to circulate audited financial statements to investors within 120 days of the end of its fiscal year. Platinum Management did neither for the fiscal years 2013, 2014 and 2015.

### 2015: PPVA's Liquidity Crisis Deepens, as does the Misleading of Investors

112.    Even after having unlawfully extracted nearly $100 million out of its Black Elk holding, and having borrowed heavily at high interest rates, PPVA's liquidity troubles continued, as current investors sought to redeem investments and Platinum Management scrambled for new investor money to replace the amounts being withdrawn.

113.    In addition to trying to raise new money to keep their fund going, Platinum Management and Nordlicht embarked on a concerted effort to persuade people not to go through with their redemption requests.

114.    Multiple people at Platinum Management participated in that effort, including

Landesman, who had substantial responsibility for investor communications for PPVA, and

Mann, who worked in Platinum Management's investor relations department.

115.    For example, in a January 23, 2015 email chain discussing an upcoming

redemption request for the end of the first quarter, a Platinum employee told Landesman that he

had just gotten a $19 million full redemption request from an investor.  Landesman replied that

he would "try to avert, directly tied into lack of November statements."

116.    As of January 30, 2015, a PPVA spreadsheet reflected that Landesman himself

had made a $6,000,000 redemption request in the prior quarter (12/31/2014), and was waiting to

get paid.

117.    On March 3, 2015, Nordlicht forwarded an investor's contact information to

Landesman, saying, "I don't trust myself, I feel I came off really defensive with Leon.  I think u

give us best possibility to try and keep him."  Nordlicht provided positive talking points,

including "tremendous optionality that cd produce some lumpy positive monthly returns in any

one month," but did not mention any disclosures regarding liquidity problems or their difficulties

in meeting redemption obligations.  Landesman replied, "I'll handle it."

118.    By mid-March 2015, Nordlicht, Landesman and other senior Platinum Partners

officials schemed to meet a sudden wave of over $70 million in redemptions by pressing

redeeming investors to cancel those redemptions or at least defer them one quarter, and to launch

an aggressive push for new investment money, all while concealing PPVA's liquidity

crisis.  Their pitch focused on anticipated investment gains in the following month, while

omitting the firm's significant liquidity crisis, which would obviously scare new investors and

people looking to redeem.

34

119.    The plan to mislead investors is illustrated by an email exchange that same month in which Nordlicht and another employee, copying Landesman, were crafting a response to an investor who had made a redemption request.  The draft response stated:  "By the way, we have significant interest on the subscription side for April which we expect to be our best month since the fund was founded. Therefore, we are limiting net inflows to 5% of the fund in April. On the off chance you decided to recant or defer your withdrawal to June 30, please let us know by April 1st so that we can process the subscriptions in a timely manner. Regards…"

120.    Given the fund's financial straits, capping new investments does not appear to have been a sound management strategy.  Instead, it appears to have been a stock marketing ploy to make the fund appear more desirable.  This is particularly so because subscriptions effective on January 1, February 1 and March 1, 2015 totaled only approximately $14 million, making the possibility of reaching 5% on April 1 (let alone having to implement the cap) remote.

121.    Landesman himself called investors in an attempt to obtain deferrals of March 31, 2015 redemptions.  At the time of those calls, he was aware that there wasn't even enough cash to finish paying the December 31, 2014, redemptions that had been made, including by having been on emails in which a Platinum employee pressed Nordlicht with respect to an overdue redemption and Nordlicht eventually replied:  "Working on it."  After speaking with Landesman, one investor canceled half its redemption, telling Landesman that it was based on "your message of the April rebalancing of PPVA."

122.    On March 31, 2015, Landesman hosted Platinum Partners' quarterly investor conference call.  In introducing the call, Landesman provided a materially misleading explanation for why the call had been moved up to March 31 – an odd date for a quarterly conference call as the quarter-end performance data, usually the main purpose for such calls,

was still unavailable.  Landesman told investors that the call had been moved up because Passover fell in early April.  However, as Landesman knew, the real reason for the early conference call was that Platinum Management had decided to meet the liquidity crisis by spreading word of their expected April performance gain early enough to induce deferrals of redemptions and new subscriptions by early April, when they still could count as effective as of March 31.

123.    During the same quarterly investor call, Nordlicht falsely claimed "we have not really gone out and tried to market aggressively based on the month that we're having," touted their expected April gain, and omitted any mention of PPVA's liquidity crisis.  Finally, Nordlicht repeated the marketing ploy that net subscriptions would be capped at 5% of the fund.

