# **Exhibit 3**

## AMENDED AND RESTATED

## INVESTMENT MANAGEMENT AGREEMENT

This AGREEMENT is effective as of March 11, 2012 by and among:

(i)    PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company with its principal office located at 152 West 57th Street, 4th Floor, New York, New York 10019 ("Platinum Management");

(ii)    PLATINUM LIQUID OPPORTUNITY MANAGEMENT (NY) LLC, a Delaware limited liability company with its principal office located at 152 West 57th Street, 4th Floor, New York, New York 10019 ("Platinum Liquid Opportunity Management" and together with Platinum Management, the "Managers"); and

(iii)    DANIEL SMALL, an individual with an address at 255 West 85th Street, #9C, New York, New York 10024 (the "Portfolio Manager").

### W I T N E S S E T H:

**WHEREAS**, Platinum Management serves as the Investment Manager to Platinum Partners Value Arbitrage Fund, L.P., a Cayman Islands limited partnership ("PPVA"), and Platinum Liquid Opportunity Management serves as the Investment Manager to Platinum Partners Liquid Opportunity Master Fund L.P. and Platinum Partners Liquid Opportunity Master Fund II L.P., each a Cayman Islands exempted limited partnership (together, "PPLO" and collectively with PPVA, the "Funds"), and are responsible for making all investment and trading decisions on behalf of such Funds, respectively; and

**WHEREAS**, the Managers desire to retain the Portfolio Manager to provide investment advisory services to the Managers regarding a portion of the Funds' capital on behalf of and under the supervision of the Managers on the terms set forth herein, and the Portfolio Manager desires to provide such services to the Managers regarding such portions of the Funds' capital on such terms;

**WHEREAS**, this Agreement was originally made as of August 24, 2010;

**WHEREAS**, the parties hereto desire to amend and restate this Agreement in its entirety as set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Definitions.  For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

(a)      "Account" means those assets of the Funds as set forth on Schedule A hereto, which shall be updated in the ordinary course of business by the mutual consent of the Managers and the Portfolio Manager.

(b)      "Account Expenses" means any direct or indirect expenses incurred by a Manager, a Fund or the Portfolio Manager for the benefit of the Account.

(c)      "Bonus Percentage" means 6.50%; provided, that the Bonus Percentage with respect to any calendar year shall equal 4.55% with respect to any Net Profits in excess of $15,500,000 for such calendar year.

(d)      "Cause" means any one or more of the following: (i) the Portfolio Manager materially breaches any of his obligations or covenants under this Agreement, and such breach is not cured (if such breach is capable of being cured) within 30 days of his receipt of written notice thereof from a Manager; (ii) any of the Portfolio Manager's representations or warranties made hereunder were materially false or materially misleading at the time they were made; (iii) any court, regulatory agency or self-regulatory agency prohibits the Portfolio Manager from being associated with a broker-dealer, commodity trading advisor, commodity pool operator or investment adviser; (iv) the Portfolio Manager is convicted of a felony or pleads guilty or *nolo contendere* to any felony charge in either case relating to a violation of the securities laws, investment advisory laws, embezzlement, misappropriation or fraud, or involving moral turpitude; (v) the Portfolio Manager becomes insolvent or a petition for bankruptcy is filed by or with respect to him; or (vi) alcohol or drug abuse by the Portfolio Manager that materially affects the performance of his duties and responsibilities hereunder which is not cured by him within 30 days of his receipt of written notice from a Manager of such Manager's good faith belief that such condition exists.

(e)      "Client" means a Platinum Fund and any partner, shareholder or other equity holder of any Platinum Fund.  For the avoidance of doubt, an investor in a collective investment entity (other than an entity established primarily for the purpose of investing in one or more Platinum Funds or that invests substantially all of its assets in one or more Platinum Funds) that, in turn, invests in a Platinum Fund will not be deemed a "Client" solely by virtue of such entity's investment in such Platinum Fund.

(f)      "Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

(g)      "Control Person" with respect to a particular entity, means a person who has the ability, by means of equity ownership, contractual rights or otherwise, to establish policy for or exercise operating control over any portion of the business of such entity in which he is to be involved.

