UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL SMALL,

                Plaintiff,

    - against -

CHRISTOPHER KENNEDY, in his capacity as the
Operating Manager of DMRJ Group LLC; and
MARTIN TROTT, in his capacity as the Operating
Manager of DMRJ Group LLC,

                Defendants.

Case No. 18-cv-5000 (PKC)

## DECLARATION OF MARTIN TROTT IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, **MARTIN TROTT**, a citizen of the United Kingdom of Great Britain and Northern Ireland and a resident of the Cayman Islands, declare under penalty of perjury pursuant to the laws of the United States of America:

1. My colleague Christopher Kennedy and I are the duly appointed joint official liquidators ("**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**"). PPVA is the sole operating member of DMRJ Group LLC ("**DMRJ**") and, in connection with my appointment as Liquidator, I was also previously appointed as an operating manager of DMRJ. The current operating member of DMRJ is PPVA, and I perform PPVA's role as such by virtue of my position as a Liquidator of PPVA.

2. I am a qualified insolvency practitioner and a director of RHSW (Cayman) Limited ("**RHSW**"). My colleague and fellow Liquidator, Mr. Kennedy, also is a qualified insolvency

practitioner at RHSW.  We both meet the statutorily proscribed requirements under the Cayman Islands Insolvency Practitioners' Regulations 2018 to act as Liquidators.[1]

3.      By orders entered on August 25, October 27 and December 16, 2016 and September 29, 2017, the Grand Court of the Cayman Islands (the "**Cayman Court**") placed PPVA into first provisional, then official liquidation, and appointed the Liquidators as its joint official liquidators (the "**Cayman Liquidation**").  True and correct copies of the Cayman Liquidation orders are attached hereto as Exhibit 1.

4.      On November 23, 2016, the Bankruptcy Court for the Southern District of New York entered an Order recognizing the Cayman Liquidation of PPVA as a foreign main proceeding and the Liquidators as PPVA's duly appointed foreign representatives pursuant to chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101, *et seq.* ….  A true and correct copy of the Chapter 15 Recognition Order is attached hereto as Exhibit 2.

5.      The Cayman Liquidation arises out of one of the largest fund collapses since the Ponzi scheme perpetuated by Bernard Madoff.  Many of the former principals and senior executives of Platinum Management (defined below), the former manager of PPVA, including Mr. Small, have been indicted on federal charges in proceedings pending in the United States District Courts for the Eastern and Southern Districts of New York.[2]  The Securities and Exchange Commission ("**SEC**") has brought parallel proceedings in the District Court for the Eastern District

---

[1] I note that Mr. Kennedy recently resigned from RHSW and as a result, will be replaced as a liquidator of PPVA in the near future.  I will inform the Court when the Cayman Court enters an order appointing a replacement Liquidator.

[2] *United States of America v. Mark Nordlicht, et al.*, Case No. 16-cr-640 (E.D.N.Y.) (BMC); *United States v. Murray Huberfeld et al.*, No. 1:16-cr-00467-AKH-2 (S.D.N.Y.)  Mr. Huberfeld recently plead guilty to the charges pending against him in the Southern District.

of New York as a result of which Platinum Management's control of PPVA's U.S.-based affiliated funds has been placed in the hands of a receiver.[3]

6.      Before the commencement of the Cayman Liquidation, Platinum Management represented to investors that PPVA's net asset value ("**NAV**") was approximately $1.4 billion. This means that Mr. Small and others represented that the *equity* of PPVA's limited partnership interests purportedly were worth this sum, based upon the aggregate value of the assets and investments PPVA owned and that Mr. Small had helped manage, less its liabilities.  In fact, PPVA is insolvent and its equity has zero value based upon the value of the assets under management. Even if PPVA is successful in all of its contemplated litigation, PPVA almost certainly will not be able to repay creditors in full (including redemption creditors), let alone make any distribution to investors in respect of their equity.[4]

7.      Mr. Small is a defendant in the criminal and the SEC proceedings pending in the Eastern District of New York, as well as various civil proceedings brought by various victims, including but not limited to litigation by the Black Elk Trustee.  *Guy E. Matthews et al. v. Black Elk Energy Offshore Operations, LLC et al.*, No. 16-3237 (Bankr. S.D. Tex.); *Freedom Specialty Ins. Co. v. Platinum Mgmt. (NY), LLC*, Index No. 652505/2017 (Supreme Court of New York, New York County).

