## **EXHIBIT 6**

# Exhibit  H

JAMS ARBITRATION
NO. 1425019011

———————————————————————

| | |
|---|---|
| DANIEL SMALL | X |
| | X |
| Claimant, | X |
| | X |
| | X |
| | X |
| | X |
| AND | X   PARTIAL FINAL AWARD |
| | X |
| | X |
| PLATINUM MANAGEMENT (NY) LLC AND | X |
| PLATINUM LIQUID OPPORTUNITY | X |
| MANAGEMENT (NY) LLC, | X |
| | X |
| | X |
| Respondents. | X |
| | X |
| | X |

———————————————————————

COUNSEL:

Howard J. Rubin, Esq.
Jacob Freeman, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
**Counsel for Claimant**

Ira A. Sturm, Esq.
Raab, Sturm & Ganchrow, LLP
1250 Broadway — 36th Floor
New York, New York 10001
**Counsel for Respondents**

ARBITRATOR:

Hon. Theodore H. Katz (Ret.)
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018

**PLACE OF ARBITRATION:** New York, New York

1

The Undersigned Arbitrator, having been designated in accordance with paragraph 13(a) of the parties' Amended and Restated Investment Management Agreement, effective March 11, 2012 (the "Employment Agreement"), and having examined the submissions, proof and allegations of the parties, finds, concludes and issues this Partial Final Award as follows:

On May 13, 2016, I issued an Interim Award in which I concluded:

(1) Claimant Daniel Small ("Small" or "Claimant") has established that Respondents Platinum Management (NY) LLC and Platinum Liquid Opportunity Management (NY) LLC (collectively "Platinum" or "Respondents"), owe him bonus compensation in the amount of $7,916,482.25, plus prejudgment interest;

(2) Claimant is entitled to declaratory relief requiring that until all positions in his Account as of his termination date are liquidated, he or his estate or heirs shall continue to receive the bonus calculated and payable as set forth in his Employment Agreement (construed in a manner consistent with this Award);

(3) Claimant is entitled to the reasonable attorneys' fees and expenses he incurred in this Proceeding;

(4) Claimant is not entitled to any relief provided in

the New York Labor Law or, at this time, to specific performance of ¶ 3(i) of his Employment Agreement.

The reasons I issued the Award as an Interim Award are: (1) I perceived a potential, minor mathematical discrepancy in Claimant's calculation of the bonus compensation he claimed; (2) the determination of the amount of prejudgment interest required updated information; and (3) Claimant was directed to submit his application for attorneys' fees and costs, with appropriate support. (See Interim Award at 61.)

Since the issuance of the Interim Award, the parties have submitted a series of communications and applications. Broadly speaking, Claimant seeks: (1) an Order requiring Platinum to use its reasonable best efforts to cause the Platinum Funds for which Small served as an Investment Manager to pay Small the bonus compensation he is owed; (2) a Final Award setting forth that Mr. Small is owed $7,736,481.95 in bonus compensation and $1,291,393.00 (plus $1,934.12 for each day subsequent to May 25, 2016 through the entry of the Final Award) in prejudgment interest; (3) attorneys' fees in the amount of $528,984.00 and costs in the amount of $81,983.71, for a total of $610,967.71; and (4) an order directing Platinum to perform its obligations under of paragraph 3(i) of Small's Employment Agreement.

3

Respondents oppose Claimant's application in all respects and affirmatively seek the following relief: (1) Platinum seeks to reopen the Hearing and submit new arguments and supporting material in support of its position that Small is not entitled to bonus compensation attributed to the Northstar position in his Account; and (2) Platinum requests that no Award be entered that contemplates the immediate payment of bonus compensation or any other monetary relief to Small because it will be asserting claims against Small in a separate arbitration for breach of fiduciary duty.

Each of the arguments and claims asserted by the parties since the entry of the Interim Award are addressed below, beginning at page 65. However, because the Interim Award sets forth in detail the jurisdictional basis and procedural history of this proceeding, as well as my findings of fact and conclusions of law, it is set forth below and incorporated in this Partial Final Award.[1]

## INTERIM AWARD

The Undersigned Arbitrator, having been designated in accordance with paragraph 13(a) of the parties' Amended and

---

[1] To the extent that the facts set forth below differ from any party's position, that is the result of determinations as to credibility, relevance, burden of proof, and the weight of the evidence, both oral and written.

Restated Investment Management Agreement, effective March 11, 2012 (Claimant's Employment Agreement), and having examined the submissions, proof and allegations of the parties, finds, concludes and issues this Interim Award as follows:

### Procedural History

Claimant Daniel Small (hereinafter "Small or "Claimant") brought this proceeding against his former employers -- Platinum Management (NY) LLC and Platinum Liquid Opportunity Management (NY) LLC (collectively "Respondents" or "Platinum") - claiming unpaid bonus compensation for the years 2012, 2013 and 2014. He asserts that the failure to pay his bonus compensation breached his employment contract and deprived him of wages in violation the New York Labor Law.  In addition, Small claims that he was unlawfully terminated in retaliation for his assertion of claims under the New York Labor Law.

Jurisdiction over this proceeding is derived from Claimant's most recent Employment Agreement, effective March 11, 2012, otherwise know as the Amended and Restated Investment Management Agreement (hereinafter, either "Employment Agreement" or "IMA").  Paragraph 13(a) of the IMA provides, in pertinent part:

Any dispute, claim or controversy arising out of

5

or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York City before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures.

A Motion to Dismiss was denied on November 23, 2015,

The Hearing in this matter took place on December 1, 2, 4, 14, 21, and 29, 2015, and January 5, 6 and 7, 2016. The parties have since submitted post-Hearing Memoranda of Law that, along with the testimonial and documentary evidence, have been thoroughly considered. My findings of fact and conclusions of law are set forth below. To the extent that the recitation of facts set forth below differs from any party's position, it is the result of determinations as to credibility, relevance, burden of proof and the weight of the evidence.

## BACKGROUND

Respondents are limited liability companies primarily engaged in providing investment management services to certain hedge funds. Platinum is also the General Manager of the funds.[2] Mark Nordlicht (hereinafter "Nordlicht") is Platinum's Co-Chief Investment Officer and, in that

---

[2] The funds pay Platinum a 2% management fee and 20% incentive allocation, plus expenses.

capacity, generally control's Platinum's operation. He also has a significant ownership interest in Platinum.

The parties executed three successive Employment Agreements governing Small's employment and compensation, in 2010, 2011 and 2012, respectively. Small agreed to be employed by Platinum as a portfolio manager, to provide investment advisory services with respect to the capital of three funds: 1) Platinum Partners Value Arbitrage Fund L.P. ("PPVA"), 2) Platinum Partners Liquid Opportunity Master Fund, L.P., and 3) Platinum Partners Liquid Opportunity Master Fund II L.P. (together, "PPLO" and collectively with PPVA, the "Funds"). He invested the Funds assets primarily in debt (direct loans to companies) and private equity. (See Tr. at 116.)

Under the 2010 Employment Agreement, Platinum agreed to pay Small an annual base salary of $180,000, together with an annual incentive bonus consisting of (i) 6.5% of the first $15.5 million of "Net Profits" attributable to Small's Account, plus, (ii) 4.55% of any "Net Profits" in excess of $15.5 million attributable to Small's Account, minus (iii) Small's annual base salary and any "Loss Carryforward Amount." (See 2010 IMA, Cl.'s Ex. 1, ¶ 3(b).) "Net Profit" is defined as "all realized and unrealized investment and trading profits attributable to the Account,

less all Account Expenses with respect to each calendar year." (Id. ¶ 1(j).)    The Account on which net profits would be determined is defined as "those assets of the Funds set forth on Appendix [or Schedule] A [to the IMA], which shall be updated in the ordinary course of business by the mutual consent of the Managers and the Portfolio Manager." (Id. ¶ 1(a).)    Finally, the IMA provides that 80% of Small's bonus (based on Platinum's reasonable best estimate of the Net Profits) shall be paid to Small on or before February 15th of the year following the year in which the bonus is earned, with the remaining balance of the bonus (the "Holdback Amount") paid promptly following the Funds' audits.[3]

Both Small and Platinum fulfilled their obligations under the 2010 IMA, and no claims are made with respect to the year 2010.

Platinum and Small entered into a second IMA for the year 2011.   Two provisions of the 2010 IMA were renegotiated. First, Small agreed that his bonus would be paid on "realized-only" profits for four of the positions

_____

[3] In actuality, the Funds were responsible for paying Small's bonus compensation, as directed by Platinum.   The Funds would either pay Small directly or reimburse Platinum for its payments to Small. (See, e.g., Cl.'s Ex. 62 at ¶¶ 2.08-2.09; Tr. at 149.)

on Schedule A of the IMA. (See 2011 IMA, Cl.'s Ex. 2, ¶ 1(j).) Under the 2010 IMA, Small's bonus had been calculated on the basis of both realized and unrealized profits. Second, Platinum agreed to pay Small's bonus compensation on the four realized-only positions in a manner that was more tax-favorable to Small in order to compensate for the loss of unrealized profits on the four positions. Platinum placed the four realized only positions into five limited liability companies ("LLC's") in which Small was given a nominal interest. The realized profits of those four positions, that was due to Small as a bonus, was to be paid as distributions from the LLC's, rather than W-2 wages from Platinum.

Small and Platinum each met their obligations under the 2011 IMA; thus, no claims are asserted with respect to 2011.

On March 11, 2012, the parties entered into the final version of the IMA, which applied retroactively to January 1, 2012. The 2012 IMA was identical to the 2011 IMA and served as the operative employment agreement for the next three years -- the remainder of Small's tenure at Platinum. Small's employment at Platinum was terminated effective July 31, 2015.

For the three years of 2012, 2013, and 2014, Small received his base salary and was paid a total of $219,000 in bonus compensation.   He contends that he is owed approximately $7.7 million in unpaid compensation. Platinum disagrees, and that disagreement is what led to this proceeding.

Small claims that: (1) Platinum breached his Employment Agreement and he is owed $7,736,482 in bonus compensation, plus $1,061,530 in prejudgment interest; (2) the failure to pay his bonus compensation is an unlawful withholding of wages in violation of Section 193 of the New York Labor Law, entitling him to liquidated damages of $7,736,482; (3) he was unlawfully terminated in retaliation for his demand for his bonus compensation, and is therefore entitled to front and back pay; (4) he is entitled to a judgment declaring that he must be paid annual bonus payments until all positions in his Account have been liquidated; (5) he is entitled to specific performance of paragraph 3(i) of the IMA which provides that in the event Platinum is unable to pay any portion of his salary or incentive fees, Platinum agrees to use its reasonable best efforts to cause the Funds to pay Small's unpaid compensation; and (6) he is entitled to the attorneys' fees and costs he incurred in this proceeding.

DISCUSSION

## I. Jurisdiction and Arbitrability

Respondents argue in their post-Hearing Memorandum of Law, for the first time in this proceeding, that Claimant is not entitled to seek relief through arbitration based on estoppel principles.   They contend that since Small has made representations in his tax filings that he is a member of the various LLC's set up to distribute his bonus compensation, he cannot claim relief as an employee of Platinum under the IMA, which contains the arbitration provision.[4]

Respondents' estoppel argument has no relevance to the arbitrability of the claims asserted in this proceeding and, in any event, the estoppel authority cited by Respondents does not support the proposition that Small cannot claim relief as an employee of Platinum.

The case primarily relied upon by Respondents is Mahoney-Buntzman v. Buntzman, 12 N.Y.3d 415 (2009).   The issue in the case was whether money received by a husband pursuant to a settlement agreement was marital property. Because the husband reported on his federal income tax

---

[4] Respondents make the same estoppel argument in opposing Small's Labor Law wage claims. That subject is addressed later in this Decision.

return that the settlement money he received was business income, the court found that the trial court properly classified the money as marital property, holding "[a] party to litigation may not take a position contrary to a position taken in an income tax return." Id. at 422.

Respondents argue that the same principle applies to Claimant's self-identification on his federal tax returns as a partner in, or member of, the LLCs through which his bonus compensation is paid. They contend that having taken that position on his tax returns, Claimant cannot now claim rights as an employee of Platinum. This argument is misplaced.

First, there is nothing inconsistent with Claimant identifying himself as both a member of an LLC and an employee of Platinum. One does not preclude the other. In fact, Claimant received both W-2 wages from Platinum and partnership distributions from the LLCs. Moreover, Small has not made any representations on his tax returns with respect to the compensation he seeks in this proceeding. He cannot be estopped based on a representation in a past tax return relating to other compensation. Finally, it is well-established that a representation in a tax return as to employment status cannot, by itself, serve to establish an individual's actual employment status under the New York

Labor Law or otherwise.  See, e.g., Hernandez v. Chef's Diet Delivery, LLC, 915 N.Y.S.2d 623, 626 (2d Dep't 2011) ("the federal income tax documents submitted by the defendants which identified some of the plaintiffs as independent contractors were insufficient to conclusively establish that the plaintiffs and the other drivers in the putative class were independent contractors"); Blodnick, Gordon, Fletcher & Sibell, P.C. v. Commissioner of Labor, 791 N.Y.S.2d 225, 226 (3d Dep't 2005) (finding an individual to be an employee notwithstanding "[t]he fact that [the employer] considered claimant to be an independent contractor and claimant deducted expenses on her federal tax return as if she were self-employed"); Gagen v. Kipany Prods., Ltd., 812 N.Y.S.2d 689, 691 (3d Dep't 2006) ("While the manner in which the relationship is treated for income tax purposes is certainly a significant consideration, it is generally not singularly dispositive [of whether an employee-employer relationship exists].").

