# EXHIBIT P

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------- x
FREEDOM SPECIALTY INSURANCE COMPANY,  :
ATLANTIC SPECIALTY INSURANCE COMPANY, :
AND BERKLEY INSURANCE COMPANY,        :
                                      :
    Plaintiffs,                       : Index No.: 652505/2017
                                      :
   v.                                 : Hon. O. Peter Sherwood
                                      :
PLATINUM MANAGEMENT (NY), LLC, PLATINUM : **FIRST AMENDED**
CREDIT MANAGEMENT, LP, MARK NORDLICHT, : **COMPLAINT**
DAVID LEVY, DANIEL SMALL, URI LANDESMAN, :
JOSEPH MANN, and JOSEPH SANFILIPPO,   :
                                      :
    Defendants.                       :
------------------------------------------------- x

    For their First Amended Complaint against Defendants, Plaintiffs Freedom Specialty Insurance Company ("Freedom"), Atlantic Specialty Insurance Company ("Atlantic"), and Berkley Insurance Company ("Berkley") (collectively, the "Excess Insurers") state the following.

## INTRODUCTION

    1.    According to the United States Attorney's Office and the Securities Exchange Commission, Defendants engaged in a fraudulent Ponzi-like scheme to defraud innocent investors and bondholders out of millions of dollars.

    2.    As that alleged scheme was unraveling, Platinum Management (NY), LLC ("Platinum Management") increased its E&O and D&O insurance coverage from $5 million to $25 million. The Excess Insurers required their Insureds to submit "Warranty Statements" in which the Insureds affirmed that, prior to November 18, 2015, no Insured was aware "of any wrongful act of any Insured, or any fact, circumstance or situation which (s)he has reason to suppose might result in a claim being made against any of the Insureds."

    3.    Based on the information currently known to the Excess Insurers, the Insureds knew when signing and submitting the Warranty Statements to the Excess Insurers of wrongful acts, facts, circumstances and situations that they had reason to suppose might (and did) result in a claim.

4. In addition, each of the Excess Insurers' policies contains a "Prior and Pending Litigation Exclusion" that precludes coverage for claims arising out of, among other things, proceedings pending on or prior to November 20, 2015.

5. As such, based on information and belief, no coverage exists under the policies issued by the Excess Insurers for any of the Defendants in connection with a criminal indictment by the U.S. Attorney's Office, a civil fraud action by the SEC, or any of the other related civil lawsuits and matters pending against the Defendants.

## PARTIES

6. Freedom is an insurance company duly organized and existing under the laws of the State of Ohio with its principal place of business located in New York, New York.

7. Atlantic is an insurance company duly organized and existing under the laws of the State of New York with its principal place of business located in Plymouth, Minnesota.

8. Berkley is an insurance company duly organized and existing under the laws of the State of Delaware with its principal place of business located in Greenwich, Connecticut.

9. Upon information and belief, Defendant Platinum Management is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business located in New York, New York.

10. Upon information and belief, Defendant Mark Nordlicht is an "Insured" under the policies issued by the Excess Insurers, and he resides in New Rochelle, New York.

11. Upon information and belief, Defendant David Levy is an "Insured" under the policies issued by the Excess Insurers, and he resides in New York, New York.

12. Upon information and belief, Defendant Daniel Small is an "Insured" under the policies issued by the Excess Insurers, and he resides in New York, New York.

13. Upon information and belief, Defendant Uri Landesman is an "Insured" under the policies issued by the Excess Insurers, and he resides in New Rochelle, New York.

14. Upon information and belief, Defendant Joseph Mann is an "Insured" under the policies issued by the Excess Insurers, and he resides in Brooklyn, New York.

2

15. Upon information and belief, Defendant Joseph SanFilippo is an "Insured" under the policies issued by the Excess Insurers, and he resides in Freehold, New Jersey.

## JURISDICTION AND VENUE

16. The Court has jurisdiction over this action pursuant to sections 301 and 302 of the New York Civil Practice Law and Rules.

