# EXHIBIT R

JMK:ALC/LHE/PTH/SME
F. # 2016R00505

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

MARK NORDLICHT,
DAVID LEVY,
URI LANDESMAN,
JOSEPH SANFILIPPO,
JOSEPH MANN,
DANIEL SMALL and
JEFFREY SHULSE,

              Defendants.

- - - - - - - - - - - - - - - - - -X

Docket No. 16–CR–640 (BMC)

## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION TO INTRODUCE EVIDENCE OF OTHER ACTS OF THE DEFENDANTS

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Alicyn L. Cooley
Lauren Howard Elbert
Patrick T. Hein
Sarah M. Evans
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this motion to admit certain evidence at trial as direct evidence of the charged fraud offenses, or, in the alternative, as other acts evidence pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)") for the permissible purposes of proving the defendants' intent, preparation, plan, knowledge and absence of mistake.

BACKGROUND

I. Summary of the Government's Case

As described in the Indictment, the defendants are charged variously with two distinct but interrelated fraud schemes: (1) the "Fraudulent Investment Scheme," which alleges a scheme to defraud investors in the Platinum Partners Value Arbitrage Fund ("PPVA"), a hedge fund owned and operated by Platinum Partners, L.P. ("Platinum"), and investors in the Platinum Partners Northstar Equity note offerings (collectively, "PPNE"), which were also issued by Platinum; and (2) the "Black Elk Bond Scheme," which alleges a scheme to defraud the holders of 13.75 percent senior secured notes due on December 1, 2015 (the "BE Bonds"), which were issued by Black Elk Energy Offshore Operations LLC ("Black Elk"), one of the portfolio companies in which PPVA held a substantial investment.

As is pertinent to the instant motion, in connection with the Fraudulent Investment Scheme, the Indictment alleges that the defendants Mark Nordlicht, David Levy, Uri Landesman, Joseph SanFilippo and Joseph Mann ("the defendants")[1] engaged in a scheme to defraud investors and prospective investors in Platinum through material misrepresentations and omissions relating

---

[1] The defendants Daniel Small and Jeffrey Shulse are not charged with the Investment Scheme. They, together with Nordlicht and Levy, are charged with perpetrating the Black Elk Bond Scheme.

to: (1) the performance of some of PPVA's Level 3 assets;[2] (2) PPVA's liquidity; (3) the purpose of PPNE and the use of PPNE's proceeds; (4) PPVA's preferential redemption process; and (5) related party transactions involving PPVA and the Platinum Partners Credit Opportunities Fund ("PPCO"), another hedge fund operated by Platinum. Indictment ("Ind.") ¶ 42. As further alleged in the Indictment, the defendants and others at Platinum fraudulently overvalued some of PPVA's assets in order to, among other things, boost performance numbers, attract new investors, retain existing investors, and extract lucrative management and incentive fees. Id. This overvaluation precipitated a severe liquidity crisis, which Platinum attempted to mitigate in a number of ways, including the use of high-interest inter-fund loans and selective repayment of redemptions. Id.

II.   The Evidence the Government Seeks to Admit As Direct Evidence or, in the Alternative, Under Federal Rule of Evidence 404(b)

   A.  Black Elk Bond Trading

The government intends to introduce evidence, in the form of email correspondence, witness testimony and business records, relating to Nordlicht and Levy's involvement in manipulative trading of BE Bonds in the public market. On December 8, 2014, the published price for BE Bonds, as published by Bloomberg Finance, dropped from a daily high of $56.00 to a closing price of $22.00. This precipitous drop in price resulted in Platinum's funds receiving substantial incoming margin calls from Credit Suisse and Nomura Securities. For example, on the morning of December 9, 2014, an employee of Credit Suisse sent an email to SanFilippo and two other Platinum employees. In the email, the Credit Suisse employee issued a

---

[2] A "Level 3" asset is one whose fair value cannot be determined by using observable measures, such as market prices or models. Level 3 assets are typically very illiquid.

