I7g9smah

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DANIEL SMALL,

4                  Plaintiff,

5           v.                              18 CV 5000 (PKC)

6   CHRISTOPHER KENNEDY, IN HIS
    CAPACITY AS THE OPERATING
7   MANAGER OF DMRJ GROUP LLC; AND
    MARTIN TROTT, IN HIS CAPACITY
8   AS THE OPERATING MANAGER OF
    DMRJ GROUP LLC,

9
                   Defendants.
10
    ------------------------------x
11                                          New York, N.Y.
                                            July 16, 2018
12                                          2:22 p.m.

13  Before:

14                  HON. P. KEVIN CASTEL

15                                          District Judge

16                      APPEARANCES

17  TAYLOR & COHEN
         Attorneys for Plaintiff
18  BY:  ROBERT COHEN

19  HOLLAND & KNIGHT
         Attorneys for Defendants
20  BY:  WARREN E. GLUCK
         ROBERT J. BURNS
21       MARIE E. LARSEN

22

23

24

25

I7g9smah

1          (Case called)

2          MR. COHEN:  Robert Cohen, Taylor & Cohen LLP, for the

3     plaintiff.

4          THE COURT:  All right.  And for the defendants.

5          MR. GLUCK:  Warren Gluck, your Honor, Holland &

6     Knight.  Also with me is Bob Burns and Marie Larsen and Martin

7     Trott, defendant, is also in the courtroom.

8          THE COURT:  All right.  Thank you.

9          Good afternoon to you all.  Thank you for your

10    submissions.

11         First question is apart from the submissions made

12    heretofore on the motion, does the plaintiff have any other

13    evidence that it wishes to rely on?

14         MR. COHEN:  No, your Honor.

15         THE COURT:  All right.

16         So the plaintiff rests.

17         Does the defendant have any other evidence other than

18    its submission including the Trott declaration and exhibits

19    that it wishes to rely on?

20         MR. GLUCK:  Only in the event, your Honor, the Court

21    wishes to address the circumstances of Eileen Bransten's stay

22    orders.  There's certain letters that may be relevant.  But

23    other than that, no, your Honor.

24         THE COURT:  So the defendant rests.

25         MR. GLUCK:  The defendant rests.

I7g9smah

1            THE COURT:  All right.

2            So the evidentiary record in this preliminary

3     injunction hearing is now closed.  I will give the movant an

4     opportunity to speak on behalf of the injunction and I guess

5     the first order of business would be to address -- well, I

6     think the Supreme Court's pronouncement in *Grupo Mexicano* and

7     what that means in this case.  As well as I'd like to hear from

8     plaintiff on the necessary party, indispensable party issue,

9     and anything else you'd like to address.

10            MR. COHEN:  Your Honor, and I am -- you could --

11            THE COURT:  You want some help on *Grupo Mexicano*?

12            MR. COHEN:  Yes.  If you could refresh my recollection

13     as to *Grupo Mexicano*, yes.

14            THE COURT:  This was a decision by the U.S. Supreme

15     Court in 1999 and the question before the Court was whether or

16     not a district court judge had authority -- if you want to call

17     it jurisdiction, but authority -- and whether a movant had

18     entitlement to a preliminary injunction which in essence froze

19     assets.  And the Court looked at the traditional equitable

20     powers of a court.  It looked at the adoption of Rule 64 and

21     Rule 65.  And it ultimately concluded that the right to a

22     prejudgment remedy such as an asset freeze was subsumed within

23     Rule 64.  And Rule 64 incorporated state court remedies such as

24     arrest, attachment, garnishment, replevin, sequestration, and

25     other corresponding or equivalent remedies.  But that a party

I7g9smah

generally speaking cannot employ Rule 65 in an action such as

this to basically freeze a defendant's assets pending the

outcome of litigation.

It would be a wonderful way to go and I can't think of

a particularly good reason why all litigants or nearly all

litigants wouldn't want to avail themselves of that, all

plaintiffs.  And it's not a question of solvency or the

viability of any later judgment.  It's a question of the

propriety of it as equitable relief.

So, obviously, there are cases decided after *Grupo

Mexicano*.  There are arguments that could be made to

distinguish it.  But that's the general gist of the decision.

MR. COHEN:  Your Honor, I believe the law is clear

that when there is a danger of the nonmoving party making a

judgment uncollectible, that preliminary relief is absolutely

warranted and appropriate.

THE COURT:  A preliminary injunction or an attachment?

MR. COHEN:  Preliminary injunctive relief.

THE COURT:  So you say this is very clear.  Well, I'm

asking you to distinguish *Grupo Mexicano* which makes it very

unclear to this judge.

MR. COHEN:  So, your Honor, I am not prepared to do

that at this time.  What I would request, your Honor, is some

expedited, very limited briefing on this very issue.  We could

get you something tomorrow, for instance.  But for me to stand

I7g9smah

1    here today and answer your question I would need to do some

2    additional research.

3              THE COURT:  Well tell me why you think you're entitled

4    to preliminary injunction.

5              MR. COHEN:  As a matter of law, your Honor, or on the

6    facts, or both?

7              THE COURT:  This is your motion so I'm giving you an

8    opportunity how you would like to present it.

9              MR. COHEN:  Your Honor, there are a number of

10   uncontested facts here:  One, that the operating agreement

11   entitles Mr. Small to 6.5 percent of DMRJ's yearly net profits.

12   It's also uncontested that Implant Sciences was DMRJ's only

13   investment.  It's uncontested that in 2012 through 2014 Implant

14   Sciences generated $38 million in realized profits.  This comes

15   from defendants' own submissions.

16             THE COURT:  They haven't paid money your client is

17   owed.

18             MR. COHEN:  They haven't paid.  But not only the $38

19   million, your Honor.

20             THE COURT:  Didn't your client bring an arbitration?

21             MR. COHEN:  My client did bring an arbitration decided

22   by Judge Katz formerly of this Court.

23             THE COURT:  Did the arbitration address the

24   compensation or only the basis for the termination?

25             MR. COHEN:  The arbitration addressed both issues,

I7g9smah

| | |
|---|---|
| 1 | found Mr. Small was not fired for cause. |
| 2 | THE COURT:  OK. |
| 3 | MR. COHEN:  And it also -- it addressed bonus |
| 4 | compensation under a different contract.  It's called the |
| 5 | investment management agreement.  But in concluding that |
| 6 | Mr. Small was entitled to bonus compensation under the |
| 7 | investment management agreement, Judge Katz, in a 95-page |
| 8 | opinion, after eight days of hearings, found that Implant |
| 9 | Sciences, which was part of the bonus calculation, generated |
| 10 | $38 million in realized profits from 2012 to 24014.  Defendants |
| 11 | themselves -- |
| 12 | THE COURT:  Let me pause.  Why was that claim |
| 13 | arbitrable and not your claim for compensation under the |
| 14 | agreement arbitrable? |
| 15 | MR. COHEN:  There are two different agreements, your |
| 16 | Honor.  So the IMA had an arbitration clause.  This DMRJ's |
| 17 | agreement, the operating agreement, does not have an |
| 18 | arbitration clause. |
| 19 | THE COURT:  That's the agreement that gives your |
| 20 | client the right to the compensation. |
| 21 | MR. COHEN:  To the 6.5 percent. |
| 22 | THE COURT:  To the 6.5.  All right.  So that explains |
| 23 | why it's not part -- wasn't part of the arbitration before |
| 24 | Judge Katz. |
| 25 | MR. COHEN:  Exactly, your Honor. |

I7g9smah

1          THE COURT:  And you're suing for that 6.5 percent

2     here, right?

3          MR. COHEN:  Yes.  We're suing for that 6.5 percent

4     here.

5          THE COURT:  Putting aside the necessary party issue,

6     let me see whether I understand your injunction is what?

7          MR. COHEN:  Because, your Honor, defendants have made

8     it abundantly clear, page fifteen of their opposition brief, I

9     believe, paragraphs 10 and 49 of Mr. Trott's declaration, that

10    they believe that Mr. Small was not entitled to any

11    distributions under the operating agreement.  They have zero

12    incentive to hold back any funds to pay Mr. Small should he

13    prevail.

14         THE COURT:  That's why you have an action for breach

15    of contract, right?

16         MR. COHEN:  That's why we have an action for breach of

17    contract.

18         But, your Honor, if I may, on top of that the

19    defendants have refused, despite the clear language in Section

20    11 of the operating agreement, and clear Delaware law, refused

21    Mr. Small books and records.  So their actions are very

22    suspect, your Honor.

23         We have no -- well, we had no reason to believe that

24    they would act in good faith and withhold the necessary sums

25    and they've made that abundantly clear now in their filings

I7g9smah

1  here.

2          THE COURT:  So, you have a right under Delaware law to

3  access to certain books and records to the extent it's

4  reasonably related to a member's interest as a member of the

5  LLC.

6          What is the interest as a member of the LLC that

7  you're looking to inspect the books and records?

8          MR. COHEN:  Your Honor, before I answer that question

9  there's a right under Delaware law, but there's also an

10 explicit contractual right.

11         THE COURT:  Well that's a right for you to conduct an

12 audit, right?  That's 11C -- 11.1C, excuse me.

13         MR. COHEN:  Yes.

14         THE COURT:  Now answer my question about Delaware

15 books and records.

16         MR. COHEN:  Mr. Small is entitled to profits, net

17 profits of the LLC; yearly net profits.  In order to assess

18 whether he -- whether those profits are being distributed in

19 accordance with the provisions of the LLC agreement, of the

20 operating agreement, he is entitled under Delaware law to

21 examine the books and records that the operating manager --

22         THE COURT:  Let me ask you.  Have they made any

23 distribution to your client under the operating agreement?

24         MR. COHEN:  Mr. Small received a distribution of

25 approximately $200,000 several years ago.

I7g9smah

| | |
|---|---|
| 1 | THE COURT:  And you would like to know from your |
| 2 | inspection of the books and records whether there are other |
| 3 | sums that he's entitled to.  Is that -- |
| 4 | MR. COHEN:  Yes. |
| 5 | THE COURT:  And tell me about the audit.  What kind of |
| 6 | an audit do you propose? |
| 7 | MR. COHEN:  We propose that Mr. Small have access to |
| 8 | the books -- well, it's really in some sense an alternative |
| 9 | relief, your Honor.  The books and records are needed to |
| 10 | perform an analysis, an audit, to determine what sums Mr. Small |
| 11 | is owed.  It's simply an alternative form of relief. |
| 12 | THE COURT:  It's not an accounting though? |
| 13 | MR. COHEN:  It's not an accounting, no.  We're not |
| 14 | seeking an accounting. |
| 15 | THE COURT:  OK. |
| 16 | MR. COHEN:  Well, your Honor -- no.  Let he me |
| 17 | rephrase.  The complaint does seek an accounting. |
| 18 | The complaint seeks the books and records, whether |
| 19 | under a contractual -- whether by virtue of the contract or the |
| 20 | defendants' fiduciary obligations, so that Mr. Small may assess |
| 21 | what he is owed under the agreement. |
| 22 | THE COURT:  That's access to the books and records |
| 23 | under the Delaware statute and under the contractual provision. |
| 24 | MR. COHEN:  And under the contractual provision. |
| 25 | THE COURT:  OK.  That's what I thought it was. |

I7g9smah

1          Go ahead.

2          MR. COHEN:  So there is no dispute that -- also, there

3     is no dispute that DMRJ has received in 2017, this is in

4     paragraph 64 of Mr. Trott's affidavit, at least $46 million in

5     cash from its investments in Implant Sciences.  Now we contend

6     it's far more than that but for the purposes this hearing today

7     we can go with 46 million.

8          THE COURT:  This is Mr. Trott in his individual

9     capacity?

10         MR. COHEN:  Mr. Trott's affidavit states in paragraph

11    64 that DMRJ received approximately $46 million --

12         THE COURT:  No.  No.  That's what I'm trying to find

13    out from you.  When you said Mr. Trott received $46 million.

14         MR. COHEN:  I misspoke, your Honor.  DMRJ received $46

15    million, thank you -- according to Mr. Trott, DMRJ received $46

16    million from investments in Implant Sciences in 2017.  So

17    despite the fact that there were $38 million in realized

18    profits and $46 million in cash, it's well over $80 million.

19         Again, we contend it's more than that but for the

20    purposes of today we'll settle with the defendants' numbers.