124.    On April 2, 2015, Nordlicht emailed others at Platinum Partners asking if any new "subs" [subscriptions] cleared today, instructing that "[n]ext uses of capital for ppva" should be to pay back individuals who had lent money to the fund, including insiders such as Landesman. For Landesman, the promised payment was $1 million. When he learned that he would be one of the persons getting repaid when new money came in, Landesman replied, "Back at ya."

125.    Five days later, on April 7, 2015, Nordlicht and Landesman learned of another investor who, despite another employee's efforts to reach the investor to try to change his mind, was redeeming his group's PPVA investment.  Later that day, Landesman sent the investor an email saying he was sorry that the investor was "still redeeming," and adding that he hoped that they would one day be worthy of "your reinvestment."  Landesman forwarded this email to Nordlicht with the words "Hail Mary time."

126.    Meanwhile, PPVA's monthly marketing materials for April 2015 continued to represent that there was no lockup and withdrawals were "Quarterly, 60 day notice required,"

without disclosing the fund's struggles paying redemptions and the resulting efforts to dissuade investors from redeeming.

127.    Despite the various Platinum Defendants' efforts to reduce the amount of redemptions that would be effective March 31, 2015 and payable April 30, 2015, most of PPVA's redemptions that became effective on March 31, 2015 were not paid on April 30 as required, nor were they paid as a group at any one time.  Rather, they were paid selectively, from April through July.

128.    In late May, an investor who was still waiting to receive payment of his redemption pointedly asked:  "To address our concerns, I ask that you be fully transparent with respect to timing of the redemption, including why PPVA does not simply sell some liquid securities to fund the redemption."  Nordlicht responded:  "There are good reasons we do not liquidate trading positions but that is another story and doesn't excuse what happened.  It was really Murphy's law in terms of a few closings getting postponed or dragged out at the same time. In any event, I am hopeful for tomorrow."  Nordlicht's response omitted material information, such as that the fund had been having trouble paying redemptions for more than one quarter, and that one of its large portfolio company holdings was overvalued.

129.    As the end of the next quarter approached in June, Platinum once again worked to execute on its continued scheme to stave off redemptions.  Almost $50 million in June 30, 2015 redemptions came due by July 31.  But payments were made at various times from late-August until mid-October, with some redeeming investors not being paid at all.

130.    Landesman persuaded several investors to postpone their redemptions to September 2015, without disclosing PPVA's liquidity crisis.  Indeed, he assured one investor,

who expressed hope for a 12% annual return for 2015 and 15% for 2016-19, "all of that is doable," without mentioning that in fact PPVA was essentially out of cash.

131.    On July 1, 2015, PPVA started the day with $1,010,000 and had scheduled outflows totaling $991,000, leaving a net of $20,000. The scheduled outflows did not include any redemption obligations.

132.    PPVA's financial condition at the time was so perilous that Platinum Management principals made loans to allow PPVA to meet certain of its financial obligations. For example, as of July 24, 2015, the PPVA master fund bank account was overdrawn $1.5 million. That day, a Platinum Management principal wired $1.65 million into the Platinum Management bank account, and that $1.65 million was transferred that same day into the PPVA master fund account. From there, the money was used for various PPVA obligations, including $50,000 that was transferred to the PPVA (USA) account to fund payments to two investors.

133.    In other words, in July 2015, Platinum Management was resorting to obtaining short-term loans from its principals even to selectively fund $50,000 worth of redemption obligations while other redemption requests remained unpaid.

134.    Consistent with prior months' marketing materials, PPVA's July 2015 marketing materials made no mention of any liquidity or redemption issues and instead represented that there was no lockup and that withdrawals were "Quarterly, 60 days' notice required."

135.    Even as unpaid redeeming investors pressed for explanations, Platinum employees held back on revealing the whole truth. For example, in mid-August 2015, one investor who was still waiting for payment on his June 30, 2015, redemption asked in an email received by Landesman and Mann whether any outstanding redemptions have been paid. He

received a misleading response from another Platinum employee, on which both Landesman and Mann were copied: "We endeavor to treat all investors equally. We are open to providing priority to investors who show severe hardship, but very much prefer to make simultaneous payments to all investors at the same time." By the time of that response, however, twelve redemptions for June 30 had been paid out, at least in part.

136. Throughout this period, Mann was aware of PPVA's liquidity problems because he prepared internal reports on, among other things, dates and amounts of redemptions and subscriptions, and was also aware of investor complaints about late redemptions and pointed questions about PPVA's liquidity. Despite that knowledge, he continued to communicate with investors about processing new redemptions and deferrals without disclosing the full picture of the fund's troubles.