(h)      "Good Reason" means any one or more of the following: (i) a Manager materially breaches any of its obligations or covenants under this Agreement, and such breach is not cured (if such breach is capable of being cured) within 30 days of its receipt of written notice thereof from the Portfolio Manager; (ii) any of a Manager's representations or warranties made hereunder were materially false or materially misleading at the time they were made; (iii) Mark

2

Nordlicht ceases to serve as the Chairman and Chief Investment Officer of the Managers; or (iv) the death or disablement of the Portfolio Manager.

(i)      "Net Loss" means, for each calendar year, all realized and unrealized investment and trading losses (net of profits) attributable to the Account plus all Account Expenses with respect to such calendar year, provided, however, that the investment and trading losses (and profits) attributable to the assets in the Account which are designated as "Realized Only" shall be included in Net Loss on a realized basis only, and provided further that the immediately preceding proviso shall not apply for purposes of Section 3(e)(iv) hereof.

(j)      "Net Profit" means, for each calendar year, all realized and unrealized investment and trading profits (net of losses) attributable to the Account less all Account Expenses with respect to such calendar year, provided, however, that the investment and trading profits (and losses) attributable to the assets in the Account which are designated as "Realized Only" shall be included in Net Profit on a realized basis only.

(k)      "Person" means an individual, trust, estate, corporation, partnership, limited liability company or other entity.

(l)      "Platinum Fund" means the Funds or any other collective investment entity for whom a Manager or any affiliate of a Manager provides investment management and/or administrative services, including, but not limited to, any collective investment entity of which a Manager or an affiliate of a Manager is a general partner, investment manager or investment adviser.

(m)      "Profits Interests" means the profits interests issued to the Portfolio Manager by DMRJ Group LLC, DMRJ I LLC, PPVA Black Elk (Equity) LLC, PPVA Black Elk (Investor) LLC, and DD China Cablecom LLC, and the singular "Profits Interest" shall refer to any of such profits interests individually as the context shall indicate.

(n)      "Termination Date" means the effective date of the termination of this Agreement.

(o)      "Termination Valuation Date" means the last day of the month in which the Termination Date occurs.

2.      Engagement.

(a)      Each of the Managers hereby appoints the Portfolio Manager, on the terms and conditions set forth herein, to provide investment advisory services with respect to the Account. The Portfolio Manager's responsibility for providing investment advisory services to the Managers shall be limited to those assets in the Account and such other assets as are agreed upon from time to time by the Portfolio Manager and a Manager.

(b)      The Managers shall be free at all times, in their sole discretion, to retain other portfolio managers to manage the Funds' capital and/or to manage the Funds' capital themselves using any investment techniques or strategies that they determine are appropriate.

3

3.    <u>Compensation</u>.

(a)    ***Base Salary***. The Managers (on a pro rata basis) shall pay a salary to the Portfolio Manager (the "<u>Base Salary</u>") at the rate of $180,000 per annum, payable in arrears in equal semi-monthly installments and pro-rated for partial years. The Base Salary shall be subject to all applicable withholdings for taxes. The Base Salary is non-refundable, but will serve as a "draw" against the Bonus described below. The Portfolio Manager will also be entitled to receive an employee benefits package from the Managers that is comparable to the packages provided by the Managers to similarly situated employees from time to time.

(b)    ***Bonus***. The Portfolio Manager shall also receive a bonus for each calendar year (the "<u>Bonus</u>") equal to (I) the product of (A) the Bonus Percentage multiplied by (B) the Net Profit for such calendar year, reduced as described below for any applicable Loss Carryforward Amount, less (II) the amount of Base Salary paid to the Portfolio Manager with respect to such calendar year and less (III) the aggregate amount of profits allocated to the Portfolio Manager with respect to the Profits Interests for such calendar year, provided that the calculation under this clause (III) shall be done by (C) excluding all allocations to the Profits Interests to the extent they do not correspond to realized amounts, so that, for example, a "book-up" or "book-down" of a capital account of any of the Profits Interests pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f)-(g) to the extent it does not reflect realized amounts shall be excluded, and (D) in the case of an exclusion of an allocation pursuant to the preceding clause (C), such excluded allocation shall be taken into account when the allocated item is realized. The Bonus shall be subject to all applicable withholdings for taxes.

(c)    ***Loss Carryforward***. In the event that either (i) the Account suffers a Net Loss for any calendar year or (ii) the Bonus is negative for any calendar year, the amount of such Net Loss or such negative Bonus, whichever is further below zero (deeming the amount of any Net Loss to be a negative number) (the "<u>Loss Carryforward Amount</u>"), shall be carried forward into the next succeeding calendar year and deducted from the Net Profits for such calendar year for the purpose of calculating the Bonus for such calendar year. For the avoidance of doubt, any such unrecovered Loss Carryforward Amount will be carried forward to such number of future calendar years as is necessary until such Loss Carryforward Amount is fully offset by subsequent Net Profits.