8.      On behalf of PPVA and DMRJ, as well as other PPVA subsidiaries, the Liquidators are investigating substantial claims against Mr. Small and myriad other entities and persons, wherein the damages sought are anticipated to be in the hundreds of millions of dollars in any event, an amount believed to be substantially in excess of Mr. Small's net worth.

---

[3] *SEC v. Platinum Management (NY) LLC, et al.*, Case No. 16-cv-6848 (E.D.N.Y.) (BMC) (Dkt. 216).

[4] For the sake of comparison, investors in the Bernard Madoff scheme ultimately received above eighty cents on the dollar.  In this case, it is relatively clear that *creditors* will receive less than the full amount of their accepted claims.

9.     Based upon the information currently available to me, Mr. Small engaged in acts that both reduced the value of PPVA's assets and investments, created a class of tort creditors against PPVA and its subsidiaries and, across his portfolio, never generated net profits for PPVA.

10.     In any case, it is clear that he is not entitled to any payments under his investment management agreement and is not entitled to any profit interest in DMRJ.  The losses associated with the various positions he managed offset any net profit that ultimately may be realized by DMRJ as a result of the Implant Sciences settlement (described further below), and under the clear terms of his investment management agreement, losses from one year carry forward into future years.

11.     I respectfully submit this declaration (the "**Declaration**") in opposition to the Motion for a Preliminary Injunction ("**PI Motion**") against myself and Mr. Kennedy in our former capacities as Operating Managers of DMRJ filed by Mr. Small seeking to require us to maintain a $6 million cash reserve during the pendency of this action, to satisfy a judgment, if any, in favor of Plaintiff Daniel Small ("**Mr. Small**" or "**Plaintiff**") in this action.

12.     It is my opinion that the PI Motion was filed by Mr. Small in bad faith.  In particular, Mr. Small was assured, both verbally and in writing, that the Liquidators, in our capacities as the Operating Managers of DMRJ would adhere to Delaware law in respect of his disputed profit interest claims – including the maintenance of suitable reserves and insurance -- given the totality of DMRJ's asset, capital and debt structure.

13.     These verbal and written assurances were made just a few months ago, in February 2018, well after the general and high-level creditors report that Mr. Small cites out of context.

14.      At all times Mr. Small's claims have been accounted for and discussed within the PPVA liquidation and in connection with DMRJ.  Mr. Small's claims to DMRJ profits have been,

and are being continually analyzed and evaluated.  Claims <u>against</u> Mr. Small are similarly being analyzed and evaluated.

15.     While I am informed that in the United States, unlike the Cayman legal system to which I am subject, attorneys' fees are not awarded to the prevailing party as of right, I respectfully submit that an award of attorneys' fees to DMRJ is justified under the circumstances.  I am an officer of the Cayman Court and an independent fiduciary for all stakeholders of PPVA and their subsidiaries.

16.     I am duly authorized to make this Declaration.  I am fully familiar with the facts of this matter as a consequence of my day to day conduct in connection with the Cayman Liquidation and position as a Liquidator of PPVA and, through PPVA, an operating manager of DMRJ.  Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of the operations and financial condition of PPVA and DMRJ, my review of relevant documents and from my conversations with relevant personnel.  I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

**Statement of the Case**

17.     This case involves a claim by Mr. Small for a purportedly owed profit interest payment pursuant to certain investment management agreements between Mr. Small and Platinum Management (NY) LLC, Platinum Liquid Opportunity Management (NY) LLC (together, "**Platinum Management**"), as well as the Amended and Restated Operating Agreement of a PPVA subsidiary, DMRJ Group LLC.

18.     Based on my review of the First Amended Complaint and the PI Motion filed in this action, Mr. Small has made various allegations that the Operating Managers of DRMJ have previously or will at some time in the future improperly use the funds under their management

without due consideration for his claim for a profit interest payment pursuant to the investment management agreements.  He is wrong, and has impugned my role as fiduciary without any basis in fact.