Whether or not Small's claimed compensation is ultimately found to be non-forfeitable wages under the New York Labor Law or bonus compensation not covered by the Labor Law, there can be no question that he is seeking to enforce his right to compensation under his Employment Agreement with Platinum, just as there can be no question

13

that he was an employee of Platinum.   Platinum employed
Small as an investment advisor/portfolio manager and agreed
to pay him a base salary as well as bonus compensation.
(See IMA ¶¶ 2 & 3.)   Platinum relied upon Small's Employment
Agreement in paying him compensation in 2010 and 2011.
Small worked under Platinum's supervision; was required to
comply with Platinum's policies; could only invest in
assets approved by Platinum; and his employment was subject
to termination by Platinum. (See id. at ¶¶ 2(a), 4(a) (vii),
6(a), 8(a)) ("the managers may terminate this Agreement
(and the Portfolio Manager's employment with the Managers")
(emphasis added).   Under Small's Employment Agreement, it
is Platinum who is obligated to pay his compensation and
only in the event that Platinum is unable to do so is it
required to use its best efforts to cause the Funds, whose
assets Claimant helped manage, to pay his compensation.
(See id. ¶¶ 3 (a), (b) and (i).)   That Platinum agreed to pay
some of Small's compensation through LLC entities does not
alter the fact that Platinum was his employer.

Small contends in this proceeding that Respondents
breached his Employment Agreement by failing to pay his
bonus compensation. He has asserted no claims against the
Funds or the LLCs.   That this proceeding involves "a
dispute arising out of or relating to [his] employment

14

agreement" could not be clearer. (See, e.g., Second Amended Statement of Claim, ¶¶ 1-25, 60-65.)

It follows that because the parties' dispute arises out of Claimant's Employment Agreement, the dispute resolution provision of the Employment Agreement controls. That provision requires arbitration before JAMS. (See IMA ¶ 13.)

## II. Contractual Compensation Claim

Claimant contends that Platinum breached his Employment Agreement by failing to pay him bonus compensation for the years 2012, 2013 and 2014. Other than receiving his base salary and $219,000 in bonus compensation, Small received no other bonus compensation for the three years in issue. He contends that he is owed in excess of $7.7 million.

As an initial matter, Small argues, paragraph 3(d) of his Employment Agreement creates an unambiguous obligation on Platinum's part to pay "eighty percent (80%) of the Bonus based on the Managers' reasonable best estimate of Net Profits . . . on or before February 15th of the year immediately following such calendar year," and the remaining 20% of the Bonus "promptly following the Funds' completion of the Funds' audits" for the previous year. Mr. SanFilippo testified that, acting on behalf of the Managers, it was his responsibility as Platinum's CFO to calculate

Platinum's reasonable best estimate of the annual net profits of Small's Account and that he did so by preparing net profits statements that were sent to Small and Nordlicht. (See Tr. at 783-85; Cl.'s Exs. 8, 19 & 29.) With Nordlicht's approval, SanFilippo applied GAPP standards in calculating net profits and losses, based on his understanding of Small's Employment Contract. (See Tr. at 845.)   Platinum has not taken issue with that testimony and, until this proceeding was commenced, no one at Platinum took issue with SanFilippo's calculations.   Yet, Platinum has failed to pay Claimant any of the bonus compensation that SanFilippo calculated for the years 2012, 2013 and 2014.   I must agree that Platinum's failure to pay that compensation is a breach of an unambiguous obligation under Small's Employment Contract. (See IMA ¶ 3(d).)

Nonetheless, there is an argument to be made that SanFilippo's best estimate of "Net Profits" must be based on a definition of "Net Profits" to which the parties agreed.

The parties disagree primarily about three issues pertinent to Small's compensation claim: (1) how "net profit" generally should be determined, and the application of that definition to two investment positions in Small's Account – Black Elk and Implant Sciences; (2) whether Small is entitled to bonus compensation with respect to

investment positions that do not appear on Schedule A to the IMA; and (3) with respect to the Northstar investment (a) whether Small served as its Portfolio Manager and, therefore, whether it can properly be considered part of Small's Account, and (b) if it is part of Small's Account, whether it is an asset for which only realized profits should be credited to Small's bonus compensation.

### A. Calculation of Net Profit

Respondents argue that the term "realized and unrealized Net Profits" is not clearly defined in Small's Employment Agreements and it must be understood in the context of the firm's longstanding philosophy and how it was traditionally understood at Platinum. According to Platinum and, more specifically, Mark Nordlicht – who is also the person who negotiated Small's Employment Agreements and whose approval is required for the payment of bonus compensation – the term "realized profit" is defined as when a fund receives more cash in than it has paid out on an investment. Thus, for example, if interest and dividends are received on an investment, but the outlay for the investment still exceeds the amount that came into the fund from the investment, Nordlicht contends that there is no realized profit at that point. Similarly, if a portion of an account's stock is sold at a profit, but the overall

investment has not yet been recouped, no realized gain would be recognized. (See, e.g., Tr. at 1241-42.)

Claimant contends that Nordlicht's position on how net profit is determined has no grounding in Small's Employment Contract and is inconsistent with how Platinum historically calculated net profit.

To determine whether there has been a breach of Small's Employment Agreement we must first look to the plain language of the Agreement. Under each of the three IMA's, Small's bonus was determined by applying his bonus percentage of 6.5% to the first $15.5 million in "Net Profits" generated by Small's Account, and 4.55% to the remaining "Net Profits" generated by his Account, reduced by the amount of his Base Salary and any "Loss Carryforward", that is, any negative bonus amount in prior years. In the 2010 Employment Agreement, "Net Profits" was defined as "all realized and unrealized investment and trading profits (net of losses) attributable to [Small's] Account, less all Account Expenses with respect to such calendar year." (See Cl.'s Ex. 1, ¶ 1(j).). In the 2011 and 2012 IMA's, the only relevant change was that with respect to four specific positions, the Net Profits were to be on a "realized only" basis. (See Cl.'s Exs. 2 & 5, par. 3(j) & Schedule A.)

Under the IMA, realized profit and loss was to be calculated based "on the actual net purchase or sales prices paid or received." (Id.) [5]  The IMAs require unrealized profit and loss to be determined "based upon prices at which open positions are valued by the Managers for the purposes of reporting to investors in the Funds." (Cl.'s Ex. 5, ¶ 3(g).)

Under New York law, a contract is ambiguous when it could suggest multiple meanings to a reasonable, objective reader familiar with the context of the contract. See Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's London England, 136 F.3d 82, 86 (2d Cir. 1998).

The Employment Agreement defines "Net Profits" as "realized and unrealized investment and trading profits (net of losses) attributable to [Small's] Account," but the Agreement does not speak to the issues of what constitutes "realized investment and trading profit" or when it occurs. Thus, in order to discern the parties' intent in entering into the Employment Agreement, it is appropriate to

---

[5] SanFilippo testified that realized net profits could be achieved in two ways – either through the sale of all or part of an investment or through the receipt of interest and dividends on an investment, which he regarded as trading profits. (See Tr. at 774-75.)

consider extrinsic evidence. See Greenfield v. Philles
Records, Inc., 98 N.Y.2d 562, 569 (2002) ("Extrinsic
evidence of the parties' intent may be considered only if
the agreement is ambiguous, which is an issue of law for
the courts to decide.").

> Extrinsic evidence can take various forms, such
> as the negotiation history of the ambiguous
> provision and documents that shed light on its
> meaning. But, of course, extrinsic evidence
> concerning the contracting parties' understanding
> as to a particular contract provision is not
> limited to documents or witnesses bearing
> directly on the facts surrounding its execution.
> Instead, evidence, e.g., pertaining to past, or
> even subsequent courses of conduct between the
> contracting parties in like situations may prove
> instructive.

CDR-Wantagh, Inc. v. Shell Oil Co., 2011 WL 6371582, at *10
(E.D.N.Y. Dec. 20, 2011); see also N.Y. Marine and General
Ins. Co. v. LaFarge N. Am., Inc., 599 F.2d 102, 119 (2d
Cir. 2010) ("[t]here is no surer way to find out the intent
of the parties to a contract than to see what they have
done.") (internal quotations omitted).

Indeed,

> [t]he parties' practical interpretation of their
> contract prior to litigation provides "compelling
> evidence of the parties' intent." Ocean Transport
> Line, Inc. v. American Philippine Fiber
> Industries, Inc., 743 F.2d 85, 91 (2d Cir.1984).
> As the Supreme Court has observed: "Generally
> speaking, the practical interpretation of a
> contract by the parties to it for any
> considerable period of time before it comes to be

the subject of controversy is deemed of great, if not controlling, influence." Old Colony Trust Co. v. Omaha, 230 U.S. 100, 118, 33 S. Ct. 967, 972, 57 L. Ed. 1410 (1913).

Gestetner Holdings, PLC v. Nashua Corp., 784 F. Supp. 78, 83 (S.D.N.Y. 1992).

In contrast to Mr. Nordlicht's testimony about his subjective intent, the parties' course of dealing under Small's successive Employment Agreements is highly probative. Post hoc interpretations say nothing of what was intended when the parties entered into an agreement. See Faulkner v. National Geographic Soc., 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006); Ingersoll Mill. Mach. Co. v. M/V Bodena, 619 F. Supp. 493, 506 (S.D.N.Y. 1985) (proffered interpretation of what contract meant constituted "subjective views" that were "never communicated" until the litigation, and could not be used to explain the meaning of the contract).

Both the 2010 and 2011 Agreements, under which the parties performed and were in compliance, contained definitions of realized and unrealized profits virtually identical to the 2012 Agreement.

In 2010 and 2011 and 2012, Mr. SanFilippo, Platinum's CFO and a certified public accountant, was charged with

calculating the annual net profits on Small's Account and, based on that calculation, determining Small's bonus. [6] Indeed, it was SanFilippo's responsibility to arrive at the "best estimate" of the net profits generated by Small's Account, as required under the IMA. (See Tr. at 766, 783.) He testified that it was his practice, and understanding under Small's Employment Agreement, to treat capital gains, cash dividends and interest payments received by the Funds as realized trading profits. (See Tr. at 772, 774-75, 1460-61.) [7] Over the course of Small's employment by Platinum, SanFilippo employed Generally Accepted Accounting Principles ("GAPP") in arriving at his "net profits" calculation for purposes of Small's bonus. (See Tr. at 1485-86.) In calculating the bonus, he relied on Small's Employment Agreement and income statements generated by Platinum's fund administrator. (See Tr. at 767-68.)

For example, for the year 2010 he prepared a detailed itemization of the gains and losses (realized and unrealized) for each position in Small's Account. (See Cl.'s Ex. 3.) Applying GAPP, he calculated the realized profits and interest income without regard to the Funds'

---

[6] Actual payment of the bonus, however, required Nordlicht's approval.
[7] SanFilippo testified that "unrealized profit" "is basically a markup in valuation" of an asset. (Tr. at 1460-61.)

remaining exposure in the various positions. Thus, for example, if Platinum sold a portion of its equity in a position at a price higher than the price at which the equity was originally acquired, he recorded a realized profit for the difference in price, even if the Funds still had exposure on the retained equity. (See Tr. at 1454.) Similarly, if Platinum received interest payments on debt that it had issued, he recorded realized profit on the amount of the interest received, even if the Funds still had an outstanding investment in the position. (See Tr. at 1464.) On the basis of that construction of the IMA, in 2010 SanFilippo determined that Small's Account yielded approximately $75 million in net profits; Small's bonus formula was applied to that amount; and Small was compensated in the amount of $3,545,655.13, with Nordlicht's approval.

The 2011 IMA did not alter the definition of net or realized profits, and there is no evidence that Small and Nordlicht discussed or reached agreement on a new definition of net or realized profits.. Consistent with the parties' previous course of dealing, applying the same methodology as in 2010, SanFilippo arrived at a reasonable best estimate of Small's net profits for 2011. (See Tr. at 1485-86.) He provided a spreadsheet to both Small and

23

Nordlicht, calculating realized and unrealized profits for all positions other than the four that were specifically designated as "realized profits only". (See Cl.'s Ex. 4.) Moreover, he included in Small's net profits calculations the amount of all realized profits on each relevant position, such as gains on sales, distributions, and interest income, even where the Funds had remaining exposure on the investments. (See Tr. at 1485-86.) SanFilippo determined that Small's Account generated net profits of $20 million, entitling Small to an annual bonus of $1,111,422.52 for 2011. (See Cl.'s Ex. 9; Tr. at 1430-31.) Nordlicht approved payment of Small's 2011 bonus compensation after receiving SanFilippo's 2011 Net Profits Spreadsheet. (See Tr. at 1430-31.)

Small's 2012 Employment Agreement was virtually identical to the 2011 IMA, and remained the operative IMA for the remainder of Small's tenure at Platinum. There is no credible evidence indicating that Small and Nordlicht discussed or reached agreement on new definitions of net and realized profits. For each of the years 2012, 2013 and 2014, SanFilippo calculated Platinum's reasonable best estimate of the net profits for Small's Account, applying precisely the same methodology he had applied in 2010 and 2011, without regard to the Funds' remaining exposure on a

24

position. (See Tr. at 1479-80.) He determined that Small's Account generated $38,026,887.87 in net profits in 2012, $8,758,584.50 in 2013, and $22,689,444.78 in 2014. (See Cl.'s Exs. 14, 19, 29, 39.) Applying the bonus formula in the 2012 IMA, SanFilippo found Small entitled to bonus compensation, after deducting his base salary, of $1,852,473.40 for 2012, $827,500 for 2013, and $1,154,619.74 for 2014. (See Cl.'s Ex. 39.) That entire amount, except for $218,662.15 paid in 2012, remains unpaid ($3,615,930.99). (See Cl.'s Ex. 39; Tr. at 1484-85.)