17. Venue is proper in this District and Division pursuant to section 503 of the New York Civil Practice Law and Rules. Defendants Platinum Management, David Levy, and Daniel Small reside in this District and Division.

## FACTUAL ALLEGATIONS

### Background

18. Upon information and belief, Platinum Management is the registered investment advisor for Platinum Partners, a New York-based hedge fund that was founded in 2003 (the "Fund").

19. Upon information and belief, beginning at least as early as May 2015, the United States Attorney's Office (the "USAO") for the Southern District of New York ("SDNY") began an investigation into an alleged bribery scheme between a manager of Defendant Platinum Management, Murray Huberfeld, and Norman Seabrook, President of the New York Corrections Officers' Benevolent Association ("COBA").

20. The USAO for the SDNY alleged, as part of its investigation, that Mr. Huberfeld bribed Mr. Seabrook to induce a $20 million investment from COBA with Platinum Management.

21. The USAO for the SDNY issued a grand jury subpoena to Platinum Management on or about May 21, 2015 in connection with its bribery investigation (the "Grand Jury Subpoena").

22. Mr. Huberfeld was arrested on or about June 8, 2016 and was criminally indicted on or about July 7, 2016 (the "SDNY Indictment"). A copy of the SDNY Indictment is attached hereto as "Exhibit 1."

3

23. On or about December 19, 2016, the USAO for the EDNY filed an indictment against additional Platinum Management executives in the case captioned *U.S. v. Nordlicht, et al.*, Case No. 16-CR-640 (E.D.N.Y.) (the "EDNY Indictment"). A copy of the EDNY Indictment is attached hereto as "Exhibit 2."

24. Also on or about December 19, 2016, the SEC filed a civil fraud action against Platinum Management and certain of its executives captioned *SEC v. Platinum Mgmt. (NY) LLC, et al.*, Case No. 16-CV-6848 (E.D.N.Y.) (the "SEC Proceeding"). A copy of the complaint filed in the SEC Proceeding is attached hereto as "Exhibit 3."

25. In the EDNY Indictment and the SEC Proceeding, the government alleged that, beginning as early as 2012, Platinum Management engaged in a fraudulent scheme to overstate the value of its investments in order steal money from its investors. Platinum Management charged its investors a two percent management fee and a 20 percent incentive fee so, by overstating the amount that its investments were worth, Platinum Management would be able to claim fees that it had not earned. Platinum Management's deceit also helped it attract additional investors whose investments, according to the government, were used to pay off prior investors in a traditional Ponzi scheme fashion. According to the government, the overvaluations resulted in a liquidity crisis, such that, by early 2014, Platinum Management relied almost exclusively on new investments and inter-fund loans to pay investors' redemption requests. (Exs. 2 and 3.)

26. In the EDNY Indictment and the SEC Proceeding, the government also alleged that, in early 2014, Platinum Management engaged in a scheme to defraud third-party bondholders of Black Elk. According to the government, Platinum Management rigged a vote of Black Elk's bondholders to allow Platinum Management to sell Black Elk's prime assets and divert the proceeds to Platinum Management, after which Black Elk was allegedly placed into bankruptcy to the detriment of Black Elk's bondholders. (Exs. 2 and 3.)

27. In support of the EDNY Indictment and SEC Proceeding, the government cites and extensively quotes the Defendants' own emails and other documents, including but not limited to the following:

a. a June 2014 e-mail from Mr. Nordlicht to Mr. Landesman stating: "It can't go on like this or practically we will need to wind down . . . this is code red. We can't pay out 25 million in reds [redemptions] per quarter and still have 5 come in." (Ex. 3 ¶ 74);

b. a March 2014 e-mail from Mr. Nordlicht to Mr. Small stating: "This is also a week I need to figure out how to restructure and raise money to pay back 110 million of preferred which if unsuccessful, wd [sic] be the end of the fund." (id. ¶ 79);

c. an April 2014 e-mail from Mr. Nordlicht to Mr. SanFilippo stating: "Start paying down [redemptions] as [you] can. Between [a new investor] and [Platinum Partners Black Elk Opportunity Fund LLC] (additional $10 million), [should] have decent short term infusion." (Ex. 2 ¶ 55);

d. a "flurry of redemption requests exceeding $84 million" that Platinum Management received between December 2014 and March 2015 and that the Insureds knew they could not fulfill. (id. ¶ 67); and

e. a December 2015 e-mail from an unknown conspirator to Mr. Nordlicht stating: "Don't forget books. Assume we are not coming back to ny[.] Just to be safe. Depends on Miami[.] We can fly straiggt [sic] to Europe from Miami on Tuesday[.] Take passport." (Id.)