2

margin call for PPVA in the amount of $8.5 million and for Platinum Partners Liquid Opportunities Fund ("PPLO") in the amount of $4.1 million and instructed SanFilippo to "[p]lease advise by 10AM how call will be met." In response, one of the Platinum employees forwarded the email to SanFilippo and others at Platinum and wrote: "I think this is due to black elk bonds. [B]loomberg has a price of 22 for last night's close. And that is what CS is using as a mark." Later in the day on December 9, 2014, an employee at Nomura Securities sent an email to Levy and two other Platinum employees. In that email, the Nomura employee advised one of the Platinum employees that "we have had a few conversations internally with our Credit and Risk teams. They have investigated and believe the price [for the BE bonds] of 22 is a valid price. We have also asked our High Yield desk to see if they can quote a price. They have also advised that they would not price it any higher than 22. As it stands, we believe the call for $6,9533,109 [sic] is valid and are asking the call be met today."

    The margin calls triggered Nordlicht, together with others at Platinum, including the Platinum employee identified as Co-Conspirator 7 in the Indictment, to begin a campaign of manipulative trading in order to artificially inflate the price of the BE Bonds. Specifically, email correspondence between Nordlicht and Co-Conspirator 7 shows Nordlicht instructing Co-Conspirator 7 to make bids for BE Bonds at inflated prices and enlisting contacts at other financial firms to bid up the price of the bonds. For example, in an email exchange at approximately 10:30 a.m. on December 9, 2014, Co-Conspirator 7 informed Nordlicht and Levy, among other Platinum employees, that he was "bidding 90 but nobody hitting me yet." Nordlicht then responded, copying Levy and two other employees and advising "u can back off a little. Bid 70 or 80 . . . u can go up later in the day." A few days later on December 12, 2014, Levy sent an

3

email to Nordlicht to inform him of a BE Bond trade they conducted with a brokerage firm with close ties to Platinum.

  B. <u>Optionable Misconduct</u>

    The government also anticipates offering limited evidence of prior bad acts committed by Nordlicht in connection with the company Optionable, Inc. ("Optionable"). Specifically, the government anticipates that certain of its witnesses will testify to their knowledge of Nordlicht's involvement in Optionable when explaining the background of their relationship with Nordlicht and any diligence they conducted upon him and/or Platinum.

    From approximately February 2000 to May 2007, Nordlicht was the Chairman of the Board of Directors of Optionable, and as of 2009, he was its largest shareholder. On August 28, 2009, the Bank of Montreal filed a lawsuit in the Southern District of New York against Optionable, Nordlicht and several other entities and individuals alleging that those defendants engaged in a scheme to defraud the Bank of Montreal by concealing large losses generated by David P. Lee, an options trader at the Bank. <u>See</u> Compl., <u>Bank of Montreal v. Optionable, Inc.</u>, No. 09-CV-7557 (GBD) (S.D.N.Y.), ECF Docket No. 1 (attached hereto as Exhibit A) at ¶ 1. The U.S. Securities and Exchange Commission ("SEC") also filed an enforcement action charging Optionable and two of its executives with fraud and violations of securities laws in connection with the same events. <u>See</u> Compl., <u>SEC v. Lee, et al.</u>, No. 08-CV-9961 (GBD) (S.D.N.Y.), ECF Docket No. 1. The SEC Complaint's factual allegations regarding the Optionable fraud are largely similar to those asserted by the Bank of Montreal. <u>See</u> <u>SEC v. Lee</u>, 720 F. Supp. 2d 305, 316-20 (S.D.N.Y. 2010) (providing factual background on the Bank of Montreal/Optionable scheme).

4

The Bank of Montreal's Complaint alleged that Optionable, along with another entity, provided purported "independent" market price quotations to the Bank of Montreal that were actually fictitious quotes supplied by Lee, entered into or encouraged Lee to enter into a number of options trades that would disguise the risk of his trading book, and induced the Bank of Montreal to enter into large, unprofitable natural gas options trades that Lee recorded in a manner that created the appearance of large profits, but actually resulted in large losses for the bank. Ex. A ¶ 1. Through these schemes, Optionable was alleged to have benefited by receiving commissions, fees and other revenue, allowing it to portray itself as a successful and growing business. This appearance of success in turn enabled Nordlicht and two other Optionable executives and officers, Kevin P. Cassidy[3] and Edward J. O'Connor, to sell $29 million in Optionable stock to the New York Mercantile Exchange ("NYMEX"). Id. ¶ 2. In the Bank of Montreal's Complaint, Nordlicht was alleged to have aided and abetted this fraudulent scheme. Nordlicht settled those claims for an undisclosed amount. Nordlicht was not named as a defendant in the SEC's lawsuit, nor were criminal charges brought against him in connection with the scheme. The SEC's case concluded with judgment being entered in favor of the SEC on the consent of Optionable, Cassidy and O'Connor. SEC v. Lee, et al., No. 08-CV-9961 (GBD) (S.D.N.Y.), ECF Docket Nos. 67, 105 & 128.