21         There's been no distribution.

22         It's also uncontested that Mr. Small has a contractual

23    right, as we just spoke about, to receive the books and

24    records.  It's uncontested that he's made a demand.  It's

25    uncontested that the demand has been refused.

I7g9smah

```
1        THE COURT:  Have you sought to make a summary judgment
2   motion on your books and records demand?
3        MR. COHEN:  We have not, your Honor.
4        THE COURT:  But you have decided to make a preliminary
5   injunction argument on the basis that if your books and records
6   action succeeded and if you were able to establish through an
7   examination of the books and records that you are owed money,
8   you fear that that money would be dissipated, and that's your
9   argument for the asset freeze?
10       MR. COHEN:  Our argument for the asset freeze is that
11  we believe we have demonstrated that Mr. Small is entitled --
12  is entitled to distributions under the operating agreement.
13  The defendants have said that they have for intention to do
14  that.
15       They have no intention to do that.  They have -- there
16  is a complete absence of evidence for that contention that I
17  can get into in a moment.
18       But the basis for the preliminary injunction motion is
19  that these assets will be dissipated.  They've stated in papers
20  that they are spending the money and that they do not believe
21  Mr. Small is entitled to any distribution.
22       THE COURT:  Go ahead.
23       MR. COHEN:  So it's also undisputed, your Honor, that
24  there has been a liquidating event, namely PPVA's filing for a
25  voluntary liquidation in the Grand Court of the Cayman Islands
```

I7g9smah

1    that triggers Section 10 of the operating agreement's

2    dissolution procedures.

3           The defendants, in their capacity as the operating

4    managers, have not proceeded to initiate any of those

5    liquidation procedures.

6           Defendants have, in court filings -- or I should say

7    Mr. Small's interest in DMRJ is completely absent from any

8    court filings in the Grand Cayman in the Court of the Grand

9    Cayman or here in federal bankruptcy court.  They have given no

10   indication that they will do anything to protect his interests.

11   And the evidence that supports -- and I use that term advisedly

12   here, your Honor -- the evidence that supports their

13   contention, there's really four pieces.  There's Mr. Trott's

14   affidavit.  There's the indictment in the Eastern District of

15   New York together with the SEC complaint.  There's the

16   investment management agreement which we just spoke about.  And

17   there's Judge Katz's 95-page arbitration decision.  I just want

18   to briefly talk about those four pieces of evidence, for lack

19   of a better term.

20          Mr. Trott's -- I'm not going to speak about the

21   falsehoods that Mr. Trott peddles in his affidavit.  What's

22   probably more striking is that these are just self-serving

23   conclusionary allegations, your Honor.  The allegations

24   themselves are devoid of content.  It's not as if Mr. Trott is

25   saying that this investment here lost this much money and

I7g9smah

1     provides no support.  That's not what we have here.  We have

2     just vague conclusions, also, without any evidentiary support.

3             Paragraphs 6, 20, 34, 62 -- paragraph 62, for

4     instance, speaks to massive losses caused by Mr. Small's

5     actions.  No indication of what assets are there.  There is no

6     indication of what actions Mr. Small took.  To say that there

7     is no evidence to backup any of this whatsoever.  So just

8     conclusionary self-serving, quite frankly, spurious

9     allegations.

10            Mr. Trott also then speaks about his investigation.

11    We know nothing about this investigation, your Honor.  There's

12    not one iota of detail there.  All he offers up are conclusions

13    masquerading as facts.  We don't know when the investigation

14    began, what was investigated, who was spoken to, what documents

15    were reviewed.  Again no mention of any asset, any loss, any

16    dates, nothing.

17            The SEC -- the EDNY indictment is of no help, your

18    Honor.  As we've pointed out in our papers, the U.S. Attorney

19    for the Eastern District of New York has stated in court, in a

20    court filing, that Mr. Small is not part of the valuation

21    scheme that is alleged in the indictment.  What the indictment

22    does allege with respect to Mr. Small is that he was involved

23    in a single bond redemption transaction.  And the indictment

24    alleges that he played a role in allegedly providing false

25    information in a solicitation that was allegedly designed to

I7g9smah

1    divert proceeds to equity holders.  In short, the indictment

2    alleges that Mr. Small was part of an alleged scheme that

3    induced some bondholders not to tender their bonds, not to

4    tender their bonds.  Those who did tender their bonds -- this

5    is in the indictment -- received one hundred percent of par

6    value.

7                THE COURT:  Bonds of what issuance?

8                MR. COHEN:  An entity called Black Elk, your Honor.

9                The SEC complaint does not allege that Mr. Small was

10   involved in any scheme to inappropriately or misvalue any

11   assets.  It doesn't allege that he was involved in the

12   valuation of assets.  In fact, it only alleges that one entity,

13   Golden Gate Oil, was misvalued.  And defendants have provided

14   no evidence whatsoever, and there's none in the SEC complaint,

15   that Mr. Small had any role in that valuation.

16               What I'd like to now turn to, very briefly, is Judge

17   Katz's decision, because Judge Katz was interpreting the IMA.

18   The defendants' position is that under the IMA there were

19   massive losses, again completely unspecified -- not one single

20   asset even mentioned -- massive losses that somehow offset any

21   money Mr. Small would be entitled to under the DMRJ's operating

22   agreement.

23               First, Judge Katz held that from 2012 to 2014

24   Mr. Small was entitled to receive $7 million in bonus

25   compensation based on his net profits under the IMA.  So this

I7g9smah

finding by Judge Katz, your Honor, directly contradicts

statements that Small's accounts -- by defendants that Small's

accounts generated only losses.  In direct contradiction.

          Now what defendants will say is:  Oh, Judge Katz did

not have this information that assets were allegedly misvalued

when he issued that decision.  That information didn't come

until later.

          But, again, defendants run up against the very

fundamental problem that pervades their entire submission and

that is evidence.  Not one single asset is mentioned.  Not --

there's nothing mentioned about any -- about the value of any

of these assets that were supposedly misvalued, what losses

PPVA supposedly incurred.  Nothing, your Honor.  There is no

evidence there.

          Second, Judge Katz makes a point that defendants gloss

over that the majority of the assets in the -- that were in

Mr. Small's account in the IMA, that his bonus was based on a

realized only basis, a realized only basis.

          Thus, even if those assets were improperly valued --

and, again, I don't even know what assets they're talking

about -- but even if they were, Mr. Small's bonus would not be

impacted by that improper valuation.

          THE COURT:  Look, the bonus and any compensation that

Mr. Small is entitled to under the award of the arbitrator is

not a matter that's before this Court, is it?

I7g9smah

1          MR. COHEN:  I agree with you, your Honor.  I agree

2     with you.  We –– yes.  Yes.  He –– Judge Katz has decided ––

3          THE COURT:  It's not before me, period.

4          MR. COHEN:  It's not before you.  I agree with you.

5          THE COURT:  Well in that case maybe I should suggest

6     that you get to the part that is before me rather than the part

7     that's not before me.

8          MR. COHEN:  Well, your Honor, if I may, defendants are

9     contending that Mr. Small is not entitled to distributions

10    under the DMRJ's operating agreement because he suffered

11    losses, because he suffered losses under the IMA.  And I made

12    my point to inform the Court that Judge Katz firmly disagreed

13    with that.  He found that no, there were actually profits

14    generated under the IMA that entitled Mr. Small to a bonus.

15         THE COURT:  Listen, maybe I misheard you, maybe I

16    misread, maybe I misunderstood, but I thought the premise of

17    your 6.5 percent claim was based on DMRJ's investment in

18    Implant, secured by a convertible note plus warrants.  And he

19    claims that he's entitled to annual distributions under the

20    operating agreement.

21         Am I missing something?

22         MR. COHEN:  You are not, your Honor.  I'm simply

23    responding to an argument that defendants have made in their

24    opposition papers.  But I can move on.

25         I also want to point out that while Judge Katz ruled

I7g9smah

1    conclusively for Mr. Small on his contract claims, he denied

2    Mr. Small's claim under New York labor law.  And I point this

3    out because in Judge Katz's ruling he found, among other

4    things, that Mr. Small did not have the "authority to make key

5    decisions that generated the net profits on which his bonus was

6    based."  So then Judge Katz went onto identify specific aspects

7    of the investments over which Small had no authority.

8              THE COURT:  Let me ask you, was Mr. Small ever

9    employed by DMRJ?

10             MR. COHEN:  Yes, he was.

11             THE COURT:  In what capacity?

12             MR. COHEN:  He was the portfolio manager.

13             THE COURT:  And the portfolio consisted solely of the

14   investment in Implant.

15             MR. COHEN:  Solely of the investment in Implant.

16             THE COURT:  All right.  And when did he cease to be

17   the portfolio manager?

18             MR. COHEN:  July 31, 2015.

19             THE COURT:  Same day as his employment by Platinum

20   Management ended?

21             MR. COHEN:  Yes.

22             THE COURT:  OK.

23             MR. COHEN:  So I just want to note, your Honor, that

24   Judge Katz, when he was describing specific aspects of the

25   investments over which Small had no authority.

I7g9smah

1          THE COURT:  Was DMRJ a party to the arbitration before

2     Judge Katz?

3          MR. COHEN:  No, your Honor.

4          Again, Mr. Small was not seeking the 6.5 percent from

5     DMRJ.  He was seeking his bonus compensation under the IMA.

6          THE COURT:  Yes.

7          But describing his responsibilities for Platinum is

8     not describing his responsibilities for DMRJ, correct?

9          MR. COHEN:  That is correct, your Honor.

10          THE COURT:  Go ahead.

11          MR. COHEN:  I only note that Judge Katz on page 55 and

12     56 of his ruling held that unrealized profits were determined

13     by Platinum's valuation committee.  And he made no finding that

14     Mr. Small was a part of that valuation committee or had any

15     role in the valuation of assets.

16          Again, this directly contradicts the vast majority of

17     defendants' argument that Mr. Small somehow had some

18     unspecified role in bankrupting and financially ruining PPVA.

19     Judge Katz --

20          THE COURT:  What do you think you have to show in

21     order to get a preliminary injunction?

22          MR. COHEN:  I think I have though show a strong prima

23     facie case, your Honor, which I believe we have shown.

24          THE COURT:  Prima facie case of what?

25          MR. COHEN:  A prima facie case that Mr. Small is

I7g9smah

1    likely to succeed on his contract claim.

2              THE COURT:  Thank you.

3              MR. COHEN:  And I believe we have.  We have shown that

4    DMRJ has realized profits.  We have shown they have at least

5    $46 million in cash coming in.  This is not an ambiguous

6    contract provision that defendants are arguing over.  He hasn't

7    been paid out any of the money.

8              And defendants, their defenses, which seem to say that

9    Mr. Small somehow bankrupted PPVA, was somehow responsible for

10   its financial ruin are based -- there is no evidence there.

11   Not only is there no evidence, there are no specific

12   allegations.  So I think we more than made our strong showing.

13   There is, as I said before, there is a danger, given

14   defendants' statements, that there will be no money left to

15   collect because they don't believe Mr. Small is entitled to any

16   money.

17             So that's all I have.  I'd be happy to answer any more

18   questions, your Honor.

19             THE COURT:  Maybe you can address the necessary party

20   issue.

21             MR. COHEN:  Well, your Honor, there are -- in order to

22   get complete relief, I do not believe DMRJ needs to be here.

23   DMRJ acts through its operating managers.  As defendants have

24   stated, they control the company.  They are the operating

25   managers.  They control the company.  Complete relief can be

I7g9smah

1   afforded if the operating managers do what they are supposed to

2   do under the operating agreement and make the distribution to

3   Mr. Small.

4            THE COURT:  And if you lose in this action?

5            MR. COHEN:  If we lose in this action?

6            THE COURT:  You can proceed against DMRJ, correct?

7            MR. COHEN:  I suppose that's a theoretical

8   possibility.

9            THE COURT:  Because it's theoretical because you can

10  win.

11           MR. COHEN:  Well, your Honor, it would be the same

12  relief on the same sets of facts, what we're asking for.  DMRJ

13  acts through its operating managers.  We're telling the

14  operation managers to disburse funds.  If we told DMRJ to

15  disburse funds, the operating managers would be the ones to do

16  it.

17           THE COURT:  But the point is DMRJ would not be

18  protected by a judgment in this case?