137. Mann also followed Platinum Management's practices of selective redemptions, pressing Nordlicht to provide payment to an investor on hardship grounds while ignoring emails of another investor who inquired about the status of his own pending redemption request.

### PPVA Borrows from PPCO, Violating the Funds' Rules Made Known to Investors

138. As PPVA's liquidity crisis deepened, Platinum Management turned to yet another source for desperately needed cash: PPCO. The PPMs of both PPVA and PPCO prohibited the lending or borrowing of funds from one to the other for any purposes other than to facilitate an investment. Starting in October 2014, however, the two funds ignored this restriction, and PPCO frequently extended large loans at least in part to help ease PPVA's cash crisis. Nordlicht readily executed this scheme, since he was the co-CIO of both funds and essentially controlled their affairs, treating their funds as a single "stew."

139.    In October 2014, PPVA borrowed $10 million from PPCO at 16% interest.  This principal was paid back by the end of 2014.  In 2015 the two funds entered into a $25 million revolving credit arrangement.  The note evidencing this was dated as of January 1, 2015, and on or about that date PPVA borrowed another $18 million.  The outstanding principal declined and then rose again, so that by late August, it exceeded $12 million.

140.    From August 1 to August 20, 2015, alone, a net $3.35 million flowed from PPCO to PPVA.

141.    Toward the end of August 2015, however, Nordlicht briefly reversed course.  From August 21 to August 31, 2015, with PPCO facing its own unpaid redemption requests, PPVA transferred $2.275 million from its master fund account to PPCO (and PPCO transferred back only $15,000).  During that same period, PPCO paid outstanding June 30, 2015 redemptions totaling approximately $3.7 million.  At the same time that PPVA was helping PPCO pay its outstanding redemptions, PPVA as of the end of September 1 had at least fourteen overdue redemptions of its own totaling at least $10 million.  It was not until mid-October that Platinum Management completed paying those fourteen redemptions.

142.    Nordlicht then reversed course again.  From September 9 through 30, PPVA's ability to pay redemptions was aided by $3.7 million in new funding from PPCO to PPVA.

143.    Still, the September quarter brought continued redemption strains.  Of the approximately  57 redemptions that became effective on September 30, 2015, most have never been paid, although 17 investors did receive preferential payments for some or all of their redemptions, in one form or another.

144.    On September 30, 2015, PPVA's principal bank accounts were again nearly empty and the fund faced approximately $20 million in new net redemptions and repayment of a short-term loan of $7.2 million.

145.    That same day, two related foreign funds subscribed to PPCO by wiring $6.5 million and $1.2 million, respectively, into a PPCO account.

146.    The next day, October 1, 2015, those subscribers' funds were transferred to a PPCO Master Fund account at the same bank.  From there, $7.3 million of the new PPCO investors' money was wired to the PPVA Master Fund bank account at a different bank.  PPVA used that money to repay its outstanding loan.

147.    Thus, within 24 hours of investing $7 million in PPCO, these investors' monies had, without their knowledge or consent, been diverted to a separate fund, PPVA, to pay off a short-term loan.

148.    The $7 million was then added to the outstanding principal owed by PPCO to PPVA on its revolving loan.  This "loan" contradicted representations made in the PPMs of both funds because PPVA was borrowing, and PPCO was lending, money to handle a short-term cash crunch rather than for the permitted purposes of making investments.

149.    Meanwhile, PPVA's monthly marketing materials for September 2015 again provided no information on liquidity problems, and repeated that there was no lockup provision and that withdrawals were "Quarterly, 60 days' notice required."

150.    On September 16, 2015, PPVA finally provided investors with audited financials for the 2014 audit year, 139 days following the April 30, 2014 due date.  This prolonged delay once again violated Platinum Management's obligations under the Custody Rule.  Even worse, although the audited financials disclosed that PPVA had borrowed approximately $95 million

during 2014, they repeated the misleading statement from the prior year's audit that the purpose

of those loans was to complete "investment transactions."

### Investors Transfer Interests from PPVA to PPCO, But PPCO Gets No Cash

151.    In October and November 2015, Platinum Management, Platinum Credit and

Nordlicht also misused PPCO to help PPVA by engaging in preferential, cashless redemptions of

some PPVA investors and cashless transfers of those investors' interests into PPCO.

152.    In an attempt to redeem certain PPVA investors without having to pay out cash,

Platinum Management caused them to execute PPCO subscription agreements, together, in most

cases, with detailed wire instructions to Platinum Management's fund administrator authorizing

that the proceeds of their PPVA redemptions be wired to a designated PPCO bank account. One

other investor did not submit wire instructions, but nonetheless gave the direction to

"sell/redeem" $500,000 from PPVA and "invest the redemption proceeds" into PPCO.