(d)    ***Payment of Bonus***. Subject to the remainder of this Section 3, the Bonus for each calendar year shall be paid by the Managers (on a pro rata basis) to the Portfolio Manager as follows:

(i)    eighty percent (80%) of the Bonus based on the Managers' reasonable best estimate of Net Profits shall be paid on or before February 15th of the year immediately following such calendar year (the "<u>Initial Payment Date</u>"), and

(ii)    the remaining balance of the Bonus (the "<u>Holdback Amount</u>") shall be paid promptly following the completion of the Funds' audits for the year <u>following</u> the year in which the Initial Payment Date occurred, but in any case no later than the last day of the taxable year following the year to which the audit relates. Amounts held back pursuant to this subsection (d)(ii) shall bear interest at the net rate of return of the Fund or Funds selected by the

4

Managers in their sole discretion from the applicable Initial Payment Date until such amount is paid to the Portfolio Manager.

In the event that a Manager fails to make the payment to the Portfolio Manager set forth in subsection (d)(i) above by the Initial Payment Date, the amount that was failed to be paid shall accrue interest commencing on the Initial Payment Date at a rate equal to the higher of (i) the net return of the Fund or Funds selected by the Managers pursuant to subsection (d)(ii) above and (ii) 1.0%.

For purposes of determining the Holdback Amount under Section 3(d)(ii) above, the Bonus shall be computed as if no Profits Interests had been issued and instead the Bonus for such year was calculated without the inclusion of clause (III) in Section 3(b) hereof.  For the avoidance of doubt, the Holdback Amount shall be funded to the maximum extent possible from the Bonus payable hereunder, and not from any amounts distributable pursuant to the Profits Interests; provided that if there is insufficient Bonus payable hereunder for a year to equal the Holdback Amount, then the obligation to hold back the Holdback Amount hereunder shall be deemed to be satisfied by adjustments to distributions under the Profits Interests as may be included in the limited liability company agreements governing the Profits Interests from time to time.

(e)     ***Voluntary Termination without Good Reason; Termination for Cause***. If during any calendar year (I) the Portfolio Manager voluntarily terminates this Agreement without Good Reason or (II) the Managers terminate this Agreement for Cause, the following shall apply:

(i)     no Base Salary will be payable after the Termination Date;

(ii)     no Bonus will be payable for the calendar year in which the Termination Date occurs;

(iii)     all Holdback Amounts from the current or any prior calendar year which remain unpaid as of the Termination Date will be forfeited by the Portfolio Manager;

(iv)     if the Termination Valuation Date is prior to the end of the first quarter of the calendar year in which such termination occurs, and the Account has a Net Loss for the elapsed portion of such year, the Bonus, if any, for the immediately preceding calendar year shall be recalculated to include such Net Loss (the "Adjusted Bonus"), and the Portfolio Manager shall reimburse the Managers for the excess of such Bonus over such Adjusted Bonus within 10 days of the date of the Termination Valuation Date; and

(v)     if the Termination Valuation Date is on or after January 1st but prior to February 15th, the Portfolio Manager will forfeit any Bonus with respect to the just completed calendar year.

(f)     ***Voluntary Termination with Good Reason; Termination without Cause***. If during a calendar year (I) the Managers terminate this Agreement without Cause or (II) the Portfolio Manager terminates this Agreement for Good Reason and the event which gave rise to

5

such Good Reason is still continuing as of the date of such termination, the following shall apply:

(i)      No Base Salary will be payable following the Termination Date; and

(ii)      Until all securities positions in the Account as of the Termination Date are liquidated by or on behalf of the Managers, the Portfolio Manager or his estate or heirs as applicable shall continue to receive the Bonus calculated and payable as set forth herein.

(g)      *Valuation*. Unrealized profit and loss shall be calculated by the Managers based upon prices at which open positions are valued by the Managers for purposes of reporting to investors in the Funds. Realized profit and loss shall be calculated on the actual net purchase or sale prices paid or received. The value of positions in the Account may be changed by the Managers in certain circumstances (such as large positions, discount or premium or fair value) upon consultation with the Portfolio Manager; provided that such adjustments shall be consistent with valuations established for the Funds' respective year-end accounting.