19.     What Mr. Small fails to mention in his First Amended Complaint and PI Motion is that he is the subject of criminal and SEC proceedings in connection with an alleged billion dollar fraud perpetrated on innocent investors and creditors, which ultimately led to the financial collapse of PPVA.

20.     Now, having bankrupted PPVA as well as its many subsidiaries and investment vehicles, Mr. Small is seeking to recover against DMRJ: the sole asset under his former management that generated actual returns as opposed to incredible losses by asserting an entitlement to a portion of its net profits.  This claim fails to take into account that any "bonus" Mr. Small was due under his investment management agreement (including but not limited to the DMRJ Profit Interest) was to be calculated across all of the assets Mr. Small was charged with managing, nearly all of which were, in fact, loss making or were valued improperly by Mr. Small and former Platinum Management.   Mr. Small's claim similarly does not take into account the well-founded position that he breached his contractual and fiduciary duties, generally engaged in tortious conduct, and allegedly engaged in criminal conduct that further devalued both DMRJ and PPVA.

21.     As the Liquidator of PPVA, which is the Operating Manager of DMRJ, I am a Court-appointed fiduciary responsible for the management of PPVA's assets for the benefit of victims of its collapse, and the tortious acts of Mr. Small and others.  My acts are strictly governed by Cayman and Delaware law and I have acted at all times in accordance with my duties to those obligations.

22.     There is no risk of improper dissipation of DMRJ assets, and Mr. Small filed this action despite having received written assurances of the same.

23.     Moreover, I am advised that a preliminary injunction is only available for an injury that is irreparable.  While it is vehemently denied that Mr. Small faces risk of injury to any legally protected right, the very Delaware and Cayman law to which I have pledged to adhere concerning Mr. Small's disputed claim provide for numerous remedies – including money damages – in the event that DMRJ or PPVA are not properly wound down or Mr. Small's disputed claim is not properly addressed.

24.     Finally, Mr. Small is simply wrong on his facts.  DMRJ is still operating and may support other estate assets.  Furthermore, its profitability is highly unclear as there are other disputed claims to DMRJ's assets.[5]  Meanwhile, PPVA itself is in the final stages of funding negotiations, with multiple offers for the same.

25.     I respectfully request that Mr. Small's request for a preliminary injunction should be denied and attorneys' fees awarded on the ground that Mr. Small's request for injunction has no basis in fact or (I am advised) United States law.

**PPVA's Collapse**

26.     Before the Cayman Liquidation, PPVA was a Cayman Islands-based investment fund with a purported NAV of over $1.4 billion.  PPVA and Platinum Management utilized various

---

[5] For example, since June 2017, DMRJ has filed two pending actions in New York State Supreme Court seeking declaratory judgments that fraudulent debts incurred by Platinum Management and its principals, using the assets of DMRJ, totaling tens of millions of dollars are invalid and unenforceable.  *See, e.g., DMRJ Group LLC v. West Loop South LLC, et al.*, Index No. 653019-2017 (N.Y. Sup. Ct. N.Y. Co.) (the "West Loop Action"); *DMRJ Group LLC v. B Asset Manager LP, et al.*, Index No. 655181-2017 (N.Y. Sup. Ct. N.Y. Co.) (the "B Asset Action").  Discovery is ongoing in the West Loop Action.  DMRJ has opposed defendant's motion to dismiss in the B Asset Action, and the motion is *sub judice*.  DMRJ recently entered into a transaction that reduced the total amount in controversy in that case to $3 million.  *Id.* at Dkt. 34.

subsidiaries to invest in various sectors, such as oil and gas, biotech, pharmaceuticals and consumer products. DMRJ was one such subsidiary.

27.      During this pre-Liquidation period, PPVA, DMRJ and PPVA's other subsidiaries were operated by Platinum Management and its personnel.