SanFilippo testified that, with the exception of one mistake he claimed he had made, he believed Small's compensation schedule (Cl.'s Ex. 39), sent to Nordlicht on June 8, 2015, was an accurate representation of the bonus compensation owed by Platinum to Small. (See Tr. at 843-44.) And, even Nordlicht admitted that SanFilippo's calculations were correct "from a pure accounting standpoint." (Tr. at 735-36.)

Notwithstanding the clear language of the IMA, SanFilippo's understanding of Small's Employment Agreement and his calculation of Small's bonus compensation, and the parties' previous course of dealing, Mark Nordlicht expressed views at the Hearing that generally repudiated his obligations under the IMA. For example, he disclaimed

25

the obligation to pay Small on an annual basis based on the performance of his Account, instead claiming that he "would try to get [Small] money" if he believed the various positions in Small's Account were likely to make money. (Tr. at 1167-68.)   At another point, he acknowledged that Small's bonus was based on how various investments performed in each calendar year, but then backed away from that position. (See Tr. at 1164-65.)   Yet, the IMA unambiguously requires payment of bonus compensation on an annual basis.   He disclaimed any obligation to pay Small 80% of his bonus compensation (based on a reasonable best estimate) by February of the year following the year in which the net profits were achieved. (See Tr. at 1175-79.) He claimed that the Employment Agreement was intended to limit all of Small's compensation to realized profits, notwithstanding clear language in the Agreement limiting only four positions in the Account to realized profits, and SanFilippo's calculation of Small's bonus based on realized and unrealized profits. (See Tr. 658-660.)   Indeed, Nordlicht claimed that it was a very clear firm-wide policy to limit compensation to realized profits. (See Tr. at 664.)   Yet, employment contracts that Platinum produced for other portfolio managers called for profits to be calculated on both a realized and unrealized basis.   And,

Neftali Manela, Platinum's Chief Operating Officer, testified that Small and his partner are the only portfolio managers whose contracts call for payment with respect to realized-only profits. (See Cl.'s Ex. 155; Tr. at 790-793, 1018-19.) It is also telling that Platinum pays itself annual incentive allocations on the basis of realized and unrealized gains. (See Tr. at 775.)

There may have come a point toward the end of Small's tenure at Platinum when Nordlicht personally arrived at a new-found belief that Small and other managers should not receive bonus compensation until the investors made money, or until all the investment in a position had been recouped, but that approach was not embodied in Small's Employment Agreement and was not negotiated with Small. Small credibly testified that the first time he ever heard about Nordlicht's new methodology was during a meeting in December 2014. (See Tr. at 343-44.) It was not the manner in which Small had been compensated up until that point, and was not Platinum's CFO's understanding of the method for calculating Small's bonus compensation.[8]

---

[8] In fact, even the Funds' audited financial statements disclose to the Funds' investors that individual portfolio managers may receive bonus compensation depending on the performance of a manager's portfolio, even if the Funds as

Nordlicht testified at his deposition that he did not "feel [Small] was entitled to a bonus." (Tr. at 1178.) He reached that conclusion without performing any profit and loss analysis of the investments in Small's Account. (See Tr. at 1179-80.) Nordlicht's shifting subjective views of how realized profit was to be defined and how and when he would be prepared to pay Small's bonus cannot substitute for the written contractual obligations that Platinum agreed to with Small, as clarified by the parties' course of conduct.[9] Although Nordlicht was accustomed to exercising his discretion as to when and how much bonus compensation other portfolio managers at Platinum would be paid, Small and his partner, Levy, were the only portfolio managers at

---

a whole lose money in that particular year. (See Cl.'s Ex. 84 at 35; Tr. at 212-213.)

[9] More telling is the credible testimony and evidence indicating that, in response to Small's requests for his bonus compensation, Nordlicht advised Small that he would pay the outstanding compensation over time as the Funds had greater liquidity. (See Tr. at 292-93, 329-30.) Subsequently, Nordlicht authorized periodic payments to Small, but most of the payments only covered Small's 2010 holdback compensation. His testimony that he was merely providing money to Small based on his view of the future outlook of Small's investments was not credible. Moreover, in 2014, Small sent Nordlicht several emails referencing Nordlicht's agreement to start paying the back bonus compensation that was owed. (See Cl.'s Exs. 22 & 25.) Nordlicht never responded to these emails by denying an obligation to pay the bonus compensation.

Platinum who had a contractual right to an annual bonus.[10] It is clear from Nordlicht's testimony that he gave little consideration to his contractual obligations and, ultimately, came to resent them.   Moreover, to accept Nordlicht's views of the Employment Agreement would require us to accept that he had his CFO perform pointless and erroneous annual computations of Small's bonus — computations that he did not challenge until this proceeding

Thus, as a general matter, Small is entitled to unpaid bonus compensation based on SanFilippo's methodology and calculation of the net profits on his Account.

## B. Application to Specific Investments

### 1. Black Elk

Black Elk is an oil and gas exploration company that was in Small's Account.   In 2009, the Funds extended a $25 million loan to Black Elk and eventually they acquired approximately 70% of Black's Elk's equity at no additional cost.   In 2010, at the direction of Nordlicht, Platinum

---

[10] Even though Levy had contractual rights similar to Small, Nordlicht regularly failed to pay Levy bonus compensation that he was owed (even when he did pay Small).   Levy, however, had a family relationship with Nordlicht and was involved in other money-generating enterprises with Nordlicht. He therefore chose not to assert his contractual rights and his testimony about his understanding of his and Small's contractual rights is deserving of little weight.

marked up the value of the Funds' equity in Black Elk by
approximately $60 million. As a result, SanFilippo recorded
an unrealized gain of $60 million with respect to Black Elk
in Small's net profit calculation, and Small received bonus
compensation as a result. (See Tr. at 844.)

Beginning in 2011, Black Elk was one of the four
positions in Small's Account for which Small would be
compensated on a realized-only basis. In 2011, Platinum
received approximately $14 million from Black Elk as a
shareholder distribution.  SanFilippo included that amount
in Small's net profits calculation as realized gain (even
though he recognized that Small had received compensation
based on unrealized profit in Black Elk in the previous
year). (See Cl.'s Ex. 4; Tr. at 1428-29.)   SanFilippo
believed at the time that his treatment of the distribution
was correct. (See Tr. at 858-59.)   Based on SanFilippo's
application of the bonus formula in Small's Employment
Agreement, and after receiving SanFilippo's 2011 Net
Profits Spreadsheet, Nordlicht approved payment of Small's
bonus compensation in the full amount of $1,111,442.52.

In 2011, Nordlicht also authorized the Funds to write-
up the value of the Black Elk position by $115 million.
Since that was unrealized gain, it did not figure in

Small's bonus calculation, but it was factored into Platinum's own incentive fees. (See Cl.'s Ex. 4.)

In 2012, as well, there were Black Elk distributions of approximately $12 million that SanFilippo again included in his calculation of Small's 2012 net profits. Platinum also marked up the Black Elk position to $215 million, resulting in unrealized profits of $55 million. Although Platinum itself was compensated on that unrealized gain, Small was not, as by then his IMA identified Black Elk as a realized-only position.

In June of 2015, SanFilippo provided both Small and Nordlicht an analysis of Small's Account, for the years 2010-2014. SanFilippo included a schedule detailing for each year the bonus to which Small was entitled, the amounts Small had been paid, and the amounts that remained outstanding under Small's IMA. The schedule indicated that Small was due over $3.8 million in bonus compensation, which included Black Elk compensation for 2012. (See Cl.'s Ex. 39.) SanFilippo testified that at the time that he sent the schedule he believed it to be correct. (See Tr. at 843-44.)

It was not until after this Arbitration was filed that Nordlicht chose to dispute the correctness of Small's Black Elk compensation and, shortly thereafter, SanFilippo came

to the conclusion that he "made a mistake" when he included the Black Elk distributions in Small's 2011 and 2012 net profits calculations.  Both he and Nordlicht argued that since Small had been compensated based on the $60 million in unrealized gain on Black Elk in 2010, the payment of bonus compensation based on Black Elk distributions in the subsequent years was double-dipping and improper.

I cannot accept Platinum's position.  There is nothing in the IMA that provides that if Small earned bonus compensation based on unrealized profits in 2010, he could not earn bonus compensation on realized profits through distributions and interest in future years, until they exceeded the unrealized profits in 2010.  Profit achieved through distributions and interest was traditionally treated as distinct from profits through sales.

In order to prevent Small from being paid twice for the same profits, consistent with past practice for  Small and Platinum in general, the unrealized markup in value of $60 million in 2010 will serve as the cost basis for the position going forward.  Thus, when the equity in Black Elk is eventually sold, Small will only be entitled to bonus compensation based on the difference between the 2010 marked up value and the sale price.

When Small's 2011 and 2012 IMA's were negotiated, Platinum was aware that Small had been compensated on unrealized gains in Black Elk in 2010. Other than changing Black Elk to a realized-only position, there was no change in the language of the IMA to support Platinum's position.

To the extent that the IMA is ambiguous on this issue, Platinum's custom and practice provides the most potent evidence of the parties' intent. In 2011 and 2012, SanFilippo was aware of Small's unrealized gain in 2010, yet, as had been the custom under the IMA, he attributed net profits and bonus compensation to Small in 2011 and 2012 based on the Black Elk distributions. Indeed, with Nordlicht's approval Small received a portion of that compensation in 2011. The parties' course of dealing is entitled to far greater weight than Platinum's post-hoc litigation position.[11]

2. Implant Sciences

A similar disagreement exists with respect to Implant Sciences, another realized-only position in Small's Account. In calculating Small's 2012, 2013 and 2014 net profits, SanFilippo included the Funds realized profits

---

[11] Moreover, there is nothing in the IMA that would permit Platinum to claw back bonus compensation that was paid to Small, based on its recalculation of his net profits years after payment was made or due.

resulting from the sale of shares of Implant Sciences --
$11 million in 2012, $14 million in 2013, and $13 million
in 2014. Those sales were recognized as realized profits
even though the Funds reinvested the proceeds of the sales
in the form of direct loans to Implant Sciences. And,
SanFilippo viewed that recognition as appropriate. (See
Exs. 14, 19, 29; Tr. at 845-46, 851.) Indeed, in 2015,
when SanFilippo prepared a spreadsheet for Nordlicht of the
profits generated by Small's Account, he included the
Implant Sciences sales as realized profits for which Small
was owed bonus compensation. Once again, Nordlicht's
position -- since the revenue derived from the Implant
Sciences sales was reinvested in Implant Sciences there was
no realized profit, and there can be no realized gain until
there is a profit on the entire investment – finds no
support in the IMA, SanFilippo's calculation of net profits
pursuant to GAPP and his understanding of Small's
Employment Agreement, or the parties' prior course of
conduct.

C. Northstar

1. Small as Portfolio Manager

In the Spring of 2014, Platinum saw an investment
opportunity in a Houston-based energy company called
Northstar.   In June 2014, Nordlicht specifically asked

34

Small if he was willing to work on how best to structure the acquisition. (See Cl.'s Ex. 90.)   Although other individuals were involved in limited aspects of the transaction, Small credibly testified that he dedicated the majority of his time and effort to the project during the second half of 2014.  He was involved in conducting due diligence on Northstar; negotiating and reviewing the acquisition financing documentation; negotiating, reviewing and executing the purchase documents; working with Northstar senior management on operational and strategic issues; serving on Northstar's board of directors and as Northstar's vice-president; and repeatedly traveling to Houston to oversee aspects of the transaction and investment.   (See, e.g., Tr. at 249-58, 264-67, 1110-11.) Other witnesses confirmed that Small was heavily involved in the Northstar investment.   (See Tr. at 885, 1110-11, 1300-01, 1322-24, 1531-32.)   In September 2014, the Funds made a significant investment of capital to acquire Northstar.

Small contends that he became the Project Manager on Northstar and, therefore, it should be viewed as a position in his Account for purposes of his bonus compensation. Respondent argues that Northstar was never identified in Exhibit A to Small's IMA as being part of his Account and

that Nordlicht never intended to make Small the Project Manager for Northstar.

The IMA defines Small's "Account" as "those assets of the Funds set forth in Schedule A hereto, which shall be updated in the ordinary course of business by the mutual consent of the Managers and the Portfolio Manager [Small]." (Cl.'s Ex. 5, ¶ 1(a)) (emphasis added). The IMA does not define how "mutual consent" or updating was to occur. The evidence demonstrates that Small's Account was regularly updated, in the ordinary course of business, without any alteration in Schedule A or formal written directive by Nordlicht. Thus, although only eighteen positions are identified in Schedule A, from 2010 until the termination of Small's employment Platinum recognized numerous other positions as being part of Small's Account and calculated his bonus taking those positions into consideration. (See Tr. at 140.) Indeed, Nordlicht acknowledged that Small was recognized as a portfolio manager on various positions where Nordlicht did not specifically tell him he was the portfolio manager, but instead, based on his "implied consent." (See Tr. at 1245-48, 1261.) In fact, there was no evidence of positions being added to Small's Account by express oral or written consent or by amendment of Schedule A to Small's Employment Agreement. Rather, where Small

performed the duties of a portfolio manager for an investment and the Funds allocated capital to the position, the general practice was to recognize Small as the portfolio manager and consider the position to be part of his Account. (See Tr. at 113, 119, 140-41, 458-59.)