### The Policies

28. In or around early 2015, Platinum Management sought to increase its directors and officers liability and errors and omissions insurance coverage from $5 million to $25 million. Upon

5

information and belief, this was after Platinum Management had received the Grand Jury Subpoena and the investigations into its alleged fraudulent schemes had commenced.

29. Platinum Management obtained five insurance policies totaling $25 million in coverage issued by these five insurance companies effective for the period from November 20, 2015 to November 20, 2016 (the "Policy Period"): U.S. Specialty Insurance Company ("U.S. Specialty"), Berkshire Hathaway Specialty Insurance Company ("Berkshire"), Freedom, Atlantic, and Berkley.

30. U.S. Specialty issued Investment Advisor and Fund Professional and Directors and Officers Liability Insurance Policy No. H715-62513 to Platinum Management effective for the Policy Period (the "Primary Policy"). A copy of the Primary Policy is attached hereto as "Exhibit 4."

31. Subject to the Primary Policy's terms, conditions, limitations, and exclusions, the Primary Policy has a Limit of Liability of $5 million and a $500,000 Retention per Claim. (Ex. 4.)

32. Berkshire issued Excess Policy No. 47-EPF-302023-01 to Platinum Management effective for the Policy Period (the "Berkshire Policy"). A copy of the Berkshire Policy is attached hereto as "Exhibit 5."

33. Subject to the Berkshire Policy's terms, conditions, limitations, and exclusions, the Berkshire Policy generally provides coverage in accordance with the same terms, conditions, limitations, and exclusions as the Primary Policy. The Berkshire Policy has a Limit of Liability of $5 million, which is in excess of $5 million in underlying insurance and any applicable Retention. (Ex. 5.)

34. Freedom issued Excess Policy No. XMF1501971 to Platinum Management effective for the Policy Period (the "Freedom Policy"). A copy of the Freedom Policy is attached hereto as "Exhibit 6."

35. Subject to the Freedom Policy's terms, conditions, limitations, and exclusions, the Freedom Policy generally provides coverage in accordance with the same terms, conditions, limitations, and exclusions as the Primary Policy, as well as any narrower or more restrictive terms

6

contained in the Berkshire Policy. The Freedom Policy has a Limit of Liability of $5 million, which is excess of $10 million in underlying insurance and an applicable Retention. (Ex. 6.)

36. Atlantic issued Excess Policy No. FIN00008/0000 to Platinum Management effective for the Policy Period (the "Atlantic Policy"). A copy of the Atlantic Policy is attached hereto as "Exhibit 7."

37. Subject to the Atlantic Policy's terms, conditions, limitations, and exclusions, the Atlantic Policy generally provides coverage in accordance with the same terms, conditions, limitations, and exclusions as the Primary Policy, as well as any narrower or more restrictive terms contained in the Berkshire and Freedom Policies. The Atlantic Policy has a Limit of Liability of $5 million, which is excess of $15 million in underlying insurance and an applicable Retention. (Ex. 7.)

38. Berkley issued Excess Policy No. 18013260 to Platinum Management effective for the Policy Period (the "Berkley Policy" or, together with the Freedom Policy and the Atlantic Policy, the "Excess Policies"). A copy of the Berkley Policy is attached hereto as "Exhibit 8."

39. Subject to the Berkley Policy's terms, conditions, limitations, and exclusions, the Berkley Policy generally provides coverage in accordance with the same terms, conditions, limitations, and exclusions as the Primary Policy, as well as any narrower or more restrictive terms contained in the Berkshire, Freedom, and Atlantic Policies. The Berkley Policy has a Limit of Liability of $5 million, which is excess of $20 million in underlying insurance and an applicable Retention. (Ex. 8.)