---

[3] Cassidy was criminally charged in connection with this scheme, and pleaded guilty. See United States v. Cassidy, No. 08-CR-1101 (TPG) (S.D.N.Y.). Cassidy was sentenced to 30 months in prison for his involvement in fraudulently overvaluing the gas options traded by Lee. Shortly after his release, Cassidy was hired as a Managing Director at Agera Energy LLC, one of Platinum's portfolio companies.

5

ARGUMENT

I. The Proffered Evidence Should Be Admitted As Direct Evidence of the Charged Offenses

    A. Legal Standard

Evidence of uncharged criminal activity is not considered "other acts" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted). The Second Circuit has interpreted this category of evidence to include acts that provide necessary background or context for the charged crimes. See United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997) (admitting evidence of uncharged burglary because, inter alia, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.

1988)). Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

Further, it is "well settled in the Second Circuit that where an indictment contains a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered to be 'part of the very act charged.'" United States v. Barret, No. 10-CR-809 (S-3) (KAM), 2011 WL 6704862, at *4 (E.D.N.Y. Dec. 21, 2011) (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)); see United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (stating that, in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Such acts are therefore inextricably intertwined with and direct evidence of the charged conspiracy and not subject to Rule 404(b). See Barret, 2011 WL 6704862, at *4, *6-*7 (concluding that evidence of, inter alia, uncharged attempted murder and contract for murder was "direct evidence" of drug distribution conspiracy).

B. Application

The evidence the government seeks to admit related to Nordlicht's and Levy's involvement in manipulative trading of BE Bonds arose out of the same series of transactions alleged in the Indictment and is inextricably intertwined with the facts of the charged offenses. This evidence also provides relevant context to events that will be central at trial, and accordingly should be admitted as direct evidence. The Indictment alleges both a broad scheme to misrepresent the value and performance of a number of PPVA's assets, see Ind. ¶ 42, and a scheme to defraud BE bondholders aimed at usurping the Black Elk asset sale proceeds at a time when PPVA was facing liquidity problems, see id. ¶ 77. Evidence of the scheme to manipulate

7

the price of and trading in BE Bonds constitutes direct evidence of the charged offenses because it reflects an effort by the defendants to conceal the depths of their liquidity crisis and fraudulently maintain the high values they falsely assigned to PPVA's assets. By artificially inflating the public value of BE Bonds, the defendants sought to substantiate the reported value of their holdings in such bonds. Moreover, as the email correspondence cited herein shows, the defendants hoped that, by remedying the precipitous drop in the price of BE Bonds, they could fend off mounting margin calls and thereby keep the fund afloat despite otherwise lacking the liquidity necessary to pay its brokers.

Evidence relating to Nordlicht's involvement in Optionable is also admissible as it will provide relevant background of the charged conspiracies. One or more witnesses will be testifying regarding their knowledge of Nordlicht's professional history and reputation, including his prior association with Optionable, as well as the relationship between Nordlicht and Kevin Cassidy, and the placement of Cassidy, who pled guilty to criminal charges in relation to his operation of Optionable, as an executive at one of Platinum's portfolio companies. Consequently, evidence relating to Nordlicht's involvement in Optionable is admissible evidence of the background and context of the conspiracies charged here. See Coonan, 938 F.2d at 1561.

II. The Other Acts Evidence Is Admissible Under Rule 404(b)

    A. Legal Standard

Alternatively, the "other acts" evidence set forth herein is also admissible under Rule 404(b). Evidence of a defendant's other acts is admissible under Rule 404(b) if relevant to an issue at trial other than the defendant's character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). To be admissible, the probative value of such evidence must not be substantially outweighed by the risk of unfair prejudice. See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000). This Circuit

8

follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is not overly prejudicial. Evidence admissible pursuant to Rule 404(b) should not be excluded on the ground of unfair prejudice when the evidence does not "involve conduct more inflammatory than the charged crime[s]"). United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006). Thus, where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Rule 403 balancing test. See, e.g., id.; United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999).