19           MR. COHEN:  DMRJ would not be -- DMRJ might have some

20  estoppel arguments, your Honor.  I mean defendants have not --

21  defendants who control DMRJ have not made the case that DMRJ

22  needs to be in the case to afford complete relief or to protect

23  its interests.  When a third party under the joinder rules --

24           THE COURT:  This is not an unusual situation; not the

25  first, and not the last where the plaintiff, for plaintiff's

I7g9smah

```
 1   good and sufficient reason, wants to be in federal court; and

 2   the defendant, for its good and sufficient reasons, is

 3   delighted to be in federal court rather than state court.  That

 4   does not necessarily mean that either of you belong here.  And

 5   the fact that the defendants say:  Well, if we assert the

 6   failure to join an indispensable party and we win, Mr. Small

 7   will be back at this tomorrow in state court with DMRJ as a

 8   party.

 9            MR. COHEN:  Your Honor, if I may, your Honor --

10            THE COURT:  And so they sit on their hands.

11            MR. COHEN:  If DMRJ were added to a party here, I

12   don't think we'd be in state court.

13            THE COURT:  Well you wouldn't be in this court.

14            MR. COHEN:  There would still be diversity

15   jurisdiction.

16            THE COURT:  Is Mr. Small a member of the LLC?

17            MR. COHEN:  Is Mr. -- DMRJ has no operations here.

18            THE COURT:  Stop.  Is Mr. Small a member of the LLC?

19            MR. COHEN:  He's a profit interest member.

20            THE COURT:  He's a member.

21            MR. COHEN:  He's a member.

22            THE COURT:  He's a member.

23            And he is a citizen of the State of New York?

24            MR. COHEN:  He's a citizen of the State of New York.

25            THE COURT:  And he would be suing the LLC of which we
```

I7g9smah

1   know for a fact at least one person, an individual by the name

2   of Small, is a member and, therefore, there would be no

3   diversity jurisdiction, correct?

4               MR. COHEN:  We could bring this -- correct.

5               THE COURT:  So it would affect this Court's

6   subject-matter jurisdiction.

7               MR. COHEN:  I am mistaken, your Honor.  Thank you for

8   correcting me.

9               THE COURT:  So tell me why DMRJ is not a necessary

10  party.

11              MR. COHEN:  Again, your Honor, complete relief can be

12  afforded -- if the plaintiff wins, if Mr. Small wins in this

13  case, complete relief is afforded.  Complete relief can be had

14  by Mr. Small.  If the other two factors, 19(a)(1)(B)(i) and

15  (iii) -- (i) and (ii), excuse me, are contingent upon an

16  initial requirement that the absent party claim a legally

17  protected interest related to the subject matter of the action.

18  So, we do not control DMRJ.  We cannot cause DMRJ to say that

19  it needs to be a party here.

20              THE COURT:  Well, let me ask you.  The assets that you

21  claim should be frozen are the assets of DMRJ, correct?

22              MR. COHEN:  Yes.

23              THE COURT:  Doesn't that answer the question?

24              MR. COHEN:  It still, under the joinder rules, your

25  Honor, if complete relief can be afforded without -- DMRJ is

I7g9smah

1    not a necessary party if complete relief can be afforded here.

2              THE COURT:  How is this any different than having a

3    claim against General Electric and wanting to bring it in

4    federal court.  So instead of suing General Electric which in

5    my hypothetical or XYZ Corporation is a New York corporation

6    with its principal place of business in New York, one sues the

7    CEO who happens to be a citizen of Connecticut.  How is this

8    any different?

9              You say, listen, the CEO or we can name the CEO and

10   all the directors.  They have the power to freeze the assets.

11   They have the power to direct the payment of compensation to my

12   client and, therefore, General Electric is not a necessary

13   party or the corporation is not a necessary party because full

14   relief can be afforded to my client by suing only the CEO and

15   the board.  Explain the distinction.

16             MR. COHEN:  Your Honor, here we have the operating

17   managers are specifically vested with the responsibilities here

18   of making distributions and implementing the contractual

19   obligations in the operating agreement.

20             THE COURT:  That's often true for a CEO, right?

21             MR. COHEN:  I guess -- it might depend on what the

22   CEO's contract is and what the CEO's responsibilities might be.

23             THE COURT:  But it's certainly conceivable.

24             MR. COHEN:  I will grant you that, your Honor, yes.

25             THE COURT:  The same way with the board of directors.

I7g9smah

1    If you name the whole board of directors, they are the managers

2    of the corporation, so it's their ultimate responsibility.

3              MR. COHEN:  That is a possibility, your Honor.

4              THE COURT:  Well they are the managers of the

5    corporation.

6              MR. COHEN:  Yes.

7              THE COURT:  So the distinction here is what?

8              MR. COHEN:  The distinction here, your Honor, I'm not

9    sure if -- I'm not sure on the way you present the facts if

10   there is much of a distinction, quite honestly.  I'll be candid

11   with the Court.

12             I would refer back, though, to the Federal Rules of

13   Civil Procedure which speak about complete relief, complete

14   relief afforded to the plaintiff by the parties in the case.

15   That's what the federal rules speak to.  It's fairly narrow.

16             THE COURT:  If complete relief cannot be afforded

17   without the parties' joinder, that is one of the circumstances

18   that would make the person a person required to be joined if

19   feasible.  Right?

20             MR. COHEN:  Yes.

21             But here, your Honor, under the rule, under Rule 19 --

22             THE COURT:  You say (b) doesn't apply because the

23   person hasn't claimed an interest relating to the subject of

24   the action because they're not here.

25             MR. COHEN:  The law --

I7g9smah

```
 1              THE COURT:  But you also told me the assets that are
 2    being frozen are the assets of this person not before the
 3    Court.
 4              MR. COHEN:  Well of a corporate entity, yes, your
 5    Honor, a corporate entity.
 6              THE COURT:  Or an LLC.
 7              MR. COHEN:  An LLC.  Yes, your Honor.
 8              But the operating managers, the defendants, who are
 9    the operating managers, have and are making decisions everyday
10    on how to distribute the funds, how to distribute DMRJ's funds.
11    We think they are doing it wrongfully.  But they're doing that.
12    And they are imbued contractually with the authority to make
13    these decisions and the rights to make these decisions.  So if
14    Mr. Small sues them, as he has, in their capacity as managers,
15    he, Mr. Small, can get complete relief.  And that's what the
16    rule focuses on.
17              THE COURT:  Thank you.
18              Let me hear from the defendants.  Who is going to
19    speak for the defendants?
20              MR. GLUCK:  I will, your Honor.
21              THE COURT:  First question.  Is DMRJ a necessary
22    party, yes or no?
23              MR. GLUCK:  Yes.
24              It will be a necessary party.  We've not submitted our
25    answer yet.  That will be included in our answer.  The final
```

I7g9smah

1    relief sought, which is a payment of money from DMRJ to

2    Mr. Small, requires that DMRJ be made a party.

3          THE COURT:  Why?

4          MR. GLUCK:  Because the obligation to pay is that of

5    DMRJ.  While quite right, the comptroller, the CEO, in this

6    case, the manager, makes that decision ultimately, either

7    voluntarily or pursuant to a court order, it is DMRJ that is

8    liable if Mr. Small's claims are proven true.  And what

9    Mr. Small has done is sue for a TRO remedy that is capable of

10   being affected just against the manager.  But in terms of his

11   relief, his final relief, wherefor it is requested, his relief

12   requested is as against DMRJ and its assets.

13         THE COURT:  Now, if the plaintiff were to sue --

14   continue with this suit and lose on the merits, could the

15   plaintiff -- could Mr. Small lawfully proceed to judgment in an

16   action against DMRJ?

17         MR. GLUCK:  He could sue DMRJ for his rights under the

18   operating agreement in the absence of Mr. Trott as well, yes.

19         THE COURT:  And would you have the benefit of

20   collateral estoppel or issue preclusion?

21         MR. GLUCK:  In this case, your Honor, I think the only

22   correct answer is that both parties would need to be joined.

23   The hypothetical you gave me was yes.  But in this case, your

24   Honor, the managers of DMRJ will be appearing or intervening

25   voluntarily and, therefore, I think the outcome of collateral

I7g9smah

1    estoppel -- we're going to be defending this fairly swiftly.

2    This is not any sort of game to proceed with one set of

3    defenses and then bring another set of defenses after a ruling.

4               THE COURT:  Well let's talk about game.  There was a

5    books and record demand under Delaware law.  Why haven't you

6    honored it?

7               MR. GLUCK:  There's a very good reason.

8               THE COURT:  That's what I want to hear.

9               MR. GLUCK:  Mr. Small is believed to be a security

10   risk in this case.  This is a liquidation concerning one of the

11   most serious and significant fund collapses in history.  The

12   fund is insolvent.  And I'm talking about Platinum Partners

13   Value Arbitrage fund now, PPVA, the sole member that is not a

14   profits interest member of DMRJ.

15              Now what's public information, what is in the record

16   of this Court, is that this was a fund with a purported net

17   asset value of 1.4 billion.

18              Now, net is important because it meant that the

19   equity, the shareholders of Platinum, or their collective

20   shares combined, were worth of profit of 1.4 billion.

21              It is also a matter of public record and within this

22   action that as a matter of fact PPVA doesn't really not have

23   that.  It is insolvent.  There is no circumstance where the

24   shareholders will ever realize anything, including with respect

25   to significant litigation.

I7g9smah

1        THE COURT:  Isn't that a chicken and an egg situation

2   in terms of your ability to show that?

3        So, Mr. Small says:  So you say, this is why I want to

4   exercise my right under Delaware law which gives me the right,

5   for example, to the LLC's federal state and local income tax

6   returns for each year.

7        What's the security risk there?

8        MR. GLUCK:  I'll explain it.

9        There are two.  Firstly, what the liquidators are

10  doing with assets of DMRJ are not subject to public inspection

11  under normal circumstances.  There is no question that

12  Mr. Small under -- absent the extraordinary circumstances in

13  this case --

14       THE COURT:  Do you have a Delaware case that stands

15  for that proposition?

16       MR. GLUCK:  That under extraordinary circumstances a

17  valid request for records should be denied when there is a

18  security risk?

19       THE COURT:  No.  No.  No.  You just added two

20  different things.  Extraordinary circumstance and security

21  risk.  You can give me a case on both if you have one.

22       MR. GLUCK:  Sure.  I'll be happy to provide the case.

23       THE COURT:  I assume you looked for this before you

24  walked into court today.  You have to have researched this.

25       MR. GLUCK:  What we said is that we would be happy to

I7g9smah

1    provide the finances of DMRJ to this Court in camera for a

2    variety of reasons.

3              THE COURT:  And what would I do with it, by the way?

4              MR. GLUCK:  You would see that there is so much cash

5    at DMRJ but also contingent liability.

6              THE COURT:  How does that vindicate the member of the

7    LLC's right to see that information, by showing it to me?

8              MR. GLUCK:  I'll explain why.  The persons claiming

9    the rights to the very proceeds, the profits of which Mr. Small

10   is claiming, are insiders including but not limited to the --

11   an entity owned by the former president of Platinum Management.

12   At all times -- and this will lead to my point one, in terms of

13   has there been a showing of either prospective harm or

14   irreparable injury -- at all times the liquidators have and are

15   maintaining complete and full reserves in respect of each and

16   every known contingent claim against DMRJ.  Mr. Small's claim

17   has been known for a long time.

18             THE COURT:  Let me ask you this.

19             MR. GLUCK:  And if the numbers, while there is no

20   current relationship between the amount that is being held and

21   the amount that is required to satisfy a sufficient reserve in

22   Delaware, that sort of information could provide third parties

23   with information that could lead them to determine our internal

24   evaluations of their claims against DMRJ.

25             THE COURT:  Your offer sounds pretty hollow to me

I7g9smah

1  because what am I supposed to do with the information?  What if

2  it's not as you advertise it?

3         MR. GLUCK:  We can provide it in its perfect form.

4  There's not much there.  DMRJ --

5         THE COURT:  Well, wait a minute.  The current list of

6  the name and last known business residence or mailing address

7  of each member in management.

8         MR. GLUCK:  That can be provided but that isn't what

9  was asked for.

10        THE COURT:  It was not asked for?

11        MR. GLUCK:  No, no.  What was asked for were the

12  financial records, a listing of assets and a listing of

13  liabilities.  And what I am suggesting to this Court --

14        THE COURT:  Where do I find in the record the books

15  and record demand?