153.    In fact, however, the signed wire instructions that had been provided to the fund

administrator were not followed: no transfers of funds ever occurred. Instead, the amounts –

totaling over $3 million – were simply added to the balance of PPVA's outstanding revolving

line of credit owed to PPCO.

154.    Such cashless redemptions harmed, and were a breach of fiduciary duty to, both

PPCO and PPVA. This new PPCO "loan" to PPVA clearly was not a loan for purposes of

investment, as narrowly permitted by PPCO's fund documents, and thus contradicted

representations in PPCO's PPMs. And PPCO received no cash for these new subscriptions,

merely a promise to pay by an affiliated fund that lacked sufficient funds to meet its own

redemption obligations. This left PPCO investors exposed to the risk presented by PPVA's

illiquidity.

155.    PPVA, too, was harmed, as it was forced to incur the obligation to pay high interest merely to facilitate redemptions from its own fund.  Remaining PPVA investors were also harmed by what in effect were preferential redemptions, which allowed certain redeeming investors to escape from PPVA to the relatively healthier PPCO.  Nonetheless, Platinum Management, Platinum Credit, Nordlicht and others ignored the blatant conflict of interest between PPCO and PPVA.  Further, Nordlicht as co-CIO of the advisers to both PPVA and PPCO, caused PPCO and PPVA to act in a way that was potentially contrary to each of their own interests.

156.    These were not the first cashless transfers from PPVA to PPCO.  As early as October 2014, an investor wired instructions to redeem $15 million from PPVA and "use the proceeds of the redemption to subscribe" to PPCO "for the same amount of $15,000,000" effective December 31, 2014.  Later, this was changed to a cashless transfer, which Platinum officials first thought to add to the PPNE Loan, and then decided to use as the basis for what became the new $25 million revolving note by PPVA to PPCO.  The effect was the same:  PPVA was shed of a $15 million investment interest and PPCO gained a $15 million investment interest for no cash, and just a promise to pay by PPVA.

157.    In this earlier case, the failure to deal with the obvious conflict of interest between the two funds was blatant.  PPCO's CFO wrote that "since the borrower is PPVA no need for risk and valuation to sign off as the CIO is obviously comfortable with the risk.  David Levy can just approve the deal sheet and memo."

### Late 2015 and 2016 – the Peaking of the Liquidity Crisis, New Misleading Communications with Investors and New Diversions of Funds

158.    By the late fall of 2015, Platinum Management decided to address PPVA's liquidity problems by placing certain assets in a "side-pocket" that would prevent them from

43

being used as a basis for calculating the amount of redemptions an investor would be entitled to until the assert was sold.  Still investors continued to be misled, and funds improperly diverted, even after this change occurred.

159.    Nordlicht issued a letter dated November 23, 2015 stating that PPVA USA, via its investment in the PPVA Master Fund, "still holds substantial investments in the remaining illiquid assets which require additional time before the Master Fund can realize the value of those investments.  Accordingly, the Investment Manager has a plan to segregate certain illiquid assets (and related liabilities) from the remainder of the assets in the portfolio (the 'Special Investments') in the interest of protecting investors and maximizing returns. …The Special Investments structure protects the Fund investors from being left holding a disproportionately high percentage of illiquid assets when redemptions are made by some investors."  Nordlicht asked for the investors' consent to this "Special Investments" modification of the fund.

160.    In a conference call in late November 2015 explaining this shift, Nordlicht stated that the existing fund "should quickly become very very liquid" and "I expect it to have ample liquidity," and "liquidity-wise, we're getting things back to normal and we expect to run it with ample liquidity . . . ."  In the same investor call, Nordlicht also minimized the significance of the redemptions crisis PPVA was facing, saying, "this was not a redemption-driven type of move that we've made, and in fact we've had less redemptions than you would expect in a fund of our size.  This was really a situation where it got to a point where we just had too many private equity positions.  I don't feel comfortable paying out in cash at this time."

161.    This was misleading, given that the fund was cash-strapped and had substantial past-due redemptions, a fact he omitted.

162.    Moreover, contrary to Nordlicht's promise that the fund "should quickly become very very liquid" after illiquid assets were moved to the side-pocket, most investors were not paid redemptions even out of the existing fund.  With a few selective exceptions, cash redemption payments ceased from late 2015 forward.