(h)      *Restatements*. If at any time during or following the term of this Agreement, gains or income used in the calculation of Net Profit and Net Loss are subsequently required to be surrendered or otherwise expended by a Manager or a Fund as a result of (i) taxes or other payments being due to any governmental authority or agency or (ii) an adjudication or a settlement of allegations to the effect that such gains or income were obtained in violation of applicable law where the Managers did not have actual knowledge that such gains or income were obtained in violation of applicable law, the Portfolio Manager shall promptly return any excess of the compensation previously paid to the Portfolio Manager by the Managers over the amount of compensation which would have been due the Portfolio Manager in the absence of the activity that gave rise to such surrender or expense.

(i)      *Fund Obligations*. In the event that (I) a Manager is unable to pay the Portfolio Manager all or a portion of the Base Salary and/or Incentive Fees due to him under this Agreement with respect to services he provided to a Fund of which such Manager is the investment manager, and (II) such Fund is permitted under its governing documents to pay compensation directly to the Portfolio Manager for such services, such Manager agrees to use its reasonable best efforts to cause such Fund to pay the Portfolio Manager such unpaid Base Salary and/or Incentive Fees to the extent it relates to services provided to such Fund.

4.      Representations, Warranties and Covenants.

(a)      The Portfolio Manager hereby represents, warrants and covenants as follows:

(i)      The Portfolio Manager will provide investment advice regarding the Account using a commercially reasonable professional standard of care pursuant to the investment objectives, strategies, techniques and restrictions agreed to by the Portfolio Manager and the Managers from time to time. The Portfolio Manager will discharge his duties with respect to the Account: (i) solely in the interest of the Account and not deal with the assets of the

130355.01006/21980379v.4

Account in his own interest or for his own account; and (ii) in accordance with the provisions of this Agreement and all applicable federal, state and foreign laws and regulations.

(ii)     To the knowledge of the Portfolio Manager, there are no governmental, regulatory, self-regulatory and exchange licenses, registrations, memberships and approvals, if any, required to perform his obligations under this Agreement, and to the extent any are required in the future, he will obtain and maintain all such required licenses, registrations, memberships and approvals during the term of this Agreement.

(iii)     This Agreement has been duly authorized and executed by the Portfolio Manager and constitutes a valid and legally binding agreement enforceable against him in accordance with its terms. The Portfolio Manager's execution and delivery of this Agreement and his performance of his duties and obligations hereunder do not conflict with or constitute a breach or a default under any order, settlement contract or agreement to which he is a party or by which he is bound.

(iv)     The Portfolio Manager will provide for review by the Managers all material documents, statements, agreements and workpapers reasonably requested by the Managers in connection with his activities on behalf of the Account.

(v)     There are no pending or threatened actions, suits, proceedings or investigations before or by any court, governmental, administrative or self-regulatory body, board of trade, exchange or arbitration panel to which the Portfolio Manager is a party or to which the Portfolio Manager or any of his assets is subject, nor has the Portfolio Manager received any notice of an investigation, inquiry or dispute by any court, governmental, administrative or self-regulatory body, board of trade, exchange or arbitration panel regarding any of his activities.

(vi)     If at any time during the term of this Agreement, the Portfolio Manager discovers any fact or omission, or any event or change of circumstances has occurred which would make any of his representations or warranties herein inaccurate or incomplete in any material respect if such representation or warranty were restated as of such time, he shall provide prompt written notification to the Managers of any such fact, omission, event or change of circumstance, and the material facts related thereto.

(vii)     The Portfolio Manager shall comply at all times with the Managers' respective compliance manual and code of ethics and the Managers' respective personal trading policies, as such are in effect from time to time, as adopted by a Manager in its discretion and communicated to the Portfolio Manager in writing.

(b)     Each Manager hereby represents, warrants and covenants as follows:

(i)     Such Manager has all governmental, regulatory, self-regulatory and exchange licenses, registrations, memberships and approvals, if any, required to perform its obligations under this Agreement, including applicable state securities commissions, and any other licenses, registrations, memberships and approvals that may be required by each applicable jurisdiction in which such Manager operates or performs its obligations under this Agreement,

130355.01006/21980379v.4

and will maintain all required licenses, registrations, memberships and approvals during the term of this Agreement.