28.      Those persons included Mr. Small. Platinum Management managed various investments of PPVA, as well as the investments of other Platinum-related funds, such as Platinum Partners Credit Opportunities Master Fund L.P. ("**PPCO**") and Platinum Partners Liquid Opportunity Master Fund L.P. ("**PPLO**"). Both PPCO and PPLO are under SEC Receivership, and former Chief Bankruptcy Judge for the Eastern District of New York Melanie Cyganowksi is the receiver appointed by the SEC. The Liquidators of PPVA and the SEC Receiver enjoy a cooperative and productive relationship.

29.      Despite representing having a purported NAV of over $1.4 billion, most of PPVA's purported assets, including those managed by Small, actually had little or no value, were transferred to other entities (for the benefit of insiders), or were under-water due to purported subsidiary-level encumbrances and tort claims caused by Small's conduct.

30.      One of the positions for which Mr. Small served as portfolio manager was PPVA's investment in Black Elk, an oil and gas company. Mr. Small also had a similar "profits interest" in Black Elk. Mr. Small and other Platinum Management executives engaged in a scheme to divert the vast majority of Black Elk's assets to entities controlled by Platinum or other insiders (the "**Black Elk Scheme**"), and Small was indicted by the United States Attorney for the Eastern District of New York in connection with the Black Elk Scheme.

**The Criminal and SEC Proceedings Against Daniel Small**

31.     On December 19, 2016 a criminal indictment was filed by the United States Attorney for the Eastern District of New York, pending as Case No. 16-cr-00640 (the "**Criminal Action**"). The indictment in the Criminal Action states charges against Mr. Small, as a former portfolio manager whose employment with Platinum Management terminated in 2015, and five other executives associated with Platinum Management.  The charges included Securities Fraud, Conspiracy to Commit Securities Fraud, Investment Advisor Fraud, Wire Fraud and Conspiracy to Commit Wire Fraud.  A true and correct copy of the Indictment filed in the Criminal Action is attached hereto as Exhibit 3.

32.     The complaint in the Criminal Action alleges that between November 2011 and December 2016, the defendants, including Mr. Small (until his termination in July 2015), engaged in a scheme to deprive Black Elk bondholders of proceeds of the sale of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, PPVA's ownership of and control over the Black Elk bonds and the relationship between Beechwood and Platinum.  *See* 16-cv-640, Dkt. 1 at 73-87, 99-105.  In fact, the events concerning the Black Elk bonds occurred during 2014, while Mr. Small was the Platinum Management portfolio manager with direct oversight over PPVA's Black Elk investment.  *See In Re Black Elk Offshore Operations, LLC*, Case No. 16-3237 (S.D. Tex. Bank.) (Dkt. 1).

33.     Also on December 19, 2016, a parallel civil case was filed by the SEC against Small and other Platinum Management executives, pending in the United States District Court for the Eastern District of New York as Case No. 16-cv-06848, alleging civil damages for violations of, among other things, the Investment Advisors Act of 1940, 15 U.S.C.§ 80b-1 *et seq.* and the

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("**SEC Action**").  A true and correct copy of the Complaint filed in the SEC Action is attached hereto as Exhibit 4.

34.     The mismanagement and alleged acts of Mr. Small, among others, caused or materially contributed to the financial collapse of PPVA, and irrespective of the outcome of these actions, PPVA and likely DMRJ intend to assert claims against Mr. Small and others for a variety of tortious conduct and breach of contract.

**The Investment Management Agreement between Small and Platinum Management**

35.     In connection with Mr. Small's employment with Platinum Management as a portfolio manager of PPVA's assets, Mr. Small entered into several substantially similar Investment Management Agreements with Platinum Management.  A true and correct copy of the Amended and Restated Investment Management Agreement dated March 11, 2012 (hereinafter the "**Small IMA**") is attached hereto as Exhibit 5.

36.     The Small IMA governed both Mr. Small's obligations to PPVA, as well as his compensation, including the manner of calculation; as was customary for investment managers, Mr. Small's compensation was tied to the performance of his managed investments.

37.     The Small IMA provides that Small was to receive an annual Base Salary of $180,000, plus a "Bonus."  Small IMA Section 3(a) and (b).  Small's "Bonus" under the Small IMA was to be calculated on a per-calendar-year basis, based upon a percentage of PPVA's total ***"Net Profits"*** across all of Small's "Accounts" during that calendar year (emphasis supplied).