Consistent with this general practice, SanFilippo calculated the net profits on Small's Account for 2010, 2011, 2012, 2013 and 2014, taking into consideration numerous non-Schedule A positions, all of which SanFilippo included on a realized and unrealized basis. (See Tr. at 167, 779-80; Cl.'s Ex. 47.) Consistent with Small's testimony, SanFilippo testified: "For a private equity deal, I would generally assume, unless I was told otherwise, that if a portfolio manager was making funding requests, if he was, you know, monitoring the position on a daily basis, he would be the portfolio manager. I would assume that." (Tr. at 918-20.) And, in 2015, SanFilippo prepared an analysis of Small's Account for both Nordlicht and Small, to allow Nordlicht to assess the bonus compensation to which he thought Small was entitled. A portion of that analysis, that was sent to Small, included Northstar as a position in Small's Account. SanFilippo testified that he prepared the analysis because he was instructed by both Small and Nordlicht to include "total

inflows and outflows on Small's portfolio investments." (Tr. at 912-13 (emphasis added); see also Cl.'s Ex. 116).

In addition, a number of Platinum documents actually identify Small as the portfolio manager on Northstar. For example, schedules prepared for the Platinum investors in the third and fourth quarters of 2014 identify Small alone as the portfolio manager for Northstar. (See Cl.'s Ex. 109; Tr. at 272-73, 899-900.) The minutes of a valuation meeting with Platinum's independent valuation company also list Small as the portfolio manager of Northstar (in addition to being the portfolio manager on other positions identified in Schedule A of the IMA), and confirm that he gave a detailed report about Northstar at the meeting. (See Cl.'s Ex. 152.) And, for the first three quarters of 2015, Platinum's position summaries for one of its funds listed Small as the portfolio manager for Northstar. (See Cl.'s Ex. 119; Tr. at 275, 905-06; see also Cl.'s Ex. 117 (identifying Small as the portfolio manager of Lafitte, Northstar's predecessor entity).)[12]

---

[12] The position summaries refer to "LHP" as the Northstar portfolio manager, but it is undisputed that LHP was shorthand used by Platinum to refer to Small and his colleague, David Levy, who operated as a team and enjoyed the same compensation arrangement.

Platinum's explanations as to why Small was not the portfolio manager of Northstar were inconsistent, at times contradictory, and generally lacking in credibility. For example, at his deposition SanFilippo testified that the portfolio managers for Northstar were Levy, Salafi and Weiner. (See Tr. at 883.)   At trial, he testified that there was no portfolio manager for Northstar. (See Tr. at 881-82.) At his deposition, Nordlicht testified that the portfolio managers for Northstar were Salafi and Weiner. At trial, Nordlicht testified that he alone was the portfolio manager for Northstar. (See Tr. at 696.)[13]

Small first learned that he would not be compensated for his work on Northstar in February 2015, after he had already dedicated substantial time and effort to the Northstar position.   The overwhelming weight of the credible evidence, summarized above, demonstrates that

---

[13] Other Platinum employees testified that the determination as to who was a portfolio manager was up to Nordlicht alone and that they had done work on various investments without being designated portfolio manager.  None of these employees, however, had employment contracts that were similar to Small's which, among other things, required Small's consent before a position was added to his Account. Moreover, unlike Small's contractual entitlement to bonus compensation for positions in his Account, their bonus compensation was determined solely in Nordlicht's unfettered discretion.  The testimony of these employees shed no light on the course of conduct that existed between Nordlicht and Small.

Small served as the portfolio manager of Northstar, as he assumed that role for other positions, with Nordlicht's implied consent. Consistent with the IMA requirement of mutual consent in order to add a position to Small's Account, Nordlicht asked Small if he would work on Northstar and Small agreed to do so. Nordlicht was aware that Small then went on to perform all of the tasks for Northstar that he routinely performed as a portfolio manager. Notwithstanding Nordlicht's contention that it was not his subjective intent to appoint Small the Northstar Project Manager, all of the objective manifestations of his implied consent to having Small serve as the portfolio manager were present and were consistent with the parties' prior course of dealing with respect to other positions in Small's Account.

### b. Realized-Only or Realized and Unrealized Profits

Small contends that Northstar is a position for which realized and unrealized profits should be recognized for purposes of his bonus compensation. Platinum disagrees.

Only four positions in Schedule A to Small's IMA were identified as "realized-only" positions, based upon Small and Nordlicht's renegotiation of Small's IMA. Northstar was not one of them. Thus, based upon the clear language of the IMA, Northstar's realized and unrealized profits

should factor into Small's bonus compensation. This
conclusion is also supported by the parties' consistent
course of dealing.

Each time SanFilippo included a non-Schedule A
position in his calculation of Small's net profit, he did
so on a realized and unrealized basis. (See Tr. at 776-80.)
For example, as had been the parties consistent course of
dealing, for the year 2011 SanFilippo calculated Platinum's
reasonable best estimate of Small's net profits by
itemizing the gains and losses for the various positions in
Small's Account, breaking it into two categories: "Realized
and Unrealized" positions and "Realized P&L" positions. The
Realized and Unrealized category included 35 positions that
did not appear on Schedule A to the 2011 Employment
Agreement. The Realized-Only category included only the
fours positions designated as "Realized Only" in Schedule
A. (See Cl.'s Exs. 4, 47.) SanFilippo concluded that Small
was entitled to a 2011 bonus of $1,111,422.52, which took
into account net profits from the four "realized only"
positions and many other realized and unrealized positions.
(See Cl.'s Ex. 9.) After receiving the 2011 Net Profits
Spreadsheet that SanFilippo prepared, Nordlicht approved
Small's bonus compensation. (See Tr. at 1430-31.)

Similarly, SanFilippo calculated Small's 2012, 2013 and 2014 net profits with respect to numerous non-Schedule A positions, taking into consideration realized and unrealized profits. (See Cl.'s Ex. 47.)

Here again, Platinum's, and more specifically Nordlicht's, protestations as to why unrealized gains on Northstar should not be recognized for purposes of Small's compensation were not credible. For example, Nordlicht took the position that subsequent to 2010, the Employment Agreement was intended to limit all of Small's compensation to realized profits only, claiming that it was a "very, very clear" firm-wide policy. (See Tr. at 660.) This ignores the plain language of the Employment Agreement designating only four realized-only positions, as to which Nordlicht expressed "surprise". (See Tr. at 658.) [14] Moreover, Platinum, and by extension Nordlicht, received incentive fees on the basis of realized and unrealized profits. (See Tr. at 775.)

At his deposition, Nordlicht testified that the only reason that some positions were not designated "realized only" was because they were unsubstantial and it was more

---

[14] Nordlicht also viewed the unambiguous language of the Employment Agreement as being inconsistent with his subjective intent. (See Nordlicht Deposition, Cl.'s Ex. 167, at 98.)

convenient to leave them as realized and unrealized profits positions. (See Cl.'s Ex. 167, at 5.) Yet, there were non-Schedule A positions that were more substantial than some "realized-only" Schedule A positions. (See Cl.'s Ex. 118.) At the Hearing, when confronted with other portfolio managers' employment contracts that took into account both realized and unrealized profits, Nordlicht took the position that those employees were trading in marketable securities that could be sold easily. (See Tr. at 1189-90.). Implant Sciences, however, is a "realized-only" position in Small's Account, and it is publicly traded. Nordlicht later argued that when an investment involved secured debt and was illiquid, it would always be treated as a "realized-only" position. (See Tr. at 1199.) [15]

The evidence demonstrates that for purposes of Small's bonus compensation, with the exception of the four realized-only positions in Schedule A of the IMA, Platinum recognized both realized and unrealized profits for every other position in Small's Account, whether identified on Schedule A or subsequently added to Small's Account in the ordinary course of business. Accordingly, I conclude that

---

[15] As of July of 2015, neither Nordlicht nor SanFilippo could remember why the four positions were designated as "realized-only." (See Cl.'s Ex. 40.)

both the terms of Small's Employment Agreement and the parties' consistent course of dealing require that Northstar be recognized as a realized and unrealized profit position in Small's Account.

   D. Compensation Owed

   SanFilippo actually calculated the amount of bonus compensation Small was due for the years 2012, 2013, and 2014, with the exception of Northstar. In 2012, Small's Account generated $38,026,888 in net profits. Applying the terms of Small's Employment Agreement to that amount, results in bonus compensation of $2,032,473.40 (See Cl.'s Exs. 14 & 39.) After reducing that amount by the $180,000 in annual base salary and $218,662 in bonus compensation that Small received, SanFilippo determined that Small is owed $1,633,811.25 (See Cl.'s Ex. 39.) In 2013, Small's Account generated $8,758,584.50 in net profits, resulting in $569,308 in bonus compensation owed. (See Cl.'s Exs. 19 & 39.)[16] After subtracting the $180,000 base salary Small received, Small is owed $389,308 for 2013. In 2014, Small's Account generated $22,689,444.78 in net profits

_____

[16] Although SanFilippo appears to have calculated a higher bonus amount due for 2013 (see Cl.'s Ex. 39), I rely on the lower figure provided by Claimant because it is Claimant who is seeking damages and Claimant's application of the contractual bonus formula to the net profits found by SanFilippo appears to be mathematically correct.

(exclusive of Northstar), resulting in total incentive compensation owed of $1,334,619.74. After subtracting the $180,000 in base salary received by Small, bonus compensation of $1,154,619.74 is owed to Small, exclusive of Northstar. (See Cl.'s Ex. 39.) Platinum reported to its investors that Northstar's net profit for 2014 was $100,192,153. (See Cl.'s Ex. 117.) When that net profit is included in Small's Account, the bonus compensation he is owed for 2014 increases to $5,893,363.[17]

Accordingly, Small is entitled to $7,916,482.25 in bonus compensation for the years 2012-2014.

E. Prejudgment Interest

Claimant seeks prejudgment interest at the New York statutory rate of 9%. While it is clear that Claimant is entitled to some amount of prejudgment interest, see N.Y. CPLR § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ."), in light of the discrepancy in the amount of bonus compensation claimed and the amount found owing in this

---

[17] Claimant goes on to subtract $180,000 in base salary from this amount, concluding he is owed $5,713,363 for 2014. It appears, however, the base salary that was paid to Small was already subtracted from the bonus compensation due in 2014, before factoring in the Northstar profits. The parties will be free to address these mathematical discrepancies in further submissions.

45

Interim Award, as well as the passage of time until a Final Award will be entered, Claimant should update its request for prejudgment interest in a subsequent filing. Respondents will have the opportunity to respond to that update.

## III. Authority to Order Damages

Respondent argues that the Arbitrator has no authority to order the payment of bonus compensation to Small because the Employment Agreement purportedly contains the exclusive remedy for Platinum's failure to pay bonus compensation. Platinum points to paragraph 3(d)(3) of the IMA, which states:

> In the event that a Manager fails to make the payments to the Portfolio Manager set forth in subsection d()(1) above by the Initial Payment Date, the amount that was failed to be paid shall accrue interest commencing on the Initial Payment Date at a rate equal to the higher of (1) the net return of the Fund or Funds selected by the Managers pursuant to subsection (d)(ii) above and (ii) 1.0%.

Platinum argues that this provision gives it discretion as to when Small's bonus compensation is paid, and simultaneously affords Small compensation for any delay in payment. This argument has no support in logic or law.

To accept Platinum's argument would mean that it need never pay Small the bonus compensation he is owed and that the only remedy for such non-payment is the accrual of

interest.    Such   an   interpretation   of   the   Employment Agreement   is   unreasonable   and   inconsistent   with   the provision requiring payment of 80% of the bonus by February 15 of the year following the year in which it is earned, and payment of the remainder of the bonus promptly after the audited financial reports for the previous year are produced.

Moreover,  the  provision  of  the  IMA  providing  for interest is not even contained in a remedial provision of the Dispute Resolution section of the IMA.   By contrast, paragraph 13(b) of the IMA provides that, while the parties are free to seek immediate injunctive relief in the New York courts for breaches of certain provisions of the IMA, "nothing  in  [that  section]  shall  be  deemed  to  limit  a party's remedies at law or in equity for any breach of any provisions of this Agreement . . . ."  The clear implication of this provision is that the parties retain their rights to seek all remedies at law or in equity that are available for breach of contract.   One such remedy is a judgment requiring payment of contractually owed compensation.

Finally,  under  New  York  law,  in  the  absence  of  a contractual  provision  that  explicitly  identifies  a plaintiff's <u>exclusive</u> remedies, courts are free to grant whatever  contractual  remedies  are  appropriate.  <u>See</u>  <u>RCN</u>

47

Telecom Servs., Inc. v. 202 Centre Street Realty, LLC, 204
Fed. App'x 920, 922 (2d Cir. 2006) ("Under New York law, a
provision must be included in the agreement limiting a
party's remedies to those specified in the contract in
order for courts to find that these remedies are
exclusive."); Papa Gino's of Am., Inc. v. Plaza at Latham
Assocs., 135 A.D. 74, 76, 524 N.Y.S.2d 536, 538 (3d Dep't
1988) (holding that a lease provision - stating that if a
landlord rented any other premises to a competing business
of the tenant, the tenant would pay a different rent - did
not bar the tenant from seeking other relief, such as
specific performance, "unless there is explicit language
that it is to be the sole remedy for a breach").

Accordingly, the Employment Agreement allows the
Arbitrator to order whatever remedies are appropriate for
breaches of the Agreement.