<u>The Warranties</u>

40. As a condition precedent to Platinum Management's procurement of the Excess Policies, the Excess Insurers required the Insureds to submit Warranty Statements requiring that the Insureds disclose if any Insured had knowledge of any wrongful act or knowledge of any fact, circumstance, or situation that they had reason to suppose might result in a claim being made against any Insured.

41. Specifically, the Warranty Statement provided to Freedom was signed by Mr. SanFilippo on November 18, 2015 (the "Freedom Warranty"). A copy of the Freedom Warranty is attached hereto as "Exhibit 9."

42. The Freedom Warranty states:

In consideration of the coverage provided under the above-captioned Policy, the undersigned officer of the Entity, on behalf of all persons or entities insured under the Policy (hereafter the "Insured"), after full investigation and inquiry, declares and agrees with respect to the $5,000,000 Limit of Liability of this Policy excess of $10,000,000:

No Insured has knowledge, as of the date below written, of any wrongful act of any Insured, or any fact, circumstance or situation which (s)he has reason to suppose might result in a claim being made against any of the Insureds, except as follows (if answer is "none", so state.):

None

If any Insured has such knowledge, as of the date below written, whether or not described above, it is agreed that with respect to the $5,000,000 Limit of Liability of this Policy excess of $10,000,000 the Insurer shall not be liable to pay any loss resulting from any Claim subsequently emanating from such Wrongful Act or fact, circumstance or situation.

Any term used here that is not defined in the Policy shall have the same meaning as the term, or its equivalent, has in the Primary Policy.

This Warranty Statement shall attach to and become a part of the Policy.

(Ex. 9.)

43. As a condition precedent to the Insureds' procurement of the Atlantic Policy, Atlantic required the Insureds to submit a Warranty Statement that was substantially similar to the Freedom Warranty and which was also signed by Mr. SanFilippo on November 18, 2015 (the "Atlantic Warranty"). A copy of the Atlantic Warranty is attached hereto as "Exhibit 10."

44. As a condition precedent to the Insureds' procurement of the Berkley Policy, Berkley required the Insureds to submit a Warranty Statement that was substantially similar to the Freedom Warranty and which was also signed by Mr. SanFilippo on November 18, 2015 (the

"Berkley Warranty" or together with the Freedom Warranty and the Atlantic Warranty, the "Warranties"). A copy of the Berkley Warranty is attached hereto as "Exhibit 11."

The Relevant Policy Provisions

45. Section I.A. of the Primary Policy, to which the Excess Policies follow form, states:

INSURED ADVISER PROFESSIONAL AND MANAGEMENT LIABILITY INSURANCE AND CORPORATE REIMBURSEMENT

(1) The Insurer shall pay on behalf of the Insured Adviser and its Insured Person(s) Loss arising from a Claim first made during the Policy Period arising from any Wrongful Act(s) in the performance of Insured Adviser Activities.

(2) The Insurer shall pay on behalf of the Insured Person(s) Loss which the Insured Person(s) is legally obligated to pay and which is not indemnified by the Insured Adviser (either by reason of the insolvency of the Insured Adviser or because the Insured Adviser is not permitted to indemnify the Insured Person(s)), and which arises from a Claim first made against the Insured Person(s) during the Policy Period for any Wrongful Act(s).

(3) The Insurer shall pay on behalf of the Insured Adviser Loss which the Insured Adviser pays as indemnification to the Insured Person(s) arising from a Claim first made during the Policy Period for any Wrongful Act(s).

(Ex. 4 § I(A).)

46. Section I.B. of the Primary Policy states:

INSURED FUND PROFESSIONAL AND MANAGEMENT LIABILITY INSURANCE AND CORPORATE REIMBURSEMENT

(1) The Insurer shall pay on behalf of the Insured Fund(s) and its Insured Person(s) Loss arising from a Claim first made during the Policy Period arising from any Wrongful Act(s) in the performance of Insured Fund Activities.