    B. Application

        1. Fraudulent Trading in BE Bonds

Nordlicht's and Levy's involvement in fraudulently manipulating the price of and trading in BE Bonds is probative of their knowledge and intent with respect to the charged schemes. Manipulative trading in securities is itself a criminal offense and is punishable civilly, which Nordlicht and Levy, experienced financial professionals, undoubtedly knew in December 2014. Their willingness to engage in such conduct in order to perpetuate their broader schemes further demonstrates their fraudulent intent in connection with the charged schemes. The defendants were willing to take whatever steps were necessary in order to avoid their investors' learning the reality of PPVA's liquidity crisis and the falsity of their valuations of their Black Elk holdings.

    The probative value of evidence of Nordlicht's and Levy's involvement in manipulative trading of BE Bonds is by no means substantially outweighed by its risk of prejudice. In the Indictment, Nordlicht and Levy are charged with perpetrating years-long schemes to defraud hundreds of investors and bondholders through various means in the name of profit. Black Elk is at the center of both schemes; the BE Bonds are the very securities at issue in

9

the Black Elk Bond Scheme. In light of the Indictment's charges, evidence that they contemporaneously colluded to raise the price of a thinly traded bond security in order to advance the broader scheme is not unduly prejudicial. Such evidence is highly probative of Nordlicht's and Levy's knowledge and intent with respect to the charged schemes, and not subject to exclusion under Rule 403.

2. Nordlicht's Involvement in Optionable

While Nordlicht's being implicated in an earlier financial scandal involving allegations of fraud and overvaluation of assets is not directly related to the charged offenses, this past experience still is probative of Nordlicht's knowledge and intent with respect to the misconduct that gave rise to the Indictment. As described above, Nordlicht was the Chairman of the Board and the largest stockholder in Optionable, an entity whose value was found to have been substantially inflated through its fraudulent trades of commodities that were themselves falsely overvalued. Even though Nordlicht was not criminally charged, at a minimum, he was implicated in the misconduct by virtue of his role at and intimate involvement in Optionable, and he profited enormously from a fraudulent scheme involving overvaluation and related party transactions, closely resembling the charged Fraudulent Investment Scheme. Based on that experience, Nordlicht was well aware, at the time of the events described in the Indictment, that exaggerating the value of a fund's assets and engaging in undisclosed related party transactions were unlawful. His prior experience at Optionable is thus probative evidence rebutting any defense that Nordlicht lacked the requisite knowledge and intent to carry out the crimes charged in the Indictment.

The probative value of evidence of Nordlicht's prior involvement in Optionable is not substantially outweighed by any attendant risk of prejudice. First, Nordlicht was never

10

criminally charged in connection with the Optionable conduct, so this evidence would not generate the same risk of a propensity inference that prior criminal conviction evidence potentially would. Moreover, evidence suggesting that Nordlicht was exposed to, and thus aware of, the illegality of overvalued assets and undisclosed related party transactions—at a minimum as a result of his implication and inclusion in the civil lawsuit— is certainly not more inflammatory than the allegations in the Indictment, which depict Nordlicht as a leading participant in a considerably larger fraudulent scheme perpetrated against individual investors. Because this evidence is no more inflammatory than the allegations in the Indictment, it is not unfairly prejudicial. In a case in which issues of knowledge and intent will undoubtedly be among the most closely contested at trial, allegations that the defendant had prior experience educating him in the illegality of conduct closely resembling the charged crimes is probative of his guilt and is admissible under Rules 403 and 404(b).

CONCLUSION

For the reasons stated herein, the government respectfully submits that the other acts evidence described herein should be admitted as direct evidence or, in the alternative, pursuant to Rule 404(b).

Dated: Brooklyn, New York
May 30, 2018

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/
Alicyn L. Cooley
Lauren Howard Elbert
Patrick T. Hein
Sarah M. Evans
Assistant United States Attorneys
(718) 254-7577 (Elbert)