16        MR. GLUCK:  It would likely be in the complaint.

17        MR. COHEN:  Your Honor, if I may, there is Exhibit --

18  I believe it is Exhibit L to my declaration.

19        One moment.

20        (Pause)

21        Exhibit K to my declaration is the demand for the

22  books and records.

23        THE COURT:  Can you hand that up to me, please, if you

24  don't mind.

25        MR. COHEN:  Let me also, your Honor.  Show you the

I7g9smah

1   operating agreement's language, which is Exhibit D to my

2   declaration.  That's Exhibit K.  That's Exhibit D.

3            Your Honor, if I could direct your attention to page

4   14 of Exhibit D which is the operating agreement and

5   specifically 11.1C.

6            THE COURT:  I quoted it to you before.  I cited it to

7   you before.

8            MR. COHEN:  Yes.

9            THE COURT:  That wasn't the question I asked.  I asked

10   for your books and record demand.

11            11.1C says that you have the right from time to time

12   at your expense to have your accountants and representatives

13   examine and/or audit the books and records of the company.

14            That's not what I asked you.  I asked for the books

15   and record demand under Delaware law that you transmitted.

16            MR. COHEN:  That is Exhibit -- I believe the Exhibit I

17   just gave to you.

18            THE COURT:  Exhibit K?

19            MR. COHEN:  Exhibit K.

20            THE COURT:  This seems to be a demand under 11.1C.

21            MR. COHEN:  Your Honor, Delaware law, all Delaware law

22   requires is a written demand that gives a basis for the demand,

23   that gives a legitimate basis for the demand.

24            THE COURT:  You did.  The basis was the operating

25   agreement.

I7g9smah

1          MR. COHEN:  Yes.  Under Delaware law that's a

2     legitimate demand.

3          THE COURT:  So is your claim for breach of the

4     operating agreement or is it a claim under 6 Section 18-305(a)

5     of Delaware law?

6          MR. COHEN:  We seek both forms of relief, your Honor.

7          THE COURT:  But you didn't make a demand under the

8     books and records provision of Delaware law.

9          MR. COHEN:  Your Honor, I don't believe that Delaware

10     law requires that you specifically cite the Delaware statute in

11     order to make a demand.  It requires that a demand be made.

12          THE COURT:  Well I'm trying to tie your demand in to

13     the provisions of the Delaware statute.  The Delaware statute

14     doesn't have a provision that says produce the books and

15     records.  You know that.  It doesn't say that.

16          MR. COHEN:  I understand that.

17          THE COURT:  So I'm trying to find out what you

18     demanded under the Delaware statute.

19          MR. COHEN:  If I may refer to the -- the demand in

20     front of you references the materials in 11.1C.  Those books

21     and records, what is required --

22          THE COURT:  Actually, what it says is in order to

23     assist Mr. Small in determining the full amount of his profits

24     entitlement pursuant to the DMRJ operating agreement, we also

25     request on behalf of Mr. Small that this firm be given access

I7g9smah

1    to the books and records of DMRJ for examination purposes

2    pursuant to Section 11.1C. of the DMRJ operating agreement.

3           I'm trying to figure out what under Delaware law you

4    were seeking.  And with regard to 11.1C you have the right to

5    have your accountants and/or representatives examine and/or

6    audit the books and records of the company.  So you may be

7    entitled to it under 11.1C of the operating agreement.  And

8    that's part of your breach of contract claim, correct?

9           MR. COHEN:  It's a separate claim, but yes.

10          THE COURT:  All right.  Go ahead.

11          MR. GLUCK:  I think I can represent to the Court,

12   having just read this, it was our express understanding that by

13   the phrase "books and records" they were not seeking a

14   membership list, which we would be happy to provide them.  In

15   fact, when I get to a technical point about this caption, we

16   would be happy to and we will now.

17          What we understood that they were looking for was an

18   accounting of all revenues and liabilities.

19          THE COURT:  But they're entitled to an audit actually.

20          MR. GLUCK:  Excuse me?

21          THE COURT:  They're entitled to an audit at their

22   expense.

23          MR. GLUCK:  They're entitled to an audit at their

24   expense.

25          THE COURT:  And do you have any intention to deny them

I7g9smah

1    that right?

2              MR. GLUCK:  We do.

3              THE COURT:  Have you denied them that right?

4              MR. GLUCK:  We intend to deny them that right because

5    of a genuine concern under the circumstances of a large

6    liquidation that when they see, in particular, the assets of

7    DMRJ that are being held both temporarily and permanently, in

8    conjunction with the known liabilities of DMRJ, that our

9    internal impressions as to the reasonable value in compliance

10   with the very obligations that Mr. Trott has suggested and

11   sworn he will uphold will become available and knowable to not

12   merely Mr. Small but those persons, those entities and persons

13   who have made similar claims and, therefore, provide them with

14   information as to what we think they're worth.  And for this

15   reason -- if it was a question of assets alone and Mr. Small's

16   claim was the only claim out there --

17             THE COURT:  How does that provide a defense under the

18   agreement, the fact that this information can be used to the

19   distinct disadvantage of DMRJ?  How does that provide a

20   defensible --

21             MR. GLUCK:  Because as a profits interest member of

22   DMRJ he similarly, Mr. Small, similarly has an obligation to

23   act in the best interests of DMRJ.  And this particular request

24   is incompatible with acting in the best interests of DMRJ.

25             THE COURT:  So you would have this Court construe

I7g9smah

| | |
|---|---|
| 1 | 11.1C as saying you have the right to this audit but only if |
| 2 | the audit is in the best interests of DMRJ?  Is that your |
| 3 | position? |
| 4 | MR. GLUCK:  I would take a different position. |
| 5 | He has the right to an audit.  But in a unique |
| 6 | circumstance like this case, and it is a unique circumstance, |
| 7 | the requested audit absent extraordinary measures of safeguards |
| 8 | would have the result of detrimenting DMRJ.  And in this |
| 9 | circumstance -- and I'm not aware of another one that I've |
| 10 | had -- in this particular circumstance they're incompatible. |
| 11 | THE COURT:  Now let me ask plaintiff's counsel.  Would |
| 12 | you agree to a protective order that this information could |
| 13 | only be used by Mr. Small and only in this action? |
| 14 | MR. COHEN:  Absolutely, your Honor. |
| 15 | THE COURT:  OK.  Thank you. |
| 16 | Would that take care of it, punishable by contempt of |
| 17 | court for a violation? |
| 18 | MR. GLUCK:  For a violation, and perhaps with an |
| 19 | attorneys' eyes only provision, it would be acceptable if |
| 20 | Mr. Small's attorney were to see it.  There is a genuine |
| 21 | concern in this case, and it has happened -- |
| 22 | THE COURT:  It provides for an audit by accountants. |
| 23 | Are you an accountant?  Let me ask plaintiff's counsel.  Are |
| 24 | you an accountant? |
| 25 | MR. COHEN:  No, your Honor. |

I7g9smah

1          MR. GLUCK:  I would include accountants within that

2     caveat.

3          But there have been instances in this case, including

4     with respect to a duly constituted liquidation committee, where

5     someone had to be removed for expressly violating a court order

6     NDA.

7          THE COURT:  Was it Mr. Small?

8          MR. GLUCK:  It was not Mr. Small.  It was not.

9          But that stems from the concern.  Frankly, we believe

10    that the major issue here, this request for a TRO -- Mr. Small

11    has every right to sue.  We have divergent opinions about

12    whether he is entitled to a receive a profit distribution.  And

13    it turns on the interaction between his investment management

14    agreement and whether he breached that agreement as well as

15    caused damages and managed an asset with zero value that more

16    than dwarfs any recovery that he's entitled to.  But that's not

17    what he's done.

18         There are parties who have similarly sought recoveries

19    from Implant Sciences with claims against DMRJ who have

20    similarly either noticed their claims in writing, in some cases

21    far more money, or have filed complaints and that haven't.

22    They have every right to do it.  The managers have not merely

23    the right but the obligation to defend such claims if they

24    think it is appropriate, and it is appropriate here.  And but

25    for this TRO, a normal litigation just like two other

I7g9smah

1    simultaneous litigations involving DMRJ and purported claims to

2    these proceeds are ongoing.  What's at stake here is whether

3    the test for a TRO has been satisfied and, as the Court alluded

4    to in the first instance, whether a TRO is, in fact, available

5    in connection with a claim for money damages.  And we think,

6    your Honor, in connection just with that first question the

7    possibility of irreparable harm, there has been no showing

8    because the harm alleged is fictitious and it is inherently

9    reparable.

10            This is what happened here.  Mr. Small, who is not the

11   only profit interest of DMRJ, made a request for a payout of

12   his profits.  He was told that actually the profits -- and,

13   remember, we received the cash in 2017, there is no question

14   about that -- was the subject of competing creditor claims.

15   Creditors get paid before certainly profit interest members and

16   before us.  And that there would be no way to know what he

17   would be entitled to.  However, he was assured by court

18   fiduciaries that the very Delaware laws that protect persons in

19   Mr. Small's position, as well as the other public contingent

20   creditors out there -- Westepox being one of them, another

21   company named Beechwood being another -- would be abided by.

22            THE COURT:  What I didn't hear you say, though, is

23   that you would treat Mr. Small the same as and make payouts to

24   him to the same extent as you would to any other member of the

25   LLC entitled to a payout.

I7g9smah

1          MR. GLUCK:  Absolutely right.

2          What we said was that your rights to a payout is

3     disputed.  It's disputed.  And, in fact, it was Mr. Small's --

4          THE COURT:  So you intend to treat him differently,

5     not the same as other members of the LLC?

6          MR. GLUCK:  We intend to treat him similarly to any

7     other creditor or member of the LLC for whom the right to

8     payment is disputed.

9          THE COURT:  Well I'm not -- you do not intend to treat

10    him similarly to any other member of the LLC.

11         MR. GLUCK:  We do.

12         THE COURT:  Is that correct?

13         MR. GLUCK:  There are three members of the LLC.

14         THE COURT:  Is that correct?

15         MR. GLUCK:  Incorrect.

16         THE COURT:  OK.

17         MR. GLUCK:  There are three members of the LLC.  And I

18    believe the correct term is member.  And then there are two

19    profit members.  I'll say three members for shorthand.

20         The member of DMRJ is PPVA.  And to the best of my

21    knowledge, there is no dispute that that member is entitled to

22    dividends or profits in due course.

23         The two profit members of the LLC, both of whom have

24    been indicted, are being treated exactly the same and, in fact,

25    they're being treated exactly the same as each and every

I7g9smah

1   creditor who have a priority right to payment where rights to

2   payment are being disputed.

3            THE COURT:  Now help me out here because I haven't

4   heard it yet today.  What does an indictment or even a

5   conviction of the charges in the Eastern District indictment

6   have to do with Mr. Small's entitlement to relief under an

7   agreement with DMRJ?

8            MR. GLUCK:  The exact question.  This is what made

9   us --

10            THE COURT:  Well, try answering it, rather than how

11   you reacted when you first thought about the question, just

12   give me the answer.

13            MR. GLUCK:  Sure.  The indictment in question charges

14   Mr. Small with engaging in a conspiracy with an affiliated

15   company, in fact, what we believe is an alter ego company,

16   called Beechwood, to syphon money from this entity Black Elk

17   which was one of the investments under Mr. Small's purview.

18            THE COURT:  Stop right there.

19            Was it an investment under his purview as the

20   investment manager for DMRJ?

21            MR. GLUCK:  No.

22            THE COURT:  OK.  So why are you talking to me about

23   this?

24            MR. GLUCK:  Because of the investment management

25   agreement.  Under the investment management agreement --

I7g9smah

1          THE COURT:  Who were the parties?

2          MR. GLUCK:  Platinum Management, which is a management

3    entity charged with engaging in the operations of --

4          THE COURT:  Was DMRJ a party?

5          MR. GLUCK:  No.

6          DMRJ, as well as other subsidiaries of funds opted and

7    managed by PPVA provided consideration -- theoretical

8    consideration in the form of these profit interest memberships

9    to Mr. Small and others.  The management agreement provided

10   that he would be entitled to the lesser, the lesser -- and this

11   is the critical portion -- the lesser of the realization's

12   profits across his entire portfolio, or the percentage

13   allocation in, for example, the DMRJ agreement or the PPVA

14   agreement.