163.    Meanwhile, on November 11, 2015, an investor who was waiting to receive payment on his September 2015 redemption of approximately $394,000 sent an email to Mann asking when his redemption would be paid.  Mann replied: "[w]e hope to send it to you soon." However, during that same month another Platinum employee told the investor that Platinum could not return his investment because of liquidity issues, since liquidating their liquid holdings in order to pay him would leave remaining investors with too high a portion of the illiquid investments.  Mann subsequently ignored a January 12, 2016, email from the investor asking when his redemption would be paid.  To date, the investor has not received any portion of his PPVA investment back.

164.    In mid-January 2016, one unpaid PPVA and PPCO investor emailed Platinum complaining: "I have asked already about a dozen times about money due to me from PPVA. …you have not paid me money that is due for 75 days. Every time I ask I am told a few more days. … Also PPNE [note interest payment] is supposed to pay at the start of the month and we are now at Jan 15 with no money. This was supposedly guaranteed by the fund."  In a reply email from a Platinum Management employee, the investor was told that the PPNE interest payments would be made the following week and that they would have an answer for him on Monday when the overdue September 30 redemption would be paid.

165.    The investor responded in part: "Nothing makes investors more jittery than not paying in a timely fashion. I told you that in my opinion holding up the PPCO payment in light

45

of the changes that you wanted to implement at PPVA was a big mistake. If in fact PPCO has

nothing to do with PPVA than (sic) why was the PPCO delayed for 2 months."

166.    The investor's email reflects Platinum Management's and Platinum Credit's

failure to disclose the extensive intermingling of funds between the two funds to deal with both

funds' liquidity problems.

167.    In May 2016, with liquidity problems still not solved, Platinum Management,

Platinum Credit, Nordlicht and Levy used BAM to essentially steal investor money to obtain

cash needed for PPVA expenses.

168.    Among its many transactions BAM made with Platinum Partners affiliates, was a

$25 million participation interest in a term secured loan to a wholly-owned PPCO portfolio

company named Credit Strategies LLC.  The loan requires that Credit Strategies in effect apply

proceeds either to its own debt obligations or to general corporate purposes.

169.    In May, a Platinum portfolio manager (copying Nordlicht and Levy) emailed a

request for $1.5 million in funding under the note for purposes of "working capital."  The request

was signed by Levy, as co-CIO for Credit Strategies.  On May 11, BAM approved the funding

instructed its bank to wire the money to Credit Strategies' bank account.

170.    However, the money was not used by Credit Strategies for working capital as

required, but was diverted to a separate fund, PPVA.

171.    First, Credit Strategies wired approximately $1.5 million to the parent PPCO

fund's account.  From there, PPCO wired the money to its investment manager, Platinum Credit.

Platinum Credit, in turn, wired approximately the same amount to Platinum Management.

172.     Platinum Management then wired the money to a PPVA bank account that at the time was overdrawn by about $1.54 million because of payments the funds that had been made to prime brokers.

173.     Furthermore, in June 2016, with PPVA's liquidity crisis peaking, SanFilippo helped Nordlicht break Platinum Management's oft-repeated promise to investors that overdue redemptions would be paid once several illiquid positions were monetized.  As an example of this promise, Mann told one investor in May 2016 that "we anticipate paying/wiring the whole 12/31 redemption class their funds (minus 10% audit holdback) together sometime at the end of June or beginning of July (or maybe earlier). This is based on our current liquidity and the anticipated sale of two companies."

174.     Meanwhile, Nordlicht helped to close a transaction involving one portfolio company.  As a result, on June 9, 2016, PPVA received $37 million in proceeds.  But one of those funds were paid that month to investors.  Instead, $11 million of these proceeds were invested in a different private company – the same type of illiquid investment that had gotten PPVA into a liquidity crisis in the first place.  And, among other uses of the funds, Nordlicht emailed SanFilippo and directed him to make various payments totaling approximately $900,000 to a handful of parties, mostly insiders.  By the end of the month, there was $31,000 left in the PPVA Master Fund account.  This use of the proceeds contradicted the repeated promises by Platinum Management that such major monetizing events would fund large-scale redemption payments.

**PPVA and PPCO Cease Taking on New Investors**

175.     In June 2016, the FBI executed a search warrant at Platinum Management's offices, and the U.S. Attorney's Office for the Southern District of New York filed criminal charges against one of Platinum Partners' co-owner, in connection with a bribery scheme in

which he is alleged to have paid kickbacks to a New York City Correction Officer's Union official to obtain the union's retirement fund investments in PPVA during the time it was experiencing its liquidity crisis.