(ii)     This Agreement has been duly authorized and executed by such Manager and constitutes a valid and legally binding agreement enforceable against such Manager in accordance with its terms. Each of such Manager's execution and delivery of this Agreement and its performance of its respective duties and obligations hereunder do not conflict with or constitute a breach or a default under any order, settlement contract or agreement to which it is a party or by which it is bound.

(iii)     If at any time during the term of this Agreement, a Manager discovers any fact or omission, or any event or change of circumstances has occurred which would make any of its representations or warranties herein inaccurate or incomplete in any material respect if such representation or warranty were restated as of such time, it shall provide immediate written notification to the Portfolio Manager of any such fact, omission, event or change of circumstance, and the material facts related thereto.

5.     <u>Indemnification</u>. The Portfolio Manager shall be indemnified by each Manager (severally and not jointly) from and against any and all losses, claims, damages, liabilities, expenses, judgments, fines, settlements and other amounts (collectively, "<u>Losses</u>") that relate to any threatened, pending or contemplated action, suit or proceeding, whether civil or criminal, administrative, arbitrative or investigative (each, a "<u>Proceeding</u>") or any appeal in or from any Proceeding, relating to the Portfolio Manager's performance or participation in the performance of duties or the rendering of advice or consultation with respect to such Manager, except to the extent those Losses arise from actions or failures constituting gross negligence or a willful violation of law by the Portfolio Manager or the breach of this Agreement by the Portfolio Manager. In the event that a Manager cannot fulfill its indemnification obligations hereunder, such Manager shall use its reasonable best efforts to cause each Fund to which it serves as investment manager (severally and not jointly) to indemnify the Portfolio Manager for Losses to the same extent as set above with respect to the Portfolio Manager's performance or participation in the performance of duties or the rendering of advice or consultation with respect to such Fund.

6.     <u>Portfolio Manager's Authority; Cooperation</u>.

(a)     The Portfolio Manager will have no authority to open up any accounts on behalf of a Manager or a Fund (or with respect to which a Manager or a Fund could be liable) including trading accounts or accounts with any vendors or suppliers.

(b)     The Portfolio Manager agrees that he will be available by telephone and e-mail to discuss the Account's portfolio, prospects and operations with the Managers at reasonably convenient times, and shall be available to meet with the Managers to discuss such items in person at mutually convenient times.

7.     <u>Confidential Information; Non-Disparagement; Track Record</u>.

(a)     The Portfolio Manager hereby covenants and agrees that he will not at any time during or after the term of this Agreement (other than in the performance of his duties under

8

this Agreement), directly or indirectly, make use of, furnish or divulge to any person or entity any confidential, secret, internal or proprietary information concerning the business, methods of business or business associates of a Fund or a Manager, or any affiliate of a Fund or a Manager, including without limitation: the terms of this Agreement; trading methods and the results of that trading; investment techniques, plans and programs; trading positions and execution procedures; ownership structure; operating structure and mechanisms; compensation structure; commission rates; financial data including, but not limited to, costs, profits, markets and sales; accounts and/or relationships maintained; Client and potential Client lists and contact information; the terms of any other agreement between a Fund or a Manager, or any affiliate of a Fund or a Manager, and any other portfolio manager; business strategies, promotional methods, contracts, suppliers and employees; plans for future development; and any other information of a similar nature not available to the public (herein collectively referred to as "Confidential Information"), and will keep in strict confidence all Confidential Information, except as required by law or legal process. The term Confidential Information does not include any information which: (i) is or becomes generally available to the public other than due to a breach by the Portfolio Manager of his obligations under this Agreement; (ii) the Portfolio Manager demonstrably possessed prior to the time he first provided services to a Manager; or (iii) the Portfolio Manager learns from a third party who is not under an obligation of confidentiality to a Manager or a Fund or any of their respective affiliates. All Confidential Information shall at all times be and remain the sole and exclusive property of the Managers.

(b)     On the Termination Date, the Portfolio Manager shall return to the Managers any Confidential Information in his possession or under his control, whether in written or electronic form.

(c)     The Portfolio Manager agrees, on behalf of himself and his affiliates, that at no time, even if this Agreement has been terminated, shall he intentionally publicly disparage or defame, either orally or in writing, the reputation or business of a Fund or a Manager or any current or former affiliates, Control Persons or employees of a Fund or a Manager. Each Manager agrees, on behalf of himself and his affiliates, that at no time, even if this Agreement has been terminated, shall it intentionally publicly disparage or defame, either orally or in writing, the reputation or business of the Portfolio Manager.