38.     Small's annual base salary would then be deducted from any potential annual Bonus calculated as set forth above, as well as any "Profits Interests" distributions Small received pursuant to any PPVA-related profits interest agreements, including, for example, the 2011 Amended DMRJ Operating Agreement.  Small IMA Section 3(b).

39.     Additionally, Mr. Small's bonus structure provided for a "loss carryforward," in which if in one calendar year Small's managed accounts collectively suffer a net loss, the amount of the net loss shall be carried forward to the next calendar year(s), thus offsetting the "Net Profits" from the next year(s).   This net loss would be reflected in Mr. Small's bonus for as many subsequent years as is required to be fully offset by any Net Profits.  Small IMA Section 3(c).

40.     In the Small IMA, Mr. Small covenants to perform his services with respect to Account investments "using a commercially reasonable professional standard of care," to act "solely in the interest of the Account," and to act "in accordance with the provisions of . . . all applicable federal, state and foreign laws and regulations." Small IMA Section 4(a)(i).  Breach of these covenants is one of the enumerated grounds pursuant to which the Small IMA may be terminated for "Cause." Small IMA Section 1(d).   Based on my investigations to date, including the shocking discrepancy between the alleged net asset values and their actual value, I believe each of these covenants were violated by Small, and DMRJ and PPVA intend to bring counterclaims against Small for breach of his IMA.

41.     Similar to the 2011 Amended DMRJ Operating Agreement, termination for Cause extinguishes Small's right to receive a Bonus going forward, for the calendar year during which the termination for Cause occurs, and for the preceding calendar year if the termination for Cause occurs prior to February 15 of the following year.  Small IMA Section 3(e).  If termination is not for Cause, Small's right to receive an annual bonus continues "until all securities positions in the Account as of the Termination Date are liquidated . . ." Small IMA Section 3(f).

**DMRJ Operating Agreement and the Profits Member Compensation**

42.     In connection with Mr. Small's management of DMRJ's investments and in conjunction with his IMA, Mr. Small was granted a limited "profits interest" under the Amended

and Restated Operating Agreement of DMRJ Group LLC, effective as of January 1, 2011 (hereinafter "**DMRJ Operating Agreement**"), a copy of which is attached to the Amended Complaint as Exhibit A (Dkt. 18-1).

43.     The DMRJ Operating Agreement provides at Section 6.1 that Profits Interest Members, Mr. Small, "are hereby admitted as Members of the Company, and are issued membership interests in exchange for their services, which are intended to be 'profits interests' within the meaning of IRS Revenue Procedure 93-27." Based upon my investigations to date, Mr. Small's services under the Small IMA were dishonestly and, at a minimum, tortiously performed in various material respects.

44.     Among other things, the DMRJ Operating Agreement provides that "Management of [DMRJ] shall be vested in all of the Members who shall also serve as Operating Managers . . . [DMRJ] shall be managed by the Operating Managers and the conduct of [DMRJ's] business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement." *See* DMRJ Operating Agreement § 5.4.

45.     By contrast, Profits Interest members are not eligible to serve as Operating Managers, nor are they entitled to vote on any matter related to the management of DMRJ except to the extent that such vote affects their direct interest.

46.     Section 8.2 of the DMRJ Operating Agreement provides in relevant part that "the Net Profits of the Company" are to be allocated 90% to PPVA, with up to 10% of DMRJ's Net Profits allocated as follows: Small to receive the ***lesser*** of 6.5% of DMRJ's Net Profits and Small's "Adjusted Profits Amount," [under the Small IMA] with Profits Member Levy receiving the lesser of 3.5% of DMRJ's Net Profits and Levy's "Adjusted Profits Amount."

47.     As noted above, the DMRJ Operating Agreement provides that Small is to receive the lesser of its designated percentage of DMRJ's Net Profits and "Adjusted Profits Amount." *See* Section

8.2.  The "Adjusted Profits Amount" is calculated pursuant to the complex formula set forth in Section 8.2 of the DMRJ Operating Agreement (and illustrated in Schedule A thereto). This formula takes as a starting point the "Bonus" that would be awarded pursuant to the terms of the Small IMA, less base salary.