## IV. New York Labor Law Claims

Claimant contends that his bonus compensation
constitutes "wages" under the New York Labor Law and,
therefore, the improper withholding of those wages entitles
him to statutory liquidated damages in the full amount of
the withheld wages, plus his attorneys' fees. See NYLL §
198.1-a. In addition, Small claims that Nordlicht
terminated his position at Platinum in retaliation for his

asserting a claim under the Labor Law and, therefore, he is entitled to both back-pay and front-pay until he secures comparable employment.

A. Bonus Compensation and Wages

The applicability of the New York Labor Law to Small's bonus compensation was addressed, in part, in an earlier Decision on Respondents' motion to dismiss. The excerpt of the Decision set forth below summarizes the relevant law on this issue.

* * * *

Under the Labor Law, wages are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Labor Law § 190(1). Payments made pursuant to an incentive compensation plan are not viewed as wages – – for example, a bonus pool "where an employee receives a guaranteed salary and may also receive supplemental income based upon the dual performance of the employee and the business or as a result of other factors outside of the employee's control." Truelove v. Northeast Capital & Advisory Inc., 266 A.D. 2d 648, 649, 702 N.Y.S.2d 147, 149 (3d Dep't 2000), aff'd, 95 N.Y.2d 220, 224 (2000) ("Discretionary additional remuneration, as a share in a reward to all employees for

49

the success of the employer's entrepreneurship, falls outside the protection of the statute."). As the Court of Appeals found in Truelove:

> The terms of defendant's bonus compensation plan did not predicate bonus payments upon plaintiff's own personal productivity nor give plaintiff a contractual right to bonus payments based upon his productivity. To the contrary, the declaration of a bonus pool was dependent solely upon his employer's overall financial success. In addition, plaintiff's share in the bonus pool was entirely discretionary and subject to the non-reviewable determination of his employer. These factors, we believe, take plaintiff's bonus payments out of the statutory definition of wages.

Truelove, 95 N.Y.2d at 224.

By contrast, bonus payments that are tied more directly to the individual performance of an employee, and which are non-discretionary, have been recognized as "wages" under the Labor Law. See, e.g., Ryan v. Kellogg Partners Institutional Services, 79 A.D.3d 447, 449 (1st Dep't 2010) ("[T]he type of bonus agreement involved in this case, i.e., a non-discretionary bonus based on labor and services rendered, constitutes "wages" within the meaning of Labor Law § 190(1)."), aff'd, 19 N.Y.3d 1, 16, 945 N.Y.S.2d 593, 602 (2012) ("Unlike the situation in Truelove, Ryan's bonus was "expressly link[ed]" to his labor or services personally rendered, namely, his work as a floor broker for Kellogg. Further, Ryan's bonus had been

50

earned and was vested before he left his job at Kellogg;
its payment was guaranteed and non-discretionary as a term
and condition of his employment. Since Ryan's bonus
therefore constitutes "wages" within the meaning of Labor
Law § 190(1), Kellogg's neglect to pay him the bonus
violated Labor Law § 193.") (internal citations and quotes
omitted).

\* \* \* \*

In denying Respondents' motion to dismiss, I found that
Small's bonus compensation clearly was not discretionary
and was not paid out of a general bonus pool that was
dependent on the financial success of Platinum.
Nonetheless, questions of fact existed as to whether
Small's bonus compensation was tied directly to his
personal productivity.

Platinum argues that Small's bonus compensation is not
tied directly to Small's performance but, rather, to the
success or lack of success of the businesses in which Small
invested. In addition, Platinum contends that Small was a
member of the LLC's through which his bonus compensation
was paid, and, as such, he shared in both the profits and
the losses of the LLC's. He filed his tax returns showing
that the distributions he received from the LLC's was K-1
income, and he was able to write off losses suffered by the

51

LLC's.   Platinum argues that K-1 income cannot be treated as wages under the Labor Law.

Having now considered all of the relevant evidence as to how Claimant's bonus compensation was earned and paid, I conclude that it does not fall within the Labor Law's definition of wages.  As the New York Court of Appeals held in Truelove, "[w]e therefore agree with those courts that have concluded that the more restrictive statutory definition of "wages," as earnings for labor or services rendered, excludes incentive compensation based on factors falling outside the scope of the employee's actual work." 95 N.Y.2d at 224, 715 N.Y.S.2d at 368 (internal quotations omitted). See also Beach v. Touradji Capital Mgmt., LP, 128 A.D.3d 501, 502 (1st Dep't 2015) ("Dismissal of the Labor Law claim was warranted since plaintiffs' unpaid extra compensation does not constitute "wages" under Labor Law § 190 (1). Such compensation depended on factors other than their personal productivity, including the efforts of defendant . . . and a team of analysts.").

Here, Small's bonus compensation, although not part of a general profit sharing pool, was completely dependent upon the success or failure of the companies in his Account.  Indeed, when those companies experienced losses, those losses were offset against profits in determining the

52

"net profits" attributable to Small's Account.   And, if Small's Account generated an overall loss for the year, Small would fail to receive any bonus compensation for that year, and the loss was carried forward as an offset to net profits and bonus compensation in future years. This is not a case where, for example, bonus compensation was tied directly to sales or trading revenue Small achieved through his own efforts. See, e.g., Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 265 (2d Cir. 1999) ("Here, Reilly's pay was guaranteed under the Percentage Bonus formula to be a percentage of the revenues he generated . . ."); Simas v. Merrill Corp., 2004 WL 213013, at * 6 (S.D.N.Y. Feb. 4, 2004) ("The signing bonuses here do not constitute incentive compensation; they were guaranteed as a term of employment tied to plaintiff's individual performance and did not involve discretion on the part of Merrill.  Pursuant to the plan, employees were eligible to receive up to 80% of one month's base revenue for the contracts sold by that individual.") (emphasis added); Westheim v. Elkay Industries, Inc., 166 A.D.2d 318, 560 N.Y.S.2d 779 (1st Dep't 1990) (affirming conclusion that bonus was wages where it amounted to 2% of the sales the employee achieved above quota).  Nor did Small's bonus take into account Small's proportional contribution to his

employer's overall billing. See Forenti v. Central Emergency Physicians, P.L.L.C, 723 N.Y.S.2d 851, 855 (Sup. Ct. Nassau Cty. 2001) (bonus formula that took into account the plaintiff's proportional contribution to employer's overall billing found to be wages).

Small's bonus compensation was based only in part, and quite indirectly, on his productivity. Although his efforts and recommendations may have contributed to the success of the companies in which he invested for the Funds, he did not run the companies and the profits and losses they generated were subject to many external forces, including the efforts of their other employees. See Quirk v. Am. Mgmt. Systems, Inc., 2002 WL 31654966, at *2 (S.D.N.Y. S.D.N.Y. Nov. 22, 2002) ("Quirk's incentive compensation was based only partially on his own performance."); Xu v. J.P. Morgan Chase & Co., 2003 WL 25964617, at * 4 (S.D.N.Y. Sept. 24, 2003) (where plaintiff alleged that he was promised a bonus based on a fixed percentage of the trading revenue he generated, court found: "[I]f the alleged oral agreement between Xu and his supervisors controls, and the terms are as Xu described,

Xu's bonus formula was based <u>entirely</u> on his own performance.") (emphasis added). [18]

Moreover, Small did not have the authority to make key decisions that generated the net profits on which his bonus was based. He did not have the discretion to determine in what companies the Funds would invest or how much to invest, and he did not have the discretion to decide when to sell an investment. Those decisions were, in large part, up to Nordlicht and the Investment Committee. In addition, unrealized profits were determined by Platinum's Valuation Committee and the Funds' auditors, based on how

---

[18] Claimant relies on the case of <u>Econn v. Barclay's Bank, PLC</u>, 2010 U.S. Dist. LEXIS 143063, at *10-12 (S.D.N.Y. May 10, 2010), for the proposition that a bonus may constitute wages even if the bonus is based on a percentage of profits generated by more than the plaintiff alone. In <u>Econn</u>, however, the court ultimately dismissed the plaintiff's Labor Law claim. <u>See</u> 2010 WL 9008868, at *5 (S.D.N.Y. June 10, 2010). In <u>Friedman v. Arensen Office Furnishings Inc.</u>, 129 A.D.3d 525 (1st Dep't 2015), also relied on by Claimant, the court merely denied a motion to dismiss because it allowed for the possibility that the plaintiff - the manager of newly-created division - could demonstrate that the net profits the division earned could be attributed to the plaintiff's services. Although we do not know the outcome of the case, in contrast to the instant case, it was possible to demonstrate a direct connection between the division's profits and the plaintiff's personal performance. Here, the profits and losses generated by the positions in Small's Account were subject to a myriad of forces not directly connected to Small's individual performance.

illiquid investments were valued and their future prospects. (See Tr. at 146-47.)

Because I conclude that Small's incentive or bonus compensation was not sufficiently tied to his personal labor and services so as to constitute "wages", Small is not entitled to the remedies provided by the New York Labor Law for the willful withholding of wages.[19]

It follows that because Small's bonus compensation does not constitute wages covered by the New York Labor Law, Small cannot succeed on his claims for retaliatory discharge under the Labor Law.

---

[19] In light of this conclusion, there is no need to address at any length Respondents' other arguments as to why Small's bonus compensation cannot be considered wages under the Labor Law. I do note, however, that Small negotiated to have at least a portion of his bonus compensation paid as profits distributions from LLC's in which he was a member. He did that in order to have his bonus compensation treated as K-1 profits, which are taxable at a lower rate than W-2 wages and can be offset with losses of the LLC's. In 2011 and 2013, for example, the entirety of Small's bonus compensation was paid as K-1 profits through one of the LLCs. (See Tr. at 179-80, 336-37, 934-35, 940.) It find it difficult to reconcile the concept of K-1 profits with the wages meant to be protected under the New York Labor Law. Similarly, under ¶ 3(h) of the Employment Agreement, there was a possibility that Small could be required to surrender a portion of the bonus compensation he had already received if, for example, Platinum was required to surrender a portion of the income it received because of a subsequent tax determination of the government. Again, I find it difficult to reconcile wages under the Labor Law with compensation that may be subject to surrender because of external developments that affect an employer.

## V. Declaratory Relief

Paragraph 3(f) of Small's Employment Agreement provides that in the event that Small is terminated without cause, "[u]ntil all securities positions in the Account as of the Termination Date are liquidated by or on behalf of [Platinum], the Portfolio Manager or his estate or heirs as applicable shall continue to receive the Bonus calculated and payable as set forth herein." Small seeks a declaratory judgment with respect to Platinum's continuing obligation to pay his bonus compensation. Platinum argues that the Employment Agreement only allows for an arbitration seeking remedies for a live dispute arising out of a breach of the Agreement, and Small's future entitlement to payments is a hypothetical dispute that has not yet arisen.

There is nothing in the Dispute Resolution provision of the Employment Agreement that precludes declaratory relief. Indeed, the Agreement provides that "any claim" arising out of or relating to the Agreement shall be determined by arbitration. Small claims that the Agreement entitles him to future bonus compensation until the positions that were in his Account are all liquidated. This is not a hypothetical dispute.

New York C.P.L.R. § 3001 authorizes courts to order declaratory relief where there is an actual controversy between genuine disputants, but not as a vehicle for an advisory opinion. See N.Y. Public Research Group, Inc. v. Carey, 42 N.Y.2d 527, 529-30 399 N.Y.S.2d 621, 623 (1977); Long Island Lighting Co. v. Allianz Underwriters Ins. Co., 35 A.D.3d 253, 253, 826 N.Y.S.2d 55, 56 (1st Dep't 2006).

> The fact that the court may be required to determine the rights of the parties upon the happening of a future event does not mean that the declaratory judgment will be merely advisory. In the typical case where the future event is an act contemplated by one of the parties, it is assumed that the parties will act in accordance with the law and thus the court's determination will have the immediate and practical effect of influencing their conduct. But a request for a declaratory judgment is premature if the future event is beyond the control of the parties and may never occur. Then any determination the court may make would be merely advisory since it can have no immediate effect and may never resolve anything.

N.Y. Public Interest Research Group, 42 N.Y.2d at 530-31.

Here, the future events that are to occur are all within Platinum's control. First, there are investment positions that were in Small's Account when he was terminated. As of the time of the Hearing, most of those positions were maintained by Platinum. Platinum has the authority to liquidate those

positions and there was testimony at the Hearing that Platinum is actively exploring selling its stake in at least one position – Implant Sciences. Such a sale would trigger bonus compensation to Small. (See Tr. at 738, 1097, 1100.) And, upon the sale or liquidation of each position, if there is a realized gain that gain must factor into Small's bonus compensation, as set forth earlier in this Decision.

Small is not seeking an advisory opinion, but a determination of a live claim. See Realtime Data, LLC v. Melone, 104 A.D.3d 748, 751-52 (2d Dep't 2013) (concluding that it was appropriate for a court to issue a declaratory judgment as to whether an employee would be entitled to a bonus based on a future asset sale). Indeed, the fact that Small's right to bonus compensation will be due each year until all of the positions in his Account have been sold is inevitable, and, for the year 2015, the right to bonus compensation has already arisen, without any compensation being paid.

There has been no argument or evidence presented to allow the conclusion that Small was terminated for "cause." Although various explanations have been given for Small's termination, such as:   (1) the need to

restructure the manner in which portfolio managers would be compensated; (2) Nordlicht's learning various things about Small's personal family matters that he found distasteful; [20] and (3) Small's claiming the right to compensation for the Northstar position in his Account, even if true, these rationales do not fit the definition of "cause" set forth in paragraph 1(d) of the Employment Agreement.