(2) The Insurer shall pay on behalf of the Insured Person(s) Loss which the Insured Person(s) is legally obligated to pay and which is not indemnified by the Insured Fund(s) (either by reason of the insolvency of the Insured Fund(s) or because the Insured Fund(s) is not permitted to indemnify the Insured Person(s)), and which arises from a Claim first made against the Insured Person(s) during the Policy Period for any Wrongful Act(s).

9

 (3) The Insurer shall pay on behalf of the Insured Fund(s) Loss which the Insured Fund(s) pays as indemnification to the Insured Person(s) arising from a Claim first made during the Policy Period for any Wrongful Act(s).

(Ex. 4 § I(B).)

47. Section II.C. of the Primary Policy, as amended by Endorsement No. 6, defines the term "Claim" to mean, in pertinent part:

 (1) any written demand for monetary damages or non-monetary or injunctive relief against any Insured(s) commenced by receipt of such demand by the Insured(s);

 (2) any civil, judicial, administrative, regulatory or arbitration proceeding (including any appeal therefrom) commenced by the service of a complaint or similar pleading and initiated against the Insured(s), including a subpoena, target letter or Wells Notice or any administrative or regulatory investigation commenced by a formal order of investigation; or

 (3) criminal proceedings commenced by the return of an indictment, information or similar document; . . .

(Ex. 4 § II(C) and Endorsement No. 6.)

48. "Insureds" is defined in the Primary Policy to mean the "Insured Organization" and the "Insured Person(s)," and includes Defendants. (Ex. 4 § II(J).)

49. Section IV.B. of the Primary Policy states:

The Insurer shall not be liable to make any payment in connection with any Claim: . . . for, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

 (1) any demand, suit, action or other proceeding against any Insured(s) which was pending on or existed prior to the date stated in Item H. of the Declarations, or based upon or arising from the same or substantially similar facts, circumstances or allegations which are the subject or the basis for such demand, suit, action or other proceeding;

 (2) any Wrongful Act(s) or any fact, circumstance or situation which has been the subject of any notice given prior to the Policy Period or policy period under any other policy or policies of which this Policy is a renewal or replacement; or

10

> (3) any other Wrongful Act(s), fact, circumstance or allegation, whenever occurring, which, together with a Wrongful Act(s) which has been the subject of such prior notice, would constitute Interrelated Wrongful Acts[.]

(the "PPL Exclusion").  (Ex. 4 § IV(B).)

50. The Excess Policies amend the PPL Exclusion to list November 20, 2015 as the Pending and Prior Litigation Date.  (Ex. 6, Declarations, Item 6; Ex. 7 at Endorsement No. 1; Ex. 8 at Addition to Section IV.)

51. The Atlantic Policy, by Endorsement, amends the PPL Exclusion in the Primary Policy as follows:

> This Policy excludes coverage for any claim or loss based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: (1) any demand, litigation, or alternative dispute resolution, administrative, regulatory, investigative, or arbitration proceeding which was pending as of, or existed prior to, the date shown in the SCHEDULE above [Prior or Pending Date: 11/20/2015]; or (2) the same or substantially similar fact, circumstance, situation, transaction, event, act, error, or omission underlying or alleged in such demand, litigation, or alternative dispute resolution, administrative, regulatory, investigative, or arbitration proceeding.

(Ex. 7 at Endorsement No. 1.)

52. The Berkley Policy, by Endorsement, amends the PPL Exclusion in the Primary Policy as follows:

> The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:
>
> (1) any prior or pending litigation, administrative or arbitration proceeding, or investigation as of November 20, 2015, or
>
> (2) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, administrative or arbitration proceeding or investigation,
>
> regardless of the legal theory upon which such Claim is predicated.

(Ex. 8 at Addition to Section IV.)

53. Section II.Z. of the Primary Policy defines "Wrongful Act" to mean, in pertinent part:

   (1)   with respect to Insuring Agreements A.(1), B.(1) and C., any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or negligent act by the Insured Person(s), or by any person for whom the Insured Organization is legally liable;

   (2)   with respect to Insuring Agreements A.(2), A.(3), B.(2) and B.(3), any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or negligent act by the Insured Person(s) in its capacity as such, or any matter claimed against it solely by reason of its status as an Insured Person(s); . . .