15         And one of our defenses, which will be more fully

16   articulated after our answer and some litigation in some court,

17   is that Mr. Small violated a, his breach -- breached the

18   investment management agreement issue that gave rise to the

19   issuance of the profit membership interest in DMRJ on the one

20   hand; and that, secondly, that same agreement contemplates a

21   portfolio-wide analysis of profits.  And so if money was --

22         THE COURT:  Where do I find in the DMRJ agreement a

23   reference to portfolio-wide profit being the standing?

24         MR. GLUCK:  You won't.  You'll find it in the

25   investment management agreement which is designed to be read in

I7g9smah

1    contention with the DMRJ -- excuse me, in conjunction with the

2    DMRJ operating agreement.  We will prove this.

3           This is the basis for the very calculations that

4    Mr. Small's counsel has been talking about within this award.

5    They looked at a portfolio-wide basis.  Unfortunately, at the

6    time that portfolio had been represented to have a certain

7    value and then a certain realized value that over the past two

8    years has been determined to be false.  But here is what's been

9    alleged here.

10           THE COURT:  And that agreement is before me?

11           MR. GLUCK:  That agreement, the investment management

12    agreement is before you.

13           THE COURT:  Where is it?

14           MR. GLUCK:  It is attached to the Trott declaration.

15    We'll find the exhibit in just a second.

16           THE COURT:  I'm going to ask you to show me where the

17    provision is that says the interest or the profit interest in

18    any particular vehicle such as DMRJ is to be reduced to the

19    lower of the portfolio-wide profits or the profit of that

20    entity.

21           MR. GLUCK:  Sure.  It's section 3(b) of the agreement

22    and if you'll just allow us a minute to find that particular

23    page.

24           THE COURT:  What exhibit is the agreement?

25           MR. GLUCK:  Exhibit 5.

I7g9smah

1              Section 3 is entitled compensation.  Section 3(b) and

2        (c) bonus and loss carry forward, that's the titles, are

3        applicable here.

4              THE COURT:  This is the agreement that was the subject

5        of the arbitration before Judge Katz?

6              MR. GLUCK:  Correct.

7              THE COURT:  And so do you contend that the arbitration

8        provision in this agreement is incorporated into the DMRJ

9        agreement?

10             MR. GLUCK:  No.  No.

11             But what we do contend that this is the very agreement

12       by which the grant of the profit -- and I don't believe this is

13       disputed --

14             THE COURT:  Well show me the provision.  I'm looking.

15             MR. GLUCK:  Sure.  It's at page four.

16             THE COURT:  I'm on page four.

17             MR. GLUCK:  Subsection 3.  At the top of the page

18       there's a 5 of 16.  Document 30-5.

19             THE COURT:  I'm on page four.  Is that what you're

20       referring to?

21             MR. GLUCK:  Page four at the bottom?

22             THE COURT:  Where do you find the language.  Under

23       which subdivisions?  I can see three.

24             MR. GLUCK:  (b) bonus.

25             THE COURT:  (b) bonus.

I7g9smah

1          MR. GLUCK:  (b) bonus.  "The Portfolio Manager shall

2     also receive a bonus for each calendar year (the "Bonus") equal

3     to (I) the product of (A) the Bonus Percentage multiplied by

4     (B) the net profit for such calendar year, reduced as described

5     below for any applicable loss carryforward amount, the amount

6     of base salary paid to the portfolio manager with respect to

7     such calendar year..." and this is it "...the aggregate amount

8     of profits allocated to the portfolio manager with respect to

9     the profit interests."  That profit interest is this profit

10    interest in the DMRJ agreement.  "...for such calendar year

11    provided that the calculation under this clause shall (III) be

12    done by excluding allocations to the profit interests to the

13    extent that they don't correspond to the realized amount."

14          Now, it goes on.

15          THE COURT:  Just give me a second now.

16          MR. GLUCK:  Then I'm going to refer the Court to a

17    second page which will be important.

18          THE COURT:  All right.  Because I'm not getting it out

19    of that.

20          Go ahead.

21          MR. GLUCK:  And so that profit interest, capitalized

22    term, is the very profit interest we are here in this court

23    discussing today.  It's not just this profit interest.  It is

24    also other profit interests under -- with respect to

25    investments under Mr. Small's purview.

I7g9smah

1          And then I will also refer the Court to page 9 --

2          THE COURT:  So (m) on page 3, 1(m) defines profit

3     interests to include profit interest issued to the portfolio

4     manager by DMRJ Group LLC.

5          MR. GLUCK:  Correct.

6          THE COURT:  Go ahead.

7          MR. GLUCK:  Your Honor, as to everything we've just

8     suggested in terms of that this is the profit interest, I don't

9     believe there's any dispute between the parties.

10          THE COURT:  OK.  Go ahead.

11          MR. GLUCK:  I'm also going to refer the Court to

12     Article VIII of the amended DMRJ, which is Exhibit A to the

13     amended complaint -- D to the amended complaint, excuse me.

14     I'm sorry, your Honor.  D to the Cohen declaration.

15          THE COURT:  What does it say?

16          MR. GLUCK:  It says, "Subject to Section 8.4 hereof,

17     net profits of the company shall be allocated to members as

18     follows:  90 percent to Platinum Partners Value Arbitrage fund;

19     6.5 percent to the first profit interest member," that is

20     Mr. Small in this case, and this is critical, "...or if a

21     lesser amount of his adjusted profits amount."  And then it

22     goes on to say, "The initial adjusted profits amount shall be

23     calculated separately for each promised profits interest member

24     as equal to the bonus defined in the IMA," which we just read.

25          THE COURT:  What page are you on now?

I7g9smah

1          MR. GLUCK:  Page 9 of the LLC agreement.

2          THE COURT:  Hang on now.

3          MR. GLUCK:  Section 8.2.

4          THE COURT:  I got it.  "Or if a lesser amount his

5   adjusted profits amount."

6          MR. GLUCK:  Yes.

7          THE COURT:  All right.  OK.

8          MR. GLUCK:  For that reason, because of the

9   relationship between the Small profits agreement and the Small

10  profits interest, we believe there is a very strong defense

11  that at a minimum the losses associated with Mr. Small's other

12  investments must be netted down.  But we also have two other

13  arguments that are set forth in our papers.

14          First, a breach of Mr. Small's portfolio management

15  agreement.  He engaged in tortious conduct and violated its

16  good faith provisions and, specifically, that tortious conduct

17  resulted not only in losses that would be defined as being

18  calculable via a market, but a class of tort creditors as

19  against the Black Elk investments and PPVA other investments.

20  Those tort creditors, along with contract creditors, are in

21  excess of $600 million.

22          These are the defenses.  And these go to the

23  requirement here that a probability of success be shown by

24  Mr. Small in relation to his application for an injunction.

25          Turning to the first requirement, which both parties

I7g9smah

1    concede is the most important one, he needs to show the

2    existence of both harm, imminent harm and that it needs to be

3    irreparable.  And in this context Mr. Small's argument fails

4    entirely.  We have here sitting in this courtroom --

5            THE COURT:  Now that you've explained the relationship

6    between the IMA and the agreement specifically relating to DMRJ

7    and the fact that it's the IMA that gives you the right to

8    reduce the compensation; is that right?

9            MR. GLUCK:  That's correct.  With the lesser language.

10           THE COURT:  It's clear to me that you could arbitrate

11   this if you wanted to do so.

12           MR. GLUCK:  If we wanted to do so.

13           THE COURT:  And it's clear to me you could raise

14   necessary party if you wanted to do so.

15           MR. GLUCK:  In the form of Platinum Management I

16   believe so.

17           THE COURT:  Well in the form of DMRJ in this action.

18           MR. GLUCK:  I agree.

19           THE COURT:  So I think there's a little bit of

20   manipulation of forum by both sides in this case.

21           MR. GLUCK:  Let me explain.

22           THE COURT:  You have a right to arbitrate but you

23   didn't like how it went the last time in arbitration, right?

24           MR. GLUCK:  No.  I wouldn't say that because -- for

25   two reasons.  One is no, the arbitration was conducted by, on

I7g9smah

1    the one hand, Platinum Management using values and profits that

2    we know, based on two years of investigation, were incorrect

3    and disregarded, for example, the class of tort creditors that

4    I have just suggested to you; and B, and this is the important

5    one -- I understand the Court's point about subject-matter

6    jurisdiction.  DMRJ, the entity, is a Delaware LLC.  The issue

7    of whether and what citizenship it is is presently the subject

8    of litigation in a companion case involving precisely these

9    profits.  The test seems to be that when you have an LLC you

10   need to go backwards until you find an actual human person or a

11   corporation.

12            THE COURT:  For a diversity jurisdiction.

13            MR. GLUCK:  For diversity.

14            THE COURT:  That's pretty well established and has

15   been for quite some time.

16            MR. GLUCK:  That's correct.  And the simple answer is,

17   having spent significant funds, it is unclear what the

18   citizenship of DMRJ is for diversity purposes.  It is unclear.

19   We are continuing in federal court now.  In this other case it

20   was removed.  We suggested to them that maybe it wasn't a good

21   idea because subject-matter jurisdiction would be unclear.  The

22   court ordered jurisdictional discovery, which is totally

23   inconclusive.

24            We are not playing any games whatsoever.

25            THE COURT:  Well I heard you say you plan to raise

I7g9smah

1    Rule 19 in your answer.

2              MR. GLUCK:  Yes.

3              THE COURT:  And you can leave it there.

4              MR. GLUCK:  Yes.

5              THE COURT:  And you're not going to touch it.

6              MR. GLUCK:  That's right.

7              THE COURT:  And you're just going to wait until final

8    judgment.  And then if you don't like it, you're going to

9    say --

10              MR. GLUCK:  No.

11              THE COURT:  -- that there was a failure to join an

12    indispensable party.

13              MR. GLUCK:  I don't think --

14              THE COURT:  You don't want to touch it because you're

15    afraid it's going to be granted.

16              MR. GLUCK:  I don't think so.  I think --

17              THE COURT:  So why don't you make a motion to dismiss

18    under Rule 19.

19              MR. GLUCK:  We may in our answer.  But what happened

20    here is that a few weeks ago we were presented with X, in

21    light -- in the --

22              THE COURT:  When is your answer due?

23              MR. GLUCK:  Excuse me?

24              THE COURT:  When is your answer due?

25              MR. GLUCK:  September 18.

I7g9smah

1          What happened here is that in the face of both oral

2     and written communication with Mr. Small, in which he was

3     guaranteed that an officer of the court, recognized by Chapter

4     15, was absolutely abiding by his duties to maintain adequate

5     reserves in respect of all persons.

6          THE COURT:  Who represents DMRJ in the United States?

7          MR. GLUCK:  Holland & Knight.  Myself.

8          And he was sent this --

9          THE COURT:  So DMRJ could assert its right to have

10    this action dismissed.  DMRJ could say that it is exposed to

11    jeopardy from a second action.  But you're holding back on that

12    because you're trying to figure out whether you like it in

13    federal court.

14         MR. GLUCK:  Quite the opposite.  We filed our original

15    complaint in the other case in state court.

16         THE COURT:  No.  But --

17         MR. GLUCK:  I know.  I don't think that thought has

18    ever crossed our mind.

19         THE COURT:  Well if the plan of action is to raise

20    indispensable party in your answer but to never file a motion

21    on it, then I know what the game is.

22         MR. GLUCK:  I wouldn't say that's the plan at all.

23         We are here under --

24         THE COURT:  Well you did kind of say it was the plan

25    and then you backed off.  You kind of said that was the plan

I7g9smah

1  twice, I think.  On the record.  You can go read the

2  transcript.

3          MR. GLUCK:  If I said that, it was a mistake because

4  our answer may be a motion to dismiss instead, I don't know.

5  It is something that we need to investigate.

6          Here is what I do know.

7          THE COURT:  It's been upgraded to it's going to be in

8  our answer but we're not going to move to it's going to be

9  either in our answer or we may move.  That's the upgrade.

10          MR. GLUCK:  Your Honor, I understand what the Court is

11  saying.  And I am telling you that not for one second had I or

12  any member of this team considered the issue of federal or

13  court state forum in this case in any component of the

14  strategy.

15          THE COURT:  Did you read my order which raised the

16  indispensable party?