176.    In the wake of those events, Nordlicht announced to investors that the PPVA fund would stop taking in new money and fund investments would gradually be monetized.  .

177.    On July 18, 2016, following consultations between Commission staff and counsel for Platinum Partners and its affiliates, the PPVA, PPCO, and PPLO funds retained Guidepost Solutions LLC ("Guidepost") as an "Independent Oversight Advisor," giving the firm access to information and employees and advance notice of major transactions concerning all of Platinum Partners' funds.

178.    On July 20, 2016, Platinum circulated to investors Guidepost's letter announcing its appointment "to assist the Managers with the development and implementation of a plan for the orderly liquidation of the Funds under management."

179.    On July 28, 2016, a petition was filed in the Grand Court of the Cayman Islands, commencing an involuntary liquidation proceeding and seeking the appointment of Matthew Wright ("Wright") and Christopher Kennedy ("Kennedy") of RHSW (Cayman Limited) as Joint Official Liquidators for the PPVA International feeder fund.

180.    On August 25, 2016, the Cayman Court appointed Wright and Kennedy as joint provisional liquidators of the PPVA master fund.  An involuntary liquidation proceeding was commenced against PPVA in the Cayman Islands, where the PPVA master fund and international feeder fund are incorporated.  Those PPVA funds are now under the supervision of a court-appointed liquidator.  On October 19, 2016, the Cayman liquidator commenced an

ancillary bankruptcy proceeding in the United States, pursuant to Chapter 15 of the United States Bankruptcy Code.

181.    The PPCO and PPLO funds remained under the informal monitoring of Guidepost.

182.    On October 26, 2016, the Litigation Trustee for Black Elk, a Debtor in Bankruptcy, commenced an Adversary Proceeding against PPVA, PPCO, and PPLO, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, based on claims arising from the fraudulent consent scheme alleged above.  On the same day, the Bankruptcy Court issued a TRO imposing certain restrictions on PPCO and PPLO's assets.  A hearing for a related application for injunctive relief has been set for January 12, 2017.

183.    In November 2016, in connection with the Black Elk trustee's request for preliminary relief in its adversary proceeding, the testimony of various individuals was taken.

184.    On November 29, 2016, Levy was deposed by the Trustee and asserted his Fifth Amendment right against self-incrimination, refusing to answer any questions concerning the Black Elk note transactions and any other Platinum matters.

185.    On November 30, 2016, Nordlicht was deposed by the Trustee and asserted his Fifth Amendment right against self-incrimination, refusing to answer any questions regarding the Black Elk note transactions and any other Platinum matters.

186.    On November 30, 2016, PPCO's auditor advised PPCO that it had suspended work on all outstanding engagements and that PPCO should retain a new accounting firm to replace it.

## FIRST CLAIM FOR RELIEF
### (Against Platinum Management, Platinum Credit and Nordlicht)
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### and Rule 206(4)-8 thereunder

187.    The Commission realleges and incorporates paragraphs 1 to 186 by reference as if fully set forth herein.

188.    From at least 2012 through the present, Defendants Platinum Management, Platinum Credit and Nordlicht, investment advisers, directly or indirectly, singly or in concert, by the use of the means and instruments of transportation or communication in interstate commerce, and of the mails, employed and are employing devices, schemes and artifices to defraud investors, and have engaged and are engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

189.    By engaging in the conduct described above, Defendants Platinum Management, Platinum Credit and Nordlicht have violated, are violating and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) and 80b-6(2).

## SECOND CLAIM FOR RELIEF
### (Against Nordlicht)
### Aiding and Abetting Violations of Section 206(1) and 206(2) of the Advisers Act

190.    The Commission realleges and incorporates paragraphs 1 to 189 by reference as if fully set forth herein.

191.    From at least 2012 through the present, by engaging in the conduct described above, and pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f), Defendant Nordlicht, in the alternative, singly or in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commended, induced or procured Defendant Platinum Management's

and Platinum Credit's violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C.

80b-6(1) and  80b-6(2).

192.    Unless restrained and enjoined, Defendant Nordlicht will again aid and abet

violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) and  80b-6(2).

### THIRD CLAIM FOR RELIEF
**(Against Platinum Management, Platinum Credit and Nordlicht)**
**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**

193.    The Commission realleges and incorporates paragraphs 1 to 192 by reference as if

fully set forth herein.

194.    From at least 2012 through the present, Platinum Management, Platinum Credit

and Nordlicht also served as investment advisers to a pooled investment vehicle, and (a) made

untrue statements of material fact or omitted to state a material fact, necessary to make the

statements made, in the light of circumstances under which they were made, not misleading, to

an investor in the pooled investment vehicle; and (b) engaged in an act, practice, or course of

business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective

investor in the pooled investment vehicle.