(d)     Rates of returns generated by the Portfolio Manager while managing the Account (i.e., his "track record") are the sole property of the Managers and may not be used by the Portfolio Manager for any reason including without limitation marketing by him of a fund or account which he may manage or advise. This restriction shall survive for a period of 6 months following the Termination Date; provided, however, that this restriction will expire on the Termination Date in the event that the Managers terminate this Agreement without Cause or the Portfolio Manager terminates this Agreement with Good Reason and the event which gave rise to such Good Reason is still continuing as of the date of such termination. Following the expiration of this restriction, (i) the Portfolio Manager shall be free to use his track record for any lawful purpose as he determines in his discretion, and (ii) upon the written request of the Portfolio Manager, the Managers shall provide the Portfolio Manager with reasonable back-up documentation related to the calculation of his track record (in digital format to the extent reasonably available).

8.     <u>Termination</u>.

(a)     Either the Portfolio Manager or the Managers may terminate this Agreement (and the Portfolio Manager's employment with the Managers, if applicable) at any time upon at least 30 days prior written notice to the other parties; <u>provided</u>, <u>however</u>, that after the first 120 day period during which this Agreement is in effect, the Portfolio Manager must provide an additional 30 days prior written notice (for a total of 60 days). Notwithstanding the foregoing, (i) the Managers may terminate this Agreement (and the Portfolio Manager's employment with the Managers, if applicable) immediately upon written notice to the Portfolio Manager if such termination is for Cause and (ii) the Portfolio Manager may terminate this Agreement immediately upon written notice to the Managers if such termination is for Good Reason and the event which gave rise to such Good Reason is still continuing as of the date of such termination.

(b)     The Portfolio Manager shall immediately cease providing investment advisory services to the Account as of the Termination Date; provided, however, that if the Managers instruct the Portfolio Manager in writing to liquidate the positions in the Account, the Portfolio Manager shall assist the Managers in performing such liquidation in a reasonable and orderly manner. For the avoidance of doubt, the Managers may, in their sole discretion, proceed to liquidate the Account without the involvement of the Portfolio Manager or may continue to hold some or all of the positions in the Account.

(c)     Upon the termination of this Agreement, at the Manager's request, the Portfolio Manager will provide the Managers with reasonable training and support following the Termination Date at such times as may be mutually agreed.

9.     <u>Non-Solicitation; No-Poach</u>.

(a)     For a period commencing on the date hereof and ending 6 months following the Termination Date, the Portfolio Manager shall not, on behalf of himself or any other Person, directly or indirectly solicit or raise capital from, or assist or cooperate with others soliciting or raising capital from, or otherwise render any financial or similar services to, any Client or any of affiliate of a Client. This subsection (a) shall not be applicable following the Termination Date in the event that the Managers terminate this Agreement without Cause or the Portfolio Manager terminates this Agreement for Good Reason and the event which gave rise to such Good Reason is still continuing as of the date of such termination.

(b)     For a period commencing on the date hereof and ending 12 months following the Termination Date, the Portfolio Manager shall not, on behalf of himself or any other Person, directly or indirectly, solicit, hire, retain, employ, enter into a partnership with or encourage or assist in materially altering his relationship with a Fund or a Manager or any of their respective affiliates, any employees, portfolio managers, sub-advisers or sub-managers of a Fund or a Manager or any of their respective affiliates or any person who was an employee, portfolio manager, sub-adviser or sub-manager to a Fund or a Manager or any of their respective affiliates within the prior 12 month period. This subsection (b) shall not be applicable following the Termination Date in the event that the Managers terminate this Agreement without Cause or

10

the Portfolio Manager terminates this Agreement for Good Reason and the event which gave rise to such Good Reason is still continuing as of the date of such termination.

(c)     The Portfolio Manager shall not, either directly or indirectly, on behalf of himself or any other Person, engage in any other business which is directly competitive with the business of a Fund or a Manager or trade or invest for any other client or account prior to the Termination Valuation Date. For the avoidance of doubt, the Portfolio Manager shall be permitted to trade for his own account in accordance with the terms of the Managers' respective compliance manuals and codes of ethics, as amended from time to time.

10.     Assignment. No rights under this Agreement shall be assignable nor any duties assumed by another party without the prior written consent of the other parties hereto, except that a Manager can assign its rights and duties under this Agreement to any affiliated entity.