48.     It is clear that the DMRJ Operating Agreement, and the applicable IMA (here, the Small IMA), are intended to be read together as a single, coherent economic arrangement.  The profit-based "Bonus" paid pursuant to the Small IMA deducted profit interests paid pursuant to the DMRJ Operating Agreement (and/or other similar operating agreements granting net profit interests), and vice versa.

49.     Based upon my investigation to date, Mr. Small is not entitled to any profits from the operation or investments of DMRJ because his Adjusted Profits under the Small IMA are and were negative, and he further breached that agreement in a myriad of respects.

50.     Section 8.1 of the DMRJ Operating Agreement provides, in relevant part, that "[t]he Net Profits . . . of the Company shall be the net profits . . . of the Company as determined for Federal income tax purposes, with the adjustments required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)."

51.     The DMRJ Operating Agreement speaks in terms of DMRJ's "net profit," not of DMRJ's gross proceeds, revenues, or income. Therefore, at minimum, the costs and expenses attendant to DMRJ's gross proceeds, and claims against DMRJ, revenues, and income must be taken into account in calculating the distributive shares of Small.  A number of disputed and contingent claims have been asserted against DMRJ and DMRJ's ultimate profitability is not known at this time.  Moreover, DMRJ is still engaged in trading and has recently purchased debt instruments that had the effect of lowering its contingent and disputed liabilities.  In their discretion

and subject to the advice of the duly constituted PPVA Liquidation Committee and the Cayman Court, DMRJ may well invest in or support other PPVA assets, make distributions to PPVA consistent with Delaware law, and in their discretion or as advised, provide additional capital to DMRJ.

52.     Section 6.1 of the DMRJ Operating Agreement provides that if the IMA agreement of Small is terminated for cause pursuant to the terms of the IMA, the DMRJ Operating Agreement net profits interest of the terminated individual likewise terminates. Such individual(s) whose IMA(s) are terminated for cause forfeit their DMRJ Operating Agreement net profits interest going forward, as well as for the calendar year the termination occurred (and for the preceding year, if the termination for cause occurred prior to February 15 of the following year).

**Small's Bonus Arbitration**

53.      Small's employment at Platinum Management, and apparently at all Platinum entities, was terminated effective July 31, 2015 – before PPVA's collapse and the subsequent emergence of Small and others' wrongdoing.

54.     In 2015, Small commenced an arbitration at the American Arbitration Association against Platinum Management, alleging breach of the Small IMA for non-payment of the required Bonuses for the preceding several years (the "**Arbitration**").

55.     The arbitrator, based on information available at that time, determined that Mr. Small's employment had not been terminated for Cause, and accordingly that he was entitled to continue receiving from Platinum Management Bonuses on Account investments until the various funds' position in those investments was fully liquidated.  A true and correct copy of the Partial Final Award issued on July 12, 2016 is attached hereto as Exhibit 6.

56.     Further, the arbitrator accepted Mr. Small's proposed methodology for calculating the Bonus under the Small IMA, in conjunction with the terms of the DMRJ Operating Agreement, which is: calculate all annual profits (gains minus cost basis) on all of the investments within Small's Account, net them against all annual losses on other investments within the Account, deduct Account Expenses, and deduct Small's base salary for that year.

57.     Appearing in the arbitration on behalf of Platinum Management was Mark Nordlicht, the Chief Investment Officer of PPVA, who, like Small, has been indicted in the Criminal Action and also is named as a defendant in the SEC Action and the various other pending proceedings arising out of the collapse of PPVA and its affiliated funds.  Given that both sides of the arbitration involved persons involved in the very activity that later would result in criminal and civil charges, including grossly inflated and incorrect asset values that led to similarly incorrect profits calculations, it is understandable that, at the time, the arbitrator based his decision concerning the calculation of Mr. Small's bonus payment on inflated, inaccurate numbers concerning the assets managed by Mr. Small.

58.     Yet, as noted above many of PPVA's investments and assets not only were *valueless* but tortious and alleged criminal actions by Mr. Small and others in respect of those investment and assets actually created *liabilities* for PPVA and its subsidiaries that substantially exceed any value of those assets.