Small is therefore entitled to a declaration that Platinum is required to pay his bonus compensation for 2015 and all future years that the positions he managed are retained by Platinum and generate net profits for the Funds.

## VI. Specific Performance

Section 3(i) of Small's Employment Agreement provides:

> In the event that (I) Manager is unable to pay the Portfolio Manager all or a portion of the Base Salary and/or Incentive Fees due to him under this Agreement with respect to the services he provided to a Fund of which the Manager is the investment manager, and (II) such Fund is permitted under its governing documents to pay compensation directly to the Portfolio Manager for such services, such Manager agrees to use its reasonable best efforts to cause such Fund to pay the Portfolio Manager such unpaid Base Salary and

---

[20] Nordlicht's purported concern about Small's "propensity for violence" was not credible and was not based on any work-related conduct.

Incentive Fees to the extent it relates to services provided to such Fund.

Small seeks specific performance of this provision.

With respect to this relief, I find that there is no ripe controversy. Small has not yet attempted to collect on any Award that has yet to be issued in this proceeding, or any judgment entered by a court, and Platinum has not taken the position that it is unable to pay Small's incentive compensation. Small seeks specific performance of a contractual provision for which the predicate has not yet occurred.

Accordingly, Small's claim for specific performance is denied.

## VII. Attorneys' Fees and Costs

Claimant seeks the award of the costs and attorneys' fees he incurred in this proceeding. The Disputes Provision in Small's Employment Agreement authorizes a discretionary award of costs and fees, stating "[t]he arbitrator may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party." (Employment Agreement ¶ 13(a).) Accordingly, the Arbitrator has the authority to award the reasonable fees and costs Small incurred in this

proceeding. See Landmark Ventures, Inc. v. InSightec, Ltd.,
63 F. Supp. 3d 343, 357-58 (S.D.N.Y. 2014) ("[B]y contract,
the Arbitrator had clear authority to award attorney's fees
and costs, and was acting within the scope of this
authority when she awarded to [Respondent] most of the fees
they requested. . . . . The Arbitrator was not required to
find that [Claimant] was acting in bad faith as would be
required for an award of punitive damages."); New York
Merchants Protective Co., Inc. v. RW Adart Poy, 108 A.D.3d
554, 968 N.Y.S.2d 552 (2d Dep't 2013) ("As a general
matter, attorneys' fees may not be recovered in an
arbitration proceeding unless they are expressly provided
for in the arbitration agreement."); Emery Roth & Sons,
P.C. v. M & B Oxford 41, Inc., 298 A.D.2d 320, 321, 750
N.Y.S.2d 10, 11 (1st Dep't 2002) ("Legal fees could not be
awarded absent provision therefor in a statute or the
agreement to arbitrate"); see also JAMS Comprehensive
Arbitration Rule 24(g) ("The Award of the Arbitrator may
allocate attorneys' fees and expenses . . . if provided by
the Parties' Agreement . . . .").

Small should recover if not all, at least a
significant portion of, the costs and attorneys' he incurred
in this proceeding. He is clearly the prevailing party.
Moreover, he has not been paid incentive compensation he

has been owed since 2012. The quantification of that compensation was made years ago by Mr. SanFilippo, Platinum's CFO, and was not disputed by Mr. Nordlicht until 2015, shortly before Small filed this Arbitration, or, indeed, during the Arbitration.[21]

In order for the Arbitrator to determine the amount of fees and costs to be awarded, Claimant shall submit an application appropriately documenting the fees and costs being sought (including hourly billing rates and the experience of the attorneys for whom fees are sought) within twenty-one days of this Interim Award. Respondent shall have two weeks from receipt of the application to respond. Any reply shall be submitted within three business days.

### CONCLUSION

For the reasons set forth above, Claimant Daniel Small has established that Respondents owe him bonus compensation in the amount of $7,916,482.25, plus prejudgment interest. Claimant is also entitled to

---

[21] Even if Nordlicht had a principled basis, rooted in Small's Employment Agreement, for objecting to some of the compensation sought by Small (for example, the Northstar compensation), that compensation was not in issue until 2014. In any event, the Employment Agreement does not require bad faith in order to justify the award of fees and costs.

declaratory relief requiring that until all securities positions in his Account as of his termination date are liquidated by or on behalf of Platinum, he or his estate or heirs as applicable shall continue to receive the bonus calculated and payable as set forth in his Employment Agreement (to be construed in a manner consistent with this Award). Finally, Claimant is entitled to the reasonable attorneys' fees and expenses he incurred in this proceeding, with the amount to be determined. Claimant is not entitled to any relief provided for in the New York Labor Law or, at this time, to specific performance of ¶ 3(i) of his Employment Agreement.

Within twenty-one days of the issuance of this Interim Award, Claimant shall submit its application for attorneys' fees and costs, as well as its position with respect to (1) the relatively minor mathematical discrepancy noted with respect to the amount of bonus compensation owed, and (2) prejudgment interest. Respondents shall have two weeks from Claimant's submission to respond, and Claimant shall have three business days to submit a reply.

To the extent any argument has not been discussed herein, it has been considered and either rejected or found unnecessary to a determination of the issues in contention.

To the extent any claim is not specifically mentioned
herein, it is denied.

                          * * *


              MATTERS RAISED SINCE ENTRY OF THE INTERIM AWARD


I. Respondents' Application to Reopen the Hearing and Modify
the Interim Award

       Respondents seek to reopen the Hearing and submit
additional evidence in order to establish that the award of
bonus compensation to Small for the unrealized profits of
Northstar is clear error and would result in manifest
injustice.  Platinum argues that "[i]n determining whether
Small's bonus calculation should include unrealized gains,
. . . the Arbitrator should have considered not only
whether Northstar is mentioned by name as "Realized Only" on
Schedule A, but also whether it was owned by or part of an
asset that was designated "Realized Only." Platinum contends
that Northstar is owned by the same holding entity that
owns Platinum's investment in Black Elk, Small knew of that
relationship, and that it was misleading for Small to not
disclose the close relationship between Northstar and Black
Elk.

                              65

Although an Interim Award has been entered, it was not, as Respondents' counsel characterizes it, "inherently tentative, . . . thus reflecting that no resolution has been reached of even one of [Claimant's] claims, much less all the claims." (Ltr. from Ira A. Sturm, dated June 15, 2016, at 3.) There was nothing tentative about my conclusion that Claimant is entitled to bonus compensation for the unrealized gains on the Northstar position. The only reason that the Award was characterized as "Interim" is because (1) the Arbitrator had a question about a minor mathematical issue as to the precise amount of bonus compensation owed; (2) there was a need to update the calculation of prejudgment interest; and (3) although Claimant was found to be entitled to attorneys' fees and costs, the amount of fees and costs had not yet been specified or supported with appropriate documentation.

Nonetheless, as there has been no Final Award, the Arbitrator does have discretion to reopen the Hearing and consider additional evidence. As provided in JAMS Arbitration Rule 17(i), "[a]t any time before the Award is rendered, the Arbitrator may, *sua sponte*, or upon the application of a Party for good cause shown, reopen the Hearing."

66

> Whether a case should be reopened for the taking
> of additional testimony rests within the broad
> discretion of the arbitrators, and even an abuse
> of such discretion, in the absence of misconduct,
> would not be ground for setting aside an
> award. Mere refusal to reopen a case to take additional
> testimony upon an issue which had been addressed
> at length or to take posthearing evidence offered
> to bolster testimony already presented, as in the
> case at bar, does not constitute misconduct which
> would allow for vacatur of an award.

Matter of Sedlis, 161 A.D.2d 228, 230 (1st Dep't 1990)

(internal citations and quotations omitted).

I conclude that Respondents have not shown good cause to reopen the Hearing. In any event, and in the alternative, having considered Respondents' argument to modify the Interim Award and the evidence they have submitted in support of the argument, I conclude that there is no sound reason to alter the finding in the Interim Award that Small is entitled to bonus compensation for the unrealized profits of Northstar.

Respondents argue that the Arbitrator should have considered not only whether Northstar is mentioned by name as "Realized Only" on Schedule A, but also whether it was owned by or part of an asset that was designated as "Realized Only." (Sturm June 15th Ltr. at 4.) They go on to argue that Small was aware that Black Elk and Northstar were held in the same Platinum entity and that it was misleading of him not to testify to that fact. Respondents

fail to acknowledge, however, that (1) they never made the argument that they now contend the Arbitrator should have adopted, and (2) the information they contend Small should have volunteered was information that they were fully aware of and could have offered as well.   Simply put, Platinum and Mr. Nordlicht never argued that the reason that Northstar should be treated as a "Realized Only" position was because it is owned by the same entity that owns Black Elk – PPVA Oil & Gas LLC.   Platinum's contrivance of an after-the-fact argument with respect to Northstar, which could have been made before the record was closed and the Interim Award was issued, is not good cause for altering a decision that was based on an extensive record and fully briefed arguments.

In any event, there is nothing in Small's Employment Agreement, in the parties' course of conduct under that Agreement, or in Mr. Nordlicht's testimony that even suggests that whether Northstar or any other position should be treated as "Realized Only" should turn on whether it is owned by an entity that also owns a "Realized Only" position.   Black Elk and Northstar are two distinct companies; one (Black Elk) is identified as "Realized Only" in Small's Employment Agreement, and the other (Northstar) is not.

For the foregoing reasons, Respondents' motion to modify the Interim Award is denied.

## II. Motion to Hold Award in Abeyance

Respondents request that any Award requiring a cash payment be held in abeyance pending the resolution of claims that will be asserted against Small in another proceeding. Platinum contends that it will be asserting claims of breach of fiduciary duty, faithless servant disgorgement, gross negligence and indemnification and/or contribution against Small, all related to a $33 million loan/investment Small made on behalf of Platinum. Platinum contends that Small improperly made the investment without obtaining a security interest for Platinum in the borrower's assets, thus creating an inordinate risk to Platinum. The borrower ultimately defaulted on its obligations and filed for bankruptcy, leaving Platinum uncertain as to whether it will recoup any of its $33 million investment.

Platinum argues that under New York law, entry and enforcement of a judgment should not be authorized where the party allegedly owing the judgment has its own claim against the party to whom the judgment would be awarded. Claimant responds that the cases cited by Respondent do not support its argument for a stay in this proceeding because

(1) there are no claims that have yet been asserted against Small; (2) any such claims brought against Small are unlikely to succeed and, in any event, would be brought by a Platinum affiliate that is not even a party to this proceeding and as to which Small had a separate employment agreement; and (3) Respondents are improperly seeking to delay payment to Small of compensation which he earned years ago.

I conclude that there is no sound basis to hold the entry of a Partial Final Award in abeyance.

In the primary case relied upon by Respondents, Mike Michaelson Assocs., Inc. v. Soifer, 182 A.D.2d 503, 582 N.Y.S.2d 412 (1st Dep't 1992), the trial court granted partial summary judgment on the defendant's counterclaim, entitling the defendant to $50,000. But the claims against the defendant that remained to be tried were for a far greater amount of money. Under those circumstances, the Appellate Division concluded that "execution on the judgment should be stayed pending the outcome of plaintiff's action on condition that such action is prosecuted expeditiously " Id., 182 A.D.2d at 505. Here, there are no counterclaims asserted against Claimant; there are only potential claims that may be asserted in another proceeding and on behalf of a different entity than the

70

Respondents in this proceeding.  Moreover, the entry of a Partial Final Award is analogous to the entry of partial summary judgment in the Michaelson case; enforcement of the Award, as with execution on a judgment, is a distinct act that will occur in another proceeding.

In Susan Ives, New York, Ltd. v. Base Lodge, Inc., 46 A.D.2d 622, 359 N.Y.S.2d 1001 (1st Dep't 1974), summary judgment was entered against a defendant for an amount that was less than the plaintiff could be liable to the defendant on claims in another proceeding.  The court found that the allegations in the related proceeding were "inextricably intertwined with this plaintiff's present claims," and would have appropriately constituted a counterclaim in the immediate proceeding. While the court concluded that there was "not a bar to judgment" in the case, it exercised its discretion to stay execution of the judgment, "on condition that defendant proceed expeditiously with the prosecution of the [separate] action and on the further condition that it provide an undertaking securing payment of the judgment affirmed hereon." Id., 46 A.D.2d at 622.  Unlike the Susan Ives case, here there are no other claims by Respondents pending against Claimant, and the claims that purportedly will be filed are not inextricably intertwined with the claims in this proceeding.  Moreover,

71

the entry of a Final Award is no different than the entry of judgment in the Susan Ives case; it is not analogous to execution on a judgment.

Similarly, in Levy v. Renck, 137 A.D.2d 464, 465, 525 N.Y.S.2d 41 (1st Dep't 1988), the court found,

> [s]ince the amount of the unsettled causes of action of the complaint is in excess of the amount of the defendants' third counterclaim, we find, after reviewing the record, that failure to stay execution of partial summary judgment, pending the resolution of the unsettled claims, could result in possible financial prejudice to the plaintiff should [plaintiff] subsequently prevail on the unsettled claims Accordingly, we exercise our discretion (CPLR 3212 [e] [2]), and stay execution of partial summary judgment.