(Ex. 4 § II(Z).)

54. Section II.R. of the Primary Policy defines the term "Interrelated Wrongful Acts" as "any Wrongful Act(s) which has as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." (Ex. 4 § II(R).)

55. Section V.D. of the Primary Policy states:

More than one Claim involving the same Wrongful Act(s) or Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times:

   (1)   at the time at which the earliest Claim involving the same Wrongful Act(s) or Interrelated Wrongful Acts is first made, or

   (2)   at the time at which the Claim involving the same Wrongful Act(s) or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Clause VII.B.

(Ex. 4 § V(D).)

56. Section II.S. of the Primary Policy, as amended by Endorsement No. 10, states that "Loss" shall not include:

   (1)   multiplied damages or the multiple portion of any multiplied damage award or fines or penalties (Certain FCPA Penalties shall will [sic] not be deemed fines or penalties) other than, with respect to Insuring Agreement E. only, the five percent or less, or the twenty percent or less, of the civil fines

imposed upon the Named Insured or any Insured Person(s) under Section 502(i) or (1) of ERISA; . . .

(1) matters deemed uninsurable under the law pursuant to which this Policy shall be construed, including but not limited to, any disgorgement or payment of ill-gotten gains or any other monies to which an Insured was not legally entitled (notwithstanding the foregoing, the Insurer shall not assert that a Claim alleging violations of Section 11, 12 and 15 of the Securities Act of 1933, as amended, constitutes uninsurable loss under the Policy); . . .

(7) the return or restitution of any money, assets or personal profit received by any Insured(s) to which such Insured(s) is not legally entitled; . . .

(Ex. 4 § II(S) and Endorsement No. 10.)

### The Excess Insurers' Coverage Position

57. Defendants have notified U.S. Specialty, Berkshire, and the Excess Insurers (collectively, the "Insurers") and/or the Insurers have independently become aware of the Grand Jury Subpoena, the SDNY Indictment, the EDNY Indictment, and the SEC Proceeding, and certain other related matters (collectively, with the EDNY Indictment, the SEC Proceeding, the "Matters"), and have sought coverage for certain of those Matters under the Primary Policy, the Berkshire Policy, and the Excess Policies (collectively, the "Policies").

58. U.S. Specialty has identified coverage issues and defenses that may limit or preclude coverage for the Matters reported for coverage under the Primary Policy, and has reserved all of its rights and defenses under the Primary Policy and available at law.

59. Each of the Excess Insurers has sent one or more letters to the Insureds and/or a representative of the Insureds in which it adopted coverage positions of U.S. Specialty by reference, raised additional coverage issues, including with respect to the Warranty Statements and the relevant PPL Exclusion, and reserved its rights under the Primary Policy and its respective Policy.

60. Between October 31, 2016 and the present, the Excess Insurers have sent numerous letters and e-mails to the Insureds and/or the Insured's representatives or attorneys requesting that the Insureds provide them with information and materials to assist them in evaluating coverage for the Matters under the Excess Policies.

13

61. While the Defendants have only provided the Excess Insurers with a small subset of the information and materials responsive to the Excess Insurers' reasonable requests, based upon the information currently known to the Excess Insurers, including but not limited to the evidence relied upon and publicly described by the government in the EDNY Indictment and the SEC Proceeding, contrary to the Insureds' representations in the Warranty Statement, prior to November 18, 2015, the Insureds did have knowledge of wrongful acts, facts, circumstances, or situations that they would have had reason to suppose might result in a Claim against them, including but not limited to knowledge of the Grand Jury Subpoena and the corresponding bribery investigation that resulted in Mr. Huberfeld's arrest.

62. Moreover, upon information and belief, contrary to their representations in the Warranty Statements, prior to November 18, 2015, the Insureds also had knowledge of additional wrongful acts, facts, circumstances, or situations that they would have had reason to suppose might result in a Claim against them, including knowledge arising from information contained in the EDNY Indictment and the SEC Proceeding, which allege that, as early as 2012, Platinum Management was defrauding potential investors with material misrepresentations and omissions regarding the value of Platinum Management's assets and liquidity.