17          MR. GLUCK:  We did.

18          THE COURT:  What did you do about that?

19          MR. GLUCK:  I read the order.

20          THE COURT:  And you found it very interesting?

21          MR. GLUCK:  My actual thought was that it was

22  referring to whether DMRJ, the person to pay, was an

23  indispensable party.

24          THE COURT:  Correct.  It was.

25          MR. GLUCK:  I think the answer is yes.

I7g9smah

1          What it did not trigger, especially in light of the

2     subject-matter jurisdiction, which I said is very unclear, is

3     that this Court was inferring or requesting us -- and now I

4     do -- to consider the issue of which court this action ought to

5     be in.  Absolutely not.

6          Today is the first time that I understand that.  I

7     will tell you the chronology here is that we, in the face of

8     both written and oral communications with Mr. Small, under

9     circumstances where he was promised that -- by a fiduciary, a

10    court-appointed fiduciary -- that Delaware law and reserve

11    requirements would be complied with in respect to his claim, I

12    received an e-mail containing attachments on an afternoon a few

13    weeks ago.  Those attachments sought an ex parte TRO,

14    prospectively the relief here; that the hearing schedule

15    conflicted with the two babies the persons on this table were

16    going to have within two weeks of each other, made the proposal

17    that rather than briefing this on an emergency or expedited

18    basis that we agree to keep whatever it was, $5 million, until

19    their preliminary motion could be decided.  We then each had

20    our babies, prepared these papers, and we sit here today.  That

21    is why I don't want to bind my client.

22          The Court asked me a question.  Do I think DMRJ is a

23    necessary party?  Standing here today, I think the answer is

24    yes.  Have we done any research or analysis on it?  The answer

25    is no.  We need to before September.

I7g9smah

1          What we're standing here today about is a request --

2          THE COURT:  I'll keep that in mind next time I draft

3     an order I should make it explicit that the parties should

4     brief it.  I failed to do that.

5          MR. GLUCK:  I apologize.

6          THE COURT:  And that was my fault.

7          MR. GLUCK:  I absolutely apologize and I did not

8     realize, again, perhaps because of the difficulties that exist

9     with subject-matter jurisdiction and DMRJ, that subject-matter

10    jurisdiction was at all within the intent of the Court's

11    inscription.  I can tell you that right now.  And that's one of

12    the reasons you can tell we're thinking about it live here.

13         What we did do is examine Mr. Small's request for a

14    preliminary injunction and found that it was infirm in all

15    possible respects.  And the one I would like to go to is this

16    irreparable harm component.  It has to be imminent irreparable

17    harm.

18         Mr. Small, other than saying the liquidators dispute

19    his claim, has provided no evidence whatsoever to suggest that

20    appropriate reserves would not be held in Delaware.  The only

21    things they point to is a suggestion that DMRJ funds would be

22    used.  From, by the way, a report that's a year-and-a-half ago,

23    after they received all the assurances.

24         But even there, there is nothing incompatible about

25    the utilization of DMRJ funds and the adherence to Delaware law

I7g9smah

1    in respect of Mr. Small's claims and every other claim out

2    there.  Both can be done.  There are tens of millions sitting

3    in my Holland & Knight escrow account alone.  Adequate reserves

4    are in place.  Some of that money can be used while absolutely

5    maintaining the appropriate level of reserves that are

6    necessary.  There are a number of claims against DMRJ.  If any

7    one of those claims is successful, it will reduce Mr. Small's

8    interest.  We are defending them in part on his behalf if he is

9    successful and also on behalf of the other members of DMRJ.

10           But there is no suggestion here that DMRJ is

11   insolvent, which does lead to the *Grupo Mexicano* issue.  There

12   have been some cases suggesting that in extraordinary emergency

13   situations where there is insolvency and money is about to be

14   dissipated from the jurisdiction with no possibility of relief,

15   that that restriction -- at least the state courts felt this --

16   can be lifted.  But that's not this case.  Those exceptions

17   don't apply.  We have someone who is subject to the

18   jurisdiction not only of this Court but the Chapter 15 Court.

19   We have a court officer who has pledged to maintain adequate

20   reserves.  If ever those reserves -- by the way now it's wholly

21   solvent; there is no risk of anything -- if ever those

22   reserves, if it would to ever come to light that those reserves

23   were inadequate for whatever reason, DMRJ could be

24   recapitalized.  The intent on using the funds as much possible,

25   yes, we can use the funds that are clearly excess, that's the

I7g9smah

most basic test, beyond the maximum scope of claims against

DMRJ.  And then there is a more subtle test which suggests we

need to make appropriate provisions.  There are also assets of

DMRJ that are not cash.  There are also litigation claims of

DMRJ.  All of this we are happy to do.

We knew that Mr. Small's profit interest claim would

have to be dealt with at a certain point.  He's in the midst of

a trial.  What we suggested to him is to hold off.  Why don't

we see what the profits actually look like, what the outcome of

the trial is; not that it's dispositive.  Because if it --

there are certain rulings, it will strengthen the case that the

IMA was violated and strengthen the case that as a result of

the breach of fiduciary duties this class of tort creditors

were created.  But the civil standards and criminal standards

are totally different.

What's totally absent here is any indication, any

evidence whatsoever that is meaningful that there is going to

be dissipation that is wrongful.  And the accusation is not

being made against Joe Schmo but against a court-appointed

fiduciary.  And, again, when they say:  Look, they're going to

use DMRJ funds, I asked them:  What in any way is incompatible

with that and maintaining reserves?

I will submit to the Court that's exactly what's being

done.  And the amount of those reserves, the minimum amount of

those reserves, and the nature of those calculations are

I7g9smah

precisely the information we don't want getting into

third-party hands.

        So on an irreparable harm front there is none.  That's

the dangerous thing.  That's why I say the danger here is

fictitious.

        The second component is it has to be irreparable.  And

here it's reparable.  Let's just say that a mistake was made.

Let's say at the end of the day a year from now, whenever,

after all due process is had, that Mr. Small is entitled to

everything that he is suggesting he is entitled to.  In that

event, if there were insufficient funds or insufficient

determinations had been made as to the appropriate reserves of

DMRJ, Mr. Small would have a clear recourse.  Delaware

statutes, the law, and his own fiduciary obligations as a

member clearly provide for this.  And for that reason the

irreparable harm portion is wholly absent here.

        Now I think we've talked about the defenses that we

have that we think are very strong.  And it's not based on

sheer speculation.  Sitting before you, and the author of the

Trott declaration before you, is based upon the investigation I

conducted over 18 months, part of which has spilled over into

discovery litigation in the bankruptcy court that this court

has been referred to in the papers, discovery litigation

involving CohnReznick and millions of documents.  Here are the

conclusions:  That PPVA is totally insolvent; that the 1.4

I7g9smah

1   billion valuation, it's not just zero, it's negative.  And one

2   of the reasons it's negative is because Mr. Small's actions,

3   which happen to be alleged by the SEC and the U.S. Government

4   but have been separately confirmed within this investigation,

5   it has been represented to you, create an entire class of tort

6   creditors.  If the assets had just been worthless, the net

7   should be zero.  Now we're in negative territory.  And those

8   actions constituted a breach of Mr. Small's IMA.  Now, PPVA may

9   have its own claims.  That's not before this Court.

10          But one and two, irreparable harm, being totally

11   absent; and two, the probability of success on the merits, the

12   plaintiff has not demonstrated; in fact, quite the opposite.

13   And I think it is very worthwhile for this Court to consider

14   the unique posture of Mr. Small's request here.  This Court has

15   been made aware that there are other creditors of DMRJ,

16   purported creditors, right.  There's ongoing litigation.  Some

17   have simply made letter demands like Mr. Small but they haven't

18   resulted in litigation.  The sole person -- and if of them,

19   they've all received this letter saying we're going to use DMRJ

20   funds.  No one has dared suggest, based on a letter saying

21   we're using DMRJ funds, in the face of unequivocal

22   representations from a court officer that appropriate reserves

23   have been made, seek an injunction.  What they're entitled to

24   is appropriate reserves.

25          THE COURT:  That's not a very strong argument.  No one

I7g9smah

1   else has done what Mr. Small has done.  That's your argument.

2            MR. GLUCK:  Under similar circumstances.

3            THE COURT:  That's not very probative of anything.

4            MR. GLUCK:  They would theoretically --

5            THE COURT:  In my opinion, sir.

6            Move on to your next argument.

7            MR. GLUCK:  Next argument.

8            Point one.  Irreparable harm.  There is no harm.

9            THE COURT:  By the way, do you have this in the case

10  law that a court should look to see whether other people have

11  sought the relief and if no one else has sought the relief then

12  it's probably not good relief to be seeking?

13           MR. GLUCK:  No.  But I would suggest that it goes to

14  the validity of the harm that's being suggested.

15           THE COURT:  What other people have chosen to do?

16           MR. GLUCK:  What has been suggested here today in this

17  courtroom --

18           THE COURT:  No, no.  I'm asking you.  That was a

19  question for you.

20           MR. GLUCK:  My answer to you --

21           THE COURT:  Go ahead.  Thank you.  Go ahead.

22           MR. GLUCK:  What has been suggested today here in this

23  courtroom is that because the liquidators, the managers of

24  DMRJ, have rejected Mr. Small's claim, there is an inherent

25  security risk there, there is -- that inherently means they

I7g9smah

1   have no intention of paying reserves.

2          What I am suggesting to you is that there are many

3   other claims that the liquidators have similarly rejected.

4   That is what I am saying.  And, therefore, what I am saying is

5   the argument that denial of a claim is grounds for irreparable

6   harm is specious.  That's what I'm saying.

7          So we have irreparable harm.  It's neither imminent.

8   It's been promised by an officer of the court that there will

9   be reserves.  And it's reparable in any event because both the

10  common law, the contract, and the rights provide for remedies

11  in any sort of situation that Mr. Small is suggesting.

12         The third issue is the public interest.  In this case

13  it is a significant case.  It's a high profile case.  The

14  public interest weighs in favor of the liquidators.  It weighs

15  in favor of the liquidators for the very same reason that they

16  were granted rights of discovery and rights of recognition

17  under very difficult circumstances.  They are conducting a

18  liquidation of a purported billion dollar fund without former

19  management assistance.  And the discretion -- their discretion

20  to utilize funds and assets within the subsidiaries as they see

21  fit is in both the private interests of the parties here and

22  the public interest.  What Mr. Small is seeking is an

23  injunction three times the amount of his claim.  Your Honor,

24  neither of the three components have been met here.

25         That is our submission, if the Court has any other

I7g9smah

1    questions.

2         THE COURT:  Thank you.

3         Mr. Cohen.

4         MR. COHEN:  Your Honor, I'll address a few of the

5    points here.

6         First of all, with respect to defendants' failure to

7    provide the books and records, I will note that there is a

8    protective order in the criminal case in which Mr. Small is a

9    party.  He has been entitled to have access to and review

10   millions of pages of records.  And there has not been one

11   complaint from the government or any other entity that any

12   provision of that protective order has been violated in any

13   way, shape, or form by Mr. Small.  The security risk that

14   defendants cite is a smokescreen.  There is no substance there.

15        Mr. Glock basically offered Mr. Small the sleeves to

16   his vest.  He said Mr. Trott -- Mr. Trott is behaving in

17   accordance with his fiduciary duties and that repeatedly Mr. --

18        THE COURT:  You left out that he's an officer of the

19   court.

20        MR. COHEN:  And he's an officer of the court.  He's an

21   officer of the court that has refused to abide by a fundamental

22   contractual provision in a contract with absolutely no good

23   reason.  He's an officer of the court that has refused, until

24   this very -- until right now, until this very day to even

25   acknowledge -- even tell Mr. Small the range of reserves they

I7g9smah

1   are supposedly contemplating on keeping with respect to his

2   claim.

3          Putting all that aside, Mr. Glock talks about there is

4   no evidence of irreparable harm because the defendants have

5   agreed to keep the appropriate level of reserves.  We know what

6   those appropriate levels are, your Honor.  Mr. Trott, in

7   paragraph 10 and paragraph 49 of his affidavit, says that in

8   all likelihood Mr. Small is entitled to nothing.  So by

9   behaving in his fiduciary duties, supposedly in accordance with

10  his fiduciary duties, the net result will be zero funds coming

11  to Mr. Small.  That's where the irreparable harm is, your

12  Honor.

13         Additionally, defendants have stated in page 13 of

14  their opposition brief and at page 21 that they intend to use

15  assets of DMRJ to invest in PPVA assets and to satisfy PPVA

16  obligations.  Mr. Small is, in fact, being treated differently

17  than other members of DMRJ.  The defendants are refusing to

18  abide by their contractual obligations while taking this money

19  to prop up PPVA and to satisfy PPVA's obligations.