195.    By engaging in the foregoing conduct, Defendants Platinum Management,

Platinum Credit and Nordlicht have violated, are violating and, unless restrained and enjoined,

will continue to violate 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8

thereunder, 17 C.F.R. § 275.206(4)-8.

### FOURTH CLAIM FOR RELIEF
**(Against Levy, Small, Landesman, Mann, SanFilippo and Nordlicht)**
**Aiding and Abetting Violations of Section 206(4)**
**of the Advisers Act and Rule 206(4)-8 Thereunder**

196.    The Commission realleges and incorporates paragraphs 1 to 195 by reference as if

fully set forth herein.

197.     From at least 2012 through the present, by engaging in the conduct described above, and pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Defendants Levy, Small, Landesman, Mann, SanFilippo, and Nordlicht in the alternative, singly or in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commended, induced or procured Defendant Platinum Management's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder and Defendant Nordlicht, in the alternative, singly or in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commended, induced or procured Defendant Platinum Credit's Management's violations of Sections 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4),  and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

198.     Unless restrained and enjoined, Defendants Levy, Small and Nordlicht will again aid and abet violations of Sections 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## FIFTH CLAIM FOR RELIEF
### (Against Platinum Management)
### Violation of Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder

199.     The Commission realleges and incorporates paragraphs 1 to 198 by reference as if fully set forth herein.

200.     By engaging in the conduct described above, Platinum Management willfully violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), which prohibits a registered investment adviser from engaging in fraudulent, deceptive or manipulative conduct, and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2, which requires an adviser to take certain enumerated steps to safeguard client assets over which it has custody.

201.     By reason of the foregoing, Platinum Management violated, is violating and, unless restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2.

**SIXTH CLAIM FOR RELIEF**
**(Against Platinum Management, Platinum Credit, Nordlicht, Levy, Landesman and SanFilippo)**
**Violations of Section 17(a) of the Securities Act**

202.     The Commission realleges and incorporates paragraphs 1 to 201 by reference as if fully set forth herein.

203.     Interests in PPVA and PPCO are securities within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

204.     By engaging in the conduct described above, Defendants Platinum Management, Platinum Credit, Nordlicht, Levy, Landesman and SanFilippo, directly or indirectly, singly or in concert, in the offer or sale of securities, knowingly, recklessly or negligently,  by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; (b) have made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) have engaged, are engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities.

205.     By reason of the foregoing, Defendants Platinum Management, Platinum Credit, Nordlicht, Levy, Landesman and SanFilippo have violated, are violating, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SEVENTH CLAIM FOR RELIEF
### (Against Mann)
### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

206.    The Commission realleges and incorporates paragraphs 1 through 205 by reference as if fully set forth herein.

207.    Shares of PPVA and PPCO are securities within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

208.    By engaging in the conduct described above, Defendant Mann, directly or indirectly, singly or in concert, in the offer or sale of securities, knowingly, recklessly or negligently,  by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) has employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; and/or (b) has engaged, are engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities.

209.    By reason of the foregoing, Defendant Mann has violated, is violating, and unless restrained and enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)  and 15 U.S.C. § 77q(a)(3).

## EIGHTH CLAIM FOR RELIEF
### (Against Nordlicht and Levy ,Landesman, Mann and SanFilippo)
### Aiding and Abetting Violations of Section 17(a) of the Securities Act

210.    The Commission realleges and incorporates paragraphs 1 through 209 by reference as if fully set forth herein.

211.    By engaging in the conduct described above, and pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), Defendants Nordlicht, Levy, Landesman, Mann and

SanFilippo, in the alternative, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendant Platinum Management's, and Defendants Nordlicht and Levy, in the alternative, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Platinum Credit's, primary violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], because they knowingly or recklessly provided substantial assistance to Defendants Platinum Management's, and Defendants Nordlicht and Levy knowingly and recklessly provided substantial assistance to Platinum Credit's, violations of the Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

212.    Unless restrained and enjoined, Defendants Nordlicht, Levy, Landesman, Mann and SanFilippo will again aid and abet violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) .