11.     Entire Agreement; Amendments. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes and replaces all prior agreements or understandings, whether written or oral, with respect thereto. This Agreement may not be amended or modified, or compliance with any of its provisions waived, except by a writing signed by the parties.

12.     Notices. All notices and other communication hereunder shall be in writing and shall be deemed given when delivered personally, by reputable overnight or second-day courier or by registered mail, return receipt requested, to the address of the party set forth in the preamble to this Agreement (or at such other address for a party as may be designated by such party in writing to the other parties in accordance with this Section). Notices may also be sent by e-mail; provided, that all notices sent by e-mail to the Managers shall be sent to each of Mark Nordlicht and Joan Janczewski (and/or such other persons as a Manager shall identify to the Portfolio Manager from time to time).

13.     Disputes.

(a)     Subject to Section 13(b) below, the parties waive their right to seek remedies in court, including any right to a jury trial. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York City before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures.   Judgment on the award may be entered in any court having jurisdiction. The arbitrator of any such controversy shall not have the authority or power to modify or alter any express condition or provision of this Agreement, or any modification thereof or to render any award which by its terms has the effect of altering or modifying any express condition or provision of this Agreement, or modification thereof. The arbitrator may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

(b)     Notwithstanding the foregoing, the parties expressly agree and understand that the breach or threatened breach by a party of Section 7 or 9 of this Agreement may cause

130355.01006/21980379v.4

irreparable harm to the other parties, that the remedy at law for any such breach or threatened breach will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon a party's breach or threatened breach of any provision of Section 7 or 9 above, the other parties shall be entitled to immediate injunctive relief and may, in addition, obtain a temporary or permanent order restraining any threatened or further breach; provided, however, that nothing in this Section 13(b) shall be deemed to limit a party's remedies at law or in equity for any breach of any provisions of this Agreement which may be pursued or availed of by such party. With respect to Sections 7, 9 and 10 above, the parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America located in the County and State of New York. Each party hereto also hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

14. <u>Other Actions</u>. The parties agree to execute and deliver such additional documents and instruments, and to perform such additional acts, as may be necessary or appropriate to carry out the terms of this Agreement.

15. <u>Severability</u>. If any provision of this Agreement for any reason shall be held, by a court of competent jurisdiction or an arbitrator pursuant to Section 13(a) above, to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not render the entire Agreement illegal, invalid or unenforceable, and it is the parties' desire that such court or arbitrator shall amend or modify this Agreement, and that this Agreement, in its modified form, shall be enforceable and valid to the maximum extent permitted by applicable law, and each other provision hereof shall not thereby be affected and shall be given full force and effect, and the parties shall cooperate in good faith to further modify this Agreement so as to preserve to the maximum extent possible the intended benefits to be received by the parties.

16. <u>Waiver</u>. No waiver of any breach of any Agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other Agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

17. <u>Headings</u>. The headings of the provisions hereof are for descriptive purposes only and shall not modify or qualify any of the rights or obligations set forth in such provisions.

18. <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall together constitute one document.

19. <u>Governing Law</u>. This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York (without regard to the laws that might be applicable under principles of conflicts of law, and without regard to the jurisdiction in which any action or special proceedings may be instituted).

20.     <u>Survival</u>. The provisions of Sections 3, 5, 7, 8(c), 9 and 12-20 shall survive the termination of this Agreement.

**[Signature page follows]**

13

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

PLATINUM MANAGEMENT (NY) LLC

By: _____   March 11, 2012
Mark Nordlicht, CIO


PLATINUM LIQUID OPPORTUNITY MANAGEMENT (NY) LLC

By: _____   March 11, 2012
Mark Nordlicht, CIO

_____   March 11, 2012
DANIEL SMALL, individually

14

SCHEDULE A

<u>ACCOUNT ASSETS</u>

1.    Black Elk – Realized Only
2.    Brittanica
3.    China Broadband
4.    China Cablecomm – Realized Only
5.    China Networks
6.    Desert Hawk – Realized Only
7.    Ferrous
8.    Greenscape
9.    HeySpace
10.   Huiheng Medical
11.   ICM/PDM/Ancash
12.   Implant Sciences – Realized Only
13.   JW Solar
14.   Northern Star Minin
15.   Petaquilla
16.   SingKung
17.   Senetek
18.   Three AM