59.     In total, the arbitrator determined that Small was entitled to $7,736,481.95 in unpaid Bonus compensation for the years 2012-2014, plus $1,337,094.86 in accrued interest, plus $492,750.11 in costs and fees (the "**Small Arbitration Award**").  Ex. 6 at 93-94.  Further, the arbitrator directed that Small would be entitled to continue receiving a Bonus, calculated in accord

with the arbitrator's above methodology, until such time as the investments in Small's Account were fully liquidated. *Id.* p. 94.

60.     Small commenced an action to recognize the arbitration award as a judgment in New York State Supreme Court on November 17, 2016, Index. No. 656047/2016.  However, as a result of the Criminal and SEC Actions against Mr. Small and the others who had been involved in the Arbitration, in November 2017, Justice Bransten stayed the action to confirm the Small Arbitration Award into a judgment, pending the outcome of the Criminal Action and/or the SEC Action.  Justice Bransten held that a finding of criminal or civil wrongdoing by Mr. Small would invalidate his right to recover pursuant to the previously-issued arbitration award.

61.     If Mr. Small is convicted of the allegations in the Criminal and SEC Actions, it will prove that he breached the Small IMA and his fiduciary duties with respect to DMRJ and PPVA, *inter alia,* making him ineligible to receive profit interest payments in relation to DMRJ and giving rise to claims by DMRJ and PPVA against him.

62.     Regardless of the outcome of those Actions, it is clear that based on the true value (*i.e*., lack of profit) of the Platinum entities under Mr. Small's management during his employment, any net DMRJ profit will be offset by the massive losses caused by Mr. Small's actions, and significant and substantial counterclaims against Small and others are being investigated.

**DMRJ**

63.     As set forth above, DMRJ is a subsidiary of PPVA that was utilized to make various investments.  DMRJ was formed in about August 2008, to serve as the vehicle for PPVA's loans to and investments in Implant Sciences Corporation and its affiliates (collectively "**Implant Sciences**").  Between December 2008 and 2015, DMRJ made a series of term and revolving loans

to Implant Sciences that were secured by security interests in and liens on all of Implant Sciences' assets.

64.     In October 2016, Implant Sciences filed for protection under chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for the District of Delaware.  In February 2017, following negotiations among representatives of the Implant estate and the Liquidators on behalf of PPVA, DMRJ and another PPVA entity, Montsant Partners LLC, there was a settlement by which a total of $46,006,422.11 was paid to DMRJ in respect of claims held by DMRJ and Montsant against Implant Sciences, of which amount at least $5.4 million was allocable to Montsant, subject to further deduction by DMRJ in respect of an collateral agency agreement between them.  Approximately $8.9 million also was deposited into a separate escrow account in which DMRJ maintains an interest pending the outcome of litigation to which DMRJ is a party. *See DMRJ Group LLC v. West Loop South LLC, et al.*, Index No. 653019-2017 (N.Y. Super. Ct. N.Y. Cnty.)   In addition, to the West Loop/Epocs claims, other parties with claims against DMRJ and PPVA also have asserted rights to the proceeds of the Implant settlement, which claims the Liquidators are litigating or are in the process of resolving.

65.     The Liquidators are prepared to provide a complete accounting of DMRJ's assets and liabilities to the Court *in camera*.

**The Operating Managers Pledged to and Are Complying With Their Roles and Duties Under Delaware Law**

66.     As noted above, DMRJ is a Delaware limited liability company.  PPVA, over which I act as Liquidator, is the sole member with control over DMRJ.  After our appointment by the Cayman Court, the Liquidators were appointed as the operating managers of DMRJ on behalf of PPVA.  DMRJ is not the subject of any pending insolvency proceeding.

67.     The DMRJ Operating Agreement vests all authority to determine the timing and amount of distributions to members in the Operating Manager.  DMRJ Operating Agreement at §§ 7.1, 7.2.  The DMRJ Operating Agreement further provides that, all cash except amounts required for the operation and reasonable working capital requirements of DMRJ would be distributed to PPVA, except that the Profits Members were to receive distributions of their profits interests, if any, as a priority. See DMRJ Operating Agreement at § 7.2.