Staying execution of a judgment rests within the discretion of a court where there is a clear connection between the claims and counterclaims of the parties and entry of judgment on some claims would be prejudicial to a party. As the New York Court of Appeals has stated:

> The trial court, and thus the Appellate Division have wide discretion in imposing conditions upon the grant of partial summary judgment so as to avoid possible prejudice to the party against whom that judgment is granted. The device used in this case, a stay of execution pending resolution of the remaining claims and counterclaims, is an appropriate method of effectuating that objective. Such discretion, however, is not unlimited, and is to be exercised only if there exists some articulable reason for concluding that the failure to impose conditions might result in some prejudice, financial or otherwise, to the party against whom the partial summary judgment is granted should that party

> subsequently prevail on the unsettled claims. This is especially true where, as here, the counterclaims with respect to which partial summary judgment was granted are sufficiently independent of the plaintiff's claim as to have allowed defendant to bring a separate action upon them had it so chosen.

Robert Stigwood Org. v Devon Co., 44 N.Y.2d 922, 923-24, 408 N.Y.S. 2d 5 (1978) (internal citations omitted).

There is no sound reason to exercise discretion to stay the entry of a Partial Final Award in this proceeding. Respondents have not even filed their proposed claims against Claimant and, as described, they bear no connection to the claims in this proceeding. Moreover, Respondents have not demonstrated any prejudice that would result from the entry of a Partial Final Award in this proceeding. To the contrary, it is Claimant who will be prejudiced by delay, as (1) he has waited four years to receive the bonus compensation he is owed; and (2) there has been some showing that Respondents may be unable to pay Claimant the compensation to which he is entitled, and they are likely to be less able to make payment with the passage of time.

For the foregoing reasons, Respondents' motion to hold the entry of a Partial Final Award in abeyance is denied.

III. Attorneys' Fees and Costs

As found in the Interim Award, Claimant is clearly the prevailing party in this proceeding and, under his

73

Employment Agreement, is entitled to the reasonable fees and costs he incurred in vindicating his rights. Claimant seeks legal fees in the amount of $528,984.00 and costs in the amount of $81,983.71, for a total of $610,967.71.

Respondents oppose the application arguing: (1) Small was not the prevailing party because he lost more issues than he won and, in any event, Small failed to allocate the attorney time between the issues on which he did and did not prevail; (2) counsel liberally employed "block billing", creating a high probability of inflated time; (3) many of the time entries are too vague to sufficiently document the hours claimed; and (4) counsels' hourly rates are excessive and unreasonable.

A. Prevailing Party

Respondents argue that Claimant lost more than he won and, therefore, he is not the prevailing party. Respondents point to pre-Hearing proceedings in which they succeeded in reducing the size and number of Small's claims and forced Small to amend his claims to exclude non-parties to his Employment Agreement. They further argue that Small lost his claims under the New York Labor Law because his bonus compensation was found not to be "wages." This eliminated his claims for liquidated damages and retaliatory discharge.

74

The determination of prevailing party status is not dependent on the number of procedural skirmishes won or lost. "[T]o be considered a prevailing party, there must be success with respect to the central relief sought." 25 East 83 Corp. v. 83rd Street Assocs., 213 A.D.2d 269, 269, 624 N.Y.S.2d 125, 125 (1st Dep't 1995). As New York courts have concluded: "[S]uch a determination requires an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope." Excelsior 57th Corp. v. Winters, 227 A.D.2d 146, 147, 641 N.Y.S.2d 675, 676 (1st Dep't 1996).

> In this regard, the court must keep in mind that the attorney's fees should bear some relationship to the level of success achieved, and therefore time spent on claims that failed is not normally compensable. However, the fact that a party was unsuccessful on interim proceedings in the course of the litigation does not bar recovery for time spent on claims on which the party ultimately prevailed.

Sidley Holding Corp. v. Ruderman, 2009 WL 6047187, at *17 (S.D.N.Y. Dec. 30, 2009) (internal citations omitted) Report and Recommendation, adopted at 2010 WL 963416. (S.D.N.Y. Mar. 15, 2010).

In the instant proceeding, the thrust of what Claimant sought was bonus compensation he was owed for the years 2012-2014. Claimant succeeded in securing the right to that compensation. Claimant also contended that his bonus

compensation should be treated as wages under the New York Labor Law, thus entitling him to liquidated damages that would have doubled the compensation owed, and he did not succeed on that claim.   Moreover, with dismissal of his wage claim, he could not succeed on his Labor Law claim for retaliatory termination.

That Claimant's damages were not doubled does not diminish the success he achieved.   He is clearly the prevailing party,

Nonetheless, Respondents' dispute with the fee request because it fails to take account of the issues on which Claimant lost has some merit.   A significant amount of time was spent briefing and arguing the Labor Law issues.   By contrast, the testimony and documentary evidence on those claims overlapped with the proof on Claimant's successful bonus compensation claim.   Because there is no reason for counsel to have separately delineated the time spent on the Labor Law claims and it would be virtually impossible to do so at this time, based on my knowledge of the proceeding I conclude that a 10% reduction in the fee award would be appropriate to address Claimant's lack of success on two of his claims.

B. Reasonable Attorneys' Fee

A reasonable attorneys' fee is a fee that reflects the reasonable value of the services rendered.    The factors to be considered in determining a "reasonable" fee include: "time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer's experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved."   In re Freeman's Estate, 34 N.Y.2d 1, 9, 355 N.Y.S.2d 336, 341 (1974).

### 1. Reasonableness of the Time Spent

This proceeding was lengthy and involved a substantial amount of legal work. There were a number of pre-Hearing motions, including a motion to dismiss.   Depositions and documentary discovery was conducted.   The Hearing itself took eight (8) days and both pre- and post-Hearing memoranda of law were submitted.

Claimant's counsel has submitted the contemporaneous billing records documenting the time spent on this

proceeding. [22]   Those records document approximately 990 hours spent by three attorneys over the course of a year, with an insignificant amount of time spent by two additional attorneys and less than seventy-five hours spent by paralegal assistants.

Respondents do not contend that the amount of time documented by counsel was excessive or improperly spent. They do take issue with counsels' frequent use of block billing, where a number of tasks are associated with a single time entry, rather than breaking down the time spent on each task.   They argue that block billing can result in inflated attorney time estimates.   Similarly, Respondents note that a number of time entries are sufficiently vague so as to preclude a reasonableness assessment. (See, e.g., entry for 11/21/15 - "Work on trial preparation" - 4 hours).

While block billing makes it more difficult to assess the reasonableness of the time spent by counsel, it is not per se improper.   Nevertheless, courts often impose a percentage reduction in fee awards because of the difficulties in trying to parse the hours spent to determine their reasonableness. See Community Counseling &

---

[22] Initially, only s summary of the hours spent by the various attorneys who worked on this matter was submitted. The summary was later supplemented with the contemporaneous billing records.

Mediation Servs. v. Chera, 115 A.D.3d 589, 590, 982
N.Y.S.2d 469, 471 (1st Dep't 2014) ("Although there is no
per se rule as to the maximum or minimum that block-billed
fees should be reduced to account for unnecessary work, we
find that, under the circumstances of this case, a 10%
reduction should be applied to those hours that were block-
billed."); Freidman v. Yakov, 138 A.D.3d 554, 556, 30
N.Y.S.3d 58, 60 (1st Dep't 2016)("Block billing, about
which counterclaim defendants complain, is common practice
among law firms, and does not render the invoiced amounts
per se unreasonable. Here, the work performed by
defendants' attorneys was more than sufficiently detailed
by the billing attorney's credible testimony. Furthermore,
the Special Referee reduced the amount sought by defendants
due to the block billing.") (internal citations and quotes
omitted).

Here, because there are numerous time entries that are
block billed, often for the largest amounts of time, and a
number of the time entries are vague, a 10% reduction in
the fee award is appropriate.

Having reviewed the time records in their entirety,
however, I find the remainder of the time spent to be
reasonable.

2. Hourly Rates

Claimant was ably represented by attorneys at the law firm of Davis & Gilbert, a highly respected firm with offices in New York City.   Two attorneys performed most of the work for Claimant: Howard Rubin and Michael Silver. Mr. Rubin is a 1972 graduate of Columbia Law School, is co-chair of his firm's Litigation Practice Group, and has many years of experience as a litigator. His customary hourly billing rate during the course of the arbitration was $700 in 2015 and $720 in 2016.   As a courtesy, however, he billed Claimant at the discounted hourly rate of $630. Michael Silver was an associate with Davis & Gilbert.   He is a 2010 graduate of Duke University School of Law and prior to joining Davis & Gilbert was an associate at Simpson Thacher & Bartlett.    Davis & Gilbert billed Claimant for Mr. Silver's time at his customary hourly billing rate of $440 in 2015 and $480 in 2016.    Another Davis & Gilbert associate, Sharon Cohen, assisted with certain litigation tasks.   She is a 2012 graduate of the University of Pennsylvania Law School.   She served as a law clerk to a Justice of the Supreme Court of Israel and had been an associate at the Jones Day firm.   Ms. Cohen's time

was billed at $380 per hour in 2015 and $415 per hour in 2016.[23].

Respondents contend that the hourly rates of the Davis & Gilbert attorneys are "off the scale for wage cases such as that at hand." (Sturm Ltr, dated June 15, 2016, at 5.)  I must disagree.

"As a general rule, the reasonable hourly rate [for an attorney] should be based on the customary fee charged for similar services by lawyers in the community with like experience and of comparable reputation to those by whom the prevailing party was represented." Matter of Gamache v Steinhaus, 7 A.D.3d 525, 527, 776 N.Y.S.2d 310 (2d Dep't 2004) (internal quotations omitted).   The relevant community here is New York County.

The "court may determine the reasonable hourly rate by relying both on its own knowledge of comparable rates charged by lawyers in the district" and "on evidence proffered by the parties." Adorno v. Port Auth., 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010) (internal quotation marks

---

[23] Another attorney who billed a limited number of hours in this proceeding - Jesse Schneider - is a 1998 graduate of New York University School of Law and had been a litigation attorney at Fried Frank Harris Shriver & Jacobson LLP. His hourly billing rate was $530.  Finally, Jacob Freeman, a 2011 graduate of Harvard Law School, billed at the hourly rate of $450.

omitted), reconsideration granted in part, 2010 WL 727480 (S.D.N.Y. Mar. 2, 2010). "[I]n determining reasonable hourly rates, [courts] must consider the 'range of rates plaintiff's counsel actually charge their clients. This is obviously strong evidence of what the market will bear." Jimenez v. KLB Foods, Inc., 2015 WL 3947273, at *4 (S.D.N.Y. June 29, 2015) (quoting Rozell v. Ross-Holst, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008)). See also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir.2008). ("The reasonable hourly rate is the rate a paying client would be willing to pay.").

In a 2009 federal case in the Southern District of New York, the court surveyed various attorney fee awards and found: "In terms of the market rate for representation in the Southern District of New York, recent fee awards within the district reflect hourly rates in the range of $450.00 to $600.00 for experienced partners, $350.00 for senior associates, $250.00 for junior associates . . . ." Sidney Holding Corp., 2009 WL 6047187 at *26.  That finding was made six years ago and, needless to say, attorneys' billing rates have increased since that time.[24]  See, e.g., Beastie

----

[24] In a recent decision, another court found "[i]n the Southern District of New York, fee rates for experienced attorneys in small firms generally range from $250 to $450

82

Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 55-56 (S.D.N.Y. 2015)(approving rate of $675 per hour for experienced partners in copyright case, and citing other cases approving such rates); Genger v. Genger, 2015 WL 1011718, at *2 (S.D.N.Y. Mar. 9, 2015) (approving an hourly rate of $615 and noting: "In recent years, New York district courts have approved rates for experienced law firm partners in the range of $500 to $800 per hour."); Abdell v. City of New York, 2015 WL 898974, at *3 (S.D.N.Y. Mar. 2, 2015) (awarding $650 per hour to experienced, lead counsel in civil rights action); Doe v. Unum Life Ins. Co. of America, 2016 WL 335867, at *5 (S.D.N.Y. Jan. 28, 2016) (awarding senior counsel in ERISA action $600 per hour in contrast to the $680 per hour requested).

This action was not a simple employment or FLSA case and Mr. Rubin is not simply an employment law attorney.

---

in civil cases." 6D Global Technologies, Inc. v. Lu, 2016 WL 1756920, at *4 (S.D.N.Y. May 3, 2016) (quoting Thor 725 8th Ave. LLC v. Goonetilleke, No. 14 Civ. 4968, 2015 WL 8784211, at *11 (S.D.N.Y. Dec. 15, 2015)). Similarly, in an FLSA case a court found: "[A]ttorneys in FLSA cases typically command hourly rates ... between $250 and $450 per hour, depending on their level of experience." Collado v. Donnycarney Restaurant L.L.C., 2015 WL 4737917, at *11 (S.D.N.Y. Aug. 10, 2015) (citing cases); accord Lizondro-Garcia v. Kefi LLC, 2015 WL 4006896, at *7 (S.D.N.Y. July 1, 2015)("Although courts in this district have awarded hourly rates of $550 and $600 to experienced senior litigators, FLSA litigators are rarely awarded over $450 per hour.").

The case involved a claim of breach of contract against an investment management firm for a very substantial amount of bonus compensation. Mr. Rubin is an extremely experienced litigator whose practice spans a number of different areas, including labor and employment, copyright, breach of contract and securities fraud. He is co-chair of the Litigation Group at a firm of more than 110 attorneys. His customary hourly billing rate was $700 in 2015 and $720 in 2016. Under the circumstances, the courtesy rate of $630 per hour billed to Mr. Small is a reasonable hourly rate.[25]

Three associates at Davis & Gilbert assisted in the proceeding. Michael Silver, a 2010 graduate of Duke University School of Law, played an active role in the arbitration and demonstrated a high level of competence. Mr. Small was billed at his customary hourly billing rates -- $440 in 2015 and $480 in 2016. Sharon Cohen, another

---

[25] Mr. Rubin seeks application of his customary billing rate rather than the rate that he actually charged Claimant. Although some courts have acknowledged that under certain circumstances a court has discretion to award fees at a rate higher than the rate the client was actually charged, under the circumstances of this proceeding I find that the hourly rate at which Mr. Small was actually billed is the most reasonable and falls more comfortably within the range most often applied in New York County. See Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc., 246 F.3d 142, 151 (2d Cir. 2001) ("for prevailing parties with private counsel, the actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is reasonable").