63. The Excess Insurers have advised the Insureds that, based on the information currently known to the Excess Insurers, the Warranty Statements submitted to Excess Insurers have been breached and, barring information or materials suggesting otherwise, no coverage would be available for any of the Matters under any of the Excess Policies. While the Excess Insurers have repeatedly invited the Insureds to provide the Excess Insurers with any information or materials that they believe may support a contrary conclusion, to date, none of the Insureds has done so.

## COUNT I – DECLARATORY JUDGMENT AS TO COVERAGE UNDER THE EXCESS POLICIES

64. Plaintiffs hereby adopt by reference the allegations contained in paragraphs 1 through 63 of this Complaint.

65. An actual, present, and justiciable controversy exists concerning whether the Insureds' breach of the Warranties precludes coverage for the Matters under the Excess Policies, and for any other past, pending, and future Claim(s) for, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the Matters or the facts, circumstances or allegations that are the subject or the basis for any of the Matters ("Related Matters").

66. An actual, present, and justiciable controversy exists concerning whether the Matters constitute Claims first made against Insureds prior to the inception of the Excess Policies such that there is no coverage for the Matters or any Related Matters under the Excess Policies.

67. An actual, present, and justiciable controversy exists concerning whether the PPL Exclusion as applicable to each Excess Insurer precludes coverage for the Matters or any Related Matters under the Excess Policies.

68. An actual, present, and justiciable controversy exists concerning whether the sums incurred by the Insureds in connection with any of the Matters or any Related Matters constitute covered or insurable Loss under the Primary Policy or the Excess Policies.

69. Plaintiffs request that the Court declare that there is no coverage for any of the Matters or any Related Matters under the Excess Policies and that, as a result, Plaintiffs have no obligation to pay, reimburse, advance, or indemnify any defense costs or other sums incurred by any of the Defendants in connection with any of the Matters or any Related Matters.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an Order:

1. declaring that there is no coverage for any of the Matters or Related Matters under the Excess Policies and that, as a result, Plaintiffs have no obligation to pay, reimburse, advance, or indemnify any defense costs or other sums incurred by any of the Defendants in connection with any of the Matters or any Related Matters;

15

2. awarding Plaintiffs their costs, expenses, and attorneys' fees together with pre- and post-judgment interest to the greatest extent allowed by law; and

3. awarding Plaintiffs all other relief that the Court deems just and equitable.

Respectfully submitted,

*/S/ Michael J. Bowe*
Michael J. Bowe, Esq.
Alexander B. Simkin, Esq.
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1746
Facsimile: (212) 835-5008
MBowe@kawowitz.com
ASimkin@kasowitz.com

Darius N. Kandawalla, Esq.
Ohio Bar No. 0066487
 (*pro hac vice* motion to be filed)
Sabrina Haurin, Esq.
Ohio Bar No. 0079321
 (*pro hac vice* motion to be filed)
BAILEY CAVALIERI LLC
One Columbus
10 West Broad Street, Suite 2100
Columbus, Ohio 43215-3422
Telephone: (614) 221-3155
Facsimile: (614) 221-0479
dkandawalla@baileycav.com
shaurin@baileycav.com

Counsel for Plaintiff Freedom Specialty Insurance Company

*/S/ Ivan J. Dolowich*
Ivan J. Dolowich, Esq.
KAUFMAN, DOLOWICH & VOLUCK, LLP
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
Telephone: (516) 283-8709
Facsimile: (516) 681-1101
idolowich@kdvlaw.com

Counsel for Plaintiff Atlantic Specialty Insurance Company

*/S/ Geoffrey W. Heineman*
Geoffrey W. Heineman, Esq.
ROPERS MAJESKI KOHN BENTLEY PC
750 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (646) 454-3243
Facsimile: (212) 668-5929
geoffrey.heineman@rmkb.com

Counsel for Plaintiff Berkley Insurance Company

16