20         THE COURT:  All right.  We're going to take a

21  five-minute break.

22         (Recess)

23         THE COURT:  Sorry, Mr. Cohen.  I wanted to give our

24  court reporter a break.  You may continue.

25         MR. COHEN:  Thank you, your Honor.

I7g9smah

```
1          Just a few more points here, your Honor.  Mr. Glock
2   made a number of different statements regarding the obligations
3   and the duties of defendants, of Mr. Trott, and what they were
4   entrusted with.  And at the risk of stating the obvious, the
5   defendants are not liquidators of DMRJ.  There is no court
6   order imbuing the defendants with any responsibilities,
7   directly imbuing the defendants with any responsibilities to
8   DMRJ.  In fact, one of the central points of the complaint is
9   that defendants, in exercising these duties to PPVA, are
10  violating duties to DMRJ and not acting in accordance with
11  their contractual and fiduciary obligations to DMRJ.  So I'm
12  not sure there's any relevance at all to the notion or to the
13  fact that defendants have been appointed by the Grand Court of
14  the Cayman Island.
15          THE COURT:  Let me ask you a question.  The IMA, now
16  that I've read it, appears to incorporate the profit provisions
17  of the DMRJ agreement at least in part, correct?
18          MR. COHEN:  That is correct, your Honor.  There is a
19  link.
20          THE COURT:  So you have a right to have that claim
21  arbitrated.  In fact, you heard opposing counsel say, yeah, it
22  probably is arbitrable, the claim you're asserting here.  So
23  are you -- are you waiving your right to arbitration?
24          MR. COHEN:  I mean whether a claim is arbitrable or
25  whether arbitration is a possible forum, or whether it's is
```

I7g9smah

1    mandatory forum are two different questions.

2                THE COURT:  I didn't say it was mandatory.

3                MR. COHEN:  We have decided to assert the claim

4    against DMRJ -- I mean against the defendants here in this

5    court.  There is no arbitration provision in the operating

6    agreement.

7                But if I could make an additional point about the link

8    between the IMA and the operating agreement, and this is where

9    Judge Katz's opinion is particularly important.  Judge Katz

10   specifically found, after several days of hearings, that there

11   were net profits in Mr. Small's IMA account.  So this

12   directly -- for 2012 through 2014.  So this directly

13   contradicts defendants' claims that there are huge negative

14   losses that somehow wipeout any money Mr. Small is entitled to

15   under the DMRJ operating agreement.  I believe it was -- it was

16   $38 million in realized profits -- well, that was with respect

17   to Implant.  But, overall, Mr. Small is entitled to $7 million

18   in bonus compensation precisely because his accounts under the

19   IMA were profitable.

20               Now, defendants have provided no evidence, no evidence

21   that that decision of Judge Katz was based on inflated values,

22   was based on -- was arrived at through -- or was based in part

23   on any of the allegations that are alleged against -- not

24   against Mr. Small but against other individuals in the Eastern

25   District of New York's indictment.  Again, no evidence here

I7g9smah

that there are any, any losses in Mr. Small's IMA -- in

Mr. Small's account under the IMA other than defendants'

conclusionary statements that, again, don't even point to a

single asset.

          Finally, I will say that Mr. Glock posited a

hypothetical that Mr. Small -- if Mr. Small were to prevail and

there were not sufficient funds at the end, that he would

somehow have a remedy.  And then he stopped.  I don't know what

remedy that would be.  If there's not sufficient funds to

recover from DMRJ, there's not sufficient funds to recover from

DMRJ.  I'm not quite sure what that remedy would be.  I don't

see it anywhere.

          And I make one other slightly technical but important

point, your Honor; that the profits, whether it's under the IMA

or the operating agreement, are decided on a yearly basis, a

yearly -- there is no clawback provision in any of these

agreements.  So they're decided on a yearly basis.

          So if Mr. Small realized profits in his -- in some of

the assets under his accounts in 2012, 2013, 2014, 2015 and

some of those assets then incurred losses after that point,

there is no clawback provision, your Honor.  He's still

entitled to that money.  There's a carryforward provision but

no clawback provision.

          Unless your Honor has any other questions, I'll sit

down.

I7g9smah

1          THE COURT:  All right.  Did I understand you to argue

2     that there was nothing in Judge Katz's award that was premised

3     upon the indictment in the Eastern District of New York or the

4     facts underlying that indictment?

5          MR. COHEN:  There was nothing in his award premised --

6     defendants are arguing that Judge Katz -- the determinations

7     that Judge Katz made, that he did so prior to any evidence

8     coming out about misvaluation of PPVA.

9          THE COURT:  Well I understood you to be arguing

10    something different.  Take a look at Judge Katz's decision.  He

11    didn't think any of those facts were important.  That's what I

12    understood you to be arguing to me.

13         MR. COHEN:  No, no, your Honor.  I apologize.  That's

14    not what I'm saying to you.

15         THE COURT:  Judge Katz's decision was six months

16    before the indictment.

17         MR. COHEN:  Your Honor, if that was the impression I

18    left you, I apologize.  I did not mean that in any way shape,

19    or form.  Those facts were not available to Judge Katz.

20         What I did say is that defendants have not cited one

21    asset, one loss, anything of substance to show that Judge Katz,

22    had he had that information, would have come to a different

23    conclusion.  And that is in part because, your Honor,

24    Mr. Small's bonus calculation is based on realized only gains.

25    So the inflation of assets, the inflation of the value of

I7g9smah

1    assets, if that, in fact, did occur, has nothing whatsoever to

2    do with the amount of money Mr. Small is entitled to for the

3    vast majority of his assets under the IMA and, consequently,

4    for his payout under the operating agreement.

5            THE COURT:  Thank you.

6            This is the Court's statement of reasons for its

7    decision on the motion for a preliminary injunction.

8            This action was filed on June 5, 2018 and the Court

9    received a letter from plaintiff's counsel on or about June 7

10   expressing a desire to file preliminary injunction motion.  The

11   Court noted that the plaintiff was free to file his motion and

12   for expedited discovery at his convenience, in which the Court

13   would set a briefing schedule after reviewing the submissions.

14   I also in that order required that the plaintiff demonstrate

15   why DMRJ LLC is not a necessary party to the action.

16   Thereafter, the motion for a preliminary injunction was filed

17   on June 15 and the Court set today as the date for the hearing

18   on the motion.

19           At the outset, the Court inquired whether either side

20   wished to produce any other evidence or offer any other

21   evidence of any kind, and each side independently rested on

22   their preliminary injunction written submissions.

23           The motion for a preliminary injunction is to maintain

24   a cash reserve of $6 million to satisfy a judgment, if any, in

25   favor of the plaintiff in this action.

I7g9smah

1          At argument today the plaintiff made it clear that the

2    premise of the preliminary injunction motion is that he has in

3    his view a good viable claim under the DMRJ agreement for

4    breach of contract in failing to pay certain operating profits

5    or net profits that he says was owed to him.

6          Mr. Small is a minority member of DMRJ group and

7    brings this diversity action for breach of contract, tortious

8    interference with contract.  There is a claim styled as an

9    accounting which is actually a claim under Section 10.1C of the

10   DMRJ agreement.  There is also a request for the production of

11   the books and records of DMRJ.  And it's brought against

12   defendants Christopher Kennedy and Martin Trott, DMRJ's

13   operating managers.  As I understand it, they are contractually

14   appointed operating managers of DMRJ.  Small is a former

15   portfolio manager of Platinum Management, the hedge fund

16   manager of Platinum Partners Value Arbitrage fund, that's PPVA,

17   and PPVA in turn is a member of DMRJ.  PPVA is currently in

18   liquidation in the Cayman Islands where Kennedy and Trott also

19   serve as PPVA's court-appointed liquidators.

20         It's been brought to the Court's attention that there

21   has been an indictment returned against Mr. Small and others

22   and also a SEC civil complaint has been filed against him and

23   these are pending in the Eastern District of New York and they

24   relate to his role, previous role as Platinum Management

25   executive and as a portfolio manager for certain PPVA

I7g9smah

1    investments.

2            Small alleges that Kennedy and Trott breached their

3    obligations under DMRJ's operating agreement to:  One, pay

4    Small the contractually set percentage of DMRJ's yearly net

5    profits; two, to provide Small with access to DMRJ's books and

6    records; three, to provide him with the accounting provided for

7    in the agreement; and four, to initiate the liquidation of DMRJ

8    in light of voluntary petition for liquidation of PPVA.

9            As noted, he seeks preliminary injunction to preserve

10   6 million of DMRJ's cash reserve to prevent Kennedy and Trott

11   from dissipating the assets of DMRJ to the point where DMRJ

12   would be unable to satisfy a judgment for Small.  Small relies

13   on certain of Kennedy and Trott's representations as joint

14   liquidators of PPVA to argue that they will continue to loot

15   DMRJ for PPVA's benefit in liquidation proceedings.

16           To justify the issuance of a preliminary injunction a

17   party must show that it will suffer an irreparable harm and

18   either a likelihood of success on the merits or sufficiently

19   serious questions going to the merits to make them a fair

20   ground for litigation and a balance of hardships tipping

21   decidedly in the movant's favor.

22           The plaintiff's claim for preliminary injunction fails

23   on several grounds.  First of all, in *Grupo Mexicano v.*

24   *Alliance Bond Fund*, which was decided by the Supreme Court in

25   June of 1999, 527 U.S. 308, it was presented with the following

I7g9smah

question:  "This case presents the question whether, in an

action for money damages, a United States District Court has

the power to issue a preliminary injunction preventing the

defendant from transferring assets in which no lien or

equitable interest is claimed."  It answered that question in

the negative.

In that case, the United States appeared as amicus

curiae and argued that the remedy should be available in

federal courts.  And the Court reviewed the historical origins

of powers in equity, the merger of law in equity, the adoption

of the Federal Rules of Civil Procedure, and concluded that a

preliminary injunction is beyond the equitable authority of the

district court.

The Court noted that "The requirement that the

creditor obtain a prior judgment is a fundamental protection in

debtor creditor law rendered all the more important in our

federal system by the debtor's right to a jury trial and the

legal claim.  There are other factors which, likewise, give us

pause.  The remedies sought here could render Rule 64, which

authorizes use of state prejudgment remedies, a virtual

irrelevant relevance.  Why go through..." this is the Court

speaking.  "Why go through the trouble of complying with local

attachment and garnishment statutes when this all-purpose

prejudgment injunction is available?  More importantly, by

adding, through judicial fiat, a new and powerful weapon to the

I7g9smah

creditor's arsenal the new rule could radically alter the

balance between debtor's and creditor's rights which has been

developed over centuries through many laws, including those

relating to bankruptcy, fraudulent conveyance and preferences.

        "Because such a remedy was historically unavailable

from a court of equity we hold that the district court had no

authority to issue a preliminary injunction preventing

petitioners from disposing of their assets pending adjudication

of respondent's contract claim for money damages."

        Well, here we heard that the claim is premised on

Mr. Small's claimed right to entitlement under the agreement.

And that's a straight-up breach of contract action.  And I

further find that he has not shown a probability of success on

the merits of his breach of contract action because he has

failed to account in his evidence the provisions of the IMA

agreement which appear to require an adjustment in the

6.5 percent profit allocation based on the results of other

portfolios under the management of Mr. Small.

        I've looked at *Gucci America v. Weixing* which in

limited circumstances in the trademark infringement context and

Lanham Act cases allowed a prejudgment asset restraint based on

the Lanham Act claim and its accounting.  That case is

distinguishable and falls outside the general rule outlined in

*Grupo Mexicano* which is applicable here.

        I also note that Kennedy and Trott are fiduciaries of

I7g9smah

PPVA and DMRJ and, accordingly, their decisions will also be governed by their fiduciary duties.  And the representation has been made today that DMRJ is not solvent.