### NINTH CLAIM FOR RELIEF
**(Against Platinum Management, Platinum Credit, Nordlicht, Levy, Small, Landesman and SanFilippo)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

213.    The Commission realleges and incorporates paragraphs 1 through 212 by reference as if fully set forth herein.

214.    By engaging in the conduct described above, Defendants Platinum Management, Platinum Credit, Nordlicht, Levy, Small, Landesman and SanFilippo directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, in connection with the purchase or sale of securities, knowingly or recklessly: a) employed, are employing or are about to employ devices, schemes and artifices to defraud; b) have obtained, are obtaining or are about to obtain money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and/or c) have engaged, are

engaging or are about to engage in transactions, practices or courses of business which have

operated, operate or will operate as a fraud and deceit upon investors.

215.    By engaging in the foregoing conduct, Defendants Platinum Management,

Platinum Credit, Nordlicht, Levy, Small, Landesman, and SanFilippo have violated, are

violating, and unless restrained and enjoined will again violate Section 10(b) of the Exchange

Act, 15 U.S.C. §§78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## TENTH CLAIM FOR RELIEF
### (Against Mann and Shulse)
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

216.    The Commission realleges and incorporates paragraphs 1 through 215 by

reference as if fully set forth herein.

217.    By engaging in the conduct described above, Defendants Mann and Shulse,

directly or indirectly, singly or in concert, by use of the means or instruments of transportation or

communication in, or the means or instrumentalities of, interstate commerce or by the use of the

mails, in connection with the purchase or sale of securities, knowingly or recklessly: a)

employed, are employing or are about to employ devices, schemes and artifices to defraud;

and/or b) have engaged, are engaging or are about to engage in transactions, practices or courses

of business which have operated, operate or will operate as a fraud and deceit upon investors.

218.    By engaging in the foregoing conduct, Defendants Mann and Shulse have

violated, are violating, and unless restrained and enjoined will again violate Section 10(b) of the

Exchange Act, 15 U.S.C. §§78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R.

§240.10b-5(a) and 17 C.F.R. §240.10b-5(c).

## ELEVENTH CLAIM OR RELIEF
### (Against Small , Landesman, Mann, SanFilippo and Shulse)
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10(b)-5 Thereunder

219.    The Commission realleges and incorporates paragraphs 1 through 218 by reference as if fully set forth herein.

220.    By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants Small, Landesman, Mann, SanFilippo and Shulse, in the alternative, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendant Platinum Management's primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 thereunder 17 C.F.R. § 240.10b-5, because they each knowingly or recklessly provided substantial assistance to Defendant Platinum Management's violations of Section 10b of the Exchange Act, 15 U.S.C. § 78j(b),  and Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10b-5.

221.    Unless restrained and enjoined, Defendants Small Landesman, Mann, SanFilippo and Shulse will again aid and abet violations of Section 10b of the Exchange Act and Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

A Final Judgment finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged herein.

### II.

An Order temporarily, and preliminarily through a final judgment, restraining and enjoining Platinum Credit,  its agents, servants, employees and attorneys and all persons in

active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting or controlling, future violations of Sections 206(1), 206(2), 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8, thereunder; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b), Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

An order temporarily, and preliminarily through a final judgment, appointing a Receiver over the Receivership Entities.

### IV.

An Order permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting or controlling, future violations of Sections 206(1), 206(2), 206(4) of the Advisers Act,15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-2 [17C.F.R. § 275.206(4)-2] and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8]; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 thereunder 17 C.F.R. § 240.10b-5.

### V.

A Final Judgment ordering all Defendants, except Shulse, to disgorge, on a joint and several basis, all ill-gotten gains and unjust enrichment, plus prejudgment interest thereon.

### VI.

A Final Judgment ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

### VII.

58

An Order temporarily, and preliminarily through a final judgment, appointing a receiver over the Receivership Entities.

## VIII.

An Order temporarily, and preliminarily through a final judgment, freezing the assets of X and Y, including their bank and brokerage accounts pending a final judgment, pursuant to the Court's equitable power and Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

## IX.

An Order granting expedited discovery.

## X.

An Order temporarily, and preliminarily through a final judgment, restraining and enjoining Defendants and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

## XI.

Granting such other and further relief as this Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:  December 19, 2016
        New York, New York

                                        Respectfully submitted,

                                        By: _____
                                            Andrew M. Calamari
                                            Sanjay Wadhwa
                                            Adam Grace
                                            Kevin P. McGrath
                                            Neal Jacobson
                                            Jess Velona
                                            Danielle Sallah
                                            Attorneys for the Plaintiff
                                            SECURITIES AND EXCHANGE
                                              COMMISSION
                                            New York Regional Office
                                            Brookfield Place
                                            200 Vesey Street, Suite 400
                                            New York, NY 10281-1022
                                            (212) 336-0180 (Velona)

60