68.     These provisions, however, are subject to the limitation set forth in Del. Code tit. 6 § 18-607(a).  This section prohibits a limited liability company from distributing assets to members without first determining that it will have sufficient unencumbered assets to pay its liabilities exclusive of liabilities to members arising out of their interests in the company.

69.     I understand that Mr. Small claims that DMRJ is in dissolution and so is obligated to distribute monies to him.  It is not in dissolution, but even if it were, the same rules apply when a limited liability company is distributing assets in connection with a dissolution.  As a condition of dissolution and distribution to members, a Delaware LLC must first pay all known claims and set aside reasonable assets for contingent claims under the circumstances.

70.     To that end, section 18-804(a) of the Delaware Limited Liability Company Act ("**DLLCA**") provides that "upon the winding up of a limited liability company, the assets shall be distributed [first] to creditors," and that a limited liability company (LLC) that has dissolved "shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within ten years after the date of dissolution." *See* Del. Code Ann. tit. 6 § 18-804(b)(3). This includes contingent, conditional and unmatured claims and obligations

known to the LLC, and obligations known to the LLC but for which the claimant's identity is unknown. *Id.* § 18-804(b)(1).

71.     Notably, unless specifically limited or eliminated by the LLC agreement, the DLLCA specifies that the rules of law and equity, including the laws relating to fiduciary duties and the laws merchant, govern the conduct of managers and members of an LLC. *Id.* at §§ 18-1101(c), 1104. The DMRJ Operating Agreement does not contain a provision eliminating or limiting fiduciary or other obligations.

72.     As an appointed liquidator of PPVA by the Cayman Court and an Operating Manager of DMRJ, I and my colleague are officers of the Court.  We are bound to act with respect to DMRJ in compliance with Delaware law, and have pledged to do so in writing specifically in respect of Small's disputed claim.

73.     The foregoing provisions make clear that DMRJ must undertake analysis of its known and expected liabilities and establish reasonable reserves for the payment of the same before it can distribute assets to its members, or otherwise make provisions for recapitalization. Accordingly, we have evaluated (and re-evaluated, where appropriate), the reasonable expected value of the various claims against DMRJ, including that of Mr. Small, and maintain reasonable assets and cash reserves both at the DMRJ and PPVA level under the circumstances.

74.     In February 2018 Mr. Small demanded that he both be paid his profits interest from DMRJ assets and receive access to DMRJ's books and records.  Both requests were rejected because Mr. Small's claim was not accepted, either on the merits or in quantum, and the Liquidators consider Mr. Small to be a security risk and are not prepared to provide him with any information concerning PPVA or its subsidiaries.

75.     My attorney confirmed, at my instruction, that the Liquidators, in our capacities as Operating Managers of DMRJ, would act in accordance with their obligations under Delaware law as fiduciaries and officers of the court (the "**Small Claim Email**").  A true and correct copy of the email correspondence is attached hereto as Exhibit 7.

76.     All of the "evidence" upon which Mr. Small relies in support of his claims that he will suffer "irreparable injury" is dated long before the unequivocal pledge in the Small Claim Email.  Tellingly, Mr. Small chose not to include the Small Claim Email in his submissions.

77.     For the foregoing reasons, Mr. Small cannot demonstrate that he will suffer any injury, any such injury he could conceivably suffer is not irreparable, and he has failed to demonstrate that he is likely to prevail in respect of his disputed claim to DMRJ's profits.

**Conclusion**

78.     It is clear that Mr. Small seeks to do here, via a "Hail Mary" preliminary injunction application he apparently hoped would result in a nuisance payment, what he has been denied in several other forums.  Mr. Small has made a claim in the Cayman Liquidation, but he has no further rights in that action until his claim is adjudicated. His action for enforcement of the Small Arbitration Award in New York state court has been stayed due, in part, to the very serious allegations and merits defenses I intend to assert to his claims in this litigation.

79.     Based on the foregoing, I respectfully request that this Court should deny Mr. Small's request for a preliminary injunction, and, under the circumstances, award attorneys' fees expended in defense of Mr. Small's meritless application.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated:  June 29, 2018

_____

Martin Trott