Davis & Gilbert associate, billed at her customary hourly rate of $380 per hour in 2015 and $415 in 2016. Finally, Jacob Freeman, a 2011 graduate of Harvard Law School, billed for a handful of hours at his customary rate of $450. The associates' hourly rates fall within the range of rates approved by courts, albeit at the high end of the range. See Genger, 2015 WL 1011718, at *2 (approving associate hourly rate of $395 and noting: "New York district courts have also recently approved rates for law firm associates in the range of $200 to $450 per hour."); In re Nissan Radiator/Transmission Cooler Litigation, 2013 WL 4080946, at *17 (S.D.N.Y. May 30, 2013) (finding that associate hourly rates of $325, $595 and $675, respectively, fell within the prevailing market rates); Therapy Prods., Inc. v. Bissoon, 2010 WL 2404317, at *5 (S.D.N.Y. Mar. 31, 2010) (finding fourth year associate hourly rate of $430 to be commensurate with rates charged by in other large New York law firms) (Report and Recommendation adopted, Erchonia Corp. v. Bissoon, 2010 WL 2541235 (S.D.N.Y. June 15, 2010).

Finally, two paralegal assistants and the managing clerk at Davis & Gilbert performed various tasks to assist in the arbitration. Claimant was billed at their customary hourly rates of $225 in 2015 and $230 in 2016. These rates

85

fall within the range of standard paralegal billing rates in large New York law firms. See <u>Scarsdale Central Service, Inc. v. Cumberland Farms, Inc.</u>, 2016 WL 1644372, at *1 (S.D.N.Y. Apr. 21, 2016) (finding paralegal hourly rate of $245 to be reasonable); <u>In re AOL Time Warner Shareholder Derivative Litigation</u>, 2010 WL 363113 at *13 (S.D.N.Y. Feb. 1, 2010) (finding paralegal rates ranging from $90 to $250 per hour to fall within acceptable range in New York); <u>Merck Eprova AG v. Gnosis S.P.A.</u>, 2011 WL 1142929, at *10 (S.D.N.Y. Mar. 17, 2011) (finding paralegal rate of $215 per hour for work performed in 2010 to be in line with what courts in the Southern District of New York have allowed).

C. Costs

"Courts . . . will generally grant 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" <u>Navig8 Chemicals Asia Pte., Ltd. v. Crest Energy Partners, LP</u>, 2015 WL 7566866, at *3 (S.D.N.Y. Nov. 24, 2015) (quoting <u>LeBlanc-Sternberg v. Fletcher</u>, 143 F.3d 748, 763 (2d Cir. 1998) (quoting <u>U.S. Football League v. Nat'l Football League</u>, 887 F.2d 408, 416 (2d Cir. 1989)).

Claimant has submitted documentation demonstrating that $11,246.69 was incurred for disbursements for such

matters as courier services, travel, duplication costs and legal research. An additional $13,019.00 was incurred for court reporter costs and $57,718.02 was incurred for fees in connection with this arbitration. Respondent takes issue with only one cost identified as "Court Services", in the amount of $400. Claimant has clarified that this was the JAMS filing fee.

All of the costs incurred are properly included in a cost award and routinely reimbursed for prevailing parties in litigation. See, e.g., Rubenstein v. Advanced Equities, Inc., 2015 WL 585561, at *9 (S.D.N.Y. Feb. 10, 2015) (awarding reimbursement for court fees, filing fees, legal research expenses and printing and binding fees); Collado v. Donnycarney Restaurant L.L.C., 2015 WL 4737917 at *14 (S.D.N.Y. Aug. 10, 2015). ("Courts, in their discretion, have awarded reasonable costs for various expenses, including computer research, attorney transportation and meals, mailing and copying fees and service and filing fees.").

* * *

In conclusion, the total fees Claimant incurred for legal services was $513,458.00. Applying a 10% reduction to that amount for lack of success on the Labor Law claims and another 10% reduction for block billing and vague time

entries, results in a fee award of $410,766.40. Claimant is also entitled to reimbursement of his costs in the amount of $81,983.71.

## IV. Prejudgment Interest

Claimant seeks prejudgment interest at the New York statutory rate of 9%. Although Respondents do not dispute Small's right to prejudgment interest, they contend, contrary to Small's position, that the date for accrual of interest can be no earlier than the date when the instant action was commenced.

Section 5001(b) of the New York Civil Practice Law and Rules (CPLR") provides:

> [I]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

Thus, it is the date when the cause of action accrues, not when the action is commenced, that is controlling.

> Under CPLR 5001, interest on a sum awarded as a result of a breach of contract is computed from the earliest date that the claim accrued, "except that interest upon damages incurred thereafter shall be computed from the date incurred" (CPLR 5001[a], [b] ). Thus, CPLR 5001 permits a party that prevailed in a breach of contract action to obtain prejudgment interest . . . And where a contract provides for periodic payments or

> installments, the defaulting party is required to pay prejudgment interest on any missed payment from the date the payment became due.

NML Capital v. Republic of Argentina, 17 N.Y.3d 250, 257-589 (2011); accord Seward Park Housing Corp. v. Greater New York Mutual Ins. Co., 43 A.D.3d 23, 34 (1st Dep't 2007)("In insurance breach of contract actions, interest is computed from the date of accrual. Here, pursuant to the policy, the plaintiff was entitled to payment 30 days after submission of sworn proof of loss, thus the date of accrual was August 7, 1999."); Advanced Retail Marketing, Inc. v. News America Marketing FSI, Inc., 303 A.D.2d 231, 231 (1st Dep't 2003) ("Plaintiff, as prevailing party in this action for breach of contract, is entitled to prejudgment interest from the earliest ascertainable date the cause of action existed. That date, under the facts at bar, is December 30, 2001, the date on which payment would have been due plaintiff after the end of the so-called 'earn-out' period.") (internal citations and quotations omitted).

Here, there are specific dates by which Platinum was required to pay Small his annual bonus compensation, but failed to do so. Claimant has properly calculated prejudgment interest owed from the date of each breach, totaling $1,295,127.00 through June 20, 2016. (See Ex. B to June 20, 2016 Rubin Ltr.) An additional $1,907.63 is due

for each of the 22 days from June 21, 2016 to July 12, 2016, the date of this Award, for a total of $41,967.86. In sum, Claimant is entitled to $1,337,094.86 in prejudgment interest.

## V. Specific Performance

Section 3(i) of Small's Employment Agreement provides:

> In the event that (I) Manager is unable to pay the Portfolio Manager all or a portion of the Base Salary and/or Incentive Fees due to him under this Agreement with respect to the services he provided to a Fund of which the Manager is the investment manager, and (II) such Fund is permitted under its governing documents to pay compensation directly to the Portfolio Manager for such services, such Manager agrees to use its reasonable best efforts to cause such Fund to pay the Portfolio Manager such unpaid Base Salary and Incentive Fees to the extent it relates to services provided to such Fund.

Claimant again seeks specific performance of this provision. In the Interim Award I declined to grant this relief on the ground that the issue was not ripe for determination because Small had not made a demand for his bonus compensation and it had not yet been established that Platinum was unable to pay Small's bonus compensation. See supra, at 60-61. Small now renews his request for specific performance arguing: (1) he has now demanded the bonus compensation he was found to be owed in the Interim Award and Platinum has not responded; (2) Platinum has never paid

Mr. Small's compensation out of its budget; rather, Small's bonus was always paid by the Funds; (3) recent events reported in the press about alleged illegal activity by a Platinum partner add to the urgency of the relief Small seeks because, with the passage of time and reported threats to liquidate Platinum's main hedge fund, the likelihood of Small recovering the compensation he is owed becomes more tenuous.

Respondents argue that this issue remains not ripe for determination because there has not yet been a Final Award finding that Small is owed bonus compensation and any such Award has not yet become an enforceable judgment. Platinum contends that until an enforceable judgment is entered, Small makes a demand for his compensation and Platinum is then unable to pay it, any relief under this provision would be premature.

The landscape has changed in some respects since the Interim Award was entered. First, Platinum's obligation to pay Small bonus compensation of close to $8.0 million, plus prejudgment interest, attorneys' fees and costs, is about to become a determination in a Partial Final Award. Second, Small has demanded the bonus compensation found to be owed in the Interim Award and Platinum has not responded.

Moreover, as Small points out, when he was paid his bonus compensation it was paid by the Funds, not Platinum. And, as SanFilippo testified, the traders' fees are due directly from the Funds. (See Tr. at 1471.) Further, at the Hearing both Nordlicht and SanFilippo testified that Platinum was not making a profit from the management of the Funds, but was just breaking even. The management fees it receives merely enable it to meet its overhead expenses. (See Tr. at 1292-93; 1470-71.) Indeed, even in response to the instant application, Platinum does not assert that it is able to pay what it owes to Small. Moreover, the events that have been reported in the press and the allegations contained in the criminal complaint filed against one of its partners further jeopardize Platinum's ability to pay a judgment of more than $8.0 million.

Notwithstanding all of the above, until this Award is confirmed in a judicial proceeding, it is not enforceable as a judgment. And until it is confirmed and is en enforceable judgment, Platinum has no obligation to pay Small the amounts required by this Award. Should it then be unable to do so, it will have the contractual obligation to make its best reasonable efforts to secure payment from the Funds.

Under these circumstances, while it is appropriate to declare Claimant's right under the Employment Agreement to have Platinum make its best effort to secure payment of his bonus compensation from the Funds should Platinum be unable to make such payment itself, it would be premature to grant specific performance requiring Platinum at this time to use its best efforts to cause the Funds to pay Small his bonus compensation.   It is for this reason that a Partial Final Award will issue, allowing Claimant to seek confirmation of the Award and an enforceable judgment with respect to all other relief that has been granted.   The Arbitrator will retain jurisdiction to address the issue of specific performance if and when such relief becomes necessary and appropriate.

## CONCLUSION

For the reasons set forth above, including the Interim Award (incorporated herein), Claimant Daniel Small is entitled to the following relief against Respondents:

(1) bonus compensation for the years 2012-2014 in the following amounts:

(a) $1,633,811.25 for 2012;

(b) $389,308.00 for 2013;

(c)  $5,713,362.70 for 2014,

for a total amount of $7,736,481.95;[26]

(2) attorneys' fees and costs in the amount of $492,750.11;

(3) prejudgment interest in the amount of $1,337,094.86;

(4) declaratory relief requiring that until all securities positions in Small's Account as of his termination date are liquidated by or on behalf of Platinum, Small or his estate or heirs as applicable shall continue to receive the bonus calculated and payable as set forth in his Employment Agreement (to be construed in a manner consistent with this Award).

Claimant is denied relief with respect to his New York Labor Law wage and retaliatory termination claims. Claimant's claim for specific performance of ¶ 3(i) of his Employment Agreement is denied without prejudice to renew at a more appropriate time should such relief be necessary. The Arbitrator retains jurisdiction to address the issue of specific performance.

---

[26] In the Interim Award I concluded that Small was entitled to a somewhat higher amount of bonus compensation ($7,916,482.25), but invited further submissions on the issue from the parties. Small has now clarified and demonstrated that the amount owed is the lesser amount set forth above. (See May 25, 2016 Rubin Ltr. containing calculation of bonus owed.)

94

To the extent any argument has not been discussed herein, it has been considered and either rejected or found unnecessary to a determination of the issues in contention. To the extent any claim is not specifically mentioned herein, it is denied.

_____
Hon. Theodore H. Katz (Ret.)
Arbitrator


Dated: July 12, 2016
       New York, New York


State of New York)
                 ss:
County of New York)

I, Theodore H. Katz, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this Partial Final Award.

_____
THEODORE H. KATZ


Dated: July 12, 2016

95

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Small, Daniel vs. Platinum Management (NY) LLC, et al.
Reference No. 1425019011

I, Anne Goodwin, not a party to the within action, hereby declare that on July 12, 2016, I served the attached Partial Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Howard J. Rubin Esq.
Michael C. Silver Esq.
Daniel Feinstein Esq.
Davis & Gilbert
1740 Broadway
New York, NY   10019
Phone: 212-468-4800
hrubin@dglaw.com
msilver@dglaw.com
DFeinstein@dglaw.com
    Parties Represented:
    Daniel Small

Mr. Harvey Weblowsky
Platinum Management (NY) LLC
250 West 55th Street
14th Floor
New York, NY   10019
Phone: 212-582-2222
HWerblowsky@platinumlp.com
    Parties Represented:
    Platinum Liquid Opportunity Management (NY)
    Platinum Management (NY) LLC

Ira A. Sturm Esq.
Raab Sturm & Ganchrow LLP
1250 Broadway
36th Floor
New York, NY   10001
Phone: 212-683-6699
isturm@rsgllp.com
    Parties Represented:
    Platinum Liquid Opportunity Management (NY)
    Platinum Management (NY) LLC

Jacob Freeman Esq.
Davis & Gilbert
1740 Broadway
New York, NY   10019
Phone: 212-468-4800
jfreeman@dglaw.com
    Parties Represented:
    Daniel Small

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on July 12, 2016.

Anne Goodwin
agoodwin@jamsadr.com