I also look at the first amended complaint at paragraph 54 and it looks to me like the claim for relief in this action is $2.5 million.  Now, there may be interest. There may be a claim for attorneys' fees.  There may be other adjustments that are appropriate.  But the request for an injunction exceeds the face amount of the claim that I find in paragraph 54.  Now, there may be reasons for this and this is not the material part of my decision but I make that observation.

It appears to this Court also that DMRJ, a Delaware LLC, is a separate legal entity with rights and obligations distinct from those of an individual member.  And the Court finds no basis to conclude that DMRJ's interests are identical in all respects to Kennedy and Trott's interests.

There remains the question of what happens if the plaintiff loses in this action, does Mr. Small have a right to bring a separate action against DMRJ and get a do-over?  While there's been some discussion of maybe collateral estoppel might have some application in this circumstance, there was substantially less than a full-throated abandonment of any claim now and forever against DMRJ that tracks the complaint in this action.

I7g9smah

1          I realize that joinder of DMRJ may not be feasible.

2     While it may be subject to service of process, it looks like it

3     would destroy the subject-matter jurisdiction of this Court

4     because Mr. Small is and remains a member of DMRJ and Mr. Small

5     is a New York domiciliary.

6          It appears likely that DMRJ will turnout to be an

7     indispensable party under Rule 19, but that requires a list of

8     factors, four factors enumerated in Rule 19(b) which I don't

9     need to decide today.

10         In terms of irreparable harm, this is a suit

11    principally for money damages and the money damages are an

12    adequate remedy and have not been shown to be anything other

13    than an adequate remedy.  Whether Mr. Small is entitled to a

14    books and records inspection or whether he's entitled to

15    conduct an audit of DMRJ does not support in and of itself a

16    injunction requiring the maintenance of a cash reserve, not on

17    this record.

18         Accordingly, the request for a preliminary injunction

19    is denied.

20         Let me ask my deputy for a case management order and

21    I'll set a schedule on this case.

22         How long does the plaintiff need for fact discovery in

23    this case?

24         Has the Court set a conference date, initial

25    conference date in this case?

I7g9smah

1          MR. COHEN:  I do not believe so, your Honor.

2          THE COURT:  OK.  Go ahead.

3          MR. COHEN:  Your Honor, I believe a time period of two

4   to three months to complete discovery would be perfectly

5   reasonable.

6          THE COURT:  The defendants time to answer or move runs

7   when, August 27?

8          MR. COHEN:  The defendant waived service so their

9   answer is due in September.

10          MR. GLUCK:  September 18.

11          THE COURT:  That's not by extension, that's by

12   operation of the rules; is that correct?

13          MR. COHEN:  Yes, your Honor.  Under FRCP 4, I believe.

14          THE COURT:  What I'm going to do is I'm going to set

15   this down for a conference at 2 p.m. on October 2 and set a

16   schedule for further proceedings in this action.

17          One of the issues that I'm going to want the parties

18   to address is I gather there is little dispute that the parties

19   have or had a right to arbitrate this dispute and are waiving

20   that right under the IMA, but the IMA has another provision,

21   that subject to section 13(b) below the parties waive their

22   right to seek remedies in court, including any right to a jury

23   trial.  And the parties should, at least two weeks before the

24   conference, address that issue and I expect a response from the

25   defendants -- I'm going to order a response from the defendants

I7g9smah

1    two weeks from today on the issue of Rule 19.

2              What is your position?  Is DMRJ an indispensable

3    party?  Is joinder feasible?  Is joinder otherwise necessary

4    even if it destroys diversity jurisdiction?

5              I'm sorry.  I meant October 5.  I said October 2.  I

6    meant October 5 at 2 p.m.  That was my error.  Thank you, madam

7    deputy.

8              All right.  Anything further from the plaintiff?

9              MR. COHEN:  No, your Honor.

10             THE COURT:  Anything further from the defendant?

11             MR. GLUCK:  Very small housekeeping, your Honor,

12   concerning the caption.  I did get an opportunity to speak

13   again.  The caption of this case concerns Mr. Kennedy and

14   Mr. Trott.  It was noted in our paper, and it will be in our

15   answer, Mr. Kennedy has switched liquidation firms.  He's no

16   longer a liquidator at PPVA or a manager of DMRJ.  He has been

17   replaced, I believe last week, by Cayman court order with a

18   gentleman by the name of Chris Smith, a new Chris.

19             Chris Smith nor Chris Kennedy are presently the

20   managers of DMRJ.  Well before this action was filed, a

21   resolution or more than one resolution was passed whereby PPVA

22   is the manager of DMRJ and further resolved to continue DMRJ

23   notwithstanding its articles amendment and for that reason we

24   are going to hopefully work with defendants to --

25             THE COURT:  Plaintiffs.

I7g9smah

1        MR. GLUCK:  Clear up the caption.

2        THE COURT:  Plaintiffs.

3        MR. GLUCK:  Excuse me.  Work with the plaintiffs to

4    clear up the caption.

5        THE COURT:  Let me ask you a question.  Where do I

6    find this in your papers?

7        MR. GLUCK:  There is a footnote regarding the

8    resignation of Mr. Kennedy.

9        THE COURT:  Where?  Just show me where it is.

10       MR. GLUCK:  It's footnote one.

11       THE COURT:  In what?

12       MR. GLUCK:  In our brief, document 29 on the docket.

13            As well as in the Trott declaration, also footnote 1.

14       THE COURT:  Well, I'm looking at footnote 1.  And on

15   my copy it reads as follows:  "I note that Mr. Kennedy recently

16   resigned from RHSW and as a result will be replaced as a

17   liquidator of PPVA in the near future.  I will inform the Court

18   when the Cayman Court enters an order appointing a replacement

19   liquidator."

20            Is that the footnote you're referring to?

21       MR. GLUCK:  It is.  It's one of the two.

22       THE COURT:  Is the other footnote the same?

23       MR. GLUCK:  Same exact language as the footnote in the

24   Trott declaration.

25       THE COURT:  Where would that put this Court on notice

I7g9smah

1  that it had wasted its time because neither Mr. Kennedy, nor

2  Mr. Trott, could be ordered to maintain an asset freeze because

3  neither of them are operating managers of DMRJ?  Where do I

4  find that in your papers?

5           MR. GLUCK:  In our papers it's not in there.  It's

6  when we were looking at the resolutions recently, in fact, in

7  preparation --

8           THE COURT:  No.  I'm talking about this afternoon.  In

9  this hearing at 2 o'clock today you reserved to yourself the

10  right that if I had given a contrary ruling, Mr. Glock, you

11  could whip out of your back pocket the resolution that the two

12  defendants in the action before me are not parties -- are not

13  capable of complying with the injunction because they are not

14  operating managers of DMRJ?  Is that not correct?

15           MR. GLUCK:  That is not correct in the slightest bit.

16  This issue of --

17           THE COURT:  Is it correct that they are not operating

18  managers of DMRJ?

19           MR. GLUCK:  It is correct that they are not operating

20  managers.

21           THE COURT:  And is it correct that in the 2 hours and

22  40 minutes of argument on the preliminary injunction motion and

23  in the submissions that you made in response to the preliminary

24  injunction motion you, Mr. Glock, never mentioned that fact.

25           MR. GLUCK:  It is true and I intended to mention it

I7g9smah

| | |
|---|---|
| 1 | during the course of my argument.  I had expected an |
| 2 | opportunity just -- |
| 3 |         THE COURT:  I didn't give you an opportunity?  You |
| 4 | didn't have enough time?  Is that what you want to sell to me? |
| 5 |         MR. GLUCK:  No. |
| 6 |         THE COURT:  In this 2-hour-and-40-minute hearing? |
| 7 |         MR. GLUCK:  No.  I had expected the opportunity to |
| 8 | speak.  There's a reason I stood up now and I wanted -- |
| 9 |         THE COURT:  After I ruled.  After I ruled you spoke, |
| 10 | sir. |
| 11 |         MR. GLUCK:  I did not know -- I was expecting an |
| 12 | opportunity after plaintiff's counsel finished his arguments to |
| 13 | deal with the housekeeping matters. |
| 14 |         THE COURT:  It's not a housekeeping matter, sir.  An |
| 15 | injunction from this Court -- am I correct, an injunction from |
| 16 | this Court enjoining Mr. Kennedy and Mr. Trott from requiring |
| 17 | them to maintain a reserve would be absolutely unenforceable |
| 18 | and not worth the paper it's written on, correct? |
| 19 |         MR. GLUCK:  No.  I don't think so.  I think it would |
| 20 | have been followed.  Absolutely.  In any event, at the outset I |
| 21 | suggested to the Court that there were issues with the caption |
| 22 | that I wanted to address. |
| 23 |         THE COURT:  You said at the outset of what? |
| 24 |         MR. GLUCK:  At the outset of my argument I said that |
| 25 | they were certain issues. |

I7g9smah

1          THE COURT:  This is not an issue as to a caption,

2    Mr. Gluck.  Do you want me to think that of you?

3          MR. GLUCK:  No, I don't at all.

4          THE COURT:  Do you want me to think that you think

5    this is an issue of a caption?

6          MR. GLUCK:  Firstly, this is something --

7          THE COURT:  It's a substantive issue.

8          MR. GLUCK:  It is important.  But I had discussed this

9    with plaintiff's counsel before this Court, before this

10   hearing.

11         THE COURT:  Well let's get to the bottom of that.

12   Mr. Cohen, were you aware that Mr. Trott and Mr. Kennedy were

13   no longer operating managers of DMRJ?

14         MR. COHEN:  I was aware based on defendants' footnote

15   that Mr. Kennedy had left, but no.  In fact, our court

16   filings -- our filings, your Honor, refer to numerous court

17   papers where they refer to Trott and Kennedy as the operating

18   managers of DMRJ, and that's why we included them as

19   plaintiffs.

20         MR. GLUCK:  That's true.

21         THE COURT:  Mr. Gluck, I understand what happened here

22   today.  I was here for the two hours and 41 minutes.

23         MR. GLUCK:  The current -- excuse me.  I am very

24   sorry.  But on the first paragraph of the Trott declaration it

25   says the current operating member of DMRJ is PPVA.  The very

I7g9smah

1    first paragraph.

2            THE COURT:  Well I think I asked you not more than

3    five minutes ago, Mr. Gluck, did you mention it in your papers,

4    and you told me you didn't.

5            MR. GLUCK:  I pointed to a footnote that I believed

6    encapsulated the sentiment, and I have now been alerted to the

7    fact that in the very first paragraph of the Trott declaration

8    it says, "The current operating member of DMRJ is PPVA."

9            THE COURT:  So I should not have read your answer when

10   I asked you:  Did you mention this in your papers?  Did you

11   mention it during your argument?  And you said there is this

12   footnote, I should have analyzed that and say:  Well, that

13   isn't really responsive to my question, he didn't answer it, so

14   maybe he said it some place else; he pointed to the footnote

15   but he never said I didn't say it in my papers.  Is that the

16   way I should listen to your arguments going forward, Mr. Gluck?

17           MR. GLUCK:  Absolutely not.  I think you should listen

18   to my arguments the way that I'm intending to convey them which

19   is that you asked a specific question about where in a set of

20   papers consisting of a series of declarations and briefs this

21   could be found.  I happened to remember, as I'm standing up

22   here, that there had been a footnote.  I knew there had been a

23   footnote.  And so that footnote, I asked my colleagues to find

24   and read that footnote.  What I didn't remember standing here

25   today, not having each paragraph memorized, is that in addition

I7g9smah

1    to that footnote, in the very first paragraph of the Trott

2    declaration it says, "The current operating member of DMRJ is

3    PPVA."  And this precise issue is one that I wanted to raise to

4    the Court at -- I understand the Court's --

5         THE COURT:  That's why you wrote me a letter about it

6    before the argument.  That's why you said you can't proceed

7    with the preliminary injunction motion, Judge, because it seeks

8    relief against two people who are no longer operating managers.

9         MR. GLUCK:  Again, without a perfect memory, I believe

10   our letter was requesting discovery as against the plaintiff.

11        THE COURT:  My tongue is firmly in cheek because,

12   Mr. Gluck, you never raised it in a letter.

13        MR. GLUCK:  This issue.

14        THE COURT:  The fact that the Court is entertaining a

15   preliminary injunction motion against two individuals who, if

16   the Court granted the injunction, would not be capable of

17   complying with it.  Thank you all very much.

18        (Adjourned)

19

20

21

22